UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SFR SERVICES L.L.C., for itself and AAO | Case. No.: 8:22-cv-00109-KKM-SPF |
| Plaintiff, | **DEMAND FOR A JURY TRIAL** |
| v. | |
| UNITED PROPERTY & CASUALTY INSURANCE COMPANY, FKS INSURANCE SERVICES, LLC and PROPERTY LOSS SPECIALIST, LLC | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff SFR SERVICES, LLC ("SFR") hereby sues Defendants UNITED PROPERTY & CASUALTY INSURANCE COMPANY ("UPC"); FKS Insurance Services, LLC ("FKS"), and PROPERTY LOSS SPECIALIST, LLC ("PLS") (collectively, "Defendants") and demands a jury trial for all causes of action as follows:

### INTRODUCTION

1.     This is an action related to Defendants' unlawful and unethical scheme designed to systematically deny and underpay the claims submitted as a result of Hurricane Irma under policies underwritten by UPC, no matter how badly people's roofs were damaged.

2.      SFR is a licensed Florida General Contractor with significant experience restoring and repairing commercial and multi-family properties damaged by hurricanes, windstorms, floods and fire.   In addition to general contracting services, SFR assists homeowners directly  through the insurance claims process by working with insurers.  When a policyholder retains SFR, the policyholder executes an assignment of benefits ("AOB"), assigning its rights under the insurance policy to SFR.  SFR then steps into the shoes of the policyholder, making the necessary repairs and working through the claims process with the insurance carrier.   An example of an AOB is attached as **Exhibit A**.

3.      In the wave of damage and insurance claims following hurricane Irma, SFR has discovered that UPC was not honoring its insurance agreements.

4.      In fact, UPC and each of FKS and PLS (FKS and PLS together are "Adjuster Defendants") conspired to lie and submit false reports and estimates for the purpose of being able to deny or underpay insurance claims related to the storm's damage.  FKS acted as an instrumentality of such scheme, including by sending out a text at the behest of UPC instructing claims not be adjusted at all; PLS was induced to so conspire because of the possibility purportedly being explored by UPC that it would acquire PLS for substantial money.

5.      SFR does not know the total number of homeowners and policyholders impacted by this scheme but believes it to be in the thousands.  SFR is the AOB

4821-9514-3167.2

holder for 200 (two hundred) such Florida homeowners with UPC insurance policies, who were impacted both by Hurricane Irma and this scheme to deny or underpay claims related to their property damage sustained (collectively, the "Assignors"). A complete list of the underlying policyholders is attached as **Exhibit B**. SFR brings this action on its own behalf and a/a/o the Assignors.

## THE PARTIES

6.    Plaintiff SFR is a Florida Limited Liability Company with its principal place of business located in Stuart, Florida. Its manager is Ricky McGraw.

7.    Defendant UPC is a Florida corporation with its principal place of business located in Saint Petersburg, Florida.

8.    Defendant FKS is a Florida Limited Liability Company with its principal place of business located in Saint Petersburg, Florida. It worked with UPC as an adjuster during the relevant period and acted as an instrumentality of UPC in its scheme by, among other actions, sending a text instructing adjusters not to adjust roof damage.

9.    Defendant PLS is a South Carolina Limited Liability Company with its principal place of business located in Apopka, Florida. It worked with UPC as an adjuster during the relevant period. During times relevant to this action, it was a willing acquisition target of a purported acquisition by UPC, and its principals and

4821-9514-3167.2

owners Jeff Nachgriner and Andy Corbett were the target of a pressure campaign by UPC aimed at undermining the legitimate adjusting process.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the lawsuit concerns a federal question arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*

11.     This Court may exercise supplemental jurisdiction over SFR's state law claims pursuant to 28 U.S.C. § 1367(a) because the remaining state law claims are based upon a common nucleus of operative facts, as SFR's federal claim and the entire action commenced by this Complaint constitute a single case that would ordinarily be tried in one judicial proceeding.

12.     The Court has personal jurisdiction over UPC because it is a Florida corporation, with a principal place of business in Florida, and because the events giving rise to this action occurred within this state.

13.     The Court has personal jurisdiction over FKS because it is a Florida Limited Liability Company with its principal place of business in Florida, and the events giving rise to this action occurred within this state.

14.     The Court has personal jurisdiction over PLS because its principal place of business is in Florida, and the events giving rise to this action occurred within this state.

4

15.     Venue is appropriate in the Middle District of Florida because a substantial part of the events or omissions giving rise to this action occurred within the boundaries of this district.

16.     Moreover, venue is appropriate here because UPC and Adjuster Defendants are subject to personal jurisdiction in this district, and their respective principal places of business are within the boundaries of this district.

## BACKGROUND

### The Insurance Industry and SFR

17.     UPC is a Florida domiciled property & casualty stock insurance company located in St. Petersburg, Florida.  Among other offerings, UPC provides residential homeowner insurance policies, whereby UPC agrees to protect the homeowner against certain losses.   In exchange, the homeowner pays UPC a monthly premium.

18.     When calculating what premium to charge, insurance companies such as UPC utilize sophisticated models to forecast and predict risk.  These models take certain criteria into account to evaluate this risk, such as the likelihood of a severe weather event, and the cost to repair or replace an insured's home.

19.     But such models also take into account other human factors.  For example, insurance companies like UPC know that, when a severe weather event occurs, not every policyholder will submit a claim for coverage, even if the insured

is entitled to coverage under the terms of the policy.  UPC also knows that, even when a covered event occurs, and the policyholder submits the claim, many individuals will be unable to assess whether UPC undervalued the extent of the damage.  And, if UPC wrongfully denies coverage, UPC knows that many insureds will not turn to litigation to enforce their rights under a policy.

20.    UPC's goal is to maximize profit.

21.    Policyholders whose claims are wrongfully denied are in a difficult position.  SFR's role is to help them.  In addition to providing general contracting services, SFR's clients assign the benefits under their insurance policies to SFR. SFR then steps into the shoes of the policyholder.  When a covered event causing property damage (like a hurricane) occurs, SFR works through the claims process for the homeowner, and if needed, litigates against the insurer.

22.    This arrangement provides significant benefits to the underlying policyholders, most of whom have little to no experience negotiating (let alone litigating) against insurers.  As the Florida Supreme Court has noted, "the average policyholder has neither the finances nor the expertise to single-handedly take on an insurance carrier."  *Johnson v. Omega Ins. Co.*, 200 So. 3d 1207, 1215 (Fla. 2016).

23.    SFR levels the playing field.  Because SFR handles a high volume of claims and has construction expertise, it has insight into whether the insurer is

6

providing a fair estimate.  In addition, SFR has the resources to litigate against insurance carriers.

Hurricane Irma and Defendants' Scheme

24.     In September 2017, Hurricane Irma struck Florida as a category 4 hurricane with sustained windspeeds of over 140 miles per hour.  Irma's winds and storm surge caused devastating levels of damage to Florida homes, businesses, agriculture, and infrastructure.

25.     This action arises in response to an unlawful and unethical scheme, pursuant to which Defendants systematically caused legitimate claims of policyholders affected by Irma to be undervalued or denied outright.

26.     Following Irma, hundreds of thousands of Floridians suffered property damage and submitted insurance coverage claims related to the damage.

27.     Rather than pay out the indemnity benefits under the insurance policy necessary to repair or replace covered losses as required under the policies, Defendants utilized a scheme to deny or underpay the insureds who submitted claims for damage to their properties caused by Irma.

28.     Pursuant to the scheme utilized by Defendants, when one of UPC's insureds submitted a claim for coverage related to Irma, Defendants sent a field adjuster to visit the property of UPC's insured.  The field adjusters were charged

7

with generating reports and/or creating estimates and/or making coverage determinations and valuations of the respective losses reported by the UPC insureds.

29.    Instead of ensuring that field adjusters created honest, accurate reports to confirm that UPC's insured received an assessment that reflected their loss, Defendants specifically instructed desk adjusters to modify the estimates created by field adjusters to decrease estimates in order to ultimately decrease the amount of money UPC pays to its insureds when claims are made under the insurance policies, or to outright fail to find any damages whatsoever.  In many circumstances, Defendants instructed field adjusters to modify reports to give UPC a "factual basis" to deny coverage altogether.  Defendants pressured adjusters to create factual bases that were fraudulent in order to deny claims.  After a time, Defendants also instructed field adjusters as a matter of policy to fail to write up any damages whatsoever and leave them blank so that UPC's own desk adjusters could manufacture reasons to deny the claims.

30.    As this scheme has come to light, some field adjusters have stated under oath that UPC commanded them to add language to their reports which was inaccurate and outright false, or to otherwise fail to document damages altogether.

31.    For example, Rod Buvens, a field adjuster acting on behalf of UPC through PLS following Irma, testified at deposition on or about August 8, 2020, that UPC's desk adjuster instructed him to add language into his report "[t]hat no wind

damages were observed upon inspection" at the property at issue, despite this language being categorically false based upon Mr. Buvens' own inspection of a property. *See* attached **Exhibit E** at 59:23 – 64:12. PLS echoed the demand. This testimony concerned an SFR matter.

32.     Relating to homes damaged by Irma, Mr. Buvens advised UPC's desk adjuster, Josh DeMint, numerous times that the statement "no wind damages were observed upon inspection" was incorrect multiple times; yet, Mr. Buvens was still required to include the categorically false statement in his report at the demand and instruction of UPC. *Id.*

33.     Further, Mr. Buvens testified that UPC demands its field adjusters remove items from an estimate, which ultimately results in UPC owing less to its insureds.

34.     For example, Mr. Buvens testified that he was specifically instructed to remove portions of his estimate, which would have amounted to an additional $1,376.30 that UPC would have owed pursuant to the insurance policy. Moreover, if Mr. Buvens' report and estimate were not wrongfully modified by UPC, the insured in this specific instance would have obtained a full roof replacement, which would have cost UPC thousands of dollars more pursuant to the insurance policy. *Id.* at 68:7 – 71:4.

35.     Moreover, Mr. Buvens testified that his reports were *often* changed by desk adjusters without his consent:

> Q.     (By Ms. Sabatino) So, you did not sign this particular report, is that your testimony?
>
> A.     That is a mechanical signature that is stored in the report. When you hit print -- if you go in there and hit print today, my signature will appear on it unless it is manually changed. It is locked in with the settings of the Estimator that is assigned to that report. That's correct. **It is my signature but anyone at UPC can and they have changed these reports and left my signature on them**.

*Id.* at 102:23 – 103:7 [emphasis added].

36.     Indeed, Mr. Buvens testified on August 28, 2020, that UPC had a pattern and practice of imposing fraudulent and deceptive changes to independent adjuster work and that he was instructed to go against his statutory duties, ignore damages, and thus render false statements in his reports over more than 180 times:

> Q.     (By Mr. Tolley) . . . . Is there anything else that they told you to do or not to do that you felt uncomfortable with?
>
> A.     That's going to be a long list and it's probably going to involve other claims besides this one and Ms. Sabatino is probably going to object to that.

*Id.* at 70:23 – 71:4

> Q.     (By Mr. Tolley) But there are other instructions that they gave you or told you to do or not to do on any other claims that affected your ability to adjust this claim?
>
>        Ms. Sabatino:     I'm going to object to form.  And, Mr. Buvens, I mean, I would appreciate if you would just answer as it relates to this claim.

Q.     (By Mr. Tolley)  Mr. Buvens, I believe you have to answer, you know, truthfully.  You are under oath, so.

A.     Yes. Under the constantly changing claim-handling practices 23 or 24 different processes that I'm aware of, there were several instances where they asked licensed field adjusters to go against their statutory duties to handle claims in good faith with the policyholders.

      Those include ignoring damages, ignoring mitigation amounts that the insured provided evidence of payment, removing estimates that the field adjuster wrote so that they could use snider roofing comparative estimates and therefore underpay the field adjuster for the agreed upon fee schedule, treating the independent field adjusters as employees.

      I don't know how you would fire a 1099 employee without them being an employee of a corporation but they did it, basically strong-arming the IA firms and the independent adjusters into handling the claim 100%.

Q.     On this case was this one of the only times you were asked to include a false narrative in your report that you did not agree with by the Defendant?

      Ms. Sabatino: Objection, form.

A.     No.

Q.     (By Mr. Tolley) How many times would you say you were asked to include something that you didn't believe to be true in your report?

      Ms. Sabatino: Objection, form.

A.     I don't really have a way to count that at this time.  I'm preparing you a spreadsheet to include all of those instances.

Q.     (By Mr. Tolley)  Okay.  Let's put it this way; would you say it was over 110 times?

A.     Over.

Q.     Over 150 times?

A.     Over.

Q.     Over 180 times?

A.     Over.

*Id.* at 72:11 - 74:7.

37.     As Mr. Buvens further testified, such instructions to falsify reports as a

pattern and practice came both through PLS, and through UPC directly, respecting

UPC claims:

> Q.     Okay.  And these changes – these instructions, specifically the ones
> dealing with putting false, you know, false statements in your narrative, those
> were the directives of the insurance carriers themselves or the independent
> adjusting firm?
>
> Ms. Sabatino: Objection, form.
>
> Q.     (By Mr. Tolley)  You can answer.
>
> A.     They were not consistent with the IA firms' handling on other carriers.
> So, I can only conclude that they came from UPC.  Plus I got the directive
> directly from the people who I believe to be managers and employees at UPC.
>
> Q.     And that – some of those direct instructions specifically in this case
> with regard to the false statement that there was no windstorm damage
> observed, that was actually directly from an employee of the Defendant,
> correct?
>
> Ms. Sabatino:  Objection, form.
>
> A.     Yes, directly.

*Id.* at 75:14 – 76:7.

4821-9514-3167.2

38.     Mr. Buvens exposure to UPC's practices was broad, involving what he estimated to be "well over 1000" claims.  *Id.* at 90:3 – 7.

39.     In another example, Niles Wood, an adjuster retained by UPC through PLS following Irma, adjusted damage related to a roof for an insured in St. Petersburg, Florida.  Mr. Wood's report estimated that the cost to repair covered damages for the roof related to wind damage from Irma was $59,037.30.  A copy of the report is attached as **Exhibit C**.

40.     At UPC's instruction, Mr. Wood was required to modify the report to state that the same roof only sustained $3,354.34 in covered loss related to wind damage from Irma.  A copy of the second report is attached at **Exhibit D**.

41.     UPC recorded the change in amount as a "correction" to the estimate. UPC claimed (contrary to the field adjuster's actual reporting) that roof damage was not caused by wind from Irma and thus not covered.  This was simply a lie told by UPC to underpay the value of the claim.

42.     Defendants' wrongful actions were not limited only to a few specific claims, nor were they isolated specifically to the hundreds of claims handled by Mr. Buvens or claims handled by Mr. Wood.  Instead, upon information and belief, UPC has artificially decreased estimates, or modified estimates as to pretextual warrant a denial of coverage, in hundreds of instances for which SFR has been assigned the benefits.

43.     Among the co-conspirators involved in this scheme to depreciate UPC's insureds' valid claims were FKS and PLS and Mid-American Claims; along with UPC's Claim Director Jeff Bergstrom; UPC's claims managers Tim Cotton, Brian Maries and Trevor McDonald; and desk adjuster Josh DeMint of FKS.

44.     FKS buckled under pressure from UPC to instruct its field adjusters to low ball its adjusting, and it did so repeatedly.  Notably, this campaign to have its field adjusters low ball estimates was manifested, by, among other actions, sending a text at UPC's instruction ("FKS Text") to several field adjusters instructing them not to estimate certain roof damages because UPC would be issuing blanket denials, even though that would – understandably – increase the rate of litigation.  The text instructed field adjusters to state in their reports that they "cannot determine cause of loss" on "any late reported Irma claims," and that "any re-open claims of Irma" will be denied, and no estimating will be necessary on these claims:

14



(Part 1 of 2)

(Part 2 of 2)

45.     The instructions from FKS, sent on behalf of UPC, had a predictable effect: field adjusters complied.

46.     For instance, on January 18, 2022, a field adjuster named Theodore Fiocati was deposed in a case involving UPC and FKS (**Exhibit F** at 19:1 – 9; 20:24 – 21:7).

47.     Mr. Fiocati testified that he was on a phone call in 2020 with representatives of FKS and UPC and other field adjusters for FKS, covering the ground covered in the above FKS Text.  *Id.* at 72:8-12; 55:24 – 57:21.  He was told to avoid determining the cause of a loss and instead forward to the desk adjuster for further handling.  *Id.* at 54:13-55:2.

48.     Mr. Fiocati confirmed that he followed the instructions.  *Id.* at 72:17-21.  He complied with the instructions, even though he admitted that it made him "feel uncomfortable:"

> Q.     Okay.  And, you know, talking a little bit about those instructions, did it make you feel uncomfortable to follow those instructions?
>
> A.     Yeah, I thought – well, I thought I was – just documented damages and everything was getting taken care of by the – you know, file handlers.  That was kind of where I was at with it.  I thought we were just getting ears and eyes for the in house desk adjusters.
>
> Q.     Obviously, that turned out to be true, correct?
>
> A.     Correct.

*Id.* at 70:23-71:7

49.     The source of the discomfort at deposition was clear.  The desk adjuster made observations unsupported by Mr. Fiocati's own report.  *Id.* 66:10 – 66:24.  Mr.

Fiocati himself only indicated that he could not find damage to the roof in question because he had been instructed to do so. *Id.* 67:17 – 68:18. Indeed, Mr. Fiocati confirmed that he could not rule out that wind damaged the roof in question. *Id.* at 41:1 – 10. Mr. Fiocati confirmed that the ethical guidelines and procedures in such a circumstance would require him to make a determination benefiting the Insured (the *opposite* of what ultimately happened.) *Id.* at 41:19-42:14; 48:7 – 49:14. Had he been permitted to act as a field adjuster absent instruction from FKS and UPC, he would have written an estimate for scope of damages; the ultimate finding by UPC and FKS was something that he disagreed with. *Id.* at 52:6 – 53:4. The right thing wasn't done; the claim in question *should* have been covered, but wasn't. *Id.* 73:12 – 25. In short, UPC and FKS created a procedure that allowed them to fraudulently deny coverage to the insured.

50. Crucially, Mr. Fiocati testified that *he alone* handled **"probably say over 100"** claims effected by the instructions above. *Id.* at 62:18 – 63:4. Furthermore, other adjusters were given the same instructions that he was given. *Id.* at 63:2 – 4. In fact, the instructions to avoid finding a cause of loss, and instead refer the matter to the desk adjuster for determination, applied not just to "late reported claims," but to claims that were timely reported but reopened. *Id.* at 63:19 – 64:4.

4821-9514-3167.2

51.     In short, the practice was systematic, pervasive, unethical, unlawful–and fraudulent.  It involved many, many field adjusters.

52.     PLS was also susceptible to this scheme, and was induced to participate, insofar as UPC and its principals had styled themselves as potential purchasers of PLS for a substantial sum, and PLS accordingly did not want to take any actions contrary to the scheme for fear of compromising that potential deal.  PLS's principals and owners Jeff Nachgriner and Andy Corbett were the target of a pressure campaign by UPC aimed at undermining the legitimate adjusting process.

53.     Mr. Wood and Mr. Buvens, whose testimony was cited above, were each associated with PLS.

54.     Lest there be any doubt, UPC did not just instruct field adjusters with PLS or FKS to fail to perform their jobs adequately.  This practice was pervasive in the claims UPC handled throughout Florida.

55.     To wit, on January 20, 2022, field adjuster Lari Piscitelli was deposed about yet another claim handled by UPC.  *See* **Exhibit G**.  Mr. Piscitelli worked at the time for Mid-American Claims.  He testified that he alone believed he handled some 150 – 200 claims for UPC through Mid-American Claims.  *Id.* at 16:12-14.

56.     As with Mr. Fiocati through FKS, Mr. Piscitelli attended a meeting with UPC through Mid-American Claims where he, and all other field adjusters with Mid-American Claims handling any UPC claims, were instructed how *not* to document

18

claims for UPC.  ("The Mid-American Online Meeting.")  *Id.* at 17:22 – 22:17.  At that meeting and thereafter, Mr. Piscitelli and other adjusters were instructed to in fact avoid doing their jobs:

> A.     We had a meeting at night and everybody was on the meeting and it was verbally discussed.  I believe some people from UPC was there, but I can't tell you exactly who was in the meeting.  It was mostly adjusters, and it was at night and they basically said that they were going to deny everything for late reporting and not to write the word damage, say the word damage.

*Id.* at 18:23 – 19:5.

57.     Mr. Piscitelli stated that he was instructed by UPC that "[t]hey were denying everything for late reporting.  Just take pictures and send over a report." *Id.* at 20:14-16.  Indeed this proved true:

> Q.     Okay.  So it didn't matter the circumstances.  If it was a late reported Hurricane Irma claim, you had, you know, 70% of the roof is blown off by Irma, it was going to be denied?
>
> Mr. Dempsey:     Objection.
>
> A.     It didn't matter.

*Id.* at 24:2 – 7.

58.     Furthermore, "[e]verybody that worked UPC claims for Mid-America was in the meeting."  *Id.* at 22:1-2.  He estimated that "it would probably be anywhere between 20 and 60 people in that room.  Mid-America is pretty good size." *Id.* 22:13-17.  Remember that Mr. Piscittelli *alone* handled some 150 – 200 claims

for UPC through Mid-American Claims. *Id.* at 16:12-14. Everybody from Mid-America Claims received the same instructions at that meeting from UPC.

59. Mr. Piscittelli admitted that the practice UPC forced him and other field adjusters to engage in was not permitted:

> Q. Okay. And blanketly denying claims no matter what, is that something that you can do as a licensed adjuster?
>
> A. No.
>
> Q. Okay. And that is what UPC was doing in claims like this; correct?
>
> A. Correct.

*Id.* at 28:12 – 18.

60. This is not a mere dry recitation of unlawful patterns and practices with nary a victim. The impact upon homeowners  -- the AOB's herein and the thousands upon thousands of homeowners affected otherwise – is profound. Field adjusters know this, and so the impact on field adjusters who have been forced to participate in UPC's unlawful scheme is also profound:

> Q. (By Mr. Tolley) Okay. And knowing that you would have written for a full roof replacement but you weren't allowed to, how did that make you feel?
>
> A. I quit working daily claims because of UPC.
>
> Q. And I kind of think its self explanatory –
>
> A. Thirteen years. Thirteen years. Thirteen years I worked claims and never had to go through this.

Q.      When you say you quit because of UPC, what about UPC made you quit?

A.      We weren't allowed to write any damages.  Everything was being denied.

Q.      And when did you quit working for UPC – or with UPC?

A.      Probably shortly after this.  I don't know the exact date that I quit.  They asked me not to leave, but I just couldn't take it anymore.

*Id.* at 34:14 – 35:4.

61.     The above scheme was pure and simple fraud upon Plaintiff (and others).  The above and additional similar violations of Florida law caused damages to SFR in the form of underpaid and unpaid claims, which should have been covered and fully paid.

62.     By the same token, Defendants wrongfully profited from the scheme to the detriment of UPC's insureds and SFR.

63.     Furthermore, Defendants' scheme repeatedly, systematically, as a matter of policy and practice, violated Fla. Stat. § 626.951 *et seq.,* including each of Fla. Stat. § 626.9541(1)(i) subsections (2), (3)(a), (3)(b), (3)(d) and (3)(f).

64.     Upon information and belief, the evidence gathered thus far by SFR is only the tip of the iceberg into this fraudulent scheme to improperly document, underpay and wrongfully deny valid claims.  SFR believes this fraud is widespread and impacting all of Assignors' insurance policies underwritten by UPC, for which SFR is entitled to bring this action.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION – VIOLATIONS OF 18 U.S.C. § 1962(c)

### (Against All Defendants)

<u>Enterprise</u>

65.     SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

66.     Based on SFR's current knowledge, the following constitute one or more groups of persons and entities associated in fact, hereinafter referred to as the "Enterprise": Defendants UPC, FKS, and PLS, and other persons, including but not limited to UPC's Claim Director Jeff Bergstrom; UPC's claims managers Tim Cotton, Brian Maries and Trevor McDonald; and desk adjuster Josh DeMint of FKS; and Mid-American Claims.

67.     Enterprise is an ongoing and continuing organization consisting of Defendants, entities and individuals associated for the common or shared purpose of enabling UPC to underpay and deny homeowners' claims under insurance policies underwritten by UPC through deceptive and misleading reports and deriving profits from those activities.

68.     Defendants, through Enterprise, have engaged in a pattern of racketeering activity, which involves a fraudulent scheme and conspiracy to provide the insureds with false reports for the purpose of underpaying and denying their valid claims, which should be covered and fully paid.   The collective actions of

22

Defendants and co-conspirators are related to one another and establish a pattern of racketeering activity as they have a similar purpose, similar methods and similar victims.

69.     Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as sending false communications through channels of interstate commerce and deriving illegal profits from this scheme.

70.     Within Enterprise, there is a common communication network by which co-conspirators share information on a regular basis. The Enterprise uses this common communication network for the purpose of coordinating the activities designed to underpay and deny valid claims.

71.     Enterprise has a systematic linkage because there are contractual relationships, financial ties and continuing coordination of activities.  Through Enterprise, Defendants and other co-conspirators engage in consensual decision-making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of deriving profits from their unlawful activities.

72.     The Enterprise functions as a continuing unit with the purpose of assisting with perfecting and furthering their wrongful scheme to derive profit from its unlawful activities.

73.     While Defendants participate in and are members of Enterprise, they

also have their own respective separate and distinct existence.

74.     Defendants engage in unlawful activities by causing field and desk adjusters to create false reports to defraud SFR and other holders of valid claims, by underpaying and denying valid claims, and by rewarding field and desk adjusters with paying them "much more quickly," among other things.

75.     At all relevant times, each participant in Enterprise was aware of the scheme to defraud SFR and other holders of valid claims for the purpose of reaping profit.

76.     Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

77.     UPC has directed and controlled the ongoing organization necessary to implement its scheme and illicit business practices at meetings and through communications, of most of which SFR cannot now know because all such information lies in Defendants' hands.

78.     Enterprise derived income from a pattern of racketeering activity.

<u>RICO Conspiracy</u>

79.     Defendants have not undertaken the practice described herein in isolation but as part of a common scheme and conspiracy.

80.     Defendants have engaged in a conspiracy to generate additional profits by underpaying and denying valid claims through preparation and presentation of

false reports.

81.     The objects of the conspiracy are: (1) to have adjusters prepare false reports or blank reports which are then falsified regarding the causes and the extent of damage; (b) to underpay or deny valid claims by utilizing false reports; and (c) to maximize profit of Defendants.

82.     To achieve these goals, UPC instructed Adjuster Defendants PLS and FKS, Mid-American Claims, and field and desk adjusters to prepare false reports or blank reports which could then be falsified.

83.     Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in preparing false reports and presenting them to claimholders in order to deny or underpay valid claims.

84.     Indeed, for the conspiracy to succeed, Defendants and each co-conspirator had to agree to implement and use similar devices and fraudulent tactics against their intended targets.

85.     Many instances of common conduct, activity and similar facts evidence the presence of a conspiracy, which exists among Defendants and other co-conspirators, including, but not limited to, agreements between and among Defendants and their co-conspirators to prepare false reports or blank reports that

could be falsified and to deny or underpay valid claims based on such false reports.

86.    As a direct and proximate result of the conspiracy and Defendants' racketeering activities, SFR sustained damages.

<u>Use of the Mails and Wires</u>

87.    Defendants and co-conspirators used interstate mail and telephone to communicate with insureds and claim holders who made claims for damages pursuant to insurance policies underwritten by UPC.

88.    Defendants and co-conspirators utilized the mail and wires to perpetuate their fraud by sending communications to each other and the claim holders via U.S. Mail, commercial carrier, wire, or other interstate electronic media throughout the relevant period.

89.    Among other actions, Defendants and co-conspirators caused a text to be sent in 2020, the FKS Text, setting forth a scheme to pervasively create false reports, and followed up with a group phone call to field adjusters with FKS, and also caused an online meeting to be held, The Mid-American Online Meeting, also setting forth a scheme to pervasively create false reports, in furtherance of the conspiracy.

90.    Defendants and co-conspirators have communicated false reports by U.S. Mail and electronic mail in furtherance of their scheme.

91.    Defendants' and co-conspirators' misrepresentations, acts of

concealment and omissions were knowing and intentional and made for the purpose of deceiving SFR and other valid claim holders.

92. Defendants and co-conspirators either knew or recklessly disregarded that their misrepresentations and omissions in the reports were material, and that they were relied upon by SFR and other valid claim holders.

93. Defendants engaged in racketeering activity pursuant to a scheme designed to wrongfully deny valid insurance claims following Hurricane Irma and committed mail fraud under 18 U.S.C. §1341 and wire fraud under 18 U.S.C. §1343 as part and parcel of the scheme.

WHEREFORE, SFR demands judgment against Defendants for three-fold the damages sustained by SFR, including for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under federal and Florida law, and any other and further relief this Court deems just and proper.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

### (Against UPC)

94. SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

95. Each Assignor had a policy of insurance underwritten by UPC that was in full force and effect when the covered property was damaged by Irma.

96.     Each Assignor executed a valid AOB, assigning rights under the policy to SFR.

97.     Through the AOB, SFR is entitled to bring a breach of contract action for each policy breached by UPC by way of UPC's systematic and fraudulent underpayment and nonpayment of valid claims.

98.     SFR, and the Assignors before it, have complied with all obligations under each policy of insurance.

99.     UPC failed to comply with the policies by failing to properly and accurately investigate, inspect, adjust, document, and pay the covered claims in accordance with the policies and Florida law.

100.    UPC's breach of contract has caused damage to SFR because the claims submitted under the policies were not properly and fairly investigated, reported, adjusted, documented and paid according to the terms of the policies.  SFR is further entitled to interest, costs, and attorneys' fees.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and any other and further relief this Court deems just and proper.

## THIRD CAUSE OF ACTION – FRAUD

### (Against All Defendants)

101.   SFR incorporates by reference allegations at paragraphs 1-64 contained in this Complaint, as if fully set forth herein.

102.   Defendants and their co-conspirators as a matter of policy knowingly created, or caused to be created, false adjusting reports and/or engineering reports related to claims for coverage submitted in connection with properties that suffered damage from Hurricane Irma.

103.   For example, Defendants specifically instructed adjusters creating said reports to state that certain properties had not sustained wind damage from Irma, or that damage to a property was not caused by Irma, or to abstain from documenting damages altogether so that reports could be falsified.  In reality, Defendants knew that the given properties had sustained covered loss as a result of Irma.

104.   SFR is informed and believes that this fraud was most commonly used to underpay or deny coverage for damage to roofs.  However, the full extent of Defendants' fraud is not yet known to SFR.

105.   SFR relied on Defendants' fraudulent reports and their communications based on the same, which falsely stated that the adjuster had determined a given property had not sustained a covered loss, or omitted a finding that a property had sustained a covered loss (such as omitting findings that a given roof was damages by winds from Irma), in accepting less insurance proceeds than it was entitled to under the policy.

29

106. The fraudulent statements and omissions by Defendants were material to SFR because they impacted coverage determinations, the scope of work performed by SFR, and SFR's decision-making process regarding pursuing a claim for coverage or not.

107. SFR was defrauded as a result of UPC's misrepresentations and omissions, as set forth above.

108. As a direct and proximate cause of Defendants' wrongful conduct, SFR has been damaged due to the failure of UPC to pay for covered repairs and replacement in an amount to be fully determined at trial.

WHEREFORE, SFR demands judgment against Defendants for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law, and other and further relief that this Court deems just and proper.

## FOURTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.*, SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (2)

### (Against UPC)

109. SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

110. Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and

define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices. Fla. Stat. § 626.951(1).

111. FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1). "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof. Fla. Stat. § 626.9511(2).

112. UPC is a "person" under the meaning of the statute.

113. SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

114. Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

115. FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

(i)  Unfair claim settlement practices.—

2. A material misrepresentation made to an insured or any other person having an interest in the proceeds payable under such

contract or policy, for the purpose and with the intent of effecting settlement of such claims, loss, or damage under such contract or policy on less favorable terms than those provided in, and contemplated by, such contract or policy;

Fla. Stat. § 626.9541(1)(i).

116.   UPC's conduct, as described herein, meets the definition of an unfair claim settlement practice under Fla. Stat. § 626.9541(1)(i) subsection (2).

117.   UPC willfully violated the above provision.

118.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages, or otherwise leave them blank so that they could be so modified.  Mr. Buvens, Mr. Fiocati, and Mr. Piscitelli each testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that other peer field adjusters were so instructed.  Among other items, field adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-American Online Meeting.

119.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli each testified that this happened as a matter of policy in claims that they handled,

and the claims that they handled exceeded a thousand, and that others were so instructed and affected.

120.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

121.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

122.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

### FIFTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.,* SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(a)

### (Against UPC)

123.   SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

124.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.  Fla. Stat. § 626.951(1).

125.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

126.   UPC is a "person" under the meaning of the statute.

127.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

128.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

129.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

34

(i)  Unfair claim settlement practices.—

    3.  Committing or performing with such frequency as to indicate a general business practice any of the following:

    a.  Failing to adopt and implement standards for the proper investigation of claims;

Fla. Stat. § 626.9541(1)(i).

130.   UPC's conduct, as described herein, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(a).

131.   UPC willfully violated the above provision of FUITPA.

132.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a flawed standard and an inherently improper investigation of claims.

133.   Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that they were so instructed to adopt and implement standards that by definition were not proper for the investigation of claims, and that this instruction effected well over a thousand claims that they alone handled, and that others were so instructed and affected. Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-American Online Meeting.

134.   Among other actions, UPC made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a flawed standard and an inherently improper investigation of claims.  Each of Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified to such changes taking place as a matter of policy.

135.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

136.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

137.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.*, SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(b)**

**(Against UPC)**

138.  SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

139.  Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.  Fla. Stat. § 626.951(1).

140.  FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

141.  UPC is a "person" under the meaning of the statute.

142.  SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

143.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

144.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

(i)  Unfair claim settlement practices.—

3.   Committing or performing with such frequency as to indicate a general business practice any of the following:

b.   Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

Fla. Stat. § 626.9541(1)(i).

145.   UPC's conduct, as described above, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(b).

146.   UPC willfully violated the above provision of FUITPA.

147.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a misrepresentation of pertinent facts relating to the coverage at issue under the statute.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand.  Among other items,

adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-American Online Meeting.

148.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a misrepresentation of pertinent facts relating to the coverage at issue under the statute. Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.   Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-American Online Meeting.

149.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

150.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

151.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

## SEVENTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.* SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(d)

### (Against UPC)

152.   SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

153.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.  Fla. Stat. § 626.951(1).

154.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate

thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

155.   UPC is a "person" under the meaning of the statute.

156.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

157.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

158.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

> (i)  Unfair claim settlement practices.—
>
>> 3.   Committing or performing with such frequency as to indicate a general business practice any of the following:
>>
>> d.     Denying claims without conducting reasonable investigations based upon available information;

Fla. Stat. § 626.9541(1)(i).

159.   UPC's conduct, as described above, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(d).

160.   UPC willfully violated the above provision of FUITPA.

161.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to deny claims, which as a matter of practice represented a denial of claims without the conduct of reasonable investigation based upon available information.  Mr. Buvens, Mr. Fiocati, and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand.  Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-American Online Meeting.

162.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to deny claims, which as a matter of practice represented a denial of claims without the conduct of reasonable investigation based upon available information.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand.  Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-American Online Meeting.

163.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

164.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

165.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

## EIGHTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.*, SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(f)

### (Against UPC)

166.   SFR incorporates by reference allegations 1-64 contained in this Complaint, as if fully set forth herein.

167.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.  Fla. Stat. § 626.951(1).

168.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

169.   UPC is a "person" under the meaning of the statute.

170.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

171.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

172.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

(i)  Unfair claim settlement practices.—

3.  Committing or performing with such frequency as to indicate a general business practice any of the following:

f.  Failing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement;

4821-9514-3167.2

Fla. Stat. § 626.9541(1)(i).

173.   UPC's conduct, as described above, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(f).

174.   UPC willfully violated the above provision of FUITPA.

175.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to manufacture a flawed and unreasonable explanation for its denial of claims and offers of compromise settlement, which as a matter of practice violated the above provision of FUITPA.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.

176.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to manufacture a flawed and unreasonable explanation for its denial of claims and offers of compromise settlement, which as a matter of practice violated the above provision of FUITPA.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened

45

as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.

177.  FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

178.  Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

179.  FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff SFR hereby demands a jury trial on all issues so triable.

Respectfully submitted,

**LAW OFFICE OF ROBERT N. PELIER, P.A**

By:  /s/ Robert N. Pelier
  Robert N. Pelier, Esq.
  F.B.N.: 0998834

4821-9514-3167.2

4649 Ponce De Leon Blvd,
Suite 301
Coral Gables, FL  33146
305-529-9199
RPelier@pelierlaw.com


**KUTAK ROCK LLP**

Oliver D. Griffin, Esq. (*Pro Hac Vice Pending*)  CO Bar No. 52292
1801 California Street
Suite 3000
Denver, CO  80202
(303) 297-2400
oliver.griffin@kutakrock.com

Peter N. Kessler, Esq. (*Pro Hac Vice Pending*)  PA Bar No. 209033
1760 Market Street
Suite 1100
Philadelphia, PA  19103
(215) 299-4384
peter.kessler@kutakrock.com

Anna S. Forman, Esq. (*Pro Hac Vice Pending*) NE Bar No. 25756
1650 Farnam Street
Omaha, NE 68102
(402) 346-6000
anna.forman@kutakrock.com