UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SFR SERVICES L.L.C., for itself and AAO | Case. No.: 8:22-cv-00109-KKM-SPF |
| Plaintiff, | |
| v. | **DEMAND FOR A JURY TRIAL** |
| UNITED PROPERTY & CASUALTY INSURANCE COMPANY, FKS INSURANCE SERVICES, LLC PROPERTY LOSS SPECIALIST, LLC, and MID-AMERICA CATASTROPHE SERVICES, LLC, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT[1]

Plaintiff SFR SERVICES, LLC ("SFR") hereby sues Defendants UNITED PROPERTY & CASUALTY INSURANCE COMPANY ("UPC"); FKS Insurance Services, LLC ("FKS"), PROPERTY LOSS SPECIALIST, LLC ("PLS"), and MID-AMERICA CATASTROPHE SERVICES, LLC. ("Mid-America") (collectively, "Defendants") and demands a jury trial for all causes of action as follows:

### INTRODUCTION

1.       This is an action related to Defendants' unlawful and unethical scheme designed to systematically deny and underpay the claims submitted as a result of

---

[1] The corrected second amended complaint names the proper party which was mis-identified in the second amended complaint.

Hurricane Irma under policies underwritten by UPC, no matter how badly people's roofs were damaged.

2.     SFR is a licensed Florida General Contractor with significant experience restoring and repairing commercial and multi-family properties damaged by hurricanes, windstorms, floods and fire.  In addition to general contracting services, SFR assists homeowners directly  through the insurance claims process by working with insurers.  When a policyholder retains SFR, the policyholder executes an assignment of benefits ("AOB"), assigning its rights under the insurance policy to SFR.  SFR then steps into the shoes of the policyholder, making the necessary repairs and working through the claims process with the insurance carrier.  An example of an AOB is attached as **Exhibit A**.

3.     In the wave of damage and insurance claims following hurricane Irma, SFR has discovered that UPC was not honoring its insurance agreements.

4.     In fact, UPC and each of FKS, PLS, and Mid-America (FKS, PLS, and Mid-America together are "Adjuster Defendants") conspired to lie and submit false reports and estimates for the purpose of being able to deny or underpay insurance claims related to the storm's damage.  FKS acted as an instrumentality of such scheme, including by sending out a text at the behest of UPC instructing claims not be adjusted at all, PLS was induced to so conspire because of the possibility purportedly being explored by UPC that it would acquire PLS for substantial money,

and Mid-America hosted a meeting with various field adjustors where those adjusters were instructed to simply deny claims outright.

5.      SFR does not know the total number of homeowners and policyholders impacted by this scheme but believes it to be in the thousands.  SFR is the AOB holder for 200 (two hundred) such Florida homeowners with UPC insurance policies, who were impacted both by Hurricane Irma and this scheme to deny or underpay claims related to their property damage sustained (collectively, the "Assignors").  A complete list of the underlying policyholders is attached as **Exhibit B**.  SFR brings this action on its own behalf and a/a/o the Assignors.

### THE PARTIES

6.      Plaintiff SFR is a Florida Limited Liability Company with its principal place of business located in Stuart, Florida.  Its manager is Ricky McGraw.

7.      Defendant UPC is a Florida corporation with its principal place of business located in Saint Petersburg, Florida.

8.      Defendant FKS is a Florida Limited Liability Company with its principal place of business located in Saint Petersburg, Florida.  It worked with UPC as an adjuster during the relevant period and acted as an instrumentality of UPC in its scheme by, among other actions, sending a text instructing adjusters not to adjust roof damage.

9.     Defendant PLS is a South Carolina Limited Liability Company with its principal place of business located in Apopka, Florida.  It worked with UPC as an adjuster during the relevant period.  During times relevant to this action, it was a willing acquisition target of a purported acquisition by UPC, and its principals and owners Jeff Nachgriner and Andy Corbett were the target of a pressure campaign by UPC aimed at undermining the legitimate adjusting process.

10.     Defendant Mid-America is an Alabama Limited Liability Company with its principal place of business located in Mobile, Alabama.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the lawsuit concerns a federal question arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*

12.     This Court may exercise supplemental jurisdiction over SFR's state law claims pursuant to 28 U.S.C. § 1367(a) because the remaining state law claims are based upon a common nucleus of operative facts, as SFR's federal claim and the entire action commenced by this Complaint constitute a single case that would ordinarily be tried in one judicial proceeding.

13.     The Court has personal jurisdiction over UPC because it is a Florida corporation, with a principal place of business in Florida, and because the events giving rise to this action occurred within this state.

14.     The Court has personal jurisdiction over FKS because it is a Florida Limited Liability Company with its principal place of business in Florida, and the events giving rise to this action occurred within this state.

15.     The Court has personal jurisdiction over PLS because its principal place of business is in Florida, and the events giving rise to this action occurred within this state.

16.     The Court has personal jurisdiction over Mid-America because Mid-America reached out to Florida in its dealings with Florida Defendants and a Florida plaintiff, involving insurance claims arising in Florida, and the events giving rise to this action occurred within this state.

17.     Venue is appropriate in the Middle District of Florida because a substantial part of the events or omissions giving rise to this action occurred within the boundaries of this district.

18.     Moreover, venue is appropriate here because UPC and Adjuster Defendants are subject to personal jurisdiction in this district, and their respective principal places of business are within the boundaries of this district.

## BACKGROUND

### The Insurance Industry and SFR

19.     UPC is a Florida domiciled property & casualty stock insurance company located in St. Petersburg, Florida.  Among other offerings, UPC provides

residential homeowner insurance policies, whereby UPC agrees to protect the homeowner against certain losses.  In exchange, the homeowner pays UPC a monthly premium.

20.    When calculating what premium to charge, insurance companies such as UPC utilize sophisticated models to forecast and predict risk.  These models take certain criteria into account to evaluate this risk, such as the likelihood of a severe weather event, and the cost to repair or replace an insured's home.

21.    But such models also take into account other human factors.  For example, insurance companies like UPC know that, when a severe weather event occurs, not every policyholder will submit a claim for coverage, even if the insured is entitled to coverage under the terms of the policy.  UPC also knows that, even when a covered event occurs, and the policyholder submits the claim, many individuals will be unable to assess whether UPC undervalued the extent of the damage.  And, if UPC wrongfully denies coverage, UPC knows that many insureds will not turn to litigation to enforce their rights under a policy.

22.    UPC's goal is to maximize profit.

23.    Policyholders whose claims are wrongfully denied are in a difficult position.  SFR's role is to help them.  In addition to providing general contracting services, SFR's clients assign the benefits under their insurance policies to SFR.  SFR then steps into the shoes of the policyholder.  When a covered event causing

property damage (like a hurricane) occurs, SFR works through the claims process for the homeowner, and if needed, litigates against the insurer.

24.     This arrangement provides significant benefits to the underlying policyholders, most of whom have little to no experience negotiating (let alone litigating) against insurers.  As the Florida Supreme Court has noted, "the average policyholder has neither the finances nor the expertise to single-handedly take on an insurance carrier."  *Johnson v. Omega Ins. Co.*, 200 So. 3d 1207, 1215 (Fla. 2016).

25.     SFR levels the playing field.  Because SFR handles a high volume of claims and has construction expertise, it has insight into whether the insurer is providing a fair estimate.  In addition, SFR has the resources to litigate against insurance carriers.

<u>Hurricane Irma and Defendants' Scheme</u>

26.     In September 2017, Hurricane Irma struck Florida as a category 4 hurricane with sustained windspeeds of over 140 miles per hour.  Irma's winds and storm surge caused devastating levels of damage to Florida homes, businesses, agriculture, and infrastructure.

27.     This action arises in response to an unlawful and unethical scheme, pursuant to which Defendants systematically caused legitimate claims of policyholders affected by Irma to be undervalued or denied outright.

28.     Following Irma, hundreds of thousands of Floridians suffered property damage and submitted insurance coverage claims related to the damage.

29.     Rather than pay out the indemnity benefits under the insurance policy necessary to repair or replace covered losses as required under the policies, Defendants utilized a scheme to deny or underpay the insureds who submitted claims for damage to their properties caused by Irma.

30.     Pursuant to the scheme utilized by Defendants, when one of UPC's insureds submitted a claim for coverage related to Irma, Defendants sent a field adjuster to visit the property of UPC's insured.  The field adjusters were charged with generating reports and/or creating estimates and/or making coverage determinations and valuations of the respective losses reported by the UPC insureds.

31.     Instead of ensuring that field adjusters created honest, accurate reports to confirm that UPC's insured received an assessment that reflected their loss, Defendants specifically instructed desk adjusters to modify the estimates created by field adjusters to decrease estimates in order to ultimately decrease the amount of money UPC pays to its insureds when claims are made under the insurance policies, or to outright fail to find any damages whatsoever.  In many circumstances, Defendants instructed field adjusters to modify reports to give UPC a "factual basis" to deny coverage altogether.  Defendants pressured adjusters to create factual bases that were fraudulent in order to deny claims.  After a time, Defendants also instructed

field adjusters as a matter of policy to fail to write up any damages whatsoever and leave them blank so that UPC's own desk adjusters could manufacture reasons to deny the claims.

32.     As this scheme has come to light, some field adjusters have stated under oath that UPC commanded them to add language to their reports which was inaccurate and outright false, or to otherwise fail to document damages altogether.

33.     For example, Rod Buvens, a field adjuster acting on behalf of UPC through PLS following Irma, testified at deposition on or about August 8, 2020, that UPC's desk adjuster instructed him to add language into his report "[t]hat no wind damages were observed upon inspection" at the property at issue, despite this language being categorically false based upon Mr. Buvens' own inspection of a property. *See* attached **Exhibit E** at 59:23 – 64:12.  PLS echoed the demand.  This testimony concerned an SFR matter.

34.     Relating to homes damaged by Irma, Mr. Buvens advised UPC's desk adjuster, Josh DeMint, numerous times that the statement "no wind damages were observed upon inspection" was incorrect multiple times; yet, Mr. Buvens was still required to include the categorically false statement in his report at the demand and instruction of UPC.  *Id.*

35.     Further, Mr. Buvens testified that UPC demands its field adjusters remove items from an estimate, which ultimately results in UPC owing less to its insureds.

36.     For example, Mr. Buvens testified that he was specifically instructed to remove portions of his estimate, which would have amounted to an additional $1,376.30 that UPC would have owed pursuant to the insurance policy.  Moreover, if Mr. Buvens' report and estimate were not wrongfully modified by UPC, the insured in this specific instance would have obtained a full roof replacement, which would have cost UPC thousands of dollars more pursuant to the insurance policy. *Id.* at 68:7 – 71:4.

37.     Moreover, Mr. Buvens testified that his reports were *often* changed by desk adjusters without his consent:

> Q.     (By Ms. Sabatino) So, you did not sign this particular report, is that your testimony?
>
> A.     That is a mechanical signature that is stored in the report. When you hit print -- if you go in there and hit print today, my signature will appear on it unless it is manually changed. It is locked in with the settings of the Estimator that is assigned to that report. That's correct. **It is my signature but anyone at UPC can and they have changed these reports and left my signature on them**.

*Id.* at 102:23 – 103:7 [emphasis added].

38.     Indeed, Mr. Buvens testified on August 28, 2020, that UPC had a pattern and practice of imposing fraudulent and deceptive changes to independent

adjuster work and that he was instructed to go against his statutory duties, ignore

damages, and thus render false statements in his reports over more than 180 times:

> Q.     (By Mr. Tolley) . . . . Is there anything else that they told you to do or not to do that you felt uncomfortable with?

> A.     That's going to be a long list and it's probably going to involve other claims besides this one and Ms. Sabatino is probably going to object to that.

*Id.* at 70:23 – 71:4

> Q.     (By Mr. Tolley) But there are other instructions that they gave you or told you to do or not to do on any other claims that affected your ability to adjust this claim?

>         Ms. Sabatino:     I'm going to object to form.   And, Mr. Buvens, I mean, I would appreciate if you would just answer as it relates to this claim.

> Q.     (By Mr. Tolley)  Mr. Buvens, I believe you have to answer, you know, truthfully.  You are under oath, so.

> A.     Yes. Under the constantly changing claim-handling practices 23 or 24 different processes that I'm aware of, there were several instances where they asked licensed field adjusters to go against their statutory duties to handle claims in good faith with the policyholders.
>         Those include ignoring damages, ignoring mitigation amounts that the insured provided evidence of payment, removing estimates that the field adjuster wrote so that they could use snider roofing comparative estimates and therefore underpay the field adjuster for the agreed upon fee schedule, treating the independent field adjusters as employees.
>         I don't know how you would fire a 1099 employee without them being an employee of a corporation but they did it, basically strong-arming the IA firms and the independent adjusters into handling the claim 100%.

> Q.     On this case was this one of the only times you were asked to include a false narrative in your report that you did not agree with by the Defendant?

>         Ms. Sabatino: Objection, form.

A.     No.

Q.     (By Mr. Tolley) How many times would you say you were asked to include something that you didn't believe to be true in your report?

      Ms. Sabatino: Objection, form.

A.     I don't really have a way to count that at this time.  I'm preparing you a spreadsheet to include all of those instances.

Q.     (By Mr. Tolley)  Okay.  Let's put it this way; would you say it was over 110 times?

A.     Over.

Q.     Over 150 times?

A.     Over.

Q.     Over 180 times?

A.     Over.

*Id.* at 72:11 - 74:7.

      39.     As Mr. Buvens further testified, such instructions to falsify reports as a

pattern and practice came both through PLS, and through UPC directly, respecting

UPC claims:

Q.     Okay.  And these changes – these instructions, specifically the ones dealing with putting false, you know, false statements in your narrative, those were the directives of the insurance carriers themselves or the independent adjusting firm?

      Ms. Sabatino: Objection, form.

Q.     (By Mr. Tolley)  You can answer.

A.     They were not consistent with the IA firms' handling on other carriers. So, I can only conclude that they came from UPC.  Plus I got the directive directly from the people who I believe to be managers and employees at UPC.

Q.     And that – some of those direct instructions specifically in this case with regard to the false statement that there was no windstorm damage observed, that was actually directly from an employee of the Defendant, correct?

Ms. Sabatino:  Objection, form.

A.     Yes, directly.

*Id.* at 75:14 – 76:7.

40.     Mr. Buvens exposure to UPC's practices was broad, involving what he estimated to be "well over 1000" claims.  *Id.* at 90:3 – 7.

41.     In another example, Niles Wood, an adjuster retained by UPC through PLS following Irma, adjusted damage related to a roof for an insured in St. Petersburg, Florida.  Mr. Wood's report estimated that the cost to repair covered damages for the roof related to wind damage from Irma was $59,037.30.  A copy of the report is attached as **Exhibit C**.

42.     At UPC's instruction, Mr. Wood was required to modify the report to state that the same roof only sustained $3,354.34 in covered loss related to wind damage from Irma.  A copy of the second report is attached at **Exhibit D**.

43.     UPC recorded the change in amount as a "correction" to the estimate. UPC claimed (contrary to the field adjuster's actual reporting) that roof damage was

not caused by wind from Irma and thus not covered.  This was simply a lie told by UPC to underpay the value of the claim.

44.     Defendants' wrongful actions were not limited only to a few specific claims, nor were they isolated specifically to the hundreds of claims handled by Mr. Buvens or claims handled by Mr. Wood.  Instead, upon information and belief, UPC has artificially decreased estimates, or modified estimates as to pretextual warrant a denial of coverage, in hundreds of instances for which SFR has been assigned the benefits.

45.     Among the co-conspirators involved in this scheme to depreciate UPC's insureds' valid claims were FKS and PLS and Mid-America; along with UPC's Claim Director Jeff Bergstrom; UPC's claims managers Tim Cotton, Brian Maries and Trevor McDonald; and desk adjuster Josh DeMint of FKS.

46.     FKS buckled under pressure from UPC to instruct its field adjusters to low ball its adjusting, and it did so repeatedly.  Notably, this campaign to have its field adjusters low ball estimates was manifested, by, among other actions, sending a text at UPC's instruction ("FKS Text") to several field adjusters instructing them not to estimate certain roof damages because UPC would be issuing blanket denials, even though that would – understandably – increase the rate of litigation.  The text instructed field adjusters to state in their reports that they "cannot determine cause

of loss" on "any late reported Irma claims," and that "any re-open claims of Irma"

will be denied, and no estimating will be necessary on these claims:



(Part 1 of 2)                 (Part 2 of 2)

47.     The instructions from FKS, sent on behalf of UPC, had a predictable effect: field adjusters complied.

48.     For instance, on January 18, 2022, a field adjuster named Theodore Fiocati was deposed in a case involving UPC and FKS (**Exhibit F** at 19:1 – 9; 20:24 – 21:7).

49.     Mr. Fiocati testified that he was on a phone call in 2020 with representatives of FKS and UPC and other field adjusters for FKS, covering the ground covered in the above FKS Text.  *Id.* at 72:8-12; 55:24 – 57:21.  He was told to avoid determining the cause of a loss and instead forward to the desk adjuster for further handling.  *Id.* at 54:13-55:2.

50.     Mr. Fiocati confirmed that he followed the instructions.  *Id.* at 72:17-21.  He complied with the instructions, even though he admitted that it made him "feel uncomfortable:"

> Q.     Okay.  And, you know, talking a little bit about those instructions, did it make you feel uncomfortable to follow those instructions?
>
> A.     Yeah, I thought – well, I thought I was – just documented damages and everything was getting taken care of by the – you know, file handlers.  That was kind of where I was at with it.  I thought we were just getting ears and eyes for the in house desk adjusters.
>
> Q.     Obviously, that turned out to be true, correct?
>
> A.     Correct.

*Id.* at 70:23-71:7

51.     The source of the discomfort at deposition was clear.  The desk adjuster made observations unsupported by Mr. Fiocati's own report.  *Id.* 66:10 – 66:24.  Mr. Fiocati himself only indicated that he could not find damage to the roof in question because he had been instructed to do so.  *Id.* 67:17 – 68:18.  Indeed, Mr. Fiocati confirmed that he could not rule out that wind damaged the roof in question.  *Id.* at 41:1 – 10.  Mr. Fiocati confirmed that the ethical guidelines and procedures in such a circumstance would require him to make a determination benefiting the Insured (the *opposite* of what ultimately happened.)  *Id.* at 41:19-42:14; 48:7 – 49:14.  Had he been permitted to act as a field adjuster absent instruction from FKS and UPC, he would have written an estimate for scope of damages; the ultimate finding by UPC and FKS was something that he disagreed with.  *Id.* at 52:6 – 53:4.  The right thing wasn't done; the claim in question *should* have been covered, but wasn't.  *Id.* 73:12 – 25.  In short, UPC and FKS created a procedure that allowed them to fraudulently deny coverage to the insured.

52.     50.     Crucially, Mr. Fiocati testified that *he alone* handled **"probably say over 100"** claims effected by the instructions above.  *Id.* at 62:18 – 63:4. Furthermore, other adjusters were given the same instructions that he was given.  *Id.* at 63:2 – 4.    In fact, the instructions to avoid finding a cause of loss, and instead refer the matter to the desk adjuster for determination, applied not just to "late

reported claims," but to claims that were timely reported but reopened.  *Id.* at 63:19 – 64:4.

53.    In short, the practice was systematic, pervasive, unethical, unlawful– and fraudulent.  It involved many, many field adjusters.

54.    PLS was also susceptible to this scheme, and was induced to participate, insofar as UPC and its principals had styled themselves as potential purchasers of PLS for a substantial sum, and PLS accordingly did not want to take any actions contrary to the scheme for fear of compromising that potential deal.  PLS's principals and owners Jeff Nachgriner and Andy Corbett were the target of a pressure campaign by UPC aimed at undermining the legitimate adjusting process.

55.    Mr. Wood and Mr. Buvens, whose testimony was cited above, were each associated with PLS.

56.    Lest there be any doubt, UPC did not just instruct field adjusters with PLS or FKS to fail to perform their jobs adequately.  This practice was pervasive in the claims UPC handled throughout Florida.

57.    To wit, on January 20, 2022, field adjuster Lari Piscitelli was deposed about yet another claim handled by UPC.  *See* **Exhibit G**.  Mr. Piscitelli worked at the time for Mid-America.  He testified that he alone believed he handled some 150 – 200 claims for UPC through Mid-America.  *Id.* at 16:12-14.

58.     As with Mr. Fiocati through FKS, Mr. Piscitelli attended a meeting with UPC through Mid-America where he, and all other field adjusters with Mid-America handling any UPC claims, were instructed how *not* to document claims for UPC. ("The Mid-America Online Meeting.")  *Id.* at 17:22 – 22:17.  At that meeting and thereafter, Mr. Piscitelli and other adjusters were instructed to in fact avoid doing their jobs:

> A.     We had a meeting at night and everybody was on the meeting and it was verbally discussed.  I believe some people from UPC was there, but I can't tell you exactly who was in the meeting.  It was mostly adjusters, and it was at night and they basically said that they were going to deny everything for late reporting and not to write the word damage, say the word damage.

*Id.* at 18:23 – 19:5.

59.     Mr. Piscitelli stated that he was instructed by UPC that "[t]hey were denying everything for late reporting.  Just take pictures and send over a report."  *Id.* at 20:14-16.  Indeed this proved true:

> Q.     Okay.  So it didn't matter the circumstances.  If it was a late reported Hurricane Irma claim, you had, you know, 70% of the roof is blown off by Irma, it was going to be denied?
>
>           Mr. Dempsey:       Objection.
>
> A.     It didn't matter.

*Id.* at 24:2 – 7.

60.     Furthermore, "[e]verybody that worked UPC claims for Mid-America was in the meeting."  *Id.* at 22:1-2.  He estimated that "it would probably be

anywhere between 20 and 60 people in that room.  Mid-America is pretty good size."

*Id.* 22:13-17.  Remember that Mr. Piscittelli *alone* handled some 150 – 200 claims

for UPC through Mid-America.  *Id.* at 16:12-14.  Everybody from Mid-America

received the same instructions at that meeting from UPC.

61.     Mr. Piscittelli admitted that the practice UPC forced him and other field

adjusters to engage in was not permitted:

> Q.     Okay.  And blanketly denying claims no matter what, is that something
> that you can do as a licensed adjuster?
>
> A.     No.
>
> Q.     Okay.  And that is what UPC was doing in claims like this; correct?
>
> A.     Correct.

*Id.* at 28:12 – 18.

62.     This is not a mere dry recitation of unlawful patterns and practices with

nary a victim.  The impact upon homeowners  -- the AOB's herein and the thousands

upon thousands of homeowners affected otherwise – is profound.  Field adjusters

know this, and so the impact on field adjusters who have been forced to participate

in UPC's unlawful scheme is also profound:

> Q.     (By Mr. Tolley)  Okay.  And knowing that you would have written for
> a full roof replacement but you weren't allowed to, how did that make you
> feel?
>
> A.     I quit working daily claims because of UPC.
>
> Q.     And I kind of think its self explanatory –

A.     Thirteen years.  Thirteen years.  Thirteen years I worked claims and never had to go through this.

Q.     When you say you quit because of UPC, what about UPC made you quit?

A.     We weren't allowed to write any damages.  Everything was being denied.

Q.     And when did you quit working for UPC – or with UPC?

A.     Probably shortly after this.  I don't know the exact date that I quit.  They asked me not to leave, but I just couldn't take it anymore.

*Id.* at 34:14 – 35:4.

63.     The above scheme was pure and simple fraud upon Plaintiff (and others).  The above and additional similar violations of Florida law caused damages to SFR in the form of underpaid and unpaid claims, which should have been covered and fully paid.

64.     By the same token, Defendants wrongfully profited from the scheme to the detriment of UPC's insureds and SFR.

65.     Furthermore, Defendants' scheme repeatedly, systematically, as a matter of policy and practice, violated Fla. Stat. § 626.951 *et seq.,* including each of Fla. Stat. § 626.9541(1)(i) subsections (2), (3)(a), (3)(b), (3)(d) and (3)(f).

66.     Upon information and belief, the evidence gathered thus far by SFR is only the tip of the iceberg into this fraudulent scheme to improperly document, underpay and wrongfully deny valid claims.  SFR believes this fraud is widespread

and impacting all of Assignors' insurance policies underwritten by UPC, for which

SFR is entitled to bring this action.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION – VIOLATIONS OF <u>18 U.S.C. § 1962(c)</u>

### (Against All Defendants)

<u>Enterprise</u>

67.    SFR incorporates by reference allegations 1-66 contained in this

Complaint, as if fully set forth herein.

68.    Based on SFR's current knowledge, the following constitute one or

more groups of persons and entities associated in fact, hereinafter referred to as the

"Enterprise": Defendants UPC, FKS, PLS, and Mid-America, and other persons,

including but not limited to UPC's Claim Director Jeff Bergstrom; UPC's claims

managers Tim Cotton, Brian Maries and Trevor McDonald; and desk adjuster Josh

DeMint of FKS.

69.    Enterprise is an ongoing and continuing organization consisting of

Defendants, entities and individuals associated for the common or shared purpose of

enabling UPC to underpay and deny homeowners' claims under insurance policies

underwritten by UPC through deceptive and misleading reports and deriving profits

from those activities.

70.    Defendants, through Enterprise, have engaged in a pattern of

racketeering activity, which involves a fraudulent scheme and conspiracy to provide

the insureds with false reports for the purpose of underpaying and denying their valid claims, which should be covered and fully paid.   The collective actions of Defendants and co-conspirators are related to one another and establish a pattern of racketeering activity as they have a similar purpose, similar methods and similar victims.

71.    Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as sending false communications through channels of interstate commerce and deriving illegal profits from this scheme.

72.    Within Enterprise, there is a common communication network by which co-conspirators share information on a regular basis. The Enterprise uses this common communication network for the purpose of coordinating the activities designed to underpay and deny valid claims.

73.    Enterprise has a systematic linkage because there are contractual relationships, financial ties and continuing coordination of activities.   Through Enterprise, Defendants and other co-conspirators engage in consensual decision-making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of deriving profits from their unlawful activities.

74.    The Enterprise functions as a continuing unit with the purpose of assisting with perfecting and furthering their wrongful scheme to derive profit from

its unlawful activities.

75. While Defendants participate in and are members of Enterprise, they also have their own respective separate and distinct existence.

76. Defendants engage in unlawful activities by causing field and desk adjusters to create false reports to defraud SFR and other holders of valid claims, by underpaying and denying valid claims, and by rewarding field and desk adjusters with paying them "much more quickly," among other things.

77. At all relevant times, each participant in Enterprise was aware of the scheme to defraud SFR and other holders of valid claims for the purpose of reaping profit.

78. Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

79. UPC has directed and controlled the ongoing organization necessary to implement its scheme and illicit business practices at meetings and through communications, of most of which SFR cannot now know because all such information lies in Defendants' hands.

80. Enterprise derived income from a pattern of racketeering activity.

<u>RICO Conspiracy</u>

81. Defendants have not undertaken the practice described herein in isolation but as part of a common scheme and conspiracy.

24

82.     Defendants have engaged in a conspiracy to generate additional profits by underpaying and denying valid claims through preparation and presentation of false reports.

83.     The objects of the conspiracy are: (1) to have adjusters prepare false reports or blank reports which are then falsified regarding the causes and the extent of damage; (b) to underpay or deny valid claims by utilizing false reports; and (c) to maximize profit of Defendants.

84.     To achieve these goals, UPC instructed Adjuster Defendants PLS, FKS, and Mid-America, and field and desk adjusters to prepare false reports or blank reports which could then be falsified.

85.     Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in preparing false reports and presenting them to claimholders in order to deny or underpay valid claims.

86.     Indeed, for the conspiracy to succeed, Defendants and each co-conspirator had to agree to implement and use similar devices and fraudulent tactics against their intended targets.

87.     Many instances of common conduct, activity and similar facts evidence the presence of a conspiracy, which exists among Defendants and other co-

conspirators, including, but not limited to, agreements between and among Defendants and their co-conspirators to prepare false reports or blank reports that could be falsified and to deny or underpay valid claims based on such false reports.

88.    As a direct and proximate result of the conspiracy and Defendants' racketeering activities, SFR sustained damages.

<u>Use of the Mails and Wires</u>

89.    Defendants and co-conspirators used interstate mail and telephone to communicate with insureds and claim holders who made claims for damages pursuant to insurance policies underwritten by UPC.

90.    Defendants and co-conspirators utilized the mail and wires to perpetuate their fraud by sending communications to each other and the claim holders via U.S. Mail, commercial carrier, wire, or other interstate electronic media throughout the relevant period.

91.    Among other actions, Defendants and co-conspirators caused a text to be sent in 2020, the FKS Text, setting forth a scheme to pervasively create false reports, and followed up with a group phone call to field adjusters with FKS, and also caused an online meeting to be held, The Mid-America Online Meeting, also setting forth a scheme to pervasively create false reports, in furtherance of the conspiracy.

92.    Defendants and co-conspirators have communicated false reports by

U.S. Mail and electronic mail in furtherance of their scheme.

93.     Defendants'   and   co-conspirators'   misrepresentations,   acts   of concealment and omissions were knowing and intentional and made for the purpose of deceiving SFR and other valid claim holders.

94.     Defendants and co-conspirators either knew or recklessly disregarded that their misrepresentations and omissions in the reports were material, and that they were relied upon by SFR and other valid claim holders.

95.     Defendants engaged in racketeering activity pursuant to a scheme designed to wrongfully deny valid insurance claims following Hurricane Irma and committed mail fraud under 18 U.S.C. §1341 and wire fraud under 18 U.S.C. §1343 as part and parcel of the scheme.

WHEREFORE, SFR demands judgment against Defendants for three-fold the damages sustained by SFR, including for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under federal and Florida law, and any other and further relief this Court deems just and proper.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

### (Against UPC)

96.     SFR incorporates by reference allegations 1-66 contained in this Complaint, as if fully set forth herein.

97.     Each Assignor had a policy of insurance underwritten by UPC that was in full force and effect when the covered property was damaged by Irma.

98.     Each Assignor executed a valid AOB, assigning rights under the policy to SFR.

99.     Through the AOB, SFR is entitled to bring a breach of contract action for each policy breached by UPC by way of UPC's systematic and fraudulent underpayment and nonpayment of valid claims.

100.    SFR, and the Assignors before it, have complied with all obligations under each policy of insurance.

101.    UPC failed to comply with the policies by failing to properly and accurately investigate, inspect, adjust, document, and pay the covered claims in accordance with the policies and Florida law.

102.    UPC's breach of contract has caused damage to SFR because the claims submitted under the policies were not properly and fairly investigated, reported, adjusted, documented and paid according to the terms of the policies.  SFR is further entitled to interest, costs, and attorneys' fees.

        WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and any other and further relief this Court deems just and proper.

## THIRD CAUSE OF ACTION – FRAUD

### (Against All Defendants)

103.   SFR incorporates by reference allegations at paragraphs 1-66 contained in this Complaint, as if fully set forth herein.

104.   Defendants and their co-conspirators as a matter of policy knowingly created, or caused to be created, false adjusting reports and/or engineering reports related to claims for coverage submitted in connection with properties that suffered damage from Hurricane Irma.

105.   For example, Defendants specifically instructed adjusters creating said reports to state that certain properties had not sustained wind damage from Irma, or that damage to a property was not caused by Irma, or to abstain from documenting damages altogether so that reports could be falsified.  In reality, Defendants knew that the given properties had sustained covered loss as a result of Irma.

106.   SFR is informed and believes that this fraud was most commonly used to underpay or deny coverage for damage to roofs.  However, the full extent of Defendants' fraud is not yet known to SFR.

107.   SFR relied on Defendants' fraudulent reports and their communications based on the same, which falsely stated that the adjuster had determined a given property had not sustained a covered loss, or omitted a finding that a property had sustained a covered loss (such as omitting findings that a given roof was damages

29

by winds from Irma), in accepting less insurance proceeds than it was entitled to under the policy.

108.   The fraudulent statements and omissions by Defendants were material to SFR because they impacted coverage determinations, the scope of work performed by SFR, and SFR's decision-making process regarding pursuing a claim for coverage or not.

109.   SFR was defrauded as a result of UPC's misrepresentations and omissions, as set forth above.

110.   As a direct and proximate cause of Defendants' wrongful conduct, SFR has been damaged due to the failure of UPC to pay for covered repairs and replacement in an amount to be fully determined at trial.

WHEREFORE, SFR demands judgment against Defendants for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law, and other and further relief that this Court deems just and proper.

**FOURTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA. STAT. § 626.951 *ET SEQ.*, SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (2)**

**(Against UPC)**

111.   SFR incorporates by reference allegations 1-66 contained in this Complaint, as if fully set forth herein.

30

112.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.   Fla. Stat. § 626.951(1).

113.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).   "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.   Fla. Stat. § 626.9511(2).

114.   UPC is a "person" under the meaning of the statute.

115.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

116.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

117.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

(i)  Unfair claim settlement practices.—

2.  A material misrepresentation made to an insured or any other person having an interest in the proceeds payable under such contract or policy, for the purpose and with the intent of effecting settlement of such claims, loss, or damage under such contract or policy on less favorable terms than those provided in, and contemplated by, such contract or policy;

Fla. Stat. § 626.9541(1)(i).

118.   UPC's conduct, as described herein, meets the definition of an unfair claim settlement practice under Fla. Stat. § 626.9541(1)(i) subsection (2).

119.   UPC willfully violated the above provision.

120.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages, or otherwise leave them blank so that they could be so modified.  Mr. Buvens, Mr. Fiocati, and Mr. Piscitelli each testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that other peer field adjusters were so instructed.  Among other items, field adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-America Online Meeting.

121.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli

each testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.

122.  FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

123.  Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

124.  FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

**FIFTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ*., SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(a)**

**(Against UPC)**

125.  SFR incorporates by reference allegations 1-66 contained in this Complaint, as if fully set forth herein.

126.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.  Fla. Stat. § 626.951(1).

127.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

128.   UPC is a "person" under the meaning of the statute.

129.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

130.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

131.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

(i)  Unfair claim settlement practices.—

> 3.  Committing or performing with such frequency as to indicate a general business practice any of the following:

> a.  Failing to adopt and implement standards for the proper investigation of claims;

Fla. Stat. § 626.9541(1)(i).

132.   UPC's conduct, as described herein, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(a).

133.   UPC willfully violated the above provision of FUITPA.

134.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a flawed standard and an inherently improper investigation of claims.

135.   Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that they were so instructed to adopt and implement standards that by definition were not proper for the investigation of claims, and that this instruction effected well over a thousand claims that they alone handled, and that others were so instructed and affected. Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-America Online Meeting.

136.   Among other actions, UPC made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a flawed standard and an inherently improper investigation of claims.  Each of Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified to such changes taking place as a matter of policy.

137.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

138.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

139.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.*, SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(b)**

**(Against UPC)**

140.   SFR incorporates by reference allegations 1-66 contained in this Complaint, as if fully set forth herein.

141.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.   Fla. Stat. § 626.951(1).

142.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

143.   UPC is a "person" under the meaning of the statute.

144.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

145.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

146.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

(i)  Unfair claim settlement practices.—

3.  Committing or performing with such frequency as to indicate a general business practice any of the following:

b.  Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

Fla. Stat. § 626.9541(1)(i).

147.   UPC's conduct, as described above, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(b).

148.   UPC willfully violated the above provision of FUITPA.

149.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a misrepresentation of pertinent facts relating to the coverage at issue under the statute.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand.  Among other items,

adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-America Online Meeting.

150.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages, which as a matter of practice represented a misrepresentation of pertinent facts relating to the coverage at issue under the statute. Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.   Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-America Online Meeting.

151.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

152.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

153.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

### SEVENTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ.* SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(d)

### (Against UPC)

154.   SFR incorporates by reference allegations 1-66 contained in this Complaint, as if fully set forth herein.

155.   Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.   Fla. Stat. § 626.951(1).

156.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).   "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate

thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

157.  UPC is a "person" under the meaning of the statute.

158.  SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

159.  Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

160.  FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

> (i)  Unfair claim settlement practices.—
>
> > 3.  Committing or performing with such frequency as to indicate a general business practice any of the following:
> >
> > d.  Denying claims without conducting reasonable investigations based upon available information;

Fla. Stat. § 626.9541(1)(i).

161.  UPC's conduct, as described above, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(d).

162.  UPC willfully violated the above provision of FUITPA.

163.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to deny claims, which as a matter of practice represented a denial of claims without the conduct of reasonable investigation based upon available information.  Mr. Buvens, Mr. Fiocati, and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand.  Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-America Online Meeting.

164.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to deny claims, which as a matter of practice represented a denial of claims without the conduct of reasonable investigation based upon available information.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand.  Among other items, adjusters were so instructed by the FKS text, a subsequent phone call, and The Mid-America Online Meeting.

165.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

166. Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

167. FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

**EIGHTH CAUSE OF ACTION – VIOLATION OF FLORIDA UNFAIR INSURANCE TRADE PRACTICE ACT, FLA STAT. § 626.951 *ET SEQ*., SPECIFICALLY FLA. STAT. § 626.9541(1)(i) subsection (3)(f)**

**(Against UPC)**

168. SFR incorporates by reference allegations 1-66 contained in this Complaint, as if fully set forth herein.

169. Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq.* was enacted to regulate the business of insurance in the state and define such practices in the state which constitute unfair methods of competition or unfair or deceptive acts or practices, and prohibit such practices.  Fla. Stat. § 626.951(1).

170.   FUITPA defines "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyds insurer, fraternal benefit society, or business trust or any entity involved in the business of insurance." Fla. Stat. § 626.9511(1).  "Insurance policy" or "insurance contract" means a written contract of, or a written agreement for or effecting, insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.  Fla. Stat. § 626.9511(2).

171.   UPC is a "person" under the meaning of the statute.

172.   SFR is the assignee-in-interest for each insurance policy for every Assignor identified in Exhibit B.

173.   Florida law permits SFR to enforce all statutory, common law, and contractual remedies that would otherwise be available to the policyholder through a valid AOB.

174.   FUITPA definition of an unfair method of competition and unfair or deceptive acts or practice includes, but is not limited to:

    (i)  Unfair claim settlement practices.—

        3.  Committing or performing with such frequency as to indicate a general business practice any of the following:

        f.  Failing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement;

Fla. Stat. § 626.9541(1)(i).

175.   UPC's conduct, as described above, meets the definition of an unfair method of competition and unfair or deceptive act under Fla. Stat. § 626.9541(1)(i) subsection (3)(f).

176.   UPC willfully violated the above provision of FUITPA.

177.   Among other actions, UPC made it a practice to instruct field adjusters to modify their reports to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to manufacture a flawed and unreasonable explanation for its denial of claims and offers of compromise settlement, which as a matter of practice violated the above provision of FUITPA.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.

178.   Among other actions, UPC also made it a practice to change field adjuster reports without the knowledge of field adjusters to materially misrepresent the nature, scope, and scale of damages (including by omission) so as to manufacture a flawed and unreasonable explanation for its denial of claims and offers of compromise settlement, which as a matter of practice violated the above provision of FUITPA.  Mr. Buvens, Mr. Fiocati and Mr. Piscitelli testified that this happened

as a matter of policy in claims that they handled, and the claims that they handled exceeded a thousand, and that others were so instructed and affected.

179.   FUITPA provides that any person who violates any provision may be fined up to $40,000 for each willful violation, up to an aggregate amount of $200,000 for all willful violations arising out of the same action.  Fla. Stat. § 626.9521(2).

180.   Each report that was modified by UPC or at UPC's instruction to add false information or to omit material information impacting valuation and denials of claims constitutes a separate action under FUITPA.

181.   FUITPA provides that any remedy under that Act is cumulative to rights under the general civil and common law.  Fla. Stat. § 626.9631.

WHEREFORE, SFR demands judgment against UPC for the value of a proper and accurate adjustment, all covered losses with interest on overdue payments, costs, and attorneys' fees owed under Florida law including F.S. 627.428 et seq., and other and further relief this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff SFR hereby demands a jury trial on all issues so triable.

Respectfully submitted,

**LAW OFFICE OF ROBERT N. PELIER, P.A**

By:  /s/ Robert N. Pelier
       Robert N. Pelier, Esq.
       F.B.N.: 0998834

4649 Ponce De Leon Blvd,
   Suite 301
Coral Gables, FL  33146
305-529-9199
RPelier@pelierlaw.com

**KUTAK ROCK LLP**

Oliver D. Griffin, Esq. (*Pro Hac Vice Pending*)  CO Bar No. 52292
1801 California Street
Suite 3000
Denver, CO  80202
(303) 297-2400
oliver.griffin@kutakrock.com

Peter N. Kessler, Esq. (*Pro Hac Vice Pending*)  PA Bar No. 209033
1760 Market Street
Suite 1100
Philadelphia, PA  19103
(215) 299-4384
peter.kessler@kutakrock.com

Anna S. Forman, Esq. (*Pro Hac Vice Pending*) NE Bar No. 25756
1650 Farnam Street
Omaha, NE 68102
(402) 346-6000
anna.forman@kutakrock.com

Jeffrey M. Giancana, Esq. (*Pro Hac Vice*) AZ Bar No. 035031
8601 North Scottsdale Road
Suite 300
Scottsdale, AZ 85253
(480) 429-5000
jeffrey.giancana@kutakrock.com

**EXHIBIT "A"**

**SFR**

SOUTHERN FLORIDA
RESTORATION

**THE FOLLOWING TERMS ON BOTH SIDES ARE AGREED TO BY THE CUSTOMER & SFR SERVICES LLC (CGC#1528824 & CCC#1332477) MUST BE SIGNED BY ALL POLICYHOLDERS**

Insurance: _____   Claim: _____

Adjuster Info: _____

Accepted by: _____   Printed Name: _____   Date: _____

Accepted by: _____   Printed Name: _____   Date: _____

Email:_____   Email: _____

Street/City/ST/ZIP:_____

Phone (home): _____   (cell): _____   Mortgage: _____

Questions can be directed to your SFR representative(Signature/Phone):_____

I, the owner of the above property, authorize SFR Services, to enter my property and provide all services and furnish all materials neces-sary to preserve and protect my property from further damage. Additionally, in consideration for these repairs and SFR Services' promise to provide all work approved or paid for by my insurance company, I agree to assign my insurance benefits to SFR Services, subject to the terms and conditions in this contract. This Assignment of Benefits is effective on the date last signed ("Effective Date"), between the undersigned customer(s) ("Customer") and SFR Services, LLC ("Company") (collectively, "Parties"), subject to the terms and conditions herein:

**AUTHORIZATION/ACCESS:** Customer authorizes Company to enter property described herein ("Property"), furnish materials, supply all equipment, and perform all labor necessary to preserve and protect the Property. Customer hereby assigns Customer's insurance claim ("Claim") to Company in consideration for Company completing the scope of work approved or otherwise paid for by Customer's insurance company ("Carrier") under Customer's insurance policy(ies) covering the Property ("Policy"). Customer is responsible for any interruption of the Services (and any related damages or claims) caused by Customer's failure or refusal to provide such access. Customer shall, within 30 days of the Carrier approving or otherwise paying for the Claim, select the specific materials and colors to be provided by Company, as limited by the Carrier's payment and/or approval of same.

**ASSIGNMENT OF BENEFITS:** Customer assigns all insurance rights, benefits, proceeds, claims, causes of action, and supplementary claims under all applicable insurance policies (collectively, "Benefits") to Company for the Services rendered or to be rendered by Company. Company will provide all labor and materials for the scope of work approved by or paid for by Carrier (collectively, "Services"). Company shall commence provision of the Services within 36 months of the Effective Date ("Commencement Date"). Customer directs Carrier to release all information requested by Company, its representatives, and Company's attorney to obtain the Benefits from Carrier. Customer hereby authorizes and unequivocally directs Carrier to deliver any and all payments related to the Claim solely to Company, and any and all check(s) to be made payable jointly to the Parties.  Company must provide a copy of this Agreement to the Carrier within 3 business days after the date this Agreement is executed or the date on which work begins, whichever is earlier.

**PAYMENT:** Customer's only out-of-pocket obligations are Customer's deductible, any betterment ordered and performed approved by Customer, and any contracted work performed before this Agreement's rescission (collectively, "Customer's Obligations"). Payment terms are net-30 days to Company after Customer receives a check. Without limiting Company's rights herein, Customer agrees to pay or disburse money received from the Carrier or schedule mortgage inspections in accordance with the percentage of Company's work completed at the Property, and Company may stop work if Customer does not schedule inspections or pay or disburse such monies within 7 days of receiving such request. Customer shall pay all of Company's attorney's fees and costs incurred by Company in connection with collecting any amounts due which are related to  Customer's Obligations. Company is hereby appointed as Limited Power of Attorney for the sole purpose of giving Company the power to endorse and deposit in its account any insurance or mortgage company check received as payment for authorized services which has both the Customer(s) and Company as payees. The power of attorney coupled with an interest is given as security for payment of services rendered by Company.

**WARRANTY:** Contingent upon full and timely payment of all amounts due, Company warrants all workmanship covered by this Agree-ment for two years from the earlier of (i) the date Company ceases work on the Property, or (ii) the date Company's building permit is closed (either, the "Termination Date"). To make a warranty claim, Customer must file a warranty claim directly with Company within 7 days of the cause of the claim. Company shall not be responsible for any repairs caused by or made more costly by Customer's failure to provide prompt notice of same. Upon receipt of warranty claim, Company shall be entitled, but not required, to inspect the Property (which inspection may take up to 10 business days) and otherwise investigate the warranty claim. Customer shall fully cooperate with such investigation, including without limitation, providing all requested documents, giving oral and written statements, and allowing

inspection of the Property. All warranty work must be completed by Company or third parties authorized by Company. Any work performed without Company's authorization nullifies all warranty claims related to such work.

**LIMITATION:** Company is not responsible for damage caused by the acts or omissions of other parties, trades, or contractors, lightning, winds of 50+ mph, hail storms, hurricanes, tornadoes, floods, earthquakes, or other unusual phenomena of the elements; structural settlement; failure, movement, cracking or excess deflection of the roof deck; defects or failure of materials used as a roof substrate over which Company's roofing material is applied; faulty condition of parapet walls, copings, chimneys, skylights, vents, supports, or other parts of the Property; vapor condensation beneath the roof; penetrations for pitch boxes; erosion, cracking and porosity of mortar and brick; dry rot; stoppage of roof drains and gutters; penetrations of the roof from beneath by rising fasteners of any type; inadequate drainage, slope or other conditions beyond Company's control which cause ponding or standing water; any events that would be insured against in the Policy; termites or other insects, rodents, or other animals; or fire. If Customer's roof fails to maintain a watertight condition because of damage by reason of any of the foregoing, Company's warranty shall immediately become null and void unless such damage is repaired by Company, as recommended by Company, at Customer's expense. Company shall not be responsible for any damage resulting from vibrations, including without limitation interior drywall damage, nail pops, or disconnection of chimneys, flues, air ducts, ventilation shafts, exhaust vents, furnace vents, or sewer vents. Company is not responsible for damage arising from delay due to inclement weather, strikes, fires, accidents, delays in shipments or delivery of materials, or any causes beyond Company's control. Customer agrees that Company does not warrant workmanship or materials not provided by Company and is not responsible for latent defects in materials, nor for rework required as a result of the acts of others.

**PERSONAL PROPERTY:** Company shall not be responsible for protection of the Property, except to provide that protection which is specifically called for under the specifications provided by this Agreement. Customer shall remove, store and protect Customer's personal property during Company's work. All work shall be completed in a workmanlike manner, according to standard industry practices. The Services are subject to change upon discovery of hidden defects.

**MISC:** Company agrees to indemnify and hold harmless Customer from all liabilities, damages, losses, and costs, including, but not limited to, attorney fees, should the Policy subject to this Agreement prohibit, in whole or in part, the assignment of benefits. Customer hereby indemnifies and holds Company harmless for all harm related to or caused by Customer's failure or refusal to allow Company to provide Company's recommended services or to follow Company's recommended procedures. If any portion hereof is held to be invalid or unenforceable by a court of competent jurisdiction, the Parties agree that such term shall be reformed as necessary to make such term valid and enforceable while adhering as closely as possible to the original term and further agree that the remaining terms hereof shall remain in full force and effect. The Parties further waive the right to claim that they were induced to enter into this Agreement by anything except the terms hereof. This is the entire agreement between the Parties and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties. Company is hereby appointed as Limited Power of Attorney for the purpose of giving Company the power to hire an attorney, public adjuster, or other entities deemed necessary in the resolution of the entire claim. You have the right to cancel this agreement without penalty or fee within 14 days after the date this agreement is executed, at least 30 days after the date work on the property is scheduled to commence if the assignee has not substantially performed, or at least 30 days after the execution of the agreement if the agreement does not contain a commencement date and the assignee has not begun substantial work on the property.

**YOU ARE AGREEING TO GIVE UP CERTAIN RIGHTS YOU HAVE UNDER YOUR INSURANCE POLICY TO A THIRD PARTY, WHICH MAY RESULT IN LITIGATION AGAINST YOUR INSURER. PLEASE READ AND UNDERSTAND BOTH SIDES OF THIS DOCUMENT BEFORE SIGNING IT. YOU HAVE THE RIGHT TO CANCEL THIS AGREEMENT WITHOUT PENALTY WITHIN 14 DAYS AFTER THE DATE THIS AGREEMENT IS EXECUTED, AT LEAST 30 DAYS AFTER THE DATE WORK ON THE PROPERTY IS SCHEDULED TO COMMENCE IF THE ASSIGNEE HAS NOT SUBSTANTIALLY PERFORMED, OR AT LEAST 30 DAYS AFTER THE EXECUTION OF THE AGREEMENT IF THE AGREEMENT DOES NOT CONTAIN A COMMENCEMENT DATE AND THE ASSIGNEE HAS NOT BEGUN SUBSTANTIAL WORK ON THE PROPERTY. HOWEVER, YOU ARE OBLIGATED FOR PAYMENT OF ANY CONTRACTED WORK PERFORMED BEFORE THE AGREEMENT IS RESCINDED. THIS AGREEMENT DOES NOT CHANGE YOUR OBLIGATION TO PERFORM THE DUTIES REQUIRED UNDER YOUR PROPERTY INSURANCE POLICY.**

**EXHIBIT "B"**

| First Name | Last Name | Address Line | City | Ins Carrier | Case # | Claim # | Desk Adjuster Name | Field Adjuster Name | Carrier Engineer | Date Of Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Spring Bay Villas Condominium | Maui | 1604 Spring Bay Cove | Orlando | American Coastal | 2020-CA-8634 | 4148196 | Tracy Melnick | Kevin Bryant | | 9/10/2017 |
| Tropic | | 1500 Eagle Ridge Drive | Fort Myers | American Coastal | 21-CA-631 | 4143129 | Sharon Blow | Frank Shortt | | 9/10/2017 |
| Tina | Terrace | 1100, 1200 Tropic Terrace | North Fort Myers | American Coastal | 21-CA-003183 | 4145589 | Helen Singletary | TBD | | 9/10/2017 |
| Muhammad & Nisreen | Tina | 1300 OAK BEND WAY | WELLINGTON | UPC | 2019-CA-005600 | 2018FL137729 | Cassandra Messmore | Demetri Michelen | | 9/20/2017 |
| Joseph & Kathleen | Broussau | 2912 Country Golf Dr | Wellington | UPC | 50-2019-CA-013204-XXXX-MB **UPDATED** | 2018FL225863 | bridgette Williams | Danny Schirmer | | 9/10/2017 |
| Muhammad & Nisreen | Tina | 4190 BAHIA ISLE CIR | WELLINGTON | UPC | 2019-CA-008107 | 2018FL137728 | Ashley Falconer | Charlie Fisher | | 9/10/2017 |
| Ashley | Martin | 7512 Cameron Circle | Estero | UPC | 21CA001871 | 20FL00094945 | Josephine Burdett | Kevin Wisnieski | | 9/10/2017 |
| Brian & Leslie | Card & Blaskie | 20462 Larino Loop | Estero | UPC | 21-CA-002723 | 20FL00037340 | Jeff Fontenakis | David Benson | | 9/10/2017 |
| Sean & Jennifer | Conner-Gosling | 1623 SW 30th ST. | Cape Coral | UPC | 21CA001882 | 20FL00035233 | Tony Thompson | TBD | N/A | 12/20/2018 |
| Mark/Helen | Steinberg | 3921 SE 22ND PL | Cape Coral | UPC | 21CA001499 | 20FL00020647 | Denise Caraker | tbd | | 9/10/2017 |
| David | Roberts | 22561 Glenview Ln | Bonita Springs | UPC | 20171CA045401 | 2017FL134401 | Marissa Parvis | TBD | | 9/10/2017 |
| Allan | Crull | 832 Commerans Circle | Venice | UPC | 2020 CA 004928 NC | 20FL00031055 | Denise Caraker | TBD | | 10/19/2019 |
| | Theresias | 20628 East Silver Palm Dr | Estero | UPC | 20CA008375 | 19FL00004832 | Marsha Sanders | Niles Wood | | 12/20/2018 |
| Kenneth and Bonnie | Lytton | 5557 Seagrass Dr | Venice | UPC | 2020 CA 004832 NC | 20FL00025394 | Josephine Burdett | Julia Harkins | | 9/10/2017 |
| Joseph and Keira | Collins | 4873 Hanover Ridge Dr. | Sarasota | UPC | 2020CA005951 | 20FL00018278 | William Sanders | TBD | US Forensic | 12/20/2018 |
| Nicklous | Coleman | 1117 Deardon Dr | Venice | UPC | 2021 CA 000653 NC | 20FL00016278 | Cecilia Gillispie | TBD | | 9/10/2017 |
| Cory Andrews & | Lucia Issa | 11087 Carolina Willow Drive | Fort Myers | UPC | 20-CA-007323 | 20FL00002204 | Cecilia Paige Gillispie | TBD | TBD | 9/10/2017 |
| Joseph | Dearden | 7766 Cameron Circle | Fort Myers | UPC | 21-CA-003614 | (New) 20FL000653 / (Old) 2019CA002... | Buddy Decando | | | 9/10/2017 |
| Sandy & Louis | Lane | 1756 Queen Palm | North Port | UPC | 2019 CA 002705 NC | 2019FL120594 | Donna Campbell | Ryan Rifer | | 9/11/2017 |
| Laura | Rogers | 10360 SE Terrapin Place | Tequesta | UPC | 1900048QCAAXXX | 2018FL131762 | Kelly Humphrey | Austin Chappell | | 4/24/2018 |
| David | Ribeiro | 19661 DIAMOND LAKE Cir | Boca Raton | UPC | 50-2021-CA-003563-XXX-M | 2018FL038564 | Cecilia Paige Gillispie | | | 9/10/2017 |
| Douglas and Patricia | Abde | 3316 Meadow Run Cir | Venice | UPC | 2020-CA-004752 NC | 20FL00016621 | Denise Caraker | TBD | tba | 9/10/2017 |
| Douglas | McLeod | 2457 SW Heronwood Rd. | Palm City | UPC | 19-CA-000818 | 2018FL032724 | Sherry Mays | tbd | | 9/10/2017 |
| John | Malatti | 25 SW 191st Ave | Pembroke Pines | UPC | CACE21000655 | 20FL025974 | Denise Caraker | TBD | | 4/30/2020 |
| Doug | Socha | 4272 N Magnolia Cir | Delray Beach | UPC | 50200 1CA00547B | 20FL025656 | April Crawford | TBD | | 9/10/2017 |
| Margaret & Christopher | Locke | 21691 Red Latan Way | Estero | UPC | 20-CA-007531 | 19FL00008332 | Denise Caraker | Ted Foccati | tbd | 9/10/2017 |
| Theodore & Theresa | Kudinski | 2968 SE Racoon Way | Stuart | UPC | 2019-CA-000097 | 2019FL121840 | Tina Bordelon | Emilio Perez | | 9/10/2017 |
| James and Lynn | Strojan | 316 Wild Pine Way | Naples | UPC | 2019-CA-000633 NC | 2015CA000661 | Tina Crawford | TBD | | 9/10/2017 |
| Asensio | Amundarian | 10332 Sundream Ln | Boca Raton | UPC | 2019-CA-006285 | 2018FL137293 | Jahira Arroyo | tba | | 9/10/2017 |
| Mark & Leayne | Ehle | 38 REVER DR | TEQUESTA | UPC | 2019FL125338 | 2019FL125338 | Dave Wolitzky | tba | | 4/24/2018 |
| | Bucci Puleo | 7807 Cameron Circle | Fort Myers | UPC | 21-CA-003665 | 20FL00008965 | April Crawford SR adjuster S | Niles Wood | | 9/10/2017 |
| Myrna & Gregg | Evans | 17584 Old Harmony Drive | Estero | UPC | 21-CA-002784 | 20FL00025974 | Destinee Snell | TBD | TBD | 9/10/2017 |
| Mary & Donald | Harris | 8917 Cascades Isle Blvd | Estero | UPC | 21-CA-002789 | 20FL00008965 | Greg Foster | TBD | | 9/10/2017 |
| Ulrich and Rosalie | Isell | 7977 Megan Hammock Way | Naples | UPC | 11-2020-CA-002125 NC | 20FL009814 | Geoff Boswell | Ludwig Blake | | 9/10/2017 |
| Richard & Susa | Geier | 527 Cypress Green Circle | Wellington | UPC | 2021-CA-005969 | 20FL00061989 | Buddy Decando | | tbd | 12/20/2018 |
| Annette | Paul | 516 NW Pine Way | Estero | UPC | 20-CA-007257 | 20FL00028533 | Susan Gallagher | n | SDI | 9/10/2017 |
| Kurt & Wendy | Kidsvatter | 20412 Larino Loop | Estero | UPC | 20-CA-002750 | 20FL000029919 New 2C... | April Crawford | | | 9/10/2017 |
| Jacqueline | Barrett | 8852 Huntington Pointe Cir | Sarasota | UPC | 2021 CA 002159 NC | 20FL127293 | April Crawford | tba | | 9/10/2017 |
| Neil & Diana | Barnhart | 5026 Seagrass Dr | Venice | UPC | 2021 CA 004917 NC | 20FL002728 | Cecilia Paige Gillispie | TBD | | 9/10/2017 |
| Cynthia & David | Vandeveide | 12480 Eagle Pointe Cir | Cape Coral | UPC | 21-CA-003693 | 20FL00035334 | Josephine Burdett | Kenny Jarvis | | 9/10/2017 |
| Patricia | Greenaway | 1940 Isla De Palma Cir | Naples | UPC | 21-CA-002842 | 19FL00006867 | Denise Caraker | | | 9/10/2017 |
| Thomas & Janet | Conner-Gosling | 747 Provincetown Dr | Boca Raton | UPC | 11-2020-CA-003010 | 20FL00050579 | Cindy Ralson | tbd | | 9/10/2017 |
| Sean & Jennifer | Le | 2637 Lambay Ct. | Cape Coral | UPC | 21-CA-001234 | 20FL00008533 | Edwin Franco | TBD | SDI | 9/10/2017 |
| Khang | Zlamba/Preisig | 18907 McGrath Cir | Naples | UPC | 21000744CA | 20FL230754 | Edwin Franco | | | 6/25/2019 |
| Richard/Christina | Schafi | 1517 Sea Breeze Cove Cir | Fort Myers | UPC | 21-CA-002771 | 20FL121754 | Cecilia Paige Gillispie | Niles Woods | Rimkus | 9/10/2017 |
| Joseph Cynthia | | 21165 SW Bevil St. | Cape Coral | UPC | 21-CA-005027-XXXX-M | 20FL124254 | Steve Grasso | | Rimkus | 12/20/2018 |
| Michelle | Brandt | 4231 SW 13th Ave | Cape Coral | UPC | 21CA001872 | 20FL125045 | Erica Marsh | | | 9/10/2017 |
| Greg/Lori | Hannah | 17714 Courtside Landings Cir | Punta Gorda | UPC | 20-CA-005759 | 19FL00010131 | Denise Caraker | Ryan Bird | | 9/10/2017 |
| Ronald & Donna | Welsh | 2013 Cheetah Lane | Fort Myers | UPC | 20-CA-002271 | 20FL00057300 | Steve Grasso | | | 9/10/2017 |
| Wayne & Lisa Mae | Warchol | 698 Lakewoode Dr | Bonita Springs | UPC | 2021 CA 001281 NC | 20FL00030410 | Colett Evans | | | 9/10/2017 |
| Christopher | Besse | 23643 Via Carino Ln | Bonita Springs | UPC | 14-CA-005491 | 2019FL123536 | Cindy Ralson | n | | 12/26/2018 |
| Walter & Kimberly | Funk (Wendy Funk (Halbert)) | 2673 Blue Cypress Lake Ct. | Wellington | UPC | 21-CA-002756 | 20FL00060949 | Tanner Van Dalsen | | Hancock Claims Consultant | 9/10/2017 |
| Craig | Stopman | 2927 Brecon Lake Dr | Naples | UPC | 2020-CA-005403 NC | 20FL00037629 | Tai Nguyen | | | 9/10/2017 |
| Richard & Regina | Young | 4158 Bahia Isle Circle | Wellington | UPC | 50-2021-CA-005715-XXXX-M | 20FL00037629 | Michael Davis | Madison Durow | | 9/10/2017 |
| Cheryl | Henry | 5077 Seagrass Dr | Venice | UPC | 2020 CA 005362 NC | 20FL00031784 | Denise Caraker | | SDI Global | 9/10/2017 |
| Harry Shirley | Tesoriero | 14072 Venanzio Loop | Bonita Springs | UPC | 20-CA-00519 | 19FL00007543 | Denise Caraker | | | 9/10/2017 |
| John & Tina | | 9042 Prosperity Way | Fort Myers | UPC | 20-CA-005285 | 20FL00058265 | Denise Caraker | Ryan Pate | SDI | 9/10/2017 |
| Lorraine & Jerry | | 6793 Sun River Rd | Boynton Beach | UPC | 50-2021-CA-005277-XXXX-M | 20FL00082069 | Sheena Gomes | N/A | N/A | 9/10/2017 |
| Leon | Hackshaw | 12144 Osado Pines Rd | Boynton Beach | UPC | 2019-CA-000184 | 20FL00009692 | Joshua Barrett | George Small | tba | 9/10/2017 |
| Klaus | Hemmert | 11096 Batello Drive | Venice | UPC | 2021 CA 002191 NC | 20FL00056892 | Abby Pursley | tbd | | 9/10/2017 |
| Jamie and Jody | Nolen | 11561 Plantation Preserve Cir. | Fort Myers | UPC | 21CA002588 | 20FL00061110 | Christopher "Topher" McGill | TBD | | 9/10/2017 |
| William And Mary | Keefer | 23688 Stonytriver Pl | Estero | UPC | 20-CA-00617 | 19FL00011150 | April Crawford | Ted Foccati | | 9/10/2017 |
| David & Kelly | Young | 9446 Golden Rain Lane | Estero | UPC | 21-CA-002788 | 20FL00066951 | Abby Pursley | | | 9/10/2017 |
| Matthew & Lisa | Dulay | 5079 Winter Rose Way | Venice | UPC | 2021 CA 001347 NC | 20FL00006623 | Dominika Van Zandt | n | | 9/10/2017 |
| Sandra | Tricu | 10253 Southwest Palm Lakes Circle | Estero | UPC | 21-CA-002294 | 20FL00048551 | Josephine Burdett | n | | 12/20/2018 |
| James & Caroline | Manger | 3323 SE 18th Ave | Cape Coral | UPC | 210003912A | 20FL00057601 | Michael Davis | TBD | TBD | 9/10/2017 |
| Mike | Meylis | 3248 Village Ln | Port Charlotte | UPC | 11-2020-CA-001241-001-XX | 2010039JCA | Angela Crowell | Todd Saarinen/Niles Wood | | 9/10/2017 |
| Steve & Dominique | Phillips & Lempeled | 1616 Candlelit Lakes Circle | Naples | UPC | 2021-CA-001227 NC | 20FL00025561 | Josephine Burdett | | | 9/10/2017 |
| Susan | Bunting | 2876 Graceland Dr | Sarasota | UPC | 20-CA-00275CA | 20FL00025891 | Michael Davis | | | 9/10/2017 |
| Thomas & Marilyn | Hall | 20170 Rookery Drive | Estero | UPC | 20-CA-002873 | 20FL00047652 | Denise Caraker | | | 9/10/2017 |
| Evan & Debbie | Mossberger | 11071 Sierna Palm Ct. | Fort Myers | UPC | 20-CA-006381 | 19FL00011881 | Denise Caraker | TBD | | 9/10/2017 |

| First Name | Last Name | Address Line | City | Claim # | Case # | Ins Carrier | Field Adjuster Name | Desk Adjuster Name | Carrier Engineer | Date Of Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Eliaz | Zimmer | 3492 Clubview Dr. | North Fort Myers | 20FL00031644 | 21CA001952 | UPC | | Josephine Burdett | TBD | 9/10/2017 |
| Peter & Denise | Kincaid | 9901 Marinaid Dr. | Fort Myers | 20FL00011647 | 20-CA-007557 | UPC | Lari Petscittle | Denise Caraker | | 9/10/2017 |
| Karen | Winterle | 3472 Sabal Springs Blvd. | North Fort Myers | 2017FL036783 | 20-CA-008463 | UPC | TBD | Denise Caraker | SDii | 9/10/2017 |
| Norma & Thomas | Schwaberland & Giovanetti | 6829 Sun River Rd | Boynton Beach | 20FL00092983 NEW | OLD 21-CA-008910 | UPC | na | Teresa Paul | | 4/26/2020 |
| Bashar Daoud | Corley | 5209 Seagull Ct | Cape Coral | 20FL00009166 | 2021-CA-003379 | UPC | n/a | Susan Gallagher | | 10/16/2019 |
| Xie | Giuseppe Battaglia | 14125 Collier Blvd. | Naples | 20FL00093910 | 11-2021-CA-001265-0001-XX UPC | | n | Tiffany Campbell | | 12/20/2018 |
| Alden | Xie | 120 Spoonbill Ct | Jupiter | 19FL00005474 | 20-CA-010910 | UPC | Austin Chappell | Denise Caraker | | 9/10/2017 |
| Robert & Stacy | McGee | 20053 Serene Meadow Ln | Estero | 20FL00027371 | 20-CA-001889 | UPC | TBD | Cecilia Paige Gillispie | TBD | 10/16/2019 |
| William & Donna | Royal | 226 SE 47th St | Cape Coral | 20FL00037495 | 20-CA-001824 | UPC | TBD | Lizette Harpold | | 6/22/2020 |
| Paul & Rita | Hickman | 27191 Driftwood Dr | Bonita Springs | 20FL00018564 | 21CA003231 | UPC | Steven Winalis | Denise Caraker | | 9/10/2017 |
| David/Michelle | Brezski | 23640 Via Carino Ln | Bonita Springs | 20FL00034564 | 20-CA-003831 | UPC | Ted Fiocatti | Chris Merritt (WA) | | 9/10/2017 |
| Michael & Jennifer | Berry | 1108 Islamorada Blvd | Punta Gorda | 20FL00016240 | 20-CA-007534 | UPC | Justin McKey | Christopher Merritt | | 9/10/2017 |
| Bernadette | Brody | 8379 SW Bent Oak Ct | Stuart | 2019FL221653 | 2019-CA-002721 | UPC | | Sherry Mayes | | 12/29/2018 |
| Anthony / Cindy | Cutting | 4166 Bahia Isle Circle | Wellington | 20FL00022271 | 50-2020-CA-002062-XXXX-M UPC | | tbd | Marci Mills | | 9/10/2017 |
| David | Farina | 2125 Sonoma Dr E | Sarasota | 2019FL062483 | 21-CA-000071 NC | TBD | | Teresa Paul | SDii | 9/10/2017 |
| Duane | Hill | 5061 Seagrass Dr | Venice | 2019FL061977 | 2021 CA 001617 NC | TBD | TBD | Susan Gallagher | | 9/10/2017 |
| Regis | Deane | 11610 Landing Place | North Palm Beach | 20FL00035513 | 50-2020-CA-014100-XXXX-M UPC | | tbd | Abby Pursley | | 9/10/2017 |
| Christopher & Amanda | Rapp | 1710 Cottonwood Trl | Sarasota | 20FL00036638 | 2021 CA 000911 NC | TBD | tbd | Buddy Saucedo | SDii | 9/10/2017 |
| Timothy | Hoover | 9843 Gladiolus Bulb Loop | Fort Myers | 20FL00062094 | 21-CA-002721 | UPC | tbd | Margaret "Marci" Mills | | 9/10/2017 |
| Sean & Piera | Mattak | 11475 Sundance Ln | Boca Raton | 2019FL121144 | 2019-CA-006206 | UPC | tba | Michael Franzi | SDii | 9/10/2017 |
| Trang | Gonzalez | 88 Allworthy St | Port Charlotte | 20FL00038438 | 21-CA001862A | UPC | Dave Benson | Joebic Jenkins | | 4/20/2020 |
| Larry and Elizabeth | Nguyen | 14595 Indigo Lakes Cir | Naples | 20FL00040461 | 11-2021-CA-001225-0001-XX UPC | | Daniel Reese | Sonya Paducch | | 10/19/2019 |
| Richard and Carole | Shook | 2948 Jeff Myers Circle | Sarasota | 2019FL132701 | 2020-CA-000406NC | UPC | TBD | Clint Sanders | | 12/26/2018 |
| Robert & Debra | CASTEEL | 17177 COURT SIDE LANDINGS CIR | Punta Gorda | 20FL00043461 | 20-CA-002115 NC | UPC | TBD | Christopher "Topher" McGill | SDii | 10/16/2019 |
| Jeffrey | Fulton | 20020 Larino Loop | Estero | 20FL00045306 | 21CA002539 | UPC | Ted Fiocatti | Veronica Lewis | | 9/10/2017 |
| Thomas | Miller | 4452 SW La Paloma Dr | Palm City | 19FL00029985 | 19000830CAAXMX | UPC | TBD | Richard Coords | | 9/10/2017 |
| Paul | Burke | 5665 Riviera Court | North Port | 20FL00022443 | 2021-CA-002115 NC | UPC | TBD | Veronica Lewis | | 9/10/2017 |
| Anders | Sapp | 12200 Honeysuckle Rd | Fort Myers | 20FL00040460 | 21CA00727 | UPC | | Steve Gratsch | | 9/10/2017 |
| PAUL & KATHLEEN | Manson | 523 SW 53RD TERRACE | Cape Coral | 19FL00002985 | 20-CA001110 | UPC | | Dominika VanZandt | | 9/10/2017 |
| Ralph & Carolyn | CARBONARO | 9600 FALCONER WAY | Wellington | 20FL00022443 | 2019-CA-004504 | UPC | | Tyra Smith | | 9/10/2017 |
| Christine | Cholewinski | 8027 Kiawah Trace | Port Saint Lucie | 20FL00006398 | 2020CA001398 | UPC | Lindsay Masterson | George Small | Rimkus | 9/10/2017 |
| Albert | Tokarski | 8231 White Rock Cir | Boynton Beach | 20FL00027098 | 50-2020-CA-012253-XXXX-M UPC | | tbd | Cecilia Gillispie | tbd | 9/10/2017 |
| Carolyn | Borchetta | 7346 Marsh Terrace | Port Saint Lucie | 20FL00011269 | 2020CA001554 | UPC | B.L. | Cecilia Gillispie | | 9/10/2017 |
| Monique | Winzkel | 2635 Sunrise Rd | North Port | 20FL00044225 | 2021CA000128 | UPC | TBD | Josephine Burdett | | 9/10/2017 |
| Jacquemae | Bain | 1739 Vestal Way | Venice | 2019FL223949 | 20FL00012360 NC | UPC | Gary Carmichael | Larry | tnd | 9/10/2017 |
| Deborah | Dannally | 3551 Royal Palm Drive | North Port | 2019FL003529 | 2020 CA 004919 NC | UPC | na | Larry | tbd | 9/10/2017 |
| Charles & Deborah | Kuzdz | 6091 Sun Rose Rd | North Port | 20FL00044225 | 2020 CA 000836 | UPC | bd | Stan | | 9/10/2017 |
| Guy / Janet | Caffarelli | 11127 Yellow Poplar Dr | Estero | 20FL00022197 | 21CA002175 | UPC | tbd | Shawna Gomes | TBD | 4/25/2020 |
| Mary Beth & Stephen | Khobb | 10563 Avonview Dr | Tampa | 2019FL006687 | 20-CA-006697 | UPC | tbd | Abby Pursley | | 9/10/2017 |
| Mark and Margaret | Hofer | 9780 Mainsail Ct | Fort Myers | 20FL00011833 | 20-CA-006895 | UPC | tbd | Sheena Gomes | | 9/10/2017 |
| Catherine | Gast / Lopez | 4279 NW 57th Dr | | 2019FL30376 | 21CA002176 | UPC | n | Josephine Burdett | | 9/10/2017 |
| Lori / Levi | Peterson | 19380 LA SERENA DR | Fort Myers | 19FL00011833 | 20-CA-006895 | UPC | tbd | Cecilia Paige Gillispie | Rimkus | 9/10/2017 |
| Murray & Charlotte | Guidas & Bonetta | 22220 Rookery Drive | Estero | 20FL00016885 | 21CA002175 | UPC | tbd | Marina Pyrris | fbd | 9/10/2017 |
| Gregory & Kim | Meikle | 2624 SW Bear Paw Trail | Palm City | 2018FL136698 | 2019-CA-000604 | UPC | TBD | Victoria Snovel | | 12/26/2018 |
| Roland & Paula | Rosa | 12239 Callaway Gardens Rd | Boynton Beach | 20FL00061352 | 21-CA-005817 | UPC | TBD | Cecilia Paige Gillispie | | 4/5/2019 |
| Ronald & Donalee | (Mozart) formerly Carr / Koch | 1813 Creekside View Dr | Venice | 2018FL136698 | 2019-CA-000197 NC | UPC | TBD | Abby Pursley | SDii | 10/19/2019 |
| Alice & Brian | Greenberg | 1432 S Brandywine Cir | Fort Myers | 20FL00056984 | 21-CA-2494 | UPC | John Knight | Sheena Gomes | | 9/10/2017 |
| Bob | Mason | 15425 Take Off Pl | Wellington | 2018FL026785 | 2019-CA-010625 | UPC | | Robert Reuter | | 5/13/2018 |
| Ann | Dupras & Philpott | 2659 Valencia Way | Naples | NEW 20FL00038130 | OLD 2019-CA-002716 | UPC | n | Lizette Harpold | | 10/16/2019 |
| John/Arleen | Heintzman | 3081 King Tarpon Dr | Punta Gorda | 19FL00012218 | 21CA-000725 NC | UPC | Matthew Hibbs | Denise Caraker | Rimkus | 9/10/2017 |
| Chris | Oberdorf & Dextradeur | 3700 Glen Oaks Manor Dr | Sarasota | 19FL00015876 | 20-CA-004202 NC | UPC | George Small | Josephine Burdett | SDii | 9/10/2017 |
| John & Joyce | Robinson | 1508 National Ave | Naples | 20FL00019917 | 21000197CA | UPC | bd | Tai Nguyen | | 4/5/2019 |
| Glenn & Joanne | Lane | 3865 Treasure Cove Circle | Naples | 20FL00017556 | 11-2020-CA-002994-0001-XX UPC | | TBD | Marina Pyrris | | 10/16/2019 |
| Roy | Cumiskey | 2001 King Tarpon Dr | Punta Gorda | 19FL00019195 | 21000197CA | UPC | Ken Jarvis | Cecilia Paige Gillispie | SDii | 10/19/2019 |
| Yael Ann | Anderson | 3744 SW Jamestown St | Palm City | 2019FL136567 | 2019-CA-000624 | UPC | tbd | Denise Caraker | SDii | 4/26/2020 |
| Frank & Dorothy | Blair | 9090 Springview Loop | Estero | 20FL00057603 | 21-CA-002791 | UPC | TBD | Margaret "Marci" Mills | SDII GLOBAL, T. CAREER 10/19/2019 |  |
| Arthur | Haig | 4949 Sabal Lake Circle | Cape Coral | 20FL00037870 | 2021CA001733 | UPC | tbd | Cecilia Paige Gillispie | | 9/10/2017 |
| Lawrence | Roy | 2665 Cape Cove Dr | Sarasota | 20FL00043251 | 2021 CA 002247 NC | UPC | TBD | Dominika Van Zandt | | 9/10/2017 |
| Richard/Carole | Wyckoff | 8076 Tiger Lily Dr | Punta Gorda | 2019FL131341 | 11-2020-CA-002476-0001-XX UPC | | n | Denise Caraker | Rimkus | 9/10/2017 |
| Dianna | Birkla | 5031 Southern Pine Cir | Venice | 19FL00011200 | 2021 CA 000725 NC | UPC | TBD | Denise Caraker | SDii | 9/10/2017 |
| John | Townsend | 17722 Courtside Landings Cir | Punta Gorda | 20FL00043075 | 21CA002392 | UPC | George Small | John Oden | | 9/10/2017 |
| John & Wendy | Fagel | 4191 Hearthstone Dr | Sarasota | 2019FL131205 | 2021 CA 002149 NC | UPC | bd | Denise Caraker | | 9/10/2017 |
| Michael & Marie | Reiner/Garde | 3826 Ruby Way | Naples | 20FL00019918 | 11-2020-CA-003179-0001-XX UPC | | bd | Ted Fiocati | | 10/16/2019 |
| Patrick | Brown | 4315 Coronado Dr | Fort Myers | 2019FL036075 | 2100197CA | UPC | Lizette Harpold | Denise Caraker | | 9/10/2017 |
| Rick & David | Cliburn | 12831 Eagle Pointe Circle | Fort Myers | 20FL00034799 | 21-CA-001732 | UPC | TBD | Denise Caraker | | 4/26/2020 |
| Stewart & Cynthia | Provenzo | 299 SW Hatteras Ct | Palm City | 2019FL120688 | 2019-CA-000632 (Martin Cou | UPC | tbd | Ricky | | 9/10/2017 |
| Mark | Jacoby | 2215 SE 19th Pl | Cape Coral | 21CA001633 | | UPC | | Denise Caraker | TBD | 9/10/2017 |

| First Name | Last Name | Address Line | City | Claim # | Case # | Ins Carrier | Field Adjuster Name | Desk Adjuster Name | Carrier Engineer | Date Of Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Anthony & Lisa, Mike & Chris | Azzarolli, Minta | 9116 Linus Dr | Fort Myers | 19FL00010030 | 21CA002199 | UPC | TBD | Cecilia Paige Gillispie | | 9/10/2017 |
| Joyce | Ingrassia | 5035 Seagrass Dr | Venice | 20FL00025063 | 2021 CA 001206 NC | UPC | TBD | Abby Pursley | | 9/10/2017 |
| Bruce & Irlene | Keller | 3505 Harbor Blvd | Port Charlotte | 2100031DCA | | UPC | TBD | Michael Davis | | 9/10/2017 |
| Gary | Gilroy | 4927 SW 6TH PL | Cape Coral | 20FL00044990 | 21-CA-002583 | UPC | TBD | Denise Caraker | | 9/10/2017 |
| Annette | Robinson | 2004 I Castlemaine Ave | Estero | 20FL00011687 | 21-CA-003058 | UPC | TBD | John Oden | | 9/10/2017 |
| James and Barbara | Kutch | 2881 Seasons Blvd | Sarasota | 20FL00025996 | 20-CA-004449 | UPC | TBD | Denise Caraker | EFI | 9/10/2017 |
| Jason | Mruczek | 2741 Harvest Drive | Sarasota | 19FL00009748 | 2020 CA 005391 NC | UPC | TBD | Tyra Samson | | 9/10/2017 |
| Marion | Sima | 1127 Deerfoot Dr | Venice | 19FL00001437 | 20-CA-006408 | UPC | TBD | Marina Purvis | | 9/10/2017 |
| Karen | Bayly | 7536 Cameron Circle | North Port | 20FL00044643 | 2021 CA 000327 NC | UPC | TBD | Cecilia Paige Gillispie | N/A | 9/10/2017 |
| Luis | Badillo | 1308 Islamorada Blvd | Fort Myers | 2019FL 131168 | 21-CA-003742 | UPC | Craig Smith | Susan Gallagher | | 9/10/2017 |
| Howard | Tewksbury | 4055 Country Manor Dr | Punta Gorda | 20FL00016783 | 20-CA-007555 | UPC | tbd | Margaret Mills | | 9/10/2017 |
| Theodore & Rosalie | Kofler | 6833 Grenelefe rd | Sarasota | 2019FL 121777 | 2018-CA-002691 | UPC | TBD | Sheena Gomes | | 9/10/2017 |
| Kathleen and Phillip | McLaughlin | 23956 Creek Branch Ln | Boynton Beach | 20FL00052194 | 20-CA-006699 | UPC | Ryan Pate | Cecilia Paige Gillispie | | 9/10/2017 |
| Sheila | Kavanagh | 473 Duchamp Dr | Bonita Springs | 20FL00017093 | 21-CA-002201 | UPC | George Small | Cecilia Paige Gillispie | | 9/10/2017 |
| Lilian | Milton | 116 Cocoplum Dr. | Nokomis | 20FL00018390 | 2020 CA 004584 NC | UPC | TBD | Josephine Burdett | | 9/10/2017 |
| Chuck | Berwald | 141 Lookout Point Dr | West Palm Beach | 20FL00019548 | QLD 2019F | 50-2020-CA-004329-XXXX-M | UPC | TBD | Randi Hussain | SDii | 10/16/2019 |
| Pablo and Orietta | Vergara | 6568 Plantation Preserve Cr. | Osprey | 20FL00019708 | + 10/19/2011 2021 CA 001797 NC | UPC | TBD | Christopher Merritt | SDii | 9/10/2017 |
| Gary and Florence | Rauschmidt | 6868 Grenelefe rd | Fort Myers | 2019FL 233568 | 20-CA-002760 | UPC | tbd | Tai Nguyen | | 9/10/2017 |
| PEGGY | PURDY | 1628 PALMETTO PALM WAY | Boynton Beach | 20FL00036362 | 20-CA-006175 | UPC | TBD | Denise Caraker | | 12/20/2018 |
| Annetta | Wilkins | 10641 Royal Caribbean Cir | North Port | 19FL00009467 | 2021 CA 000753 NC | UPC | TBD | Denise Caraker | | 9/10/2017 |
| James & Denise | Bartlett | 2168 SW Bakula Terr | Palm City | NEW: 2019FL049491 | QLD 21-CA-006035 | UPC | N/A | Abby Pursley | N/A | 9/10/2017 |
| Peter/Sharon | Feindel | 1400 Islamorada Blvd. | Punta Gorda | 2019FL 122742 | 20001195CAAXMX | UPC | tbd | Michael Davis | | 9/10/2017 |
| Brad & Danielle | Black | 14695 Indigo Lakes Cir. | Naples | 20FL00016756 | 21-CA-004483 | UPC | tbd | Abby Pursley | | 9/10/2017 |
| Phyllis | Lucas | 704 Greasy Oaks Dr | Venice | 20FL00014771 | NEW/ 2019F | 11-2021-CA-000500-0001-XX | UPC | TBD | Margaret Mills | | 9/10/2017 |
| Michael and Susan | Linder | 10624 Santa Laguna Dr | Boca Raton | 20FL00003548 | 2020 CA 005130 NC | UPC | nla | Denise Caraker | | 9/10/2017 |
| Mark | Kodner | 3692 Treasure Cove Circle | Naples | 19FL 128420 | 50-2020-CA-003224-XXXX-M | UPC | n/a | Teresa Paul | | 9/10/2017 |
| Elyn | Paxxoe | 5018 Cadenmane Ave | Estero | 20FL00019467 | 11-2020-CA-003532-0001-XX | UPC | TBD | Denise Caraker | TBD | 4/19/2019 |
| Donald & Linda | Gilligan | 2093 Rockley Dr | Venice | 20FL00037775 | NEW | QLD 20-CA-004949 | UPC | TBD | Cecilia Paige Gillispie | | 9/10/2017 |
| Glenn/Sheryl | Boden | 1405 Islamorada Blvd | Punta Gorda | 20FL00037711 | 2020 CA 001347 NC | UPC | TBD | Buddy Decandio | | 9/10/2017 |
| James and Cheryl | Barrett | 509 Monterey St. | | 20FL00024000 | 2100309CA (NEEDS TO BE | UPC | tbd | Angela Crowell | | 9/10/2017 |
| Constance & Donald | Henshaw | 2060 Rockley Dr | Estero | 20FL00051409 | 21CO02033 | UPC | tbd | Michael Davis | | 9/10/2017 |
| Farhana & Khaza | Chowdhury | 5596 Briarcliff Rd. | Fort Myers | 20FL00003783 | 20-CA-006277 | UPC | Jason Beasley | Denise Caraker | | 12/20/2018 |
| Ester & Lonnie | ELElfie & L.Peretz | 6733 Sun River Rd | Boynton Beach | 19FL00007192 | 20-CA-007853 | UPC | tbd | Michael Davis | TBD | 9/10/2017 |
| Gregory & Ingrid | Neu & Chospointe | 12941 Turtle Cove Trail | North Fort Myers | 20FL00054365 | 20-CA-007780 | UPC | Rod Buvens | Margaret "Marci" Millis | N/A | 9/10/2017 |
| Michael | Pedula | 2613 SW 41st Ter | Cape Coral | 20FL00053521 | 20-CA-006380 | UPC | kevin | Buddy Decandio | TBD | 9/10/2017 |
| Douglas & Kimberly | Roelding | 8512 Chatham Street | Fort Myers | 20FL00037710 | 11-2020-CA-003684-0001-XX | UPC | Kevin Wisniewski | Denise Caraker | TBD | 9/10/2017 |
| THOMAS/BARBARA | BARBIERI | 2168 I MASTERS CIR. | Estero | 20FL00041833 | 21-CA-002752 | UPC | Abby Pursley | Abby Pursley | | 9/10/2017 |
| Richard &Mary | Gai | 144 Livermore Ln | Naples | 20FL00024864 | 21-CA-001734 | UPC | John Knight | Angela Crowell | | 9/10/2017 |
| Sergiy | Eng | 1440 Quail Lake Dr | Venice | 20FL00030176 | 2019-CA-005248 | UPC | Area Hoch | Susan Gallagher | | 12/20/2018 |
| Bella Lago | Burnham | 6085 Forest Hill Blvd #207 | West Palm Beach | 2019FL 131871 | 50-2019-CA-008255-XXXX-M | UPC | Lee Rasmussen | Cecilia Paige Gillispie | | 12/20/2018 |
| Maribeth | Purnell | 800 Wood Sorrel Ln | wellington | 2019FL 121542 | 2020 CA 004257 NC | UPC | tba | Denise Caraker | tba | 9/11/2017 |
| Maria and Anthony | Strada | 4153 bluff harbor way | Punta Gorda | 20FL00023757 | 21-CA-005713 | UPC | tbd | Cecilia Gillispie | | 9/10/2017 |
| Stephan & Susan | Flagstad | 1403 Islamorada Blvd | Sarasota | 20FL00031796 | 20-CA-007456 | UPC | TBD | Josephine Burdett | | 9/10/2017 |
| Ahtisen | Schwarzer | 4317 Pine Meadow Ter | Estero | 20FL00045191 | 2021 CA 001337 NC | UPC | TBD | Michael Davis | | 9/10/2017 |
| Jay | Santos | 20052 Serene Meadow Lane | Lehigh Acres | 20FL00053637 | 20-CA-006380 | UPC | TBD | Yolanda Turner | | 8/9/2020 |
| Aniceto & Iraida | Lancashire, SR | 104 Maple Ave N | Naples | 20FL00052067 | 21-CA-003106 | UPC | TBD | Christopher "Topher" Mogil | | 9/10/2017 |
| Emore & Barbara | Kane | 1273 I Water Oak Dr | Estero | 20FL00052427 | 50-2020-CA-001327 NC | UPC | TBD | Cecilia Paige Gillispie | | 9/10/2017 |
| James & Roberta | McMenamy | 10100 Salisbury Ct | Sarasota | 20FL00045830 | 20-CA-007845 | UPC | TBD | Josephine Burdett | | 9/10/2017 |
| James & Terry | Swoopes | 4771 lake of the Woods Dr | Fort Myers | 20FL00052067 | 21-CA-002626 | UPC | TBD | Denise Caraker | | 9/10/2017 |
| Stephen | Kirch | 6694 Deering Cir | Sarasota | 20FL00015694 | 20-CA-007827 NC | UPC | tbd | Denise Caraker | | 9/10/2017 |
| Ben | Croce | 4010 Cape Cole Blvd. | Punta Gorda | 2019FL 133475 | 2020-CA-005430 | UPC | Niles Wood | John Oden | | 9/10/2017 |
| Paul & Lisa | Tritel | 8969 Spring Mountain Way | Fort Myers | 20FL00008833 | NEW QLD | 21-CA-003912 | UPC | TBD | Denise Caraker | | 9/10/2017 |
| David | Dessas | 4614 SW 21st Pl | Cape Coral | 2019FL 125461 | New 20FL00 | 2019-CA-005030 | UPC | TBD | Sonya Rudolph | | 9/10/2017 |

3

**EXHIBIT "C"**

 **UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

| | | | |
|---|---|---|---|
| Insured: | JOAN OCONNOR | Other: | (239) 561-7795 |
| Property: | 11014 LAKELAND CIR | Home: | (239) 561-7795 |
| | FORT MYERS, FL 33913 | E-mail: | MOCONNOR2@COMCAST.NET |
| Home: | 11014 LAKELAND CIR | | |
| | FORT MYERS, FL 33913 | | |

Claim Rep.:   Christy Connell

Estimator:   Niles Wood

Reference:                                           Business:   (888) 256-3378
Company:   UPC Insurance (NASDAQ: UIHC)
Business:   800 2nd Avenue S.
                 St. Petersburg, FL 33701-1

**Claim Number:** 2019FL125591      **Policy Number:** UHV265949205      **Type of Loss:** Wind

| | | | |
|---|---|---|---|
| Date Contacted: | 4/16/2019 | | |
| Date of Loss: | 9/10/2017 2:00 AM | Date Received: | 4/15/2019 2:00 AM |
| Date Inspected: | 4/19/2019 | Date Entered: | 4/16/2019 6:16 AM |
| Date Est. Completed: | 4/19/2019 10:36 AM | | |

Price List:   FLFM8X_APR19
                  Restoration/Service/Remodel
Estimate:   JOAN_OCONNOR

*We completed an estimate of repair for covered damages to your property. Please note, depreciation may be applied to your estimate based on the age and/or condition of the damaged property. If your policy provides for replacement cost coverage, refer to your policy for specific time limits to make claim for recoverable depreciation.*
*Your applicable policy deductible will be deducted from any payment.*
*We do not direct or warranty the work of any contractor/repair providers, whether referred by us or not. It is your decision on who to hire and to ensure any repairs are done to your satisfaction.*
*If you believe repairs will exceed this estimate, contact us immediately. No additional payment will be issued without our review and approval. Approval must be provided by us prior to any repair.*
*Should you receive a repair estimate which exceeds this estimate, please forward this information to us at:*
*Address: UPC Insurance, P.O Box 1011, St. Petersburg, FL 33731-1011*
*Email: claims@upcinsurance.com.*
*Thank you for the opportunity to service your claim. If you have any questions, please contact us.*



**UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

**JOAN_OCONNOR**

**Claim #2019FL125591**

**Dwelling - Exterior**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 1.  Drip edge/gutter apron | 257.80 LF | 2.82 | 14.41 | 145.40 | 886.81 | (506.74) | 380.07 |
| 2.  Detach & Reset Gutter - aluminum - up to 5"* | 240.16 LF | 2.68 | 0.00 | 128.72 | 772.35 | (0.00) | 772.35 |
| Seamless gutter box installed through drip edge/gutter apron with gutter hangers. | | | | | | | |
| 3.  Bird stop - Eave closure strip for tile roofing - metal | 240.16 LF | 3.95 | 24.51 | 189.72 | 1,162.86 | (465.13) | 697.73 |
| 4.  Tear off, haul and dispose of tile roofing | 31.43 SQ | 204.60 | 0.00 | 1,286.12 | 7,716.70 | (0.00) | 7,716.70 |
| 5.  Remove Roll roofing - hot mop application | 31.43 SQ | 73.04 | 0.00 | 459.14 | 2,754.79 | (0.00) | 2,754.79 |
| 6.  Re-nailing of roof sheathing - complete re-nail | 3,142.85 SF | 0.29 | 4.09 | 182.28 | 1,097.80 | (0.00) | 1,097.80 |
| This item did not previously exist or expands the scope of repairs, but is required by current building codes. The code upgrade cost is payable when incurred, subject to limits. | | | | | | | |
| 7.  Roll roofing - hot mop application | 31.43 SQ | 170.18 | 128.22 | 1,069.76 | 6,546.74 | (4,910.06) | 1,636.68 |
| 8.  Tile roofing - Concrete - "S" or flat tile | 36.14 SQ | 644.72 | 384.34 | 4,660.04 | 28,344.56 | (11,337.83) | 17,006.73 |
| 9.  Hip & ridge nailer board for tile roofing - channel metal | 248.20 LF | 3.24 | 25.81 | 160.84 | 990.82 | (132.10) | 858.72 |
| 10.  R&R Ridge / Hip / Rake cap - tile roofing | 265.83 LF | 17.38 | 119.92 | 924.04 | 5,664.08 | (1,719.52) | 3,944.56 |
| 11.  Valley metal | 42.63 LF | 5.82 | 4.96 | 49.62 | 302.69 | (172.97) | 129.72 |
| 12.  Flat roof exhaust vent / cap - gooseneck 8" | 1.00 EA | 84.86 | 1.76 | 16.98 | 103.60 | (59.20) | 44.40 |
| 13.  Prime & paint roof vent | 1.00 EA | 30.63 | 0.46 | 6.12 | 37.21 | (12.40) | 24.81 |
| 14.  Flashing - pipe jack - lead | 3.00 EA | 73.76 | 7.33 | 44.26 | 272.87 | (155.94) | 116.93 |
| 15.  Prime & paint roof jack | 3.00 EA | 34.86 | 1.38 | 20.92 | 126.88 | (42.30) | 84.58 |
| **Totals:  Roof** | | | **713.10** | **9,161.68** | **55,682.96** | **19,514.19** | **36,168.77** |
| **Total:  Dwelling - Exterior** | | | **713.10** | **9,161.68** | **55,682.96** | **19,514.19** | **36,168.77** |

**Dwelling - Interior**



**Family Room**                                                      **Height: 9' 10''**

| | |
|---|---|
| 1045.62  SF Walls | 659.45  SF Ceiling |
| 1705.07  SF Walls & Ceiling | 659.45  SF Floor |
| 73.27  SY Flooring | 106.33  LF Floor Perimeter |
| 106.33  LF Ceil. Perimeter | |

 **UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 16. Contents - move out then reset - Large room | 1.00 EA | 68.70 | 0.00 | 13.74 | 82.44 | (0.00) | 82.44 |
| 17. Floor protection - self-adhesive plastic film | 659.45 SF | 0.55 | 5.14 | 72.54 | 440.38 | (0.00) | 440.38 |
| 18. Mask and prep for paint - plastic, paper, tape (per LF) | 106.33 LF | 1.19 | 1.59 | 25.30 | 153.42 | (0.00) | 153.42 |
| 19. R&R 5/8" drywall - hung, taped, floated, ready for paint | 32.00 SF | 2.36 | 1.10 | 15.10 | 91.72 | (4.99) | 86.73 |
| 20. R&R Blown-in insulation - 10" depth - R26 | 32.00 SF | 1.64 | 1.06 | 10.50 | 64.04 | (1.95) | 62.09 |
| 21. Scrape part of the ceiling & prep for paint | 627.45 SF | 0.55 | 0.41 | 69.02 | 414.53 | (0.00) | 414.53 |
| 22. Texture drywall - light hand texture | 659.45 SF | 0.48 | 2.57 | 63.30 | 382.41 | (25.49) | 356.92 |
| 23. Seal/prime then paint the ceiling twice (3 coats) | 659.45 SF | 1.11 | 10.29 | 146.40 | 888.68 | (296.23) | 592.45 |
| 24. Ceiling fan - Detach & reset | 2.00 EA | 149.06 | 0.00 | 59.62 | 357.74 | (0.00) | 357.74 |
| 25. Recessed light fixture - Detach & reset trim only | 6.00 EA | 2.28 | 0.00 | 2.74 | 16.42 | (0.00) | 16.42 |
| 26. Mask and cover light fixture | 6.00 EA | 12.15 | 0.24 | 14.58 | 87.72 | (0.00) | 87.72 |
| 27. Heat/AC register - Mechanically attached - Detach & reset | 4.00 EA | 11.72 | 0.00 | 9.38 | 56.26 | (0.00) | 56.26 |
| 28. Final cleaning - construction - Residential | 659.45 SF | 0.20 | 0.00 | 26.38 | 158.27 | (0.00) | 158.27 |
| **Totals: Family Room** | | | **22.40** | **528.60** | **3,194.03** | **328.66** | **2,865.37** |
| **Total: Dwelling - Interior** | | | **22.40** | **528.60** | **3,194.03** | **328.66** | **2,865.37** |

### Debris Removal

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 29. Haul debris - per pickup truck load - including dump fees | 1.00 EA | 133.59 | 0.00 | 26.72 | 160.31 | (0.00) | 160.31 |

This item is included for job site waste disposal. Roofing disposal is included under the roof section of this estimate.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Totals: Debris Removal** | | | **0.00** | **26.72** | **160.31** | **0.00** | **160.31** |
| **Total: Claim #2019FL125591** | | | **735.50** | **9,717.00** | **59,037.30** | **19,842.85** | **39,194.45** |
| **Line Item Totals: JOAN_OCONNOR** | | | **735.50** | **9,717.00** | **59,037.30** | **19,842.85** | **39,194.45** |

 **UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 1,045.62 | SF Walls | 659.45 | SF Ceiling | 1,705.07 | SF Walls and Ceiling |
| 659.45 | SF Floor | 73.27 | SY Flooring | 106.33 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 106.33 | LF Ceil. Perimeter |
| | | | | | |
| 659.45 | Floor Area | 695.32 | Total Area | 1,045.62 | Interior Wall Area |
| 4,072.37 | Exterior Wall Area | 350.33 | Exterior Perimeter of Walls | | |
| | | | | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 257.80 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

| Coverage | Item Total | % | ACV Total | % |
|---|---|---|---|---|
| Covg A-Homeowner Dwelling | 59,037.30 | 100.00% | 39,194.45 | 100.00% |
| Covg A-Homeowner Dwelling - Code Upgrade | 0.00 | 0.00% | 0.00 | 0.00% |
| Covg B | 0.00 | 0.00% | 0.00 | 0.00% |
| Covg C | 0.00 | 0.00% | 0.00 | 0.00% |
| Covg D | 0.00 | 0.00% | 0.00 | 0.00% |
| Total | 59,037.30 | 100.00% | 39,194.45 | 100.00% |



**UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

## Summary for Covg A-Homeowner Dwelling

| | |
|---|---:|
| Line Item Total | 48,584.80 |
| Overhead | 4,858.50 |
| Profit | 4,858.50 |
| Material Sales Tax | 735.50 |
| **Replacement Cost Value** | **$59,037.30** |
| Less Depreciation | (19,842.85) |
| **Actual Cash Value** | **$39,194.45** |
| Less Deductible | (6,080.00) |
| **Net Claim** | **$33,114.45** |
| Total Recoverable Depreciation | 19,842.85 |
| **Net Claim if Depreciation is Recovered** | **$52,957.30** |

_____

Niles Wood

JOAN_OCONNOR                                          4/19/2019        Page: 5

 **UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

### Summary for Covg A-Homeowner Dwelling - Code Upgrade

| | |
|---|---:|
| Line Item Total | 0.00 |
| **Replacement Cost Value** | **$0.00** |
| **Net Claim** | **$0.00** |

### Covg A-Homeowner Dwelling - Code Upgrade Paid When Incurred

| | |
|---|---:|
| Line Item Total | 911.43 |
| Overhead | 91.14 |
| Profit | 91.14 |
| Material Sales Tax | 4.09 |
| **Replacement Cost Value** | **$1,097.80** |
| **Total Paid When Incurred** | **$1,097.80** |

### Covg A-Homeowner Dwelling - Additional Coverage Limit Recap

| Description | Single Item Limit | Aggregate Limit | RCV | Overage |
|---|---:|---:|---:|---:|
| Covg A-Homeowner Dwelling - Code Upgrade | $3,040.00 | $3,040.00 | $1,097.80 | $0.00 |
| | | | $1,097.80 | $0.00 |

Niles Wood



**UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

### Recap of Taxes, Overhead and Profit

| | Overhead (10%) | Profit (10%) | Material Sales Tax (6.5%) | Laundering Tax (2%) | Manuf. Home Tax (6%) | Storage Rental Tax (6.5%) |
|---|---|---|---|---|---|---|
| **Line Items** | | | | | | |
| | 4,858.50 | 4,858.50 | 735.50 | 0.00 | 0.00 | 0.00 |
| **Total** | | | | | | |
| | **4,858.50** | **4,858.50** | **735.50** | **0.00** | **0.00** | **0.00** |

 **UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

## Recap by Room

**Estimate: JOAN_OCONNOR**

**Area: Claim #2019FL125591**

**Area: Dwelling - Exterior**

| | | | |
|---|---|---|---|
| **Roof** | | **45,808.18** | **94.29%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 45,808.18 | |
| **Area Subtotal:  Dwelling - Exterior** | | **45,808.18** | **94.29%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 45,808.18 | |

**Area: Dwelling - Interior**

| | | | |
|---|---|---|---|
| **Family Room** | | **2,643.03** | **5.44%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 2,643.03 | |
| **Area Subtotal:  Dwelling - Interior** | | **2,643.03** | **5.44%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 2,643.03 | |
| **Debris Removal** | | **133.59** | **0.27%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 133.59 | |
| **Area Subtotal:  Claim #2019FL125591** | | **48,584.80** | **100.00%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 48,584.80 | |
| **Subtotal of Areas** | | **48,584.80** | **100.00%** |
| Coverage: Covg A-Homeowner Dwelling | 100.00%  = | 48,584.80 | |
| **Total** | | **48,584.80** | **100.00%** |

 **UPC Insurance (NASDAQ: UIHC)**

800 2nd Avenue S.
St. Petersburg, FL 337011
888-CLM-DEPT

### Recap by Category with Depreciation

| O&P Items | | | | RCV | Deprec. | ACV |
|---|---|---|---|---|---|---|
| **CLEANING** | | | | **131.89** | | **131.89** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 131.89 | | |
| **CONTENT MANIPULATION** | | | | **68.70** | | **68.70** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 68.70 | | |
| **GENERAL DEMOLITION** | | | | **10,040.77** | | **10,040.77** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 10,040.77 | | |
| **DRYWALL** | | | | **377.98** | **25.20** | **352.78** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 377.98 | | |
| **HEAT,  VENT & AIR CONDITIONING** | | | | **46.88** | | **46.88** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 46.88 | | |
| **INSULATION** | | | | **23.36** | **1.56** | **21.80** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 23.36 | | |
| **LIGHT FIXTURES** | | | | **311.80** | | **311.80** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 311.80 | | |
| **PAINTING** | | | | **1,774.43** | **289.07** | **1,485.36** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 1,774.43 | | |
| **ROOFING** | | | | **35,165.36** | **15,943.41** | **19,221.95** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 35,165.36 | | |
| **SOFFIT, FASCIA, & GUTTER** | | | | **643.63** | | **643.63** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 643.63 | | |
| **O&P Items Subtotal** | | | | **48,584.80** | **16,259.24** | **32,325.56** |
| **Overhead** | | | | **4,858.50** | **1,625.94** | **3,232.56** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 4,858.50 | | |
| **Profit** | | | | **4,858.50** | **1,625.94** | **3,232.56** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 4,858.50 | | |
| **Material Sales Tax** | | | | **735.50** | **331.73** | **403.77** |
| Coverage: Covg A-Homeowner Dwelling | @ | 100.00% | = | 735.50 | | |
| **Total** | | | | **59,037.30** | **19,842.85** | **39,194.45** |



Dwelling - Exterior





**EXHIBIT "E"**

```
         IN THE CIRCUIT COURT OF THE
           TWENTIETH JUDICIAL CIRCUIT
         IN AND FOR LEE COUNTY, FLORIDA

             CASE NO.: 19-CA-006261


SFR SERVICES LLC A/A/O
DANIEL AND SONIA BLACK,

      Plaintiff,

vs.

FAMILY SECURITY INSURANCE
COMPANY, INC.,

      Defendant.
_____/
```

```
              DEPOSITION OF ROD BUVENS

          TAKEN ON BEHALF OF THE PLAINTIFF

                AUGUST 28, 2020
             11:02 A.M. TO 1:48 P.M.

            ALL PARTIES APPEARED REMOTELY
                    PURSUANT TO
         FLORIDA SUPREME COURT ORDER AOSC20-23
```

```
REPORTED BY:
CAROLINA RIVAS, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
```



877.291.3376
www.UCRinc.com

```
 1                  APPEARANCES OF COUNSEL

 2   ON BEHALF OF THE PLAINTIFF:

 3         JOHN TOLLEY, ESQUIRE
           WHISLER LAW FIRM P.A.
 4         1909 TYLER STREET, SUITE 501
           HOLLYWOOD, FL 33020
 5         561-245-4703
           JOHNT@JTLWFIRM.NET
 6         (REMOTELY VIA ZOOM)

 7   ON BEHALF OF THE DEFENDANT:

 8         GINA SABATINO, ESQUIRE
           CHARTWELL LAW, LLP
 9         100 S.E. 2ND STREET, SUITE 2150
           MIAMI, FL 33131
10         305-372-9044
           GSABATINO@CHARTWELL.COM
11         (REMOTELY VIA ZOOM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
1                    INDEX OF EXAMINATION

2   WITNESS:  Rod Buvens
                                                PAGE
3   DIRECT EXAMINATION
          By John Tolley, Esquire                  5
4
    CROSS EXAMINATION
5         By Gina Sabatino, Esquire               93

6   RE-DIRECT EXAMINATION
          By John Tolley, Esquire                116
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1                   INDEX OF EXHIBITS

 2   EXHIBIT             DESCRIPTION            PAGE

 3   Plaintiff's

 4      A          NOTICE OF TAKING DEPOSITION      27

 5      B          PHOTO SHEET                      45

 6   Defendant's

 7   COMP A        TWO LETTERS                     108

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1              VIDEOTAPED DEPOSITION OF ROD BUVENS

 2                      AUGUST 28, 2020

 3    Thereupon:

 4                      ROD BUVENS,

 5    was called as a witness, and after having been first

 6    duly sworn, testified as follows:

 7                    DIRECT EXAMINATION

 8    BY MR. TOLLEY:

 9         Q    Good morning, my name is John Tolley.

10    Mr. Buvens, correct?

11         A    Yes, correct.

12         Q    Okay.  I just got to put a couple of things on

13    the record and then we'll get started with the

14    questioning.

15              But it's my understanding that you're here

16    today as the field adjuster who acted on behalf of

17    Family Security Insurance Company in the matter of SFR

18    Services, acting on behalf of Daniel and Sonia Black.

19              It's a Lee County case filed in the circuit

20    judicial -- Circuit Court under Case Number 19-CA-

21    006261.  It is August 28th, approximately 11:03 AM.

22              I'm going to go through a little bit of

23    background.  I'm sure you've given a deposition before,

24    but I'm just going to make sure we're all on the same

25    page here in terms of the rules of the deposition.
```



877.291.3376
www.UCRinc.com

```
 1              We'll go through a little bit of your
 2    background, what you did to prepare for today's
 3    deposition and then your actual inspection and handling
 4    this claim.  Okay?
 5        A    Okay.
 6        Q    All right.  So, first, could you just state
 7    your name and spell your last for the record?
 8        A    Sure.  My full name is Rodney Harold Buvens,
 9    B-U-V-E-N-S.
10        Q    Okay.  And prior to getting on the record
11    today you showed me a copy of your driver's license,
12    correct?
13        A    That is correct.
14        Q    Okay.  I'm just going to go through like I
15    said a couple of instructions today.  I ask that you
16    answer all questions out loud, try to avoid answers like
17    um-hum or uh-huh, or nodding or shaking of the head,
18    because those aren't affirmative or negative responses
19    that the Court Reporter will be able to take down.
20              You can certainly say yes or no and then
21    explain on your answer, but we need that yes or no in
22    the beginning of the answer.  Okay?
23        A    Understood.
24        Q    All right.  Try to let me finish asking my
25    question before you provide your answer.  I'm going to
```



```
 1   try to show you that same deference.  I know sometimes
 2   with Zoom it's difficult because of the lag, so I
 3   apologize in advance if I talk over you.
 4            But we just want to make sure the Court
 5   Reporter is getting a clean record, okay?
 6        A    Understood.
 7        Q    If you don't understand a question, it's
 8   highly likely us attorneys like to ask confusing
 9   questions, not intentionally but it happens, just go
10   ahead and let me know you don't understand a question
11   and you want me to rephrase or restate and I'll do my
12   best to do that.  Okay?
13        A    Understood.
14        Q    All right.  And I'm going to assume to the
15   contrary if you do hear my question and you don't ask me
16   to rephrase or restate, you answer that question I'm
17   going to assume you understood it and you're providing
18   truthful testimony.  Okay?
19        A    Understood.
20        Q    Specifically with our field adjusters these
21   always comes up a little bit.  Obviously, today I don't
22   want you to guess or to speculate but I know we're
23   dealing with maybe distances in time or distances in
24   feet or meters or centimeters or whatever type of
25   measurement.
```



1        If that becomes the case, you know, you can

2   certainly say it's an approximation or estimation and

3   the record will be clear that it's not an exact amount.

4   Okay?

5       A    Okay.

6       Q    And you understand that even though we're

7   occurring by Zoom today your testimony is still sworn to

8   and under oath?

9       A    Yes, I do.

10      Q    If you need to take a break for whatever

11  reason -- I don't think you will because I intend to at

12  least spend about an hour and that's about it.

13       But if you need a break just let me know and

14  we'll take a short break because, you know, sometimes

15  dogs run in or kids run in.

16       So, if you need that just let me know.  All

17  right?

18      A    I'm good, thank you.

19      Q    All right.  I have to ask these next couple of

20  questions.  Please don't take any offense.  Did you take

21  any medications last night or this morning that would

22  affect your ability to hear and understand my questions?

23      A    No, sir.

24      Q    All right.  Are you under the influence of

25  drugs or alcohol to the extent that it would affect your



1   ability to hear or understand my questions?

2        A    No, sir.

3        Q    Okay.  And have you ever been arrested of any

4   crimes of dishonesty or felonies?

5        A    No.

6        Q    All right.  So, who are you currently employed

7   by?

8        A    I work for myself, self-employed.

9        Q    Are you incorporated in any of the -- like a

10  sole-proprietor?

11       A    It's an LLC.  It's Archer Adjusting and

12  Appraisal.

13       Q    And that's registered in the State of Florida?

14       A    Yes.  It's actually a fictitious name

15  registration for a parent company which I'm the member -

16  - sole member, Tumbling Tumbleweed Productions, LLC.

17       Q    Tumbling Tumbleweed Productions you said?

18       A    Yes, sir.

19       Q    Okay.

20       A    And from Texas can you tell?  You can tell

21  when somebody is from Texas.  You don't have to.  You

22  can just wait for them to tell you it's going to take -

23            -

24       Q    Well, I live in New York and every New Yorker

25  lets you know they are from New York so I understand.



1      A    Welcome to Florida with the rest of your

2   State.

3      **Q    And you are the sole employee of both your**

4   **companies, correct?**

5      A    Yes, sir, CEO and janitor and everything in

6   between.

7      **Q    Okay, perfect.  And how long have you owned**

8   **both of those companies?**

9      A    Tumbling Tumbleweed goes back in Florida just

10  a couple of years, but it's been a corporation LLC for

11  probably about 10 years or something like that.  I don't

12  remember the exact date.

13     **Q    Okay.  I'm assuming before Florida it was just**

14  **in Texas?**

15     A    Yes.  It originally was like a Montana

16  corporation, but I was a Texas resident forever.

17     **Q    Okay.  And with regard to Archer Adjusting,**

18  **how long has that been a fictitious name?**

19     A    Probably sometime last year; I don't remember

20  the exact date.

21     **Q    Okay, no problem.  And what is your current**

22  **business address?**

23     A    I'm at 1222 47th Street, Suite 223 in Cape

24  Coral.

25     **Q    Okay.  You know, even though you're not --**



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

1  well, let me ask you this and get on the record. You're

2  not a direct employee of the Defendant, correct?

3      A    That is correct.

4      Q    But you were -- your services were retained

5  for purposes of performing the field inspection on this

6  matter?

7      A    Through an independent adjusting firm, yes.

8      Q    Okay.  Who was that independent adjusting

9  firm?

10     A    That's Property Loss Specialist out of Oregon

11  spelt just like the State, O-R-E-G-O-N, Wisconsin.

12     Q    And as an independent adjuster for that

13  company, do you -- I mean, I don't think you're employed

14  but you obviously get contracts from them.

15          Do you only handle claims for the Defendant or

16  do you handle claims for other carriers?

17     A    No, several other carriers.

18     Q    Okay.  What are the other carriers that you

19  handle claims for?

20     A    Well, it's a long list.  Most recently --

21  going from most recent to oldest, Main Street America,

22  Old Dominion, Austin Mutual, Acuity, Erie.

23          There's a couple other small companies up in

24  Wisconsin that I work for.  I don't even remember their

25  names.



877.291.3376
www.UCRinc.com

1    **Q    Okay.  And are all those home property or**

2    **commercial-property damage claims, or do you handle auto**

3    **as well?**

4        A    I do some auto as well.  I do some diminished

5    value primarily on auto.  I do some heavy equipment;

6    tractors, excavators, bulldozers, things like that.

7        **Q    Okay.**

8        A    But not for this company, so.

9        **Q    Okay.  So, let me ask you this.  When you were**

10   **retained on this case did you -- were you assigned like**

11   **a job title or some type of designation?**

12       A    I just -- I've got a lot of letters behind my

13   name, but I'm always an adjuster.

14       **Q    Okay.**

15       A    Just field adjuster I guess is the most

16   accurate.

17       **Q    Perfect.  So, when you were assigned to this**

18   **claim by the Defendant as the field adjuster, what were**

19   **your duties and responsibilities?**

20           MS. SABATINO:  May I object to -- I'm going to

21       object to the form.  I would not like him to

22       disclose information about the policies and

23       procedures or the guidelines of UPC, but he can

24       answer.  You can answer, Rod.

25           MR. TOLLEY:  Okay.



877.291.3376
www.UCRinc.com

```
1              THE WITNESS:  Okay.
2       A    We were just assigned to inspect the property
3  and provide an estimate of damages.
4       Q    (By Mr. Tolley) Okay, all right.  I've got to
5  ask a couple of more background questions.  Have you
6  ever been deposed before?
7       A    Yes.
8       Q    Okay.  Have you ever been deposed before
9  outside your representation of an insurance provider?
10      A    Yes.
11      Q    Okay.  What were those circumstances?
12      A    Well, I've been deposed in conjunction with
13  auto accidents where I was a driver, auto accidents
14  where I was a witness, a couple of criminal cases where
15  I was a witness.
16           I've been deposed as an expert several times
17  and there is others that I'm forgetting.  I've been here
18  before I think is the short answer.
19      Q    Okay.  Let me ask you this.  With regard to an
20  expert, when were you deposed as an expert and in what
21  capacity?
22      A    It would have been in Texas probably about
23  seven or eight years ago.  There was a big sandstorm in
24  Austin, Texas where a lot of tile roofs were affected.
25      Q    Okay.
```



1      A    And I probably stepped on more tile roofs than

2  just about everybody in the country from Washington

3  State all the way to Florida, Colorado, Oregon, Idaho.

4          I've already said Washington, Nevada, Arizona;

5  lots in Texas and lots in Florida.

6      **Q    With regards to the expert testimony in Texas**

7  **did they deem you an expert in like a particular area or**

8  **field or was it, you know, just roofing in general?**

9      A    It was tile roofing.  There was a lot of

10  discussion about that.  I think what they finally

11  settled on after, you know, lengthy arguments between

12  counsel was, an expert in hail damage to tile roofs.

13          So, it was sort of specified down but the case

14  was actually involving wind and hail damage, the

15  windstorm damage.

16      **Q    Okay.  How many times did you say you've been**

17  **deposed both, you know, I guess privately as well as on**

18  **behalf of carriers?**

19      A    It's over 1000.

20      **Q    And have you ever testified --**

21      A    I used to work for All State.  My apologies, I

22  didn't mean to interrupt you.  I used to work for All

23  State as a field adjuster.

24          So, in Texas we got sued individually to keep

25  them out of Federal Court.  So I got deposed a lot in



1  the valley.

2      Q    Oh wow, okay.  Well, let me ask you this. How

3  many times have you testified at trial?

4      A    Probably, a dozen or so.

5      Q    Okay.  All right, speaking of your employment

6  history I kind of want to go through just -- you know

7  your relevant employment in this industry it sounds like

8  it's going to be pretty extensive.

9          But if we can start at the first time you were

10 employed in this industry and go up until what you

11 currently do now.

12     A    Okay.  Hurricane Andrew in 1992 was my first

13 adjusting assignment.

14     Q    And were you employed by a carrier or were you

15 working as an independent adjuster?

16     A    Both.  I worked as an independent adjuster in

17 Florida and then Hurricane Andrew I actually went over

18 to South Louisiana and while there I actually worked

19 directly for All State.

20     Q    All right.  How long did that last for?

21     A    Through 1995 when I started law school they

22 would not allow me to be an employee as an IA so I

23 continued independent adjusting just doing hail claims

24 and wind claims primarily in South Louisiana.  And then

25 I went out to work as an attorney for about a year and



```
 1   two months I then I came right back to adjusting.  I
 2   worked for probably a couple of dozen different
 3   adjusting firms.  But since 2001 it's been all
 4   independent adjusting with the exception of one IA firm
 5   that paid me as an employee with a tile catastrophe was
 6   contracted out to All State as a loss adjuster. Probably
 7   up until 2016 or so they paid me as a debut too but I
 8   was an independent adjuster always carrying an
 9   independent adjuster license.
10       Q    Okay.  All right.  Let's go back a little bit
11   to the law.  You said you practiced law for about a
12   year?
13       A    Yes, sir.
14       Q    Okay.  And that would have been from '98 to
15   '99?
16       A    Yes, sir.
17       Q    Okay.  And what type of law did you practice?
18       A    Marine ambulance chasing.  Maritime law.  And
19   then I actually did a little bit of defense and I think
20   that's when I decided to look for the exit, insurance
21   defense.
22       Q    No comment.
23            MS. SABATINO:  Hey.
24            MR. TOLLEY:  I used to do it and I used to --
25            THE WITNESS:  It's like people in New York,
```



```
1            they all end up in Florida.  They always end up on
2            the Plaintiff side.
3       Q    (By Mr. Tolley) Okay.  And during your course
4   of independent adjusting, you know, when would you say
5   your first time -- well, I guess the first time you
6   started doing home property was in '92 with Hurricane
7   Irma, correct?
8       A    Yes, Homestead, Florida.
9       Q    Okay.  And you've consistently done home
10  property since '92 with the exceptions of going to law
11  school and stuff like that?
12      A    Yeah, I mean I took some positions at one time
13  doing some SIU work in-house, I did some desk adjuster
14  positions, I worked at home, I did cloud management, I
15  filed reviews, I've done outside field manager work, I
16  had team adjusters.  So, I kind of worked, you know,
17  probably through the ranks and then right back to where
18  I started.
19      Q    Okay.  All right.  I think I know the answer
20  to this but what's your highest level of education?
21      A    Well, JD I guess.
22      Q    And what college did you get that?  What law
23  school did you go to?
24      A    LSU.
25      Q    Do you hold any professional licenses?
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1      A    Yes, a variety of independent adjusting

2    licenses.  I think I've had as many as 30 at one time.

3    I've let some of those States drop off because I just

4    don't work in Maine, in Connecticut.

5          I don't really work up in the northeast unless

6    there's a hurricane up there.  But, yeah, I've held

7    independent adjuster licenses for years and years and

8    years.

9      Q    Do you have a Florida licenses as well?

10     A    I do not.

11     Q    Well, you've had license at one point in time,

12   correct?

13     A    Um-hum.

14     Q    Okay.  Was it Louisiana?

15     A    Louisiana, yeah, that's the only State.

16     Q    And did you just let it kind of expire or --

17     A    I did.  I did.  I think the official reason

18   was failure to maintain a client trust account because I

19   didn't have clients.  But, yes.

20     Q    Okay.

21     A    They are willing to reinstate me if I pay them

22   21 years' of bar dues and certainly 30 solid 24- hour

23   days of continuing education.  I said, "Thank you but

24   no, thank you."

25     Q    Yeah, I don't blame you for that.  Any other



1    professional licenses other than the independent

2    adjusting and bar license?

3        A    Not currently, no.

4        Q    Okay.  And you've been a licensed independent

5    adjuster for about how long?

6        A    Twenty-eight years.

7        Q    Okay.  What is your Florida license number?

8        A    I will have to look that up for you.  It's P

9    as in Paul, 197884.

10       Q    I know you said that you have been licensed in

11   a variety of different States.  But can you tell me some

12   of the States -- could you tell me the States that

13   you've actually adjusted claim in?

14       A    Yes, I will try.

15       Q    Okay.  No problem.

16       A    Alaska, Washington, Oregon, Montana, Idaho,

17   California, Nevada though I didn't hold a license there

18   I was under a carrier license.  It's kind of a hard

19   State for a non-resident to get a license in.  Arizona,

20   New Mexico, Colorado, Utah, South and North Dakota,

21   Ohio, Indiana, Wisconsin, Minnesota, Michigan, New York,

22   New Jersey, Virginias, Maine, Tennessee, North Carolina,

23   South Carolina, Alabama, Mississippi, Florida,

24   Louisiana --

25       Q    I guess I needed to ask you where you



1   haven't --

2        A    Yeah.  I don't keep track of them.  I'm

3   thinking about 28 years of traveling around.

4        Q    All right.  All right.  So, clearly you've --

5        A    Now Hawaii.  How about that?  Oklahoma is on

6   the list, I have Kansas, Missouri --

7        Q    All right.  Are you required to have

8   continuing -- well, let me ask you this.  What is your

9   home State right now?

10       A    Florida.

11       Q    Okay.  And you are required to have continuing

12  education credits, correct?

13       A    Correct.

14       Q    And are you current?

15       A    Yes.

16       Q    All right.  So, I think we kind of briefly

17  touched on this before but have you received any

18  training, certification or designations by any courts as

19  well that will deem you to be an expert or certified in

20  any particular area or field?

21       A    I had a hag roof commercial and residential

22  back before they started requiring you to pay annually.

23  At the time it was supposed to be a lifetime license

24  certification.

25            I did not elect to continue paying them the



1  yearly fee once they switched over to an installment

2  fees, let's call it that.

3         Various carrier certifications; State Farm,

4  All State, Nationwide, USAA.  I'm sure there's others

5  I'm forgetting.

6     **Q    Any other certifications other than carrier**

7  **certifications that we haven't talked about?**

8     A    I carry a variety of appraiser certifications.

9  There's going to be a bunch of abbreviations; IAUA,

10  PLAN, LTP, Wind W-I-N-D.  I think that's all right now.

11    **Q    Okay.**

12    A    So, there's appraiser and a number of

13  certifications.

14    **Q    Besides the expert designation that we've**

15  **already talked about, have you received any other expert**

16  **designations?**

17    A    No, not that I can remember.

18    **Q    Do you have any background in engineering,**

19  **general contracting performing roofing or any other type**

20  **of trade?**

21    A    Yes.  General contracting in roofing I held

22  licenses in Texas and Louisiana as a general --

23  commercial and residential contractor.

24    **Q    What about a roofer?**

25    A    Texas doesn't require a license but I did own



1  a roofing company.  Still to this day I do in Texas.  A

2  couple of times -- it's Texas rule that you can't be an

3  adjuster and own a roofing company at the same time.

4        So I abdicated those responsibilities during

5  that time that they were arguing with themselves about

6  whether that could continue.

7    **Q    Okay.**

8    A    I just stepped out of it just so that I wasn't

9  in violation.

10   **Q    Okay.  And did you also do roofing in**

11 **Louisiana as well?**

12   A    Yes, we did roofing under the residential

13 contractor's license.

14   **Q    Okay.  I want to get a little bit into your**

15 **prep for today's deposition.  What did you do in order**

16 **to prepare for today?**

17   A    I responded to about 40 e-mails from Defense

18 counsel on scheduling, I reviewed the first Notice of

19 Loss that I received, I reviewed the e-mails that were

20 sent back and forth, meet with the desk adjuster and

21 meet with my IA firm manager, I reviewed my photo report

22 estimate general loss and notes in Exact Analysis.

23   **Q    What was the last one?**

24        MS. SABATINO:  I didn't send you --

25        THE WITNESS:  I'm sorry?



```
1              MS. SABATINO:  I didn't send you 40 e-mails.
2              THE WITNESS:  It's an approximation.
3              MS. SABATINO:  Can you hear me?
4              THE WITNESS:  It seems like it.
5       Q    (By Mr. Tolley) You said general loss and the
6    last part I didn't get what you reviewed.
7       A    Exact Analysis file notes.
8       Q    Okay.  Other than any conversations that you
9    had with opposing counsel, did you talk to anybody else
10   prior to your testimony today?
11      A    Yes.
12      Q    Who did you talk to?
13      A    I talked to my assistant, I talked to my wife
14   who I had to drop off at the airport this morning at
15   6:00 a.m., I talked to my locksmith when he came to
16   reprogram my car keys--
17      Q    Let me help you out here.  When I talk about
18   "talked to," I mean about your actual -- about your
19   actual testimony.
20      A    That's the full list.  You get the whole list.
21   I texted back and forth with Defendant's counsel
22   yesterday.
23      Q    Did you guys have subsequent discussion about
24   the case or was it just scheduling?
25      A    Let me review.
```



```
1        Q    Okay.

2        A    No, it went outside of scheduling.

3        Q    Okay.  And that was with Defense counsel?

4        A    Yes.

5        Q    Okay.  And have you signed any retainer

6   agreements with Defense counsel in regard to

7   representing you?

8        A    No, they did not represent me.  I'm clear on

9   that.

10       Q    Okay.  So, what did you and Defense counsel

11  speak about that was not related to scheduling with

12  regard to this claim?

13       A    Whether or not we can do preparation prior to

14  the deposition.

15       Q    And did you prepare prior to the deposition

16  with Defense counsel?

17       A    I did not.

18       Q    Okay.  Did you have any conversations about

19  the specifics or weaknesses of the case?

20       A    Sort of.

21       Q    Okay.  What do you mean by that?

22       A    Ms. Sabatino asked me to not make her life

23  hard tomorrow.

24            MS. SABATINO:  I just wanted to make sure that

25       he didn't turn over the record -- that he didn't
```



877.291.3376
www.UCRinc.com

1      turn over the privileged documents.

2      A    I guess the privileged and payment of my

3  invoice by the client.

4      Q    (By Mr. Tolley) Okay.  Besides not turning

5  over privileged documents were you advised not to maybe

6  testify as to certain particular area or field of your

7  adjustment?

8      A    No.

9      Q    Okay.  Did you have an opportunity prior to

10  your testimony to review the Defendant's Claim File?

11      A    No.

12      Q    Okay.  And with regard to your documents, do

13  you hold those documents to yourself or do you have

14  access to the documents through the Defendant's like

15  portals or something like that?

16      A    I print out everything.

17      Q    Okay.  So, when you adjusted this claim you

18  kept all of the documents that you made or created in

19  this claim?

20      A    Yes.

21      Q    Okay.  And did you store those electronically

22  as well as print them out?

23      A    There are some that are stored electronically.

24  I keep most of my adjusting records on various hard

25  drives.



1        I kind of -- I guess it's a curse of holding

2   those letters JRB after my name like -- I have a little

3   hard drive stored at my house in Texas, I have them in

4   my safe in my house and then I have them on the phone,

5   yes.

6        **Q    Okay.  How much time would you say you spent**

7   **reviewing and preparing for today's deposition?**

8        A    Probably a couple of hours.

9        **Q    Okay.  And during your handling of this claim**

10  **would you have made any notations in the Defendant's Log**

11  **Notes or is that separate from what you do?**

12       A    Yes, that would be the Exact Analysis

13  respondent.

14       **Q    Okay.  And you have those available for your**

15  **review today, correct?**

16       A    I do.

17       **Q    Okay.  I'm going to mark as Exhibit A and I'm**

18  **going to try to screen-share with you the Notice of**

19  **taking Deposition Duces Tecum.  You've had an**

20  **opportunity to review that prior to the deposition exam?**

21       A    I did and I have it.

22       **Q    Okay.  And can you see it on your screen now.**

23  **I've marked it as A, and it's being presented to your**

24  **screen share.**

25       A    Yes, I see it.



```
 1                 (Thereupon, Plaintiff's Exhibit A was entered

 2                 into the record.)

 3       Q    (By Mr. Tolley) All right.  I'm really more

 4    concerned about the third page here entitled Exhibit A

 5    and the five enumerated paragraphs.

 6            With regards to these five enumerated

 7    paragraphs, did you bring all documents with you today

 8    that are responsive to these requests that exist?

 9       A    I did.

10       Q    Okay.  And you're prepared to testify to these

11    documents if they exist to the best of your ability

12    today, correct?

13       A    I'm.

14       Q    Okay.  When were you first assigned as a field

15    adjuster?

16       A    It appears that I received the assignment on

17    February 26th, 2019.

18       Q    Okay.  And was there a particular reason why

19    you were assigned or was it randomly done?

20       A    At the time I was one of two field adjusters

21    handling all the tile roofs in the employer county for

22    UPC.

23       Q    Okay.  And I know we've kind of touched on it

24    before but if you can for purposes of this claim

25    describe your responsibilities and duties once you were
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    assigned to it.

2        A    Generally they wanted me to contact the

3    insured.  In this case I contacted the insured who I

4    believe relayed me to the contractor's representative

5    and contemporaneously received notification from the

6    desk adjuster, Josh DeMint, that he wanted me to contact

7    the contractor's representative, a gentleman named Will

8    Minor.  And so I was to schedule the inspection with

9    him, meeting him for the inspection, inspect the

10   interior, exterior for this structure and then prepare a

11   report and an estimate.

12       Q    Okay.  At any point in time did you run any

13   claim, background checks on the insured?

14       A    I did not.

15       Q    Did you review any claims or background checks

16   on the insured?

17       A    The only thing I really reviewed was their

18   deck page on the policy and the first Notice of Loss.

19       Q    All right.  Let's talk a little about the deck

20   page.  Did you have an opportunity to see what the

21   policy period was?

22       A    Yes.

23       Q    Okay.  What was the policy period?

24       A    7/21/2017 to 8/9/2017 on the deck page that I

25   got.




1      Q     Okay.  And based on the first Notice of Loss,

2  what was the reported date of loss by the insured?

3      A     September 10th, 2017.

4      Q     So, you would agree with me that the -- I'm

5  sorry, what did you say the policy period was?

6      A     What I said.

7      Q     August --

8      A     8/9/2017.

9      Q     Did you ever receive any other deck pages from

10  the insurance carrier?

11      A     No.

12      Q     Are you aware if maybe that policy period was

13  a mistake?

14      A     Well, I'm aware that the claimed date of loss

15  is not followed up in those dates but I'm also familiar

16  with UPC's numbering policy.  So, I did ask the desk

17  adjuster to provide me with the current deck page that

18  was never provided.

19      Q     Okay.  Are you aware of any point in time that

20  there was a policy by the Defendant that would have been

21  following the claimed date of loss?

22      A     I had no way to verify that other than asking

23  the desk adjuster which I did repeatedly.

24      Q     And he never responded with an answer?

25      A     No.



1        Q    What was the Claim Number assigned to this

2    matter?

3        A    2019FL22642.

4        Q    Okay.  Did you ever receive a full copy of the

5    policy prior to your inspection?

6        A    No, sir.

7        Q    Okay.  And let me ask you this.  Are you

8    tasked with making a coverage determination or

9    recommendation when you go out to the property?

10       A    It depends.

11       Q    In this case were you tasked with making a

12   coverage determination?

13       A    Initially, yes.

14       Q    All right.  Let me ask you this because you

15   said initially.  So, at some point in time I'm assuming

16   that you were no longer requested to do a coverage

17   determination, correct?

18       A    That is correct.

19       Q    So, when was that authority I guess taken away

20   from you or when did they tell you they didn't want you

21   to make a coverage determination?

22       A    Somewhere around the middle of March.

23       Q    Was that before or after your inspection?

24       A    It was after but let me clarify.  The roof was

25   not part of my coverage determination.



1    **Q    Okay.**

2    A    That's beginning.

3    **Q    All right.  We'll get into that then as we**

4    **kind of go through your inspection.  Did you determine -**

5    **- even if you weren't tasked with it, did you make a**

6    **coverage determination?**

7    A    I wrote an estimate for the damages to the

8    interior that I saw.  I don't know if that would be

9    termed as coverage determination because there's still a

10   pending determination on the roof.  So, a partial

11   coverage determination perhaps.

12   **Q    Okay.  And since you wrote an estimate you**

13   **also determined the scope of those damages, correct?**

14   A    Correct.

15   **Q    Okay.  I want to talk a little bit about the**

16   **first Notice of Loss.  When does it say that the insured**

17   **-- well, when does it say that the claim was actually**

18   **called in?**

19   A    One day prior to the day I was assigned that

20   would be February 21st, 2019.

21   **Q    Okay.  And who reported it?**

22   A    I don't have that information.  It doesn't

23   tell me that.

24   **Q    Okay.  Does it tell you what was reported?**

25   A    Yes.



1     Q    What was reported?

2     A    Broken and cracked tiles, lifted and shifted

3   tiles.  It says no interior water damage on the loss

4   notice.  And then comments about the contractor with FAR

5   Services which is incorrect.  The contractor was SFR

6   Services.  And the phone number will be assisting with

7   the repairs.

8     Q    Okay.  Given the reported date of loss was it

9   designated as a tarp roof?

10    A    I believe so.

11    Q    Related to Hurricane Irma?

12    A    Yes sir, I recognize that date as an Irma

13  claim.

14    Q    Okay.  When you were assigned on February

15  22nd, 20196, what was the -- you know, I know you said

16  you reviewed the deck page, did you have any

17  conversations with the insured or the insured's

18  representative on that date?

19    A    I made an attempt to contact them on the

20  following date I believe.  These are my field notes so

21  they are kind of scribbled occasionally.  It looks like

22  I received it on the 26th -- April 26th, and called them

23  on the 27th, contacted them on the 28th.

24    Q    And when you say contacted them you mean the

25  insured or SFR Services?



1    A    It looks like I made contact with Will and I

2    knew him so we've done inspections before.  SO, I

3    probably called him.  I don't have notes about that.

4    Q    Okay.  No problem.  Did Will tell you anything

5    about the loss during that conversation or was it just a

6    scheduling call?

7    A    I think by that point we were down to just,

8    "Hey man, I'll see you out there.  What's the good

9    time?"

10    Q    Okay.

11    A    So, there was really no need to go into

12    further description.

13    Q    Do you know if at any point in time you ever

14    took a recorded statement of the insured?

15    A    I know that I did not.

16    Q    Okay.  When did you schedule the inspection to

17    take place?

18    A    March 4th, 2019 between 3:00 and 4:00 p.m.

19    Q    It didn't take place on that date?

20    A    It appears that that was the date that I

21    inspected it, yes.

22    Q    Anything in your notes between the 27th of

23    February and the 4th of March that occurred between you

24    and the insured or you and the insured's representative

25    or you and the insurance company?



1    A    Notes from the desk adjuster about the named

2  insured being out of town which they had been

3  transmitted to me on the 27th.  And notes that the

4  insured mentioned water stains on the ceiling in the

5  garage and that those stains were found shortly after

6  Hurricane Irma but uncertain if they had gotten worse

7  since.  That's it, there's nothing else.

8    **Q    Okay.  All right.  So, let's talk about your**

9  **inspection.  Do you have notes regarding your**

10  **inspection?**

11    A    I do.

12    **Q    Okay.  Let me ask you this.  I know you**

13  **probably do a ton of these.  That typically is the**

14  **situation with field adjusters.  Do you have an**

15  **independent recollection of this inspection without**

16  **looking at your notes or photographs?**

17    A    Yes.

18    **Q    Okay.  Is there a particular reason why you**

19  **can recall this one, you know -- let me ask you this.**

20  **How many inspections would you say you did around the**

21  **time of this inspection?**

22    A    How big of a circle?

23    **Q    Just in general for -- let's say from February**

24  **and March of 2019, how many inspections would you say**

25  **you had done?**



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    A    Somewhere between 150 and 200.  I mean, three

2  to four a day, some days it rains, some days, you know -

3  - I mean, average 100 a month, something like that.

4    **Q    Okay.  All right.  So, is there a reason why**

5  **this one kind of sticks out more than others or, you**

6  **know -- I know that's a lot of inspections so to**

7  **remember this one without looking at your notes is there**

8  **a particular reason why?**

9    A    Yes.

10   **Q    Why?**

11   A    I was directed to do a lift test to check for

12  wind damages and then directed not to.

13   **Q    Okay.  Let me ask you this.  Who directed you**

14  **initially to do a lift test?**

15   A    Josh, the desk adjuster.

16   **Q    And when did he tell you to do that?**

17   A    February 26th, 2019.

18   **Q    And then when did he instruct you not to do a**

19  **lift test?**

20        MS. SABATINO:  Can I object to form for the

21        record?  This is privileged and it goes into UPC's

22        -- FSIC's policies and procedures.  But I can't

23        instruct him not to answer so do it.

24   **Q    (By Mr. Tolley) Mr. Buvens, when did he tell**

25  **you not to do the lift test?**



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1        A    That did not come from him, that came from the

 2   IA firm.

 3        Q    And just for the record what was the name of

 4   the IA firm again?

 5        A    Property Loss Specialist.

 6        Q    Let me ask you this;  Was there a reason why

 7   they told you not to do a lift test?

 8        A    There were several given.

 9        Q    What were those several reasons?

10        A    The TAS106 test didn't apply to existing roofs

11   it only applied to construction.

12        Q    And what else?

13        A    They weren't satisfied with the way we were

14   measuring the lift or conducting the lift tests.  There

15   was an entire discussion about it.  I mean, it was -- I

16   don't -- I don't remember the exact date of that.  I

17   think that it happened during this particular claim

18   handling because in writing they told me to do a lift

19   test on a roof.

20        Q    Okay.  Did they tell you not to do it before

21   your inspection or after your inspection?

22        A    After.

23        Q    Okay.  So, let me ask you this; did you do a

24   lift test on this roof?

25        A    Yes.
```



1     Q      And did you evidence that through photographs?

2     A      Yes.

3     Q      After being instructed by the independent

4  adjusting firm not to do a lift test, what happened to

5  those photographs?

6     A      I don't know.  I assume they are in the file.

7     Q      Okay.  But you didn't remove those from your

8  photographs, correct?

9     A      Absolutely not.

10    Q      Okay.  Now, what is a TAS106 test?

11    A      It's a test -- TAS stands for Testing

12  Application Standard.  It's a standardized 35 pound lift

13  on the nose of the tile, that downslope nose of the tile

14  to determine if the tile is in fact fastened correctly

15  to the decking, the sheathing.

16           And the test -- if uplift can occur when the

17  tile is acted on forces could be wind, could be prying,

18  could be anything really, but it's a standardized way

19  and it's actually a tool that's manufactured to test the

20  amount of force being applied to the tile.

21           Lots of engineers just use their fingers to do

22  that and that's the variety that we were doing.  About

23  three of my fingers would produce 35 pounds of lift.

24    Q      Okay.  So, you actually -- you used your

25  fingers and not the tool in this case?



1     A    Correct.

2     **Q    Okay.  Based on the TAS106 test that you did**

3  **on this roof what were you able to determine?**

4     A    There was lift on the right east slope which

5  would be the windward slope and not on the back in the

6  left slope.

7     **Q    Okay.  And when you say you determined there**

8  **was lift, would that be evidence of windstorm damage?**

9     A    It could be.

10    **Q    And when you say the windward slope, when you**

11 **say that do you mean the slope that would have been**

12 **directed by Hurricane Irma or what do you mean by that?**

13    A    Yes.  East was the primary direction of Irma

14 or the source of the highest winds during that storm. It

15 would be primarily a southern or a south and an east

16 component.

17         As the storm passed you're going to get west

18 winds as well, but they are going to be at a reduced

19 velocity and also at northward component.  Those winds

20 vary by location.

21         If you get into Cape Coral which would be

22 north and west of this we actually had more of a west

23 component due to the proximity.

24    **Q    Okay.  But you did find lift on that windward**

25 **slope, correct?**



1      A    Yes.

2      Q    And that lift could be evidence of damage from

3  Hurricane Irma, correct?

4      A    It could be.

5      Q    Okay.  All right.  Let me ask you a couple of

6  background questions about your actual inspection.

7  During your inspection how would you -- how would you

8  say the condition of the property was?

9      A    It's a typical, you know, Naples, Estero, Fort

10 Meyers gated neighborhood condition.  Pretty well

11 maintained and most of these places have an HOA and they

12 stay on you could fight about making sure your exterior

13 is maintained.  I would say average to above average.

14     Q    You know, the property wasn't neglected or

15 anything like that, right?

16     A    No.  I didn't -- I mean, I didn't note any

17 underwriting concerns of anything that would make me

18 think, you know, that the insured wasn't maintaining the

19 property.

20     Q    Okay.  And during your investigation --

21 inspection of the property were the insured and the

22 insured's contractor cooperative?

23     A    The insured was not present, he was out of

24 town but he did grant access.  And I -- honestly I don't

25 remember exactly who the gentleman was, it may have been



1  a brother or a brother-in-law that lives in town.  He

2  was there but he really didn't know what was going on

3  other than he was there to get us access to the

4  interior.

5      Q    Okay.  Anything about the delay in reporting,

6  you know, the amount of time between Irma hit and your

7  inspection; did that prejudice your inspection in any

8  way whatsoever?

9      A    I don't believe so.  I believe -- I believe

10 the conditions were pretty much consistent with what it

11 would have looked like, you know, shortly after clean up

12 after the storm.

13     Q    And I just have to ask this I already know the

14 answer but just to keep this on the record.  The roof

15 from your -- at least to the best of your knowledge was

16 the same roof that was there when Hurricane Irma

17 actually struck?

18     A    It was.  There was no evidence that there was

19 a permit issued or any work done.  I mean, the visual

20 appearance of the tiles was consistent with the roof

21 that was of that age.

22     Q    Okay.  And the lift on that windward slope is

23 also consistent with it being there during Hurricane

24 Irma, correct?

25     A    It could be, yeah.  I mean assuming that it's



1  due to wind.

2      Q    How were you able to determine if it's not

3  related to wind?

4      A    There are tile roofs that for example mortar-

5  fastened roofs -- one second I just got to respond--

6      Q    No problem.

7      A    There are tile roofs that are installed for

8  example with mortar patties that show lift outside the

9  presence of wind and that can be due to a number of

10  factors.  This one was mechanically fastened though.

11      Q    All right.  So, this one it would be likely

12  that that lift was caused by wind as opposed to some

13  other issues, correct?

14      A    That's what I determined, yes.

15      Q    Were you able to determine about how much that

16  slope was damaged or was affected by Hurricane Irma?

17      A    In only did one lift test on that slope.

18  Approximately the center of the roof slope perhaps a

19  little above the center when you're looking from the

20  east through the ridge.  Just because that area is more

21  likely to be affected by wind so that's the place that I

22  chose to do a lift test.

23          The contractor was showing other areas of lift

24  that was on the roof on that slope.

25      Q    Okay.  Based on what the contractor was



877.291.3376
www.UCRinc.com

1    **showing you and your own visual observations would you**

2    **say that at least more than six tiles were affected by**

3    **this event?**

4        A    Yes.  Combined, yes.  I mean, doing one lift

5    test is only going to show you the lift on that

6    particular tile whether or not it exceeds the two inch

7    threshold under TAS106.  But as you lift that tile it

8    levers the tile above it and the one beside it and the

9    one besides the one above it.

10           So, a lift test may only show you that there

11   is disruption of the tile surface on four tiles for

12   example.  It could be more, I mean, it depends on the

13   extent of the lift.

14       Q    Okay.  **What other evidence are you looking for**

15   **in windstorm damage when you're looking at a tile roof?**

16       A    I'm looking at several factors; I'm looking

17   for debris impacts to the exterior.  Sometimes we find

18   debris impacts to the drip edge and the back stop down

19   at the eaves of the roof.

20           Sometimes there would be ridge and hip tiles

21   that are dislodged.  That's a pretty common hurricane

22   damage or wind damage.

23           And then we will be looking for impacts to the

24   tile itself, impacts to roof pertinences, vents, lead

25   jacks around plumbing vents, off-ridge vents, valley



1    metal, modified -- exposed modified bitumen roofing

2    services like the valleys and things like that, it will

3    get impact most on those.

4       Q    And I know you said dislodged tiles -- there

5    were also missing or displaced tiles the evidence of

6    windstorm?

7       A    Yeah, I considered dislodged tiles and

8    displaced tiles.

9       Q    Okay.  And what about cracked tiles; can

10   cracked tiles be evidence of windstorm?

11      A    They can.

12      Q    Is there a particular pattern you're looking

13   for with cracked tiles or, you know, can it vary?

14      A    Yes, they can vary.  There is a lot of

15   discussion about vertical versus horizontal versus

16   spider web cracking on tiles.

17           So, it definitely can vary.  I mean, the

18   direction can be any of those three plus diagonal plus

19   breaks across the fastener if it's a mechanically

20   fastened roof.

21      Q    Okay.  So, basically any type of cracking can

22   be evidence of windstorm damage?

23      A    It can be.

24      Q    Okay.  Did you observe any displaced or

25   missing tiles on this roof?



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    A    Yes, on the east slope adjacent to the off

2   ridge vent area.

3    **Q    Let me ask you this.  You took photographs of**

4   **the roof?**

5    A    I did.

6    **Q    Okay.  How many photographs did you take?**

7    A    I don't recall that right off the bat.

8    **Q    Do you have a copy of your photograph report**

9   **with you?**

10    A    I do.  It appears about 85.  And the reason I

11   say about, the numbering starts at two but the first

12   five are photographs provided by aerial roof measurement

13   company.

14    **Q    Like how many pages is that photograph report?**

15    A    I'm just looking at it on my screen.  I mean,

16   I can choose to print it out however I want.  Two per

17   page if I do a print photo report I end up with -- bear

18   with me.

19    **Q    No problem.**

20    A    46 pages.

21    **Q    Okay.  And what was the address of this**

22   **property?  I'm sorry, I don't think we're able to**

23   **establish that.**

24    A    20370 Rookery R-O-O-K-E-R-Y Drive, Estero,

25   Florida 33928.



1    Q    Were you involved in the SDII Engineering

2    inspection whatsoever?

3    A    I did not know that there was an engineering

4    inspection on this property.

5    Q    Okay.  Let me go ahead and pull out your photo

6    sheet.  I'm going to mark those as Exhibit -- I think

7    we're on B at this point.

8         (Thereupon, Plaintiff's Exhibit B was entered

9         into the record.)

10    Q    (By Mr. Tolley) Do you see that on your

11    screen?

12    A    Yes.

13    Q    Okay.  Exhibit B, the 46-page photograph

14    report, did you take any pictures of the -- let me ask

15    you.  Actually, ask you.  Let's go to the roof first. I

16    think the first several are the interior.

17         And if you can look at your photograph report

18    on your computer, can you direct me to what page any

19    lift testing photograph would have been on?

20    A    I'm not able to do that without getting

21    through --

22    Q    Let me ask you this.  Looking here on Page 30

23    bottom photograph that would be a picture of a lift

24    test?

25    A    Yes, sir.



1        Q    Okay.  And how many inches is it showing that
2    that tile roof lifted?
3        A    It's showing approximately three inches.  I
4    don't lift them past that point in order to not create
5    further damages.
6        Q    Okay.  And this is on that windward slope I'm
7    assuming?
8        A    Yes sir, the right wind slope.
9        Q    And this is consistent with windstorm damage,
10   correct?
11       A    On this particular roof it is.
12       Q    Okay.  Looking here on Page 31 the bottom
13   photograph, what is that photo showing?
14       A    It's a dislodged tile adjacent to the off
15   ridge vent also on the east slope.
16       Q    Okay.  And with regard to this tile is that
17   evidence of windstorm damage?
18       A    Yes.
19       Q    Is this on the windward slope?  I'm sorry, I
20   think you said it but I can't remember.
21       A    Yes, it's on the east slope.  The right slope.
22       Q    And I'm highlighting the tile that's clearly
23   got, you know, several inches of space between it and
24   the top tile.  Is that the displaced tile?
25       A    Yes, it would be underlayed and exposed.



1      Q    Okay.  Were you able to determine if there was

2  damage to the underlayment?

3      A    I was not.

4      Q    Okay.  Looking here on Page 32 the top

5  photograph here, I believe there is a row of displaced

6  tiles underneath this metal -- I think it's a vent.

7      A    Yeah, it's an off ridge vent.

8      Q    And you would agree with me -- how many tiles

9  would you say in this picture are displaced?

10     A    They are seven.  Well, they are not all on the

11  photograph but there are seven along the bottom edge of

12  that ridge vent -- off ridge vent that are displaced.

13     Q    Is that evidence of windstorm damage?

14     A    Yes.

15     Q    And is this on the same windward slope?

16     A    Yes.  You can see the street on the

17  background.

18     Q    Okay.  And Page 36 the top photograph, what

19  are you showing here in terms of I see you kind of

20  putting your hands on the tile?

21     A    That's the back slope and those tiles are not

22  actually able to be lifted at all.

23     Q    Okay.  So, based on -- I'm sorry.

24     A    The finger that's not touching is my pinky.

25  The other three are touching the tile.  And we referred



1  to a three-finger lift test earlier.  That's just

2  showing that even though I'm putting a pretty great

3  pressure on that tile it's not lifting.

4      **Q**   **I guess this would show that, you know, tiles**

5  **that might not have been affected by the windstorm were**

6  **securely fastened on this roof, correct?**

7      A   That would be the area that I tested.  That's

8  correct, yes.

9      **Q**   **Okay.  So, we're not dealing with a roof that**

10 **just had, you know, horrible fastening issues, correct?**

11     A   From my inspection I didn't find improper

12 installation to be a factor.

13     **Q**   **Okay.  Hold on a second.  All right.  With**

14 **regard to photograph Number 37, what are we looking at**

15 **here in the bottom photograph -- I mean Page 37?**

16     A   That's a cracked tile with a prior repair.

17     **Q**   **Any idea when this tile was repaired?**

18     A   No, sir.

19     **Q**   **Okay.  So, it could have been after Hurricane**

20 **Irma?**

21     A   It could have been.  The cock does appear to

22 be aged so it could have also been prior to the storm

23 date.

24     **Q**   **Okay.  All right.  Photograph -- the top**

25 **photograph on Page 38--**



1        A    Yes.

2        Q    --it looks like another lift test here?

3        A    It is another three-finger lift test.

4

5        Q    And would you agree with me that -- well, we

6   don't have a measurement in here but do you know if it

7   was over the two inches?

8        A    It was actually under two inches.

9        Q    Okay.  But with regard to this tile, this was

10  not on the windward slope, correct?

11       A    Correct.  That would be on the leeward slope.

12  The left slope, the west slope.

13       Q    Okay.  And on Page 39 the two photographs

14  actually they are kind of similar.  What are we seeing

15  here?

16       A    It's an unbonded ridge tile and I just

17  photographed that to show the method of attachment on

18  the ridge and hip -- that's actually a hip tile but I'm

19  just showing that they are not firmly attached.

20       Q    Okay.  And can that be the result of windstorm

21  damage or is that the result of something else?

22       A    It can be.  Normally if you've for unbonded

23  ridge tiles prior to a wind event like Irma they are

24  going to come off.  But that's -- you know, that's a

25  general evasion.  I didn't see any evidence of tiles



1  that were actually this large but I take these photos to

2  show that they are loose and that there is no mechanical

3  fastening other than the mortar.  I mean, mortar is a

4  mechanical fastening and it's applied by human being's

5  hands.  So, if there's no screw despite the fact that

6  there's actually a hole or a fastener to be placed on

7  that tile.

8      **Q     Okay.  So, given the fact that this was, you**

9  **know, not fastened out by a screw and that it appears it**

10  **was only at some point fastened out by a mortar, would**

11  **that be consistent -- the fact that it's still there,**

12  **would that be consistent with the fact that a windstorm**

13  **event caused it to be unbonded?**

14      A     In my opinion, not necessarily.

15      **Q     Okay.  And why is that?**

16      A     Usually if they are unbonded before the storm

17  some of the tiles depending on their location on the

18  roof, you get varying wind speeds across the roof, it

19  seems to be worse at the eaves and at the tops.

20          So, if you're dealing with a roof tile or a

21  hip tile that's halfway up a hip, it may not have been

22  subjected to the full impact of the storm.

23      **Q     Based on that then let me ask you, with**

24  **regards to these types of tile as being either closer to**

25  **the bottom or to the top of the roof as those tiles**



1   **obviously would have been, were those tiles screwed down**

2   **or were they also debonded?**

3        A    There was a variety of both bonded and

4   unbonded ridge and hip tiles on this roof.

5        Q    Okay.

6        A    There roof appearing a pattern to say these

7   unbonded tiles were the result of wind damage.

8        Q    **Okay.  So, you can't testify as to any**

9   **unbonded tiles being the result of wind damage?**

10       A    I was not able to on this roof, no.

11       Q    **Okay.  Photograph 42 here the bottom -- I'm**

12  **sorry, Page 42 bottom photograph, what are we looking at**

13  **here?**

14       A    It's a tile that has prior repairs applied to

15  it.  It looks like some type of caulk-like powder.

16       Q    **Any idea of when these repairs took place?**

17       A    I don't know.  Again, the cock beach shows

18  some sign of age but due to, you know, the timeframe of

19  when this happened I just can't say exactly when it was

20  done.

21       Q    **So, these cracks can be evidence of windstorm**

22  **damage?**

23       A    It could be evidence of impact damage.  It

24  could be somebody stepping on the tile.

25       Q    **Okay.**



877.291.3376
www.UCRinc.com

1    A    I can't determine the -- it's a lot easier

2    when the fragments are there in their position to

3    determine what caused the damages than after someone

4    goes back and inputs repairs on.

5    **Q    Okay.  Let me ask you this; I zoomed in a**

6    **little bit here on this top photograph on the same Page**

7    **42.  And I'm going to highlight, it looks like about the**

8    **third tile down from one of the vents.  Is there a**

9    **missing tile there?**

10    A    It looks like there may be a partial tile

11    missing.  I honestly don't remember this one.  I see it

12    on the photograph but I don't remember documenting that

13    or noting it beyond this photograph.

14    **Q    Could that be evidence of windstorm damage?**

15    A    A missing tile could be evidence of windstorm

16    damage.  This is on the leeward slope but again it's in

17    a valley so I don't -- I just don't have any

18    recollection of that particular tile.

19    **Q    And you kind of took my next question for me.**

20    **Is this the windward slope here, that slope?**

21    A    No, that's the leeward slope.  That would be

22    the west side.

23    **Q    Okay.**

24    A    And it's in a protected area down the valley

25    too.  You can see that roof above it.

1    Q    Okay.

2    A    With the tiles on it.  And that may have been

3  why I didn't really focus on it.  I don't remember.

4    Q    Okay.  Page 43, the bottom photograph here,

5  that circle -- I don't know what that's called or what

6  you call that. What is that like metal circle --

7    A    I'm sorry.  I apologize.  It's a plumbing

8  vent.  It's a led flushing applied over a plumbing vent.

9    Q    Okay.  And then the tile right there next to

10  you kind of alluded to it appears to be cracked, right?

11    A    Yes.

12    Q    Okay.  This is near the top of the roof?

13    A    Correct.  It's three rows down from the ridge.

14    Q    Okay.  So, would this be evidence of windstorm

15  damage as well?

16    A    It could be.

17    Q    Okay.  And at Page 44 just has a more zoomed

18  in version, is that correct?

19    A    Yes, and in that photo there's actually some

20  caulk visible where it's been repaired at some point.

21    Q    Okay.  And again you don't know when those

22  repairs took place, correct?

23    A    I do not.

24    Q    Okay.  I'm sorry to do this but we just kind

25  of have to go through each page photograph by



```
 1    photograph.

 2         A    We're doing good.

 3         Q    Page 45 bottom photograph, what are we looking

 4    at here?

 5         A    That's actually a more or less vertical crack

 6    in a tile.

 7         Q    And you know my question already but could

 8    this be evidence of windstorm damage?

 9         A    You know my answer already.  It could.

10         Q    All right.  And looking here at the bottom

11    page here, Page 46, is this a different tile that is

12    cracked that we just looked at on 45?

13         A    I believe that's actually a close-up of the

14    impact area or what appears to be impact area on that

15    crack.

16         Q    Okay.  All right.

17         A    And it's not a great photograph I will clearly

18    admit.  A lot of these were taken in the bright

19    sunlight.  You can see the shadow and we get some kind

20    of contrast, the difficulties with our cameras.  So, it

21    doesn't really show it very well.

22         Q    So let me ask you this.  Based on your

23    observations to the tile and the roofing system, were

24    you able to rule out windstorm damages to this roof?

25         A    No.
```



1    Q    Were you able to actually find evidence of

2  windstorm damage?

3    A    Yes.

4    Q    And what was that evidence?

5    A    The lifted tiles and dislodged tiles, the

6  impact damage tiles which were consistent with the

7  directionality of the wind.

8    Q    All right.  Did you observe any interior water

9  damage as a result of this loss?

10   A    Yes, I did.

11   Q    And where did you observe the interior water

12 damage?

13   A    That was in the garage on the ceiling.

14   Q    What about in any closets?  I know that there

15 was some reported for closets.

16   A    I did not -- I just notice that again on the

17 first Notice of Loss but the focus was on the garage.

18   Q    With regard to the garage what slope is above

19 that garage; is it the windward slope?

20   A    I believe it was the leeward slope actually

21 but it was pretty close to the center if I recall.

22   Q    What is a leeward slope?

23   A    The side opposite the windward slope.

24   Q    Let me ask you this.  When an event like

25 Hurricane Irma happens and you have a windward slope is



1    it impossible to have damage on that leeward slope?

2        A    No.

3        Q    Okay.  Is it likely to have -- are you likely

4    to have damage on that slope?

5        A    That's actually the slope that's usually

6    mostly affected due to the pattern of displacement of

7    ridge and hip tiles.  If they actually come loose during

8    the storm that's where they are going to land.

9        Q    Okay.

10       A    So, I would say -- you could say it's just as

11   likely to have damage on the leeward slope as on the

12   windward slope from tiles or from debris.  I mean, if

13   you're seeing that the neighbor's gutter flying over at

14   your roof at 75 or 80 miles an hour, it's probably going

15   to hit the windward slope and then tumble over the ridge

16   and come flattering back on the leeward slope.

17            So, it's possible but you can usually tell the

18   direction out of the storm based on the damages.

19       Q    Okay.  So, seeing evidence of water damage in

20   this drawing was it to the ceiling?

21       A    Yes.

22       Q    And would that be consistent with having

23   damage to the leeward slope as a result of Hurricane

24   Irma?

25       A    It could be.



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    Q    Okay.  I'm looking here at Page 6.  I don't

2  know if you can see the water damage in any of these

3  photographs or if you can direct me to which photograph

4  we're going to see the water damage on the ceiling.

5    A    I'm not sure.  Can you get me -- can you stop

6  sharing your screen so that I can actually see

7  something?

8    Q    Sure.

9    A    All right.  Thank you.  It's just hard to --

10   Q    I get it.

11   A    So, I'm looking at photograph Number 13 and

12  14.

13   Q    Can I screen-share those for you?

14   A    No, don't please.

15   Q    All right.  Let me go to -- when you say

16  photograph 13 and 14 do you mean the actual photograph

17  number or page number?

18   A    They make it difficult, don't they?  Let's

19  see, it's going to be on the side that's actually --

20  that's right.  He's got some peg board in the garage I'm

21  just trying to kind of piece it together as to exactly

22  where that's located in the garage.

23   Q    To me it looks like it's on Page 7 and the top

24  of Page 8.

25   A    It looks like it's on the -- if you look at



1    the house from the series of photographs, it looks like

2    it's on under the leeward slope on the right side of the

3    garage as you're looking at the house.

4         **Q    Okay.  I think I have --**

5         A    But that's just me.  I did not do a very good

6    job of over-viewing that and there's really not enough

7    clues in the photographs.  I can see the common safe

8    hand, you know, on the side of that and -- it looks like

9    it actually might be under the -- let me look back.

10        There is some peg board in these photos on the

11   right side of the garage and it looks like I've got a

12   picture of the top of that, the items that are on that

13   metal shelf.

14        If you look in -- if you look across the

15   windshield of the car there's a Christmas tree from the

16   top shelf and some sort of cylindrical object behind it

17   with some paint cans.

18        And then when you go two photos forward that -

19   - yeah, that -- it looks like it's actually under the

20   windward slope, I apologize.

21        **Q    Okay.  Let me go ahead.  I think I found the**

22   **photos so I'm going to screen-share with you, okay?**

23        A    Okay.  Go ahead.

24        **Q    All right.  Are these the photos you're**

25   **talking about?  It looks like the peg board there and**



```
 1    the paint can.

 2        A    Yes.

 3        Q    Okay.

 4        A    That shiny metal object at the top of the

 5    photo, that top photo at the top, that's the air-

 6    conditioner condensate plant.  It actually kind of inks

 7    below the surface of the ceiling.

 8        Q    So, the top photograph here on Page 7 of

 9    Exhibit B, I'm highlighting that area that looks like a

10    water stain right there on the roof, right?  On the

11    ceiling?

12        A    It looks like it, yes sir.

13        Q    Okay.  And then let's go -- in this page it

14    also looks like the water damage on Page 8 Exhibit B in

15    the ceiling, correct?

16        A    Right.

17        Q    Okay.  And that's all consistent with water

18    entering the residence from the roof, correct?

19        A    It appears to be, yes.

20        Q    And that could be consistent with windstorm-

21    related damages as a result of Hurricane Irma, correct?

22        A    It could be, correct.

23        Q    And I know you had mentioned before you had

24    said something about you -- you thought that the

25    interior damage should have been covered?
```



```
1              MS. SABATINO:  Objection, form.
2        Q    (By Mr. Tolley) You can answer.
3        A    Yes, I wrote an estimate for the interior
4    damage so that would indicate that I thought it should
5    have been covered.
6        Q    Okay.  With regard to the roof, I mean, we've
7    talked about evidence of windstorm damage, did your
8    estimate include any extension of coverage for the roof?
9        A    No, sir.
10       Q    Why not?
11       A    That wasn't part of the scope that they wanted
12   us doing on this particular claim.
13       Q    Were you instructed by the carrier not to --
14   not to scope the roof?
15             MS. SABATINO:  Objection, form.
16       A    No.  To the contrary I was instructed to scope
17   the roof.
18       Q    (By Mr. Tolley) Okay.  So, then if you were
19   instructed to scope the roof then how come it isn't
20   included in the estimate?  That's what I'm kind of
21   confused about.
22       A    We were instructed not to write an estimate
23   for the roof damages.
24       Q    Why was that?
25       A    I'm not sure of their intentions on that.
```



1    Q    And who instructed you; was it the carrier or

2    the independent adjusting firm?

3         MS. SABATINO:  Objection, form.

4    Q    (By Mr. Tolley) You can answer.

5    A    At that point it was coming from the

6    independent adjusting firm.

7    Q    But you yourself believe there was evidence of

8    windstorm damage on this roof, correct?

9    A    Correct.

10   Q    Okay.  And did you have any indication that

11   windstorm damage was not covered by the policy in this

12   case?

13   A    No.

14   Q    Did you have any indication that windstorm

15   damage was covered by the policy?

16   A    I didn't have the policy.

17        MS. SABATINO:  Objection, form.

18   Q    (By Mr. Tolley) And you stated before you did

19   not take a recorded statement of the insured, correct?

20   A    I did not do that.

21   Q    Okay.  And you said you created a report in

22   this case?

23   A    I did.

24   Q    Okay.  And did that include all of the

25   observations that we've gone over today?


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1        A    I don't think so.
 2        Q    Okay.  Does it include anything that we
 3   haven't already discussed in terms of, you know, your
 4   observations or what type of damage was observed?
 5        A    Yes.
 6        Q    Okay.  What does it include that we haven't
 7   gone over?
 8        A    My report includes language that was inserted
 9   by the desk adjuster.
10        Q    And what was that language?
11             MS. SABATINO:  Object.
12        A    That no wind damages were observed upon
13   inspection.
14        Q    Were you made aware that he added that
15   language to your report?
16        A    I wasn't -- I was told to put that in my
17   report.
18        Q    And you were told by the desk adjuster?
19        A    Yes.
20        Q    And who was the desk adjuster again?
21        A    Josh DeMint.
22        Q    And you agree with me that that statement is
23   incorrect, correct?
24        A    Correct.
25        Q    Did you try to tell Mr. DeMint that that was
```



```
 1   an incorrect statement?

 2        A    On multiple occasions.

 3        Q    And did Mr. DeMint advise or did he respond to

 4   any of your statement regarding that being a false

 5   statement?

 6             MS. SABATINO:  Objection, form.

 7        A    He ignored the six requests that I made for

 8   him to address it.

 9             MR. TOLLEY:  I'm sorry, Madam Court Reporter,

10        did you say something?

11             THE COURT REPORTER:  No, I think Gina was

12        saying something.

13             MR. TOLLEY:  Oh, okay.  And you've gotten

14        everything clearly though so far, right?

15             THE COURT REPORTER:  Yes, I have everything.

16             MR. TOLLEY:  Okay.

17        Q    (By Mr. Tolley) Were you instructed by anybody

18   other than Mr. DeMint to include that statement in your

19   report?

20        A    Yes.

21        Q    Who else?

22        A    Andy Dorbett at Property Loss Specialist.

23        Q    Could you spell his last name for me?

24        A    D-O-R-B-E-T-T.

25        Q    And he was at Property Loss -- I'm sorry, I
```



```
 1   didn't hear the last part.
 2        A    Property Loss Specialist.
 3        Q    And what was his role on this claim?
 4        A    He's the Field Claim Manager.
 5        Q    Anybody else instructed you to include that in
 6   your report?
 7        A    Yes.
 8        Q    Who else?
 9        A    Jeff Nachreiner.  And I'll spell that for you.
10   N-A-C-H-R-E-I-N-E-R.
11        Q    And who is he?
12        A    He's the owner of Property Loss Specialist.
13        Q    Are you still employed by Property -- do you
14   still do work for them?
15        A    That's a difficult question.
16        Q    What do you mean?
17        A    I do but I believe that it's coming to an end.
18             THE WITNESS:  Bear with me one second I've got
19        to take a break to see who is at my door.
20             MR. TOLLEY:  Yeah, not a problem.  Let's take
21        a five-minute break actually.
22             THE WITNESS:  Okay.  Thanks.
23             (Thereupon, a short discussion was held off
24             record.)
25             (Deposition resumed.)
```



1    Q    (By Mr. Tolley) Okay.  We left off with regard

2    regards to the six requests you made to not put that

3    statement in your report.  And I specifically asked you

4    about if you still do work with Property Loss

5    Specialist.

6         MS. SABATINO:  Okay.  I'm objecting to form.

7    Q    (By Mr. Tolley) Okay.  I'm just kind of

8    setting up where we were.  You said that it's coming to

9    an end.  What did you mean by that?

10   A    I'm completing the remaining tarps that I have

11   on my -- they call it a VA, Virtual Claim Adjuster List

12   negotiating some payments to these depositions which are

13   like an avalanche coming down a mountain there's

14   hundreds of them.  So, we're still wrapping all that

15   stuff up.  But I don't do -- I don't take any new

16   assignments from them.

17        (Thereupon, a short discussion was held off

18        record.)

19        (Deposition resumed.)

20   Q    (By Mr. Tolley) All right.  I just want to

21   kind of go back a little bit to make sure we've got

22   everything on the record given than we've had some

23   technical difficulties.

24        So, you had indicated that the field adjuster

25   along -- I'm sorry, the desk adjuster along with Andy



1    Corbett --

2        A    Dorbett.

3        Q    **Dorbett and Jeff Nachreiner had told you to**

4    **put a statement in your report that you didn't observe**

5    **wind damages, correct?**

6        A    Correct.

7        Q    **And that statement was false, correct?**

8        A    That statement is false.

9        Q    **Okay.  And you had indicated that your time at**

10   **Property Loss Specialist is coming to an end.  Is that**

11   **related in any way to this claim?**

12       A    Indirectly, yes.

13       Q    **What do you mean by that?**

14       A    Well, it and other claims.

15       Q    **And with regards to those other claims is it**

16   **the same type of events that occurred in this claim in**

17   **terms of false statements and reports and things like**

18   **that?**

19            MS. SABATINO:  Objection, form.

20       A    Yes.

21       Q    **(By Mr. Tolley) And is that limited solely to**

22   **Property Loss Specialist or also the Defendant?**

23       A    It's primarily the Defendant.

24       Q    **Okay.**

25       A    I'm going to expound on that.



1     **Q    Go ahead.**

2     A    I was told by the Claim Director to either,

3  "Play ball" with regard to this deposition or I wouldn't

4  be working for UPC anymore.

5     **Q    Wow.**

6     A    I said, "I tell the truth, the whole truth. If

7  you don't like it I'm sorry about that.  You will have

8  to do what you have to do," which he in fact did.

9          He called Jeff Nachreiner and he told him that

10  I would not be writing any more claims for UPC.

11     **Q    And when you say Claim Director you mean of**

12  **UPC?**

13     A    Yes.

14     **Q    And who was that again?**

15     A    Jeff Bergstron.

16     **Q    And can you spell the last name for me please?**

17     A    I believe it's B-E-R-G-S-T-R-O-N, but I'm not

18  positive on that.

19     **Q    Okay.  But he's the Claim Director of the**

20  **Defendant's company, correct?**

21     A    He became the Claim Director in yes, last

22  summer sometime I believe.  And as far as I know he

23  still remains in that position.

24     **Q    With regards to this claim did the Defendant**

25  **or any of the Defendant's representatives instruct you**



1   to change or alter anything else that was not true with

2   what your observations or opinions were?

3          MS. SABATINO:  Objection, form.

4      Q    (By Mr. Tolley) You can answer.

5      A    The garage damage and debris removal items

6   were directed to be removed from my estimate.

7      Q    Let's go back to your report.  With regard to

8   your report were there any other false statements or

9   changes that the insurance company made or instructed

10  you to make or any of their representatives instructed

11  you to make with regard to that?

12         MS. SABATINO:  Objection, form.

13     A    Not that I recall.

14     Q    (By Mr. Tolley) But you worked at the other

15  changes to the estimate that you created that they

16  instructed you to do or they did at a later time other

17  than the garbage -- I'm sorry, the debris removal or the

18  garage damages?

19     A    Not that I'm aware of.

20     Q    With regard to the garage damages and debris

21  removal, what specifically did they instruct you to

22  remove from the estimate?

23     A    Everything.

24     Q    What was the original amount that you scoped

25  the garage damages and the debris removal at?



1        A    Bear with me one second I give you that.  The

2    total amount was $1376.30.

3        Q    **Sorry, how much was it again?  I was --**

4        A    Sure.  $1376.30.

5        Q    **And after the conversations you had with the**

6    **Defendants or representatives you were instructed to**

7    **make that a zero amount estimate?**

8        A    Correct.

9        Q    **And you -- I'm assuming you did not agree with**

10   **that, correct?**

11            MS. SABATINO:  Objection, form.

12       A    I did not.

13            THE WITNESS:  Sorry, Gina.

14            MS. SABATINO:  It's okay.

15       Q    **(Mr. Tolley) And that's because you observed**

16   **what you believed to be coverage damage to those perils?**

17       A    Yes, it's because I have a statutory duty to

18   write the correct estimate for the insured.

19       Q    **With regards to that estimate on -- without**

20   **the instructions by the Defendant and the Defendant's**

21   **representatives, would you have included a roof repair**

22   **in that or a roof replacement in that estimate?**

23       A    Yes, there would have been a full roof

24   replacement.

25       Q    **And the only reason why you didn't scope for**



1  that was because you were instructed not to by the

2  Defendants and their representatives, correct?

3      A    That is correct.  I'm not leaving.  I'm just

4  pulling something off my printer, so I can still hear

5  you.

6      Q    No problem.

7      A    Okay, back.

8      Q    Okay.  Are you aware of who instructed you at

9  the -- either the Defendant or the Defendant's

10  representative not to include a full roof replacement in

11  the estimate?

12          MS. SABATINO:  Objection, form.

13      A    Yes.

14      Q    (By Mr. Tolley) Okay.  Who was that?

15      A    There were two -- there were three managers.

16  Mike Holingsworth.  I believe the other guy's name was

17  Sean Burns, S-E-A-N Burns and Magdela.  And I don't

18  remember Magdela's last name.  But they were all

19  involved in the process which --

20          (Thereupon, a short discussion was held off

21          record.)

22          (Deposition resumed.)

23      Q    (By Mr. Tolley) -- not instructed to do by the

24  Defendant.  Is there anything else that they told you to

25  do or not to do that you felt uncomfortable with?



```
 1              MS. SABATINO:  Objection, form.
 2         A    That's going to be a long list and it's
 3    probably going to involve other claims besides this one
 4    and Ms. Sabatino is probably going to object to that.
 5         Q    (By Mr. Tolley) Well, let's first then just
 6    start with this claim.  Besides what we've gone over so
 7    far, was there anything that they instructed you to do
 8    or not to do that you felt uncomfortable with or felt
 9    like it wasn't the proper thing to do?
10         A    Other than what we've discussed on this claim,
11    no.
12         Q    I'm going to ask the next question.  What else
13    have they told you to do or not to do that you felt was
14    in violation of your duties?
15              MS. SABATINO:  Objection, form.  Is it as
16         related to this claim or is it -- can you please
17         just limit your questioning to this claim?
18              MR. TOLLEY:  I'm going to ask him the
19         question.  I don't know if you going to instruct
20         him not to answer since he's not, you know,
21         represented by counsel but I want to know with
22         regard to his experience with this insurance
23         company what they told him to do or not to do that
24         may have affected his ability to adjust those
25         claims.
```



1          So, if you think it's related or unrelated

2     claim if he knows that they told him to do that

3     maybe it affected his ability to adjust this claim.

4     Did I cut out there?

5          THE WITNESS:  You did cut out there.  I didn't

6     hear the middle of the sandwich.

7          MR. TOLLEY:  All right.  So, here's what I'm

8     going to do.  I'm going to re-ask the question.

9     Gina, you can either instruct him not to answer or

10    whatever you have to do on your side.

11    **Q     (By Mr. Tolley) But are there other**

12    **instructions that they gave you or told you to do or not**

13    **to do on any other claims that affected your ability to**

14    **adjust this claim?**

15         MS. SABATINO:  I'm going to object to form.

16    And, Mr. Buvens, I mean, I would appreciate if you

17    would just answer as it relates to this claim.

18    **Q     (By Mr. Tolley) Mr. Buvens, I believe you have**

19    **to answer, you know, truthfully.  You are under oath,**

20    **so.**

21    A    Yes.  Under the constantly changing claim-

22    handling practices 23 or 24 different processes that I'm

23    aware of, there were several instances where they asked

24    licensed field adjusters to go against their statutory

25    duties to handle claims in good faith with the



1  policyholders.

2        Those include ignoring damages, ignoring

3  mitigation amounts that the insured provided evidence of

4  payment, removing estimates that the field adjuster

5  wrote so that they could use snider roofing comparative

6  estimates and therefore underpay the field adjuster for

7  the agreed upon fee schedule, treating the independent

8  field adjusters as employees.

9        I don't know how you would fire a 1099

10  employee without them being an employee of a corporation

11  but they did it, basically strong-arming the IA firms

12  and the independent adjusters into handling the claim

13  100%.

14     **Q    On this case was this one of the only times**

15  **you were asked to include a false narrative in your**

16  **report that you did not agree with by the Defendant?**

17        MS. SABATINO:  Objection, form.

18     A    No.

19     **Q    (By Mr. Tolley) How many times would you say**

20  **you were asked to include something that you didn't**

21  **believe to be true in your report?**

22        MS. SABATINO:  Objection, form.

23     A    I don't really have a way to count that at

24  this time.  I'm preparing you a spreadsheet to include

25  all of those instances.



1    Q    (By Mr. Tolley) Okay.  Let's put it this way;

2    would you say it was over 110 times?

3    A    Over.

4    Q    Over 150 times?

5    A    Over.

6    Q    Over 180 times?

7    A    Over.

8    Q    And about how long was this going on for?

9    A    Again, in varying degrees we had 23 or 24

10   different guideline changes; some in writing, some oral

11   that changed the way that tile roofs and/or shingle

12   roofs and/or interior damages were handled.

13   Q    And was this -- you know, was this something

14   that was occurring before Hurricane Irma or during and

15   after Hurricane Irma?

16   A    It would all be after Hurricane Irma.  I

17   didn't start working for them until after Hurricane

18   Irma.  And at first the claim handling was great. That's

19   why I signed on to work for them.

20   Q    Okay.  So, let me ask you this then.  About -

21   - you know, give me an estimate, you don't have to give

22   me an exact date -- but around what date or what year

23   did it start changing into what you've testified to now?

24   A    That's a really long answer--

25        MS. SABATINO:  I'm going to object to form as



877.291.3376
www.UCRinc.com

1    well before you start answering then you can

2    answer.

3         THE WITNESS:  Fair enough.

4    A    There were a series of guideline changes

5    probably starting at the end of 2017.  Some of the

6    guideline changes included slipping back to a prior

7    claim damage directive with slight modifications.  But

8    it just -- it was basically every four to six weeks

9    there was a new guideline change.

10   **Q    (By Mr. Tolley) Okay.**

11   A    I believe the count was four claim managers

12   over the time period that I worked for them which is

13   just a little bit over two years.

14   **Q    Okay.  And these changes -- these**

15   **instructions, specifically the ones dealing with putting**

16   **false, you know, false statements in your narrative,**

17   **those were the directives of the insurance carriers**

18   **themselves or the independent adjusting firm?**

19        MS. SABATINO:  Objection, form.

20   **Q    (By Mr. Tolley) You can answer.**

21   A    They were not consistent with the IA firms'

22   handling on other carriers.  So, I can only conclude

23   from that that they came from UPC.  Plus I got the

24   directive directly from the people who I believe to be

25   managers and employees at UPC.



1      Q     And that -- some of those direct instructions

2    specifically in this case with regard to the false

3    statement that there was no windstorm damage observed,

4    that was actually directly from an employee of the

5    Defendant, correct?

6            MS. SABATINO:  Objection, form.

7      A    Yes, directly.

8      Q    (By Mr. Tolley) Okay.

9            MS. SABATINO:  Actually I need to run to the

10          restroom.  Can I take a quick like three-minute

11          break?

12           MR. TOLLEY:  Yeah.  Let's come back at 12:55?

13           MS. SABATINO:  Perfect.

14          (Thereupon, a short discussion was held off

15          record.)

16          (Deposition resumed.)

17     Q    (By Mr. Tolley) Mr. Buvens, with regard to the

18   things we've gone over in terms of the instructions by

19   the insurance provider and the independent adjusting

20   firms to include a false statement in your report, do

21   you have any e-mails, letters, correspondences or

22   anything in writing from either of those two parties

23   that indicated they wanted you to do that?

24     A    I do.

25           MS. SABATINO:  Objection, form.



1    A    I do.

2    Q    (By Mr. Tolley) Okay.  And in that subpoenaed

3    duces tecum I asked that you provide any of those

4    correspondences.  Do you have the ability to e-mail

5    those to me?

6    A    I can.  It will take me a little while to get

7    them together.

8    Q    Okay.  So, I guess since you have a 1:30 I'll

9    reserve my right to come back and question if I need to

10   on any of those documents.  But if you could provide

11   these to me, you know, when you get a chance to

12   correlate them I'll be, you know, greatly appreciative.

13   A    Sure.

14   Q    Are they e-mails like what type of

15   correspondence evidence is caught up by the Defendant?

16   A    There is a variety.  There are messages in

17   Exact Analysis on various claims, there are e-mails from

18   managers, file reviewers at Property Loss Specialist,

19   phone calls, notes, text messages from the Claim

20   Directors of the other IA firm that UPC used.

21   Q    Are there any correspondences or e-mails from

22   anyone directly employed with UPC regarding this claim?

23   A    About this claim?

24   Q    Yes.

25   A    No.  The only correspondence that I had was



877.291.3376
www.UCRinc.com

1   with Josh DeMint through Exact Analysis and one

2   unreturned e-mail to Mr. DeMint asking him to contact

3   me.

4        **Q    Okay.  So, nowhere in writing do you have**

5   **anything -- any of the messages from Mr. DeMint to**

6   **include that statement in your report?**

7        A    I don't -- not on this claim.  I don't see

8   anything.  I basically when I'm prepping for these

9   things that I just search by the insured's name and pull

10  up any e-mails that I have that are related to the

11  claim.

12       **Q    Okay.  But in the other claims you do have e-**

13  **mails and correspondences directly from the Defendant**

14  **instructing you to do -- to engage in this type of**

15  **fraudulent behavior.  Is that fair to say?**

16            MS. SABATINO:  Objection, form.

17       A    Amazingly so, yes.

18       **Q    (By Mr. Tolley) With regards to those**

19  **correspondences that you said you sent them six times -**

20  **- six requests to not include that statement in your**

21  **report, do you at least have those six requests in**

22  **writing?**

23       A    They are in Exact Analysis.  I mean, it's

24  basically a request to contact me, is anything further

25  needed, is anything further needed.  And that's how we



877.291.3376
www.UCRinc.com

1    finally arrived at this final determination to remove

2    these -- some of the estimates.

3         Q    And did they do that by phone; the actual --?

4         A    No, it was in Exact Analysis on April 22nd.

5         Q    Okay.  So, the exact instruction to remove

6    that stuff from your estimate is in writing through

7    Exact?

8         A    Yes.  It is.

9         Q    And do any of those correspondences deal with

10   the roof as well?

11        A    Indirectly, yeah.  I mean, it's a discussion

12   of whether or not there's a storm-created opening on the

13   roof to provide coverage for the interior damages to the

14   garage.

15        Q    Did you determine if there was a storm-

16   related opening?

17        A    Yes.

18        Q    Were those -- where were those storm-related

19   openings; was it more than one?

20        A    Well, the lift on the garage -- I mean, on the

21   garage slope is the same slope as the east windward

22   slope.  I mean, it's just all -- it's all one big

23   connected slope, it's got a little jog or half valley in

24   the hip in there.  But it's all the same facing the

25   slope.



1      Q    Okay.  So, I want to ask you this because, you

2   know, obviously these are statements that usually a

3   field adjuster would make regarding a former employer or

4   a current employer.  So, did anything happen between you

5   and the Defendant's company that, you know, that cause

6   you to say anything like this or anything like that or

7   is it just simply that they are instructing you to do

8   things that you believe are unethical and immoral?

9      A    Yes, they have claimed that that's the reason

10   for my testimony.  They are incorrect.

11      Q    What have they claimed?

12      A    They have claimed that I'm mad at them and

13   trying to get revenge on the company or something like

14   that.  I'm sure you'll hear that from Ms. Sabatino

15   today.

16           But the truth is that I provided them with

17   defense for claims that actually have a defense.  I gave

18   them information that helps them settle claims.  They

19   don't seem to see it that way.

20      Q    Okay.  And what specifically did they state as

21   to being the reason that you would be mad at them or try

22   to get revenge on them?

23           MS. SABATINO:  Objection, form.

24           MR. TOLLEY:  I'm sorry Gina, you objected to

25      form?



877.291.3376
www.UCRinc.com

```
 1              MS. SABATINO:  Yes.
 2         Q    (By Mr. Tolley) Okay.  You can answer, Mr.
 3    Buvens.
 4         A    Just the fact that they owe me a large sum of
 5    money and that they couldn't let me keep working UPC
 6    claims.
 7         Q    Do they owe you a large sum of money?
 8         A    They do.
 9         Q    And because you're testifying as to -- let's
10    break it down into two; one, the evidence that you
11    observed on this roof including to the roof and to the
12    insured damages, is that affected in any way by the fact
13    that the Defendant owes you a large sum of money?
14         A    No.
15         Q    Has your testimony as to the instructions by
16    the Defendants or their representatives to eliminate
17    certain items in your estimate or not to include the
18    roof, has that been affected in any way by them owing
19    you a large sum of money?
20              MS. SABATINO:  Objection, form.
21         A    No.  And that's evidenced by my
22    contemporaneous telling them, "Hey, I'm going to be in a
23    deposition one day answering these types of questions.
24    Stop it."
25         Q    And when you say that you mean when they are
```



1    **telling you to do something to not like including things**

2    **or to include false things, that's what you mean by that**

3    **statement you just made?**

4          A    Yes, I'm not going to lie to them.

5          **Q    Okay.  That's not related in any way to them**

6    **not paying you, correct?**

7          A    No.  I told them --

8               MS. SABATINO:  Object to form.

9               THE WITNESS:  I apologize.

10         **Q    (By Mr. Tolley) You can answer, Mr. Buvens.**

11         A    I told them way before the payment issue came

12   up, we had an agreement for them to pay me for the

13   alleged disputed amounts that they did get on the roof

14   that I scoped.

15              They used a Matthews Snider estimate and took

16   those amounts out of my estimate.  We had reached an

17   agreement that they would pay me on this we became

18   partners with the Claim Director at the time.

19              They started paying on them, they got a new

20   Claim Director, they stopped paying on them.  In the

21   time when Brian Morris was the Claim Director -- the

22   interim Claim Director, that's when they changed to

23   refer to it as whining.

24              We were complaining and whining about not

25   being paid and that, "We had already been paid enough."



877.291.3376
www.UCRinc.com

1      Q     When you say "Were," are there more than just

2  you in terms of the disgruntled field adjusters?

3      A     Yes.

4      Q     Who were the other field adjusters that you

5  know of?

6            MS. SABATINO:   Objection, form.

7      Q     (By Mr. Tolley) You can answer.

8      A     There's a giant list.  There were 13 or 14 IA

9  firms working for UPC at one time.

10      Q     I know you had indicated to them that you told

11  them to stop that, you know, this could come up in a

12  deposition in terms of, you know, them telling you to

13  provide false information or to redact certain things.

14  Did you do any of those correspondences in writing?

15      A     Yes.

16      Q     Okay.  Do you have a copy of those

17  correspondences?

18      A     I do.

19      Q     Can you provide those to me as well?

20      A     I can.

21      Q     And that was -- those correspondences was that

22  prior to the issues you had in terms of the finances

23  with them?

24      A     There was -- there was always a bit of an

25  issue starting around January of 2018 with the proper



877.291.3376
www.UCRinc.com

1   payment of claims.  But like I said around February we

2   actually reached a resolution with the Claims Manager.

3   It was kind of off and on with the IA firm, where they

4   said they were going to take care of us to make sure we

5   get paid just to hang on through the months.  And three

6   months would pass, we would get the same story and then

7   there would be some sort of agreement which UPC never

8   followed up on.  And then we just finally reached the

9   point where they said we're just not going to pay you.

10          So, it's hard to quantify exactly when it

11   happened.  The issue is that we kept working for them in

12   good faith trying to get their claims settled for their

13   policyholders and they continued deviating.

14       **Q    Okay.  Let me ask you this.  With regard to**

15   **this roof of the Black residence, did you observe any**

16   **damages consistent with wear and tear or deterioration?**

17       A    There's always going to be wear and tear on

18   any surface that's exposed to the elements.  So, if

19   you're asking if the tiles looked like they did when

20   they were installed, no.

21       **Q    Okay.  But --**

22       A    That change is due to wear and tear.  But

23   again, that's not a claimed peril as far as I know on

24   this roof it appears that the peril they claimed is

25   wind.



877.291.3376
www.UCRinc.com

1    **Q    Okay.  And you agree with the backing that**
2    **there was evidence of windstorm damage to the roof,**
3    **correct?**
4        A    Yes.  I pointed that out that, you know, there
5    seems to be a systemic failure to recognize the
6    difference between the peril and the condition.  But
7    they continued down that path of denying the wear and
8    tear.
9    **Q    Besides the managers and the names that you've**
10   **already given in terms of people at the Defendant's --**
11   **the Defendant's place of business or, you know, the**
12   **independent adjusting firm, are there any other managers**
13   **or any other presidents, vice presidents or anybody else**
14   **from the Defendant that instructed you to engage in this**
15   **type of activity?**
16       A    Well, I mean it filtered down from the Claim
17   Manager to the second level which was Brian -- I think
18   his name might have been Ryan Curry, Mike Holingsworth,
19   Magdela.  There was another girl there, there were about
20   five of them in various times that directed their desk
21   adjusters, the UPC staff desk adjusters, to give us
22   those directives.
23            And as I said at one point it was myself and
24   another gentleman that were doing all of the tile roofs
25   in Collier and Lee Counties and we had specific desk



1    adjusters assigned to us.

2         Q    Who was that other gentleman?

3         A    Niles Wood.  N-I-L-E-S W-O-O-D.

4         Q    And with regards to the assigned desk

5    adjuster, who were the assigned desk adjusters that you

6    had?

7         A    Josh DeMint was one of them.

8         Q    Anybody else?

9         A    And -- I'm not sure on the spelling.

10        Q    But these were direct employees of UPC,

11   correct?

12        A    As I understand it, yes.

13        Q    My question I guess more so is they are not

14   working for the independent adjusting firm, correct?

15        A    No.  Victoria Snovel, S-N-O-V-E-L, was another

16   one.  All direct employees.  I know that Josh DeMint has

17   an adjuster's license.  I know that Ann Baron has an

18   adjuster's license.  I've been unable to find one for

19   Victoria Snovel.

20        Q    How about Carol Johns?

21        A    I think Carol would be -- I think she's an IA

22   firm desk adjuster but I'm not sure.

23        Q    Okay.  Did you have any involvement with Carol

24   on this case?

25        A    Not that I recall.



1    Q    Do you know that ultimately this case was

2    denied?

3    A    I don't know.

4    Q    Okay.  Just for you to be aware, they denied

5    every single claim damage in this matter.  Do you agree

6    with that assessment by the carrier?

7         MS. SABATINO:  Objection, form.

8    A    No.

9    Q    (By Mr. Tolley) And do you believe that

10   coverage could have been extended to the roof as well as

11   the interior damages that you observed?

12   A    Yes, based on what I saw.

13   Q    Okay.  And that's the wind-related damages to

14   the roof and the wind-created opening causing water

15   damage to the interior?

16   A    Yes, assuming there was a policy in force.

17   Again, I don't have any evidence of that.

18   Q    And that's because the Defendant failed to

19   provide you with that policy?

20   A    Correct.  Or deck page was all I ever

21   requested earlier.

22   Q    Okay.  Your independent adjusting license is -

23   - are they all still in good standing -- well, the ones

24   that are active?

25   A    Yes, I don't have any disciplinary action



```
 1   anything like that if that's what you're asking.
 2       Q    That's exactly what I'm asking.  Any
 3   suspensions, fines, revocations, anything like that?
 4       A    No, sir.
 5       Q    Any complaints from UPC following essentially
 6   what you've been testifying to your disagreement with
 7   them?
 8       A    I'm sorry, say that again?
 9       Q    Sure.  Has any of your license -- has UPC
10   lodged any complaints against any of your licenses
11   following obviously your, I guess, falling out with
12   them?
13       A    No, I'm not aware of that nor any basis that
14   they would have to file anything.
15       Q    Okay.  Has the independent adjusting firm that
16   you, you know, got this court through have they retained
17   your services for other claims?
18       A    Yes.
19       Q    Okay.  And do you continue to work for them up
20   to this day?
21       A    I'm not right now.  I don't have anything
22   currently with them and I think due to the current legal
23   climate with UPC I don't think we're going to be
24   continuing with them.
25       Q    Are you currently involved in a legal action
```



1    against or have with UPC in terms of either against you

2    or you brought against them?

3        A    I don't have anything current but the

4    discussions about settlement have been brought up.

5        Q    Okay.  I don't want you to give me any

6    incriminating instructions or something about --

7        A    I'm not.

8        Q    --confidentiality.

9        A    I'm not.

10       Q    Okay.  And with regard to -- with regard to

11   your testimony today I know you've obviously spent quite

12   a bit of time testifying as to -- testifying as to this

13   type of behavior that the Defendant was behaving in.

14   Have you provided testimony in the other matters that

15   were consistent with this?

16       A    Yes.

17       Q    Okay.  What were those matters?

18       A    I have a spreadsheet.  I mean, it's lengthy;

19   ongoing depositions, depositions they are still trying

20   to schedule.  It takes up a significant portion of my

21   time.  Which is the nature of the current dispute; they

22   don't want to pay me for my time spent adjusting and in

23   deposition and talking with the lawyers.

24            I never had an agreement with them to work for

25   free, I never had an agreement with them to work for $80



1   an hour and split that fee with my firm.  But they

2   consider that to be part of the bill.

3      **Q    Okay.  How many claims would you say that you**

4   **were involved in regarding this type of activity by the**

5   **Defendant?  Just estimate.**

6          MS. SABATINO:  Objection, form.

7   A    Well over 1000.

8          MR. TOLLEY:  All right.  At this point I don't

9          have any further questions.  Gina, I'm sure you

10         have follow-up.

11         MS. SABATINO:  So, I do and I'm not going to

12         be done by 1:30.  So, I don't know, Mr. Buvens, can

13         you move your appointment or how would you like to

14         handle it?

15         THE WITNESS:  I'm going to try to put it off a

16         little bit but if it goes too long I'm going to

17         have to discontinue and we're going to have to

18         start at another time.

19         MS. SABATINO:  Okay.  I would need to have

20         that stated on the record and I would like to pick

21         a new date today where we can have this deposition

22         be continued and I want to make it clear that it's

23         not going to be ending today until I've finished

24         the cross examination.

25         THE WITNESS:  I will be glad to agree to a new



```
1      date therefore scheduling a new date while we make

2      it clear that it's not going to be ending until

3      you're done.

4            MS. SABATINO:  Correct.

5            THE WITNESS:  Correct?

6            MS. SABATINO:  Well, it's not going to be

7      ending until I've completed all my questioning.

8            THE WITNESS:  So, when are we scheduling a new

9      date?

10           MS. SABATINO:  I'm going to try to get it done

11     today.

12           THE WITNESS:  All right.  Do you want to

13     schedule a date now because I'm going to have to

14     leave at some point?

15           MS. SABATINO:  Why don't we -- let me get

16     through my questions and then if you have -- you

17     let me know when you have to leave and then we'll

18     schedule a new date if necessary.  Okay.  Are you

19     ready?

20           THE WITNESS:  Sure.

21           MS. SABATINO:  Okay.  And Madam Court

22     Reporter, I'm also going to have to enter a few

23     exhibits.  And could I have your e-mail because I'm

24     on my phone and I don't have the camera on my

25     computer screen?
```



1          THE COURT REPORTER:  Sure.  Would you like me
2     to give it to you now or when we're done with the
3     depo so we can continue?
4          MS. SABATINO:  Well, I need to unless Josh --
5     I mean John, can I send -- can you share your
6     screen for me?
7          MR. TOLLEY:  Yeah, just send me -- just give
8     me the -- share me the documents over via e-mail.
9          MS. SABATINO:  Okay, all right.  This will
10     take me one minute.
11          MR. TOLLEY:  While you're pulling that up, I
12     actually -- can I just ask him one question with
13     regard to the insurance company's name?
14          MS. SABATINO:  Yeah.
15          MR. TOLLEY:  Okay.
16     Q    (By Mr. Tolley) Mr. Buvens, with regards to
17     this claim, the named Defendant is -- hold on one
18     second.  I closed out of it.
19          Let me make sure I get the proper name for the
20     style of the case.
21     A    It's Family Security Insurance Company
22     Incorporated.
23     Q    Okay.  And with regard to your testimony
24     you've been testifying quite a bit about UPC.  Is it
25     your understanding that UPC is kind of the umbrella



1   company to Security?

2        A    Yeah, I'm not sure of the exact legal

3   structure but the dec page actually says UPC Insurance

4   keep the promise underwritten by Family Security and

5   Insurance Company.

6        **Q    Perfect, okay.  And with regard to UPC, are**

7   **you aware of what those initials stand for?**

8        A    United Property and Casualty.

9        **Q    Okay, perfect.**

10            MR. TOLLEY:  All right, I have no further

11        questions.  Gina, whenever you send it over just

12        let me know.

13            MS. SABATINO:  Okay.  I sent it over.  I sent

14        over three documents but I'm actually going to

15        start -- I do want to ask many questions but I'm

16        going to start from the -- I'm going to walk

17        backwards because I know that we're limited in time

18        today.

19                    CROSS EXAMINATION

20   BY MS. SABATINO:

21        **Q    Okay.  When did you start working -- when did**

22   **you start working for UPC, Rod?**

23        A    It was around the start of October 2017 but,

24   again, I was not an employee of UPC.

25        **Q    So you worked for PLS, Property Loss**



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    Specialist.  Is that correct?

2        A    I was contracted by PLS, yes.

3        Q    Okay.  And can you talk to me about the

4    contract that PL -- or that you had with PLS and with

5    FSIC or --

6             And when I refer to UPC or FSIC I just want to

7    state for the record that I will be using those terms

8    interchangeably but I'm -- like Family Security

9    Insurance Company is the carrier, so I'm -- I do mean

10   FSIC.

11       A    Okay, fair enough.

12       Q    So, how much were you paid by Property Loss

13   Specialist to inspect the claim on their behalf?

14       A    I was paid on a fee schedule which was

15   provided by your firm.

16       Q    Okay.  And do you remember the exact amount?

17       A    None of those changed frequently as well.  I

18   have copies of all of them.

19       Q    Okay.  And what about your fees to be deposed?

20       A    There was an hourly fee listed on some of the

21   fee schedules which also varied, but they agreed upon

22   fee we had for the TNE work, which is Time and Expense

23   work, was $125 at my level.

24             So, basically a senior or a large loss

25   adjuster. And that was agreed to by UPC and Property



877.291.3376
www.UCRinc.com

1    Loss Specialist.

2          But, again, that was after a fee schedule

3    change when they changed from fee schedule to a hybrid

4    which said that any claim you now turn in $100,000 was

5    going to be on time expense.  As opposed to the prior

6    fee schedule which said it would be on the fee schedule

7    and commensurate with the value of the loss.

8          **Q    (By Ms. Sabatino) Okay.  So, you would be paid**

9    **more if you wrote for more damage, is that correct?**

10         A    No.

11         **Q    Okay.  Explain to me.**

12         A    Well, if it's on TNE and you're only going to

13   bill for the three hours that I spend out there

14   examining the property and then getting the estimate,

15   I'm very efficient.  I'll actually make less for

16   $105,000 loss than I would for a $90,000 loss because of

17   the changes.

18         **Q    Okay.  And --**

19         A    So, that's --

20         **Q    Okay.  Go ahead.**

21         A    The initial undertaking was yes, you would

22   have been correct.  As it changed, that fee schedule

23   changed to a hybrid.

24         **Q    Okay.  So, say you sat for a deposition such**

25   **as the one we're at today, would you be paid -- so, you**



1   would be paid $125 per hour for Plaintiff's counsel to

2   take your deposition?

3        A    That was the original fee schedule that was in

4   place for TNE work.  That does not include depositions.

5        Q    Okay.  What was your fee -- have you -- have

6   you ever been paid to sit for a deposition such as the

7   deposition that we're at today?

8        A    Yes.

9        Q    Okay.  How much were you paid per hour to sit

10  for a field -- How much?

11       A    $275.

12       Q    Okay.

13       A    It's not hourly rate; it's for everything.

14       Q    Okay.  So, you were paid by UPC $275 per hour

15  for your field adjuster deposition.  Okay.  When

16  beginning from October 2017 when you first began working

17  for Property Loss Specialist?

18       A    Again, I didn't come to this deposition to

19  answer fee scheduling questions.  But you agree to that

20  rate, your client agrees to that rate, you send me an e-

21  mail agreeing to that rate.  Are we still negotiating

22  the rate at this point?

23       Q    No, I'm just trying to understand when that

24  rate stopped.  When it began and when it stopped. That's

25  a fair question.



1      A    I don't really have an answer for that because

2  there was so much discussion over whether UPC was going

3  to pay the field adjusters that they were treating like

4  their employees, to sit in depositions and to help

5  defend the cases and prepare with their defense counsel.

6         They expected us to provide all of that for

7  free and then they went back and started paying $100 an

8  hour.

9         Then they changed it to $125 when I showed

10 them the fee schedule.  Then some of the defense

11 counsel, Peterson Bernard, for example, paid $275 an

12 hour.  So, it's not a simple answer.

13     **Q    I'm just confused because it looks like you**

14 **were paid $275 per hour at some point and then it**

15 **stopped, is that correct?**

16     A    After much discussion, yes.

17     **Q    Okay.  So, how many months would you say you**

18 **were paid that $275 per hour from beginning work at**

19 **UPC?**

20     A    I don't know.  I really -- I don't have the

21 answer for how many months I worked.  Because are you

22 talking about the time it was invoiced to the time it

23 was finally paid or the time that you and I discussed

24 about it?  I don't know.  We agreed on it and then I

25 still didn't get a payment on it.  On this claim for



1    example.
2         **Q    I'm not talking about this claim, I'm just**
3    **speaking in general.**
4         A    The discussion has been going on for well over
5    a year.  Once the flood of depositions started and the
6    depositions take up my time when I could be working as
7    an appraiser or as an umpire, and then you compound that
8    on Exact and UPC denied the claim improperly and then
9    settled it later and didn't go back and pay the field
10   adjuster for the gross amount of the loss which is what
11   they need to pay on the fee schedule.
12        **Q    Okay.  But you stated that it was about a year**
13   **ago that you've been having these discussions.**
14        **So, is it fair to say that UPC paid you $275**
15   **per hour to sit for your deposition from 2017 when you**
16   **first began working for PLS until 2019?**
17        A    No.
18        **Q    Okay.  So, how long did they pay you?**
19        A    Again, the answer is still I don't know.  I
20   have to go back and check records on how long that
21   period was.
22        **Q    Okay.  So, when you're tasked with inspecting**
23   **a property, what did UPC tell you on this case; were you**
24   **sent out to determine coverage in this matter?**
25        A    At the beginning of this one, yes.  On the



1    interior.

2        Q    Okay.  So, my question becomes -- and just to

3    confirm because I remember your testimony -- your

4    earlier testimony you stated that FSIC instructed you

5    not to scope the -- any type of loss or damage on the

6    roof.  Is that fair?

7        A    No, that's not what I said at all.  What I

8    said was that Josh DeMint's directions were to do a lift

9    test.  That would necessarily be scoping damages on the

10   roof.

11       Q    Okay.  So, when -- okay.

12       A    And it's wind damages by showing the slope

13   direction and amount of wind damage style on the slope

14   as well as the sample of at least two groups of photos

15   of wind damaged tiles per directional slope do lift

16   tests on all tile roof slopes; from the front and center

17   tile with tape measurement showing and photo

18   documentation.  Those were the directions on February

19   26th.

20       Q    Okay.  So, I'm looking at your report and

21   I'm --

22       A    Did I testify differently than that?

23       Q    My understanding was that -- and correct me if

24   I'm wrong because I do not want false statements for the

25   deposition -- but my understanding is that you were not



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1   **instructed to scope any of the damages on the roof.**

2       A    It was a coverage question I believe that you

3   are confused about.  We weren't determining coverages on

4   the roof.

5       **Q    Okay.  So, in your report -- and I'm not going**

6   **to turn it over because I have marked it as privileged -**

7   **- but I do see you made some statements that state --**

8   **and I know we discussed it -- "No wind damages observed**

9   **upon inspection."**

10      A    Correct.

11      **Q    Okay.  And I also see that you found one**

12  **vertically broken tile found at the front slope which is**

13  **consistent with footfall and mechanical damages. Was**

14  **that accurate or was that something that you contend**

15  **FSIC told you to state in your report?**

16      A    Footfall/mechanical damages.  That's different

17  than a footfall and mechanical damage.

18      **Q    Okay.  What's the difference?**

19      A    You just misstated what I put in the report

20  first of all.  It says footfall/mechanical damage.

21      **Q    Okay.  So, it doesn't mean, "And," it's both?**

22      A    No, it can mean "or" but you said it as many.

23      **Q    Okay.  What -- I'm asking you.**

24      A    Okay.  You asked me if that's what I said and

25  I said no.



1    **Q    Okay.  We can move on.**

2    A    Okay.

3    **Q    Okay.  I have another question.  So, is this**

4    **your signature on your field adjuster's report dated**

5    **March 16th, 2019?**

6              MR. TOLLEY:  Gina, I just -- is there any way

7         we can get these as exhibits?  Because I don't know

8         how this witness is going to testify to something

9         you're looking at.  And I don't even know what

10        you're looking at so I can't --

11             MS. SABATINO:  I'm looking at the field

12        adjuster's report.

13             MR. TOLLEY:  I know but you're asking who is

14        on that and it's not in evidence, we don't know

15        what -- like nobody knows what you're looking at

16        right now.  Other than the thing titled, "Field

17        adjuster's report," but I think it needs to be an

18        exhibit.

19             MS. SABATINO:  Okay.  But I'm not going to

20        agree to that right now because I need to determine

21        whether or not I'm going to turn it over.  I just

22        have one more question about it.

23             MR. TOLLEY:  I can't instruct him not to

24        answer.  So, if he knows what you're talking about

25        he can answer, if he doesn't he can simply say he



1      doesn't know.  But I just -- I don't understand how

2      we're testifying to an exhibit without even looking

3      at an exhibit.

4           MS. SABATINO:  Well, he is.

5           MR. TOLLEY:  Okay.

6      **Q    (By Ms. Sabatino) Mr. Buvens, is that your**

7   **signature on the report?**

8      A    Absolutely.

9      **Q    Okay.  So, have you ever falsified a report**

10  **before as a licensed field adjuster?**

11     A    Is this in conjunction with the signature

12  question?

13     **Q    Yes.**

14     A    That signature is stored electronically in DSX

15  files for Xactimate reports.  I have not -- your client

16  has taken the DSX report from me and used my signature

17  on a falsified report on multiple occasions. Would you

18  like me to provide you copies?

19     **Q    Sure.  You can.  So, just to confirm, you did**

20  **not -- you did not --**

21          MR. TOLLEY:  Just for the record I would also

22      like a copy of this.

23     **Q    (By Ms. Sabatino) So, you did not sign this**

24  **particular report, is that your testimony?**

25     A    That is a mechanical signature that is stored



877.291.3376
www.UCRinc.com

1   in the report.  When you hit print -- if you go in there

2   and hit print today, my signature will appear on it

3   unless it is manually changed.  It is locked in with the

4   settings of the Estimator that is assigned to that

5   report.  That's correct.  It is my signature but anyone

6   at UPC can and they have changed these reports and left

7   my signature on them.

8       **Q    Okay.**

9       A    You see the ethical problem there?

10      **Q    Okay.**

11      A    I know --

12          MR. TOLLEY:  Hold on.  But see, this is Rod

13      having a problem with the record now.  He's

14      testifying that there's a different report, you're

15      testifying that there's a report but we don't have

16      evidence of the report for him to be cross examined

17      on.

18          So, I'm objecting to the form.  I think we

19      need to reserve this for the court to determine I

20      guess.  I don't understand how we can have two

21      different types of reports and not have him look at

22      one of the reports.  That's why we're having huge

23      evidentiary issues --

24      **Q    (By Ms. Sabatino) Rod, do you have the report**

25  **in front of you?**



**UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com

```
 1        A    I have the report in front of me.
 2        Q    So, I'm done with the -- I'm just going to ask
 3   other -- I'm going to ask other questions that have to
 4   do with the interior damages but I'm not going to
 5   discuss the report verbatim.
 6             MR. TOLLEY:  But we just had a line of
 7        questioning on this witness regarding the report
 8        and now there's no clarity on the record whether or
 9        not you guys were looking at the same report and
10        what the situation is on the reports.  I'm going to
11        object to form to all those.  I'm reserving our
12        right to move to compel these reports and to obtain
13        the reports --
14             MS. SABATINO:  There's only one report.
15        There's only one report.
16             MR. TOLLEY:  How do we know that?  It's never
17        been -- it's never actually been turned over.
18             MS. SABATINO:  It's on my privilege log.
19        That's fine.  We can certify -- we can take it in
20        front of the Court.  It's fine.
21             MR. TOLLEY:  Well, I'm just reserving my right
22        to go back and question whether or not there's two
23        reports.
24             I mean, we have all this information from Mr.
25        Buvens today as to the back date that UPC is
```



1    allegedly bonding to and we can't even get a copy

2    of the afforded estimates on this case.  So, that's

3    what I'm having issues with.

4         MS. SABATINO:  I might be able to turn over

5    the estimates.

6         THE WITNESS:  Which one?

7         MS. SABATINO:  I only have one.

8    **Q    (By Ms. Sabatino) Okay.  So, Mr. Buvens, I**

9    **have a question.  So, did you find -- you testified**

10   **earlier that you found interior damage to the property,**

11   **correct?**

12   A    Correct.  In my estimates.

13   **Q    Okay.  And what do you contend caused this**

14   **interior damage to the property even though -- okay go**

15   **ahead.**

16   A    It appears to be consistent with rain which

17   entered through the roof.

18   **Q    Okay.  And were you aware -- I know that**

19   **Plaintiffs' counsel asked you about whether or not you**

20   **knew that an engineer had been retained for -- to**

21   **inspect this loss after your inspection.  Were you aware**

22   **of that?**

23   A    I was not.

24   **Q    Okay. Did you know that the engineer concluded**

25   **this roof could be prepared?**



```
 1       A    I didn't know there was an engineer involved
 2  so no, I did not have any idea that they had.  But it's
 3  interesting because I should have been compensated for
 4  the damages if they should have been included in the
 5  report.
 6       Q    I don't know what you mean.  You're saying the
 7  repair?
 8       A    If the engineer found there were damages on
 9  the roof from wind, then there would have to be an
10  estimate for the repairs that the engineer said were
11  from wind.
12            As a calculation of the gross amount of the
13  loss wouldn't that estimate be the amount that UPC owed
14  me?
15       Q    Are you deposing me?
16       A    I'm asking you a question about your question
17  that you asked me.  Can you clarify it?
18       Q    I mean I --
19       A    No.
20       Q    Yes, I can.
21       A    No.  No was my answer, I'm not deposing you.
22       Q    I'm sorry.
23       A    The question I answered is no.
24       Q    This is such a fun day.  I'm going to ask you
25  a few things about your involvement with SFR.
```



```
1       A    Okay.
2       Q    Do you have a working relationship with SFR
3    Services, LLC?
4       A    Yes.
5       Q    Okay.  What type of working relationship do
6    you have?
7       A    I do -- I've done a number of adjustments
8    where they were the contractors.
9       Q    Okay.
10      A    I regularly contract with some of the
11   attorneys that they use for -- like loss consultant
12   services, I get appointed as the independent appraiser
13   on various lawsuits.  I think right now I'm probably
14   appointed on five or six of them or the attorneys that
15   represent them.  I get appointed as the opposing
16   appraiser by carriers.  I get appointed as the umpire on
17   losses which involve not just them but a variety of
18   contractors in southwest Florida and southeast Florida.
19           So, yeah, I'm familiar with them.
20      Q    Okay.
21           MS. SABATINO:  John, I'm going to enter the
22           two letters as -- I don't know what exhibit we're
23           on but I'm going to enter the two letters --
24           MR. TOLLEY:  I think this will be Defense
25           Exhibit A and B.
```



Buvens, Rod    08-28-2020        Page 108 of 120

1          MS. SABATINO:  They would be what?

2          MR. TOLLEY:  I think you will introduce them

3      as Defense Exhibit A and Defense Exhibit B.

4          MS. SABATINO:  Okay.  Okay.  I would just like

5      to enter them as Composite Exhibit A.

6          (Thereupon, Defendant's Composite Exhibit A

7           was entered into the record.)

8          MR. TOLLEY:  Well, for some reason they didn't

9      attach to mine.

10          MS. SABATINO:  Well, I wanted to confirm from

11      -- I wanted Mr. Buvens to confirm his name on the

12      letters that it appears were sent by him.

13          MR. TOLLEY:  I'm trying to resend them to see

14      -- there we go.

15          MS. SABATINO:  I can also send them -- I can

16      send them to Rod.  Okay.

17      **Q    (By Ms. Sabatino) So, Rod, what is your**

18   **involvement with the Elite Claim Consultants?**

19      A    They are a public adjusting firm that does

20   policyholder but I guess by -- that would always be

21   policyholder side of the public adjuster.

22          They do claim consulting and public adjusting

23   services, is my understanding.  Just what you see here,

24   I get appointed as their appraiser on claims.

25      **Q    Okay.  And has UPC ever instructed you or FSIC**



1  instructed you not to do work for either SFR or Elite

2  Claims Consultants?

3      A    Not me personally, no.

4      Q    Okay.

5      A    But I'm a little confused by the question, so.

6      Q    Like maybe there was a conflict of interest

7  because it looks like you're doing work for the

8  Plaintiffs' side here, is that correct?

9      A    I do both sides; I also serve as an umpire.

10     Q    Okay.  And have you ever been paid by SFR?

11     A    I don't think that I've ever received a

12  payment from them.

13     Q    So, how are you compensated by them; do you

14  just work for free?

15     A    Only when I'm working for your client.  That

16  was really too easy.

17     Q    You're telling me you're working for free for

18  SFR, is that true?

19     A    Are you going to ask me?  If you would stop

20  testifying for me please?

21     Q    Okay.  So, tell me.

22     A    I get paid by the policyholder as the

23  appraiser.  I get paid by the policyholder and the

24  carrier when I act as an umpire.  Slowly by the carrier

25  side, more quicker by the policyholder, you know.



877.291.3376
www.UCRinc.com

1    Q     **What?**

2    A     What?

3          MS. SABATINO:  Did someone say something,

4    John?

5    A     They are slow payers.

6          MS. SABATINO:  John, did you say something?

7          MR. TOLLEY:  I didn't.

8          MS. SABATINO:  Oh, I thought you did.

9          MR. TOLLEY:  I'm not testifying.

10   Q     **(By Ms. Sabatino) Okay.  Have you ever been**

11   **designated by SFR in a claim that you served as the**

12   **insurance carrier's field adjuster on the same claim?**

13   A     I think Elite did that but not knowing.  As

14   soon as I saw that it was my claim I declined.  I can't

15   serve as an appraiser in a claim I adjusted.

16   Q     **Okay.**

17   A     And that's the very recent.  That just

18   happened I guess last week and I kind of got word

19   through the grapevine my assistant says, "Hey, the field

20   adjuster that did the initial adjustment is you." And I

21   went, "Oh, tell them I can't do that."

22   Q     **Okay.  And if I remember correctly, do you**

23   **currently work for Property Loss Specialist still or**

24   **not?**

25   A     I still have ongoing things with them.  I



1  still serve as an appraiser for them on some cases and I

2  still have current claims pending with them.

3      **Q    So, you did not terminate your relationship**

4  **with PLS?**

5      A    It's in the process.

6      **Q    On your end or did they terminate you?**

7      A    No, I mean they were just as unhappy about

8  UPC's decision as I was.  I mean, I made them a lot of

9  money.  I'm a fast, efficient claim adjuster.

10     **Q    Okay.  When did you begin your working**

11  **relationship with SFR?**

12     A    Probably back the first claim that I met them

13  on.  I mean, I'm working -- I'm an adjuster, I'm meeting

14  them on claims and dealing with their sales people or

15  their roofers.

16     **Q    Okay.  So, was it at the beginning of 2020,**

17  **was it in 2019?**

18     A    No, I mean I started -- I run into them down

19  here probably 2017.

20         MR. TOLLEY:  Can we just clarify because I

21         think we're getting lost in translation.  You're

22         saying a working relationship, Gina, and I think

23         what Mr. Buvens means is that through him being an

24         adjuster for an insurance company would have run

25         into him.



877.291.3376
www.UCRinc.com

1        It's not like he was employed by them or

2     working for them.  So, I think we just need to

3     clarify that issue.  The way you're making it s

4     sound, Gina, is that he's doing work for SFR.

5        MS. SABATINO:  But he's saying that he's doing

6     work for the policyholder?

7        MR. TOLLEY:  No.  For instance when you asked

8     him his working relationship he started with he has

9     a working relationship because he's done a number

10    of claims where he did adjustments and they were

11    the contractors.

12        I don't believe what he meant by that was he

13    was working for SFR doing adjusting.  I believe

14    what he meant was he was retained by your client or

15    other insurance carriers to adjust the claim. He

16    would go out there and SFR would actually be the

17    contractor.  But he wasn't -- he didn't have a

18    relationship in terms of employment or anything

19    like that with SFR.

20        So, Mr. Buvens, could you just clarify that?

21    A    Yes.  Nor do I now have a working relationship

22  with them; I'm not employed by them, I don't work for

23  them.  They as an AOO I guess is the closest situation

24  you will ever get to SFR directly appointing me.

25        But I think almost everything comes directly



1  through Elite Claims Services.  I get the assignments

2  via Cassandra with the documents attached.  They get

3  handled just like any of the other claims having clients

4  that I work for, policyholders and carriers and everyone

5  that appoints me as an appraiser.

6        Q    (By Ms. Sabatino) Okay.  I'm still going to

7  continue with my line of questioning.  Thank you for the

8  clarification.

9            But do you currently have any claims that

10  you're working with SFR on on any matter whether or not

11  you worked for them or not?

12       A    If I have appraisals.

13       Q    But are you currently working on any claim

14  where SFR is involved other than this one?

15       A    I have appraisal appointments through Elite

16  where SFR would be involved.

17       Q    Okay.

18       A    I have a number of depositions where they

19  apparently are involved.  I see their name all the time.

20       Q    Okay.  Have you ever been involved in any

21  claims representing the insured where you were

22  previously represented -- where you previously worked

23  for FSIC?

24       A    As an appraiser?

25       Q    As a field adjuster.



1      A    I'm not understanding the question, I'm sorry.

2   Have I ever had any claims where I was a field adjuster

3   for FSIC?

4      **Q    Where you were a field adjuster but now you're**

5   **currently representing the insured.**

6      A    No.

7      **Q    Okay.  It was the same question that I had**

8   **before.**

9      A    Yeah, I mean it's a conflict of interest.  I

10   can't be the original adjuster and be there as an

11   impartial appraiser arguing for my own estimate or

12   against my own estimate.

13      **Q    Okay.  So, based on your involvement -- let's**

14   **say involvement with SFR -- do you have any vested or**

15   **financial interest in the outcome of this case due to**

16   **your relationship with SFR?**

17      A    No.

18      **Q    Okay.  Did you have any conversations with**

19   **anyone prior to this deposition regarding this claim**

20   **other than my e-mails to show up?**

21      A    Just the people that I mentioned earlier; my

22   wife, my assistant knew about it to fill my calendar.  I

23   probably mentioned it to -- let's see, I mentioned it to

24   the homeowner that I'm supposed to be meeting with right

25   now.



1    **Q    Sorry, I'm almost done.**

2         (Thereupon, a short discussion was held off

3         record.)

4         (Deposition resumed.)

5    **Q    (By Ms. Sabatino) Okay.   And did you speak**

6    **with anybody at SFR or Plaintiffs' counsel prior to this**

7    **deposition?**

8    A    No.   Never even heard of Mr. Whistler.

9    **Q    It's not Mr. Whistler, that's Mr. Tolley.**

10   A    I know.   The law firm that was on there was

11   Whistler.

12   **Q    They are good lawyers.**

13   A    I've never heard of anybody there.   I didn't

14   say any different, I just never heard of them.   And I

15   don't work for them nor do I have a working relationship

16   with them.   They are not paying me or any of that

17   **Q    Okay.   Has FSIC or UPC ask you to recuse**

18   **yourself from any involvement in SFR claims whether you**

19   **were an umpire, an appraiser?**

20   A    Not that I -- not that I know of.   Apparently

21   there was a discussion about that last week.

22   **Q    Can you elaborate; what did they discuss?**

23   A    Apparently they don't like me as the appointed

24   appraiser for Elite.   But that's fourth hand

25   information.



1    **Q    Okay.**

2    A    That's all I heard.

3    **Q    Okay.  I think I'm done with you.**

4         MR. TOLLEY:  I just have a very brief follow-

5    up with regard to what you testified to then I'm

6    going to let you go.

7         THE WITNESS:  Sure.

8         MR. TOLLEY:  But I'm still reserving my right

9    to come back and question you on those things that

10   I reserved earlier.

11                   RE-DIRECT EXAMINATION

12   BY MR. TOLLEY:

13   **Q    Mr. Buvens, with regard to the question from**

14   **opposing counsel regarding SFR Services, you've never**

15   **been appointed by SFR Services?**

16   A    Never.

17   **Q    Okay.  You've never worked as a 1099 adjuster**

18   **for SFR Services?**

19   A    No.

20   **Q    You have no financial incentive to testify the**

21   **way you did on behalf of SFR Services for purposes of**

22   **this claim, correct?**

23   A    Absolutely not.

24   **Q    Okay.  You've only -- you only even somewhat**

25   **worked like that -- well, I want to make sure we're**



1   clear here.

2         So, with regard to your appraiser work that's

3   about the only time you've been involved with Elite

4   claims or an SFR claim on the Plaintiff side, correct?

5   A    I'm going to try to sum this up the roof.

6   Q    Please.  That's probably better.

7   A    I have --

8         MS. SABATINO:  I'm confused.

9   A    At any one time I have about 150 or 200

10  appraisals, umpire assignments, loss consultant

11  assignments, investigative authority claims, adjustment

12  assignments.  And quite frankly I don't really care who

13  they are.  They spread out enough because I don't owe

14  anybody anything.  Everybody kind of knows me as the guy

15  that calls balls and stuff.

16  Q    I do not.

17  A    That's just the way it is.  I get a bunch of

18  umpire assignments because I'm going to call it as I see

19  it.

20        If it's not damaged you're probably going to

21  get a $0 estimate.  If it's damaged you're probably

22  going to get an estimate that's enough to repair the

23  damages.

24  Q    Perfect.

25  A    And you're not beholden to anybody.  If any



```
 1    one of my 27 to 30 clients decides to say, "Client Nora,
 2    good bye."  That's fine with me.
 3         Q    All right, last question.  With regards to
 4    your testimony today, are you -- did you provide the
 5    testimony that UPC instructed you to include that false
 6    statement and remove items of your estimate because of
 7    any other reason other than that's the truth and that's
 8    what occurred?
 9         A    That's the truth and that's what occurred.
10    There are no other reasons.
11              MR. TOLLEY:  I have no further questions.
12              MS. SABATINO:  I don't have anything.
13              MR. TOLLEY:  Do you want to read or waive, Mr.
14         Buvens?
15              THE WITNESS:  Oh golly, it would be such
16         enjoyable reading but I don't have time for that. I
17         will waive.
18              MR. TOLLEY:  All right, he'll waive.  Ms.
19         Rivas, I want to order the transcript.
20              (Deposition concluded at 1:48 p.m.)
21              (Reading and signing of the deposition by the
22              witness has been waived.)
23
24
25
```



```
 1                 CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF DADE

 4

 5        I, Carolina Rivas, Court Reporter and Notary

 6    Public for the State of Florida, do hereby certify that

 7    I was authorized to and did digitally report and

 8    transcribe the foregoing proceedings, and that the

 9    transcript is a true and complete record of my notes.

10

11        I further certify that I am not a relative,

      employee, attorney or counsel of any of the parties,

12    nor am I a relative or employee of any of the parties'

13    attorneys or counsel connected with the action, nor am

14    I financially interested in the action.

15

16    Witness my hand this 11th day of September, 2020.

17

18

19

20
      _____
21    CAROLINA RIVAS, COURT REPORTER
      NOTARY PUBLIC, STATE OF FLORIDA
22

23

24

25
```



```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF DADE

 4

 5        I, Carolina Rivas, the undersigned authority,

 6    certify that Rod Buvens, appeared before me remotely

 7    pursuant to Florida Supreme Court Order AOSC20-23 and

 8    was duly sworn on the 28th day of August, 2020.

 9
      Witness my hand this 11th day of September, 2020.
10

11

12

13

14    _____
      CAROLINA RIVAS, COURT REPORTER
15    NOTARY PUBLIC, STATE OF FLORIDA
      Commission No.:  GG 267538
16    Commission Exp:  10/15/2022

17

18

19

20

21

22

23

24

25
```



877.291.3376
www.UCRinc.com

| $ | | |
|---|---|---|

**$0** 117:21

**$100** 97:7

**$100,000** 95:4

**$105,000** 95:16

**$125** 94:23
  96:1 97:9

**$1376.30**
  69:2,4

**$275** 96:11,14
  97:11,14,18
  98:14

**$80** 89:25

**$90,000** 95:16

| 0 | | |
|---|---|---|

**006261** 5:21

| 1 | | |
|---|---|---|

**1:30** 77:8
  90:12

**1:48** 1:17
  118:20

**10** 10:11

**10/15/2022**
  120:16

**100** 2:9 35:3

**100%** 73:13

**1000** 14:19
  90:7

**108** 4:7

**1099** 73:9
  116:17

**10th** 29:3

**11:02** 1:17

**11:03** 5:21

**110** 74:2

**116** 3:6

**11th** 119:16
  120:9

**12:55** 76:12

**1222** 10:23

**13** 57:11,16
  83:8

**14** 57:12,16
  83:8

**150** 35:1 74:4
  117:9

**16th** 101:5

**180** 74:6

**1909** 2:4

**197884** 19:9

**1992** 15:12

**1995** 15:21

**19-CA** 5:20

**19-CA-006261**
  1:3

| 2 | | |
|---|---|---|

**200** 35:1 117:9

**2001** 16:3

**2016** 16:7

**2017** 29:3 75:5
  93:23 96:16
  98:15 111:19

**2018** 83:25

**2019** 27:17
  31:20 33:18
  34:24 35:17
  98:16 101:5

**111:17**

**20196** 32:15

**2019FL22642**
  30:3

**2020** 1:17 5:2
  111:16 119:16
  120:8,9

**20370** 44:24

**21** 18:22

**2150** 2:9

**21st** 31:20

**223** 10:23

**22nd** 32:15
  79:4

**23** 72:22 74:9

**24** 18:22 72:22
  74:9

**267538** 120:15

**26th** 27:17
  32:22 35:17
  99:19

**27** 4:4 118:1

**27th** 32:23
  33:22 34:3

**28** 1:17 5:2
  20:3

**28th** 5:21
  32:23 120:8

**2ND** 2:9

| 3 | | |
|---|---|---|

**3:00** 33:18

**30** 18:2,22
  45:22 118:1

**305-372-9044**

**2:10**

**31** 46:12

**32** 47:4

**33020** 2:4

**33131** 2:9

**33928** 44:25

**35** 37:12,23

**36** 47:18

**37** 48:14,15

**38** 48:25

**39** 49:13

| 4 | | |
|---|---|---|

**4:00** 33:18

**40** 22:17 23:1

**42** 51:11,12
  52:7

**43** 53:4

**44** 53:17

**45** 4:5 54:3,12

**46** 44:20 54:11

**46-page** 45:13

**47th** 10:23

**4th** 33:18,23

| 5 | | |
|---|---|---|

**5** 3:3

**501** 2:4

**561-245-4703**
  2:5

| 6 | | |
|---|---|---|

**6** 57:1

**6:00** 23:15



| | | | |
|---|---|---|---|

**7**

**7** 57:23 59:8

**7/21/2017**
28:24

**75** 56:14

---

**8**

**8** 57:24 59:14

**8/9/2017** 28:24
29:8

**80** 56:14

**85** 44:10

---

**9**

**92** 17:6,10

**93** 3:5

**98** 16:14

**99** 16:15

---

**A**

**a.m** 1:17 23:15

**A/A/O** 1:5

**abbreviations**
21:9

**abdicated** 22:4

**ability** 8:22
9:1 27:11
71:24 72:3,13
77:4

**able** 6:19 38:3
41:2,15 44:22
45:20 47:1,22
51:10 54:24
55:1 105:4

**about** 8:12
10:11 12:22

13:22 14:2,10
15:25 16:11
19:5 20:3,5
21:7,15,24
22:5,17
23:17,18,23
24:11,18 27:4
28:19 31:15
32:4 33:3,5
34:1,8 36:15
37:22 39:6,12
40:5 41:15
43:9,15
44:10,11 52:7
55:14 58:25
59:24 60:7,21
65:4 67:7
74:8,20 77:23
82:24 85:19
86:20 89:4,6
92:24 94:3,19
97:22,24
98:2,12 100:3
101:22,24
105:19
106:16,25
111:7 114:22
115:21
117:3,9

**above** 39:13
41:19 42:8,9
52:25 55:18

**Absolutely**
37:9 102:8
116:23

**access** 25:14
39:24 40:3

**accidents**
13:13

**account** 18:18

**accurate** 12:16

100:14

**across** 43:19
50:18 58:14

**act** 109:24

**acted** 5:16
37:17

**acting** 5:18

**action** 87:25
88:25
119:13,14

**active** 87:24

**activity** 85:15
90:4

**actual** 6:3
23:18,19 39:6
57:16 79:3

**actually** 9:14
14:14
15:17,18
16:19 19:13
31:17
37:19,24
38:22 40:17
45:15 47:22
49:8,14,18
50:1,6 53:19
54:5,13
55:1,20
56:5,7
57:6,19
58:9,19 59:6
64:21 76:4,9
80:17 84:2
92:12 93:3,14
95:15 104:17
112:16

**Acuity** 11:22

**added** 62:14

**address** 10:22

44:21 63:8

**adjacent** 44:1
46:14

**adjust** 71:24
72:3,14
112:15

**adjusted** 19:13
25:17 110:15

**adjuster** 5:16
11:12
12:13,15,18
14:23
15:15,16
16:6,8,9
17:13 18:7
19:5 22:3,20
27:15 28:6
29:17,23 34:1
35:15
62:9,18,20
65:11,24,25
73:4,6 80:3
86:5,22 94:25
96:15 98:10
102:10 108:21
110:12,20
111:9,13,24
113:25
114:2,4,10
116:17

**adjusters** 7:20
17:16 27:20
34:14 72:24
73:8,12
83:2,4 85:21
86:1,5 97:3

**adjuster's**
86:17,18
101:4,12,17

**adjusting** 9:11



```
10:17 11:7,8              105:21                air 59:5              allegedly
15:13,23                                                               105:1
16:1,3,4 17:4        again 36:4           airport 23:14
18:1 19:2              51:17 52:16                               allow 15:22
25:24 37:4            53:21 55:16          Alabama 19:23
61:2,6 75:18          62:20 67:14                               alluded 53:10
76:19 85:12          69:3 74:9            Alaska 19:16
86:14 87:22          84:23 87:17                                almost 112:25
88:15 89:22          88:8 93:24           alcohol 8:25            115:1
108:19,22            95:2 96:18
112:13               98:19                all 1:18 5:24           along 47:11
                                            6:6,16,24              65:25
adjustment         against 72:24           7:14
  25:7 110:20        88:10 89:1,2          8:16,19,24           already 14:4
  117:11             114:12                9:6 12:1 13:4          21:15 40:13
                                           14:3,21,22            54:7,9 62:3
adjustments        age 40:21               15:5,19,20           82:25 85:10
  107:7 112:10       51:18                 16:3,6,10
                                           17:1,19              also 22:10
admit 54:18        aged 48:22              20:4,7,16             29:15 31:13
                                           21:4,10 25:18         38:19 40:23
advance 7:3        ago 13:23               27:3,7,21            43:5 46:15
                     98:13                 28:19 30:14           48:22 51:2
advise 63:3                                31:3 34:8            59:14 66:22
                   agree 29:4              35:4 39:5            91:22 94:21
advised 25:5         47:8 49:5             41:11               100:11 102:21
                     62:22 69:9            47:10,22            108:15 109:9
aerial 44:12         73:16 85:1            48:13,24
                     87:5 90:25            54:10,16 55:8       alter 68:1
affect 8:22,25       96:19 101:20          57:9,15 58:24
                                           59:17 61:24         always 7:21
affected 13:24     agreed 73:7             65:14,20            12:13 16:8
  41:16,21 42:2      94:21,25              70:18 72:7           17:1 83:24
  48:5 56:6          97:24                 73:25 74:16          84:17 108:20
  71:24 72:3,13                            79:22,24
  81:12,18         agreeing 96:21          85:24 86:16         am 5:21
                                           87:20,23 90:8         119:10,12,13
affirmative        agreement              91:7,12 92:9
  6:18               82:12,17 84:7         93:10 94:18         Amazingly
                     89:24,25              97:6 99:7,16          78:17
afforded 105:2                             100:20
                   agreements              104:11,24          ambulance
after 5:5            24:6                  113:19 116:2         16:18
  14:11 26:2                               118:3,18
  30:23,24 34:5    agrees 96:20                               America 11:21
  36:21,22 37:3                           alleged 82:13
  40:11,12         ahead 7:10                                 amount 8:3
  48:19 52:3         45:5 58:21,23                              37:20 40:6
  69:5               67:1 95:20                                68:24 69:2,7
  74:15,16,17        105:15                                    94:16 98:10
  95:2 97:16                                                   99:13
```



106:12,13

**amounts** 73:3
82:13,16

**Analysis** 22:22
23:7 26:12
77:17 78:1,23
79:4

**and/or**
74:11,12

**Andrew**
15:12,17

**Andy** 63:22
65:25

**Ann** 86:17

**annually** 20:22

**another** 49:2,3
85:19,24
86:15 90:18
101:3

**answer**
6:16,21,22,25
7:16 12:24
13:18 17:19
29:24 35:23
40:14 54:9
60:2 61:4
68:4 71:20
72:9,17,19
74:24 75:2,20
81:2 82:10
83:7 96:19
97:1,12,21
98:19
101:24,25
106:21

**answered**
106:23

**answering** 75:1
81:23

**answers** 6:16

**any** 8:20,21
9:3,9 17:25
18:25
20:17,18,20
21:6,15,18,19
23:8 24:5,18
26:10
28:12,15
29:9,19 32:16
33:13 39:16
40:7,19
43:18,21,24
45:14,18
48:17 49:25
51:8,16 52:17
55:8,14 57:2
60:8 61:10,14
63:4 65:15
66:11
67:10,25
68:8,10 72:13
76:21
77:3,10,21
78:5,10 79:9
81:12,18 82:5
83:14
84:15,18
85:12,13
86:23
87:17,25
88:2,5,9,10,1
3 89:5 90:9
95:4 99:5
100:1 101:6
106:2
113:3,9,10,13
,20
114:2,14,18
115:14,16,18
117:9,25
118:7

119:11,12

**anybody** 23:9
63:17 64:5
85:13 86:8
115:6,13
117:14,25

**anymore** 67:4

**anyone** 77:22
103:5 114:19

**anything**
33:4,22 37:18
39:15,17 40:5
62:2 68:1
70:24 71:7
76:22
78:5,8,24,25
80:4,6
88:1,3,14,21
89:3 112:18
117:14 118:12

**AOO** 112:23

**AOSC20-23** 1:19
120:7

**apologies**
14:21

**apologize** 7:3
53:7 58:20
82:9

**apparently**
113:19
115:20,23

**appear** 48:21
103:2

**appearance**
40:20

**APPEARANCES**
2:1

**appeared** 1:18

120:6

**appearing** 51:6

**appears** 27:16
33:20 44:10
50:9 53:10
54:14 59:19
84:24 105:16
108:12

**Application**
37:12

**applied** 36:11
37:20 50:4
51:14 53:8

**apply** 36:10

**appointed**
107:12,14,15,
16 108:24
115:23 116:15

**appointing**
112:24

**appointment**
90:13

**appointments**
113:15

**appoints** 113:5

**appraisal** 9:12
113:15

**appraisals**
113:12 117:10

**appraiser**
21:8,12 98:7
107:12,16
108:24 109:23
110:15 111:1
113:5,24
114:11
115:19,24
117:2



**appreciate**
72:16

**appreciative**
77:12

**approximately**
5:21 41:18
46:3

**approximation**
8:2 23:2

**April** 32:22
79:4

**Archer** 9:11
10:17

**area** 14:7
20:20 25:6
41:20 44:2
48:7 52:24
54:14 59:9

**areas** 41:23

**aren't** 6:18

**arguing** 22:5
114:11

**arguments**
14:11

**Arizona** 14:4
19:19

**around** 20:3
30:22 34:20
42:25 74:22
83:25 84:1
93:23

**arrested** 9:3

**arrived** 79:1

**ask** 6:15
7:8,15 8:19
11:1 12:9
13:5,19 15:2

19:25 20:8
29:16 30:7,14
34:12,19
35:13 36:6,23
39:5 40:13
44:3
45:14,15,22
50:23 52:5
54:22 55:24
71:12,18
74:20 80:1
84:14 92:12
93:15 104:2,3
106:24 109:19
115:17

**asked** 24:22
65:3 72:23
73:15,20 77:3
100:24 105:19
106:17 112:7

**asking** 6:24
29:22 78:2
84:19 88:1,2
100:23 101:13
106:16

**assessment**
87:6

**assigned**
12:10,17 13:2
27:14,19 28:1
30:1 31:19
32:14
86:1,4,5
103:4

**assignment**
15:13 27:16

**assignments**
65:16 113:1
117:10,11,12,
18

**assistant**
23:13 110:19
114:22

**assisting** 32:6

**assume** 7:14,17
37:6

**assuming** 10:13
30:15 40:25
46:7 69:9
87:16

**attach** 108:9

**attached** 49:19
113:2

**attachment**
49:17

**attempt** 32:19

**attorney** 15:25
119:11

**attorneys** 7:8
107:11,14
119:13

**August** 1:17
5:2,21 29:7
120:8

**Austin** 11:22
13:24

**authority**
30:19 117:11
120:5

**authorized**
119:7

**auto** 12:2,4,5
13:13

**available**
26:14

**avalanche**
65:13

**average** 35:3
39:13

**avoid** 6:16

**aware**
29:12,14,19
62:14 68:19
70:8 72:23
87:4 88:13
93:7
105:18,21

**away** 30:19

---

B

**back** 10:9
16:1,10 17:17
20:22 22:20
23:21 38:5
42:18 47:21
52:4 56:16
58:9 65:21
68:7 70:7
75:6 76:12
77:9 97:7
98:9,20
104:22,25
111:12 116:9

**background**
5:23 6:2 13:5
21:18
28:13,15 39:6
47:17

**backing** 85:1

**backwards**
93:17

**ball** 67:3

**balls** 117:15

**bar** 18:22 19:2

**Baron** 86:17

**based** 29:1



38:2 41:25
47:23 50:23
54:22 56:18
87:12 114:13

**basically**
43:21 73:11
75:8 78:8,24
94:24

**basis** 88:13

**bat** 44:7

**beach** 51:17

**bear** 44:17
64:18 69:1

**became** 67:21
82:17

**because** 6:18
7:2 8:11,14
18:3,18 30:14
31:9 36:18
41:20
69:15,17 70:1
80:1 81:9
87:18
91:13,23
93:17 95:16
97:1,13,21
99:3,24 100:6
101:7,20
106:3 109:7
111:20 112:9
117:13,18
118:6

**becomes** 8:1
99:2

**before** 5:23
6:25 10:13
13:6,8,18
20:17,22
27:24 30:23
33:2 36:20

50:16 59:23
61:18 74:14
75:1 82:11
102:10 114:8
120:6

**began** 96:16,24
98:16

**begin** 111:10

**beginning** 6:22
31:2 96:16
97:18 98:25
111:16

**behalf** 1:16
2:2,7 5:16,18
14:18 94:13
116:21

**behaving** 89:13

**behavior** 78:15
89:13

**behind** 12:12
58:16

**beholden**
117:25

**being's** 50:4

**believe** 28:4
32:10,20 40:9
47:5 54:13
55:20 61:7
64:17
67:17,22
70:16 72:18
73:21
75:11,24 80:8
87:9 100:2
112:12,13

**believed** 69:16

**below** 59:7

**Bergstron**

67:15

**B-E-R-G-S-T-R-O-N** 67:17

**Bernard** 97:11

**beside** 42:8

**besides** 21:14
25:4 42:9
71:3,6 85:9

**best** 7:12
27:11 40:15

**better** 117:6

**between** 10:6
14:11
33:18,22,23
35:1 40:6
46:23 80:4
85:6

**beyond** 52:13

**big** 13:23
34:22 79:22

**bill** 90:2
95:13

**bit** 5:22 6:1
7:21 16:10,19
22:14 31:15
52:6 65:21
75:13 83:24
89:12 90:16
92:24

**bitumen** 43:1

**Black** 1:5 5:18
84:15

**blame** 18:25

**board** 57:20
58:10,25

**bonded** 51:3

**bonding** 105:1

**both** 10:3,8
14:17 15:16
51:3 100:21
109:9

**bottom** 45:23
46:12 47:11
48:15 50:25
51:11,12 53:4
54:3,10

**break**
8:10,13,14
64:19,21
76:11 81:10

**breaks** 43:19

**Brian** 82:21
85:17

**brief** 116:4

**briefly** 20:16

**bright** 54:18

**bring** 27:7

**broken** 32:2
100:12

**brother** 40:1

**brother-in-law**
40:1

**brought** 89:2,4

**bulldozers**
12:6

**bunch** 21:9
117:17

**Burns** 70:17

**business** 10:22
85:11

**Buvens** 1:15
3:2 5:1,4,10



6:8 35:24
72:16,18
76:17 81:3
82:10 90:12
92:16 102:6
104:25 105:8
108:11 111:23
112:20 116:13
118:14 120:6

**B-U-V-E-N-S**
6:9

**bye** 118:2

―――――――――
          C
―――――――――
**calculation**
106:12

**calendar**
114:22

**California**
19:17

**call** 21:2 33:6
53:6 65:11
117:18

**called** 5:5
31:18 32:22
33:3 53:5
67:9

**calls** 77:19
117:15

**came** 16:1
23:15 36:1
75:23 82:11

**camera** 91:24

**cameras** 54:20

**can** 6:20 8:1
9:20,22
12:23,24 15:9
19:11 21:17
23:3 24:13

26:22 27:24
34:19 35:20
37:16 41:9
43:9,11,13,14
,17,18,21,23
44:16
45:17,18
47:16
49:20,22
51:21 52:25
54:19 56:17
57:2,3,5,6,13
58:7 59:1
60:2 61:4
67:16 68:4
70:4 71:16
72:9
75:1,20,22
76:10 77:6
81:2 82:10
83:7,19,20
90:12,21
92:3,5,12
94:3 100:22
101:1,7,25
102:19
103:6,20
104:19
106:17,20
108:15 111:20
115:22

**cans** 58:17

**can't** 22:2
35:22 46:20
51:8,19 52:1
101:10,23
105:1
110:14,21
114:10

**capacity** 13:21

**Cape** 10:23

38:21

**car** 23:16
58:15

**care** 84:4
117:12

**Carol**
86:20,21,23

**Carolina** 1:24
19:22,23
119:5,21
120:5,14

**carrier** 15:14
19:18 21:3,6
29:10 60:13
61:1 87:6
94:9 109:24

**carriers**
11:16,17,18
14:18
75:17,22
107:16 112:15
113:4

**carrier's**
110:12

**carry** 21:8

**carrying** 16:8

**case** 1:3
5:19,20 8:1
12:10 14:13
23:24 24:19
28:3 30:11
37:25
61:12,22
73:14 76:2
86:24 87:1
92:20 98:23
105:2 114:15

**cases** 13:14
97:5 111:1

**Cassandra**
113:2

**Casualty** 93:8

**catastrophe**
16:5

**caught** 77:15

**caulk** 53:20

**caulk-like**
51:15

**cause** 80:5

**caused** 41:12
50:13 52:3
105:13

**causing** 87:14

**ceiling** 34:4
55:13 56:20
57:4
59:7,11,15

**center**
41:18,19
55:21 99:16

**centimeters**
7:24

**CEO** 10:5

**certain** 25:6
81:17 83:13

**certainly** 6:20
8:2 18:22

**CERTIFICATE**
119:1 120:1

**certification**
20:18,24

**certifications**
21:3,6,7,8,13

**certified**
20:19



certify 104:19
  119:6,10
  120:6
chance 77:11
change 68:1
  75:9 84:22
  95:3
changed 74:11
  82:22 94:17
  95:3,22,23
  97:9 103:3,6
changes
  68:9,15 74:10
  75:4,6,14
  95:17
changing 72:21
  74:23
CHARTWELL 2:8
chasing 16:18
check 35:11
  98:20
checks
  28:13,15
choose 44:16
chose 41:22
Christmas
  58:15
circle 34:22
  53:5,6
circuit 1:1
  5:19,20
circumstances
  13:11
claim 6:4
  12:18 19:13
  24:12
  25:10,17,19

26:9 27:24
28:13 30:1
31:17 32:13
36:17 60:12
64:3,4 65:11
66:11,16
67:2,11,19,21
,24
71:6,10,16,17
72:2,3,14,17,
21 73:12
74:18 75:7,11
77:19,22,23
78:7,11
82:18,20,21,2
2 85:16 87:5
92:17 94:13
95:4 97:25
98:2,8
108:18,22
110:11,12,14,
15 111:9,12
112:15 113:13
114:19 116:22
117:4
claimed
  29:14,21
  80:9,11,12
  84:23,24
claims
  11:15,16,19
  12:2 15:23,24
  28:15
  66:14,15
  67:10 71:3,25
  72:13,25
  77:17 78:12
  80:17,18 81:6
  84:1,2,12
  88:17 90:3
  108:24 109:2
  111:2,14

112:10
113:1,3,9,21
114:2 115:18
117:4,11
clarification
  113:8
clarify 30:24
  106:17 111:20
  112:3,20
clarity 104:8
clean 7:5
  40:11
clear 8:3 24:8
  90:22 91:2
  117:1
clearly 20:4
  46:22 54:17
  63:14
client 18:18
  25:3 96:20
  102:15 109:15
  112:14 118:1
clients 18:19
  113:3 118:1
climate 88:23
close 55:21
closed 92:18
closer 50:24
closest 112:23
closets
  55:14,15
close-up 54:13
cloud 17:14
clues 58:7
cock 48:21
  51:17

college 17:22
Collier 85:25
Colorado 14:3
  19:20
Combined 42:4
come 36:1
  49:24 56:7,16
  60:19 76:12
  77:9 83:11
  96:18 116:9
comes 7:21
  112:25
coming 61:5
  64:17 65:8,13
  66:10
commensurate
  95:7
comment 16:22
comments 32:4
commercial
  20:21 21:23
commercial-
  property 12:2
Commission
  120:15,16
common 42:21
  58:7
COMP 4:7
companies
  10:4,8 11:23
company 1:9
  5:17 9:15
  11:13 12:8
  22:1,3 33:25
  44:13 67:20
  68:9 71:23
  80:5,13 92:21



93:1,5 94:9
111:24
**company's**
92:13
**comparative**
73:5
**compel** 104:12
**compensated**
106:3 109:13
**complaining**
82:24
**complaints**
88:5,10
**complete** 119:9
**completed** 91:7
**completing**
65:10
**component**
38:16,19,23
**Composite**
108:5,6
**compound** 98:7
**computer** 45:18
91:25
**concerned** 27:4
**concerns** 39:17
**conclude** 75:22
**concluded**
105:24 118:20
**condensate**
59:6
**condition**
39:8,10 85:6
**conditioner**
59:6

**conditions**
40:10
**conducting**
36:14
**confidentialit
y** 89:8
**confirm** 99:3
102:19
108:10,11
**conflict** 109:6
114:9
**confused** 60:21
97:13 100:3
109:5 117:8
**confusing** 7:8
**conjunction**
13:12 102:11
**connected**
79:23 119:13
**Connecticut**
18:4
**consider** 90:2
**considered**
43:7
**consistent**
40:10,20,23
46:9 50:11,12
55:6 56:22
59:17,20
75:21 84:16
89:15 100:13
105:16
**consistently**
17:9
**constantly**
72:21
**construction**

36:11
**consultant**
107:11 117:10
**Consultants**
108:18 109:2
**consulting**
108:22
**contact** 28:2,6
32:19 33:1
78:2,24
**contacted** 28:3
32:23,24
**contemporaneou
s** 81:22
**contemporaneou
sly** 28:5
**contend** 100:14
105:13
**continue** 20:25
22:6 88:19
92:3 113:7
**continued**
15:23 84:13
85:7 90:22
**continuing**
18:23 20:8,11
88:24
**contract** 94:4
107:10
**contracted**
16:6 94:2
**contracting**
21:19,21
**contractor**
21:23 32:4,5
39:22
41:23,25

112:17
**contractors**
107:8,18
112:11
**contractor's**
22:13 28:4,7
**contracts**
11:14
**contrary** 7:15
60:16
**contrast** 54:20
**conversation**
33:5
**conversations**
23:8 24:18
32:17 69:5
114:18
**cooperative**
39:22
**copies** 94:18
102:18
**copy** 6:11 30:4
44:8 83:16
102:22 105:1
**Coral** 10:24
38:21
**Corbett** 66:1
**corporation**
10:10,16
73:10
**correct**
5:10,11
6:12,13 10:4
11:2,3 17:7
18:12
20:12,13
26:15 27:12
30:17,18



31:13,14 37:8
38:1,25 39:3
40:24 41:13
46:10
48:6,8,10
49:10,11
53:13,18,22
59:15,18,21,2
2 61:8,9,19
62:23,24
66:5,6,7
67:20
69:8,10,18
70:2,3 76:5
82:6 85:3
86:11,14
87:20 91:4,5
94:1 95:9,22
97:15 99:23
100:10 103:5
105:11,12
109:8 116:22
117:4

**correctly**
37:14 110:22

**correlate**
77:12

**correspondence**
77:15,25

**correspondence
s** 76:21
77:4,21
78:13,19 79:9
83:14,17,21

**could** 6:6
19:12 22:6
37:17,18 38:9
39:2,4,12
40:25 42:12
48:19,21,22
51:23,24

52:14,15
53:16 54:7,9
56:10,25
59:20,22
63:23 73:5
77:10 83:11
87:10 91:23
98:6 105:25
112:20

**couldn't** 81:5

**counsel** 2:1
14:12 22:18
23:9,21
24:3,6,10,16
71:21 96:1
97:5,11
105:19 115:6
116:14
119:11,13

**count** 73:23
75:11

**Counties** 85:25

**country** 14:2

**county** 1:2
5:19 27:21
119:3 120:3

**couple** 5:12
6:15 8:19
10:10 11:23
13:5,14 16:2
22:2 26:8
39:5

**course** 17:3

**court**
1:1,19,24
5:20 6:19 7:4
14:25
63:9,11,15
88:16 91:21
92:1 103:19

104:20
119:5,21
120:7,14

**courts** 20:18

**coverage**
30:8,12,16,21
,25 31:6,9,11
60:8 69:16
79:13 87:10
98:24 100:2

**coverages**
100:3

**covered** 59:25
60:5 61:11,15

**crack** 54:5,15

**cracked** 32:2
43:9,10,13
48:16 53:10
54:12

**cracking**
43:16,21

**cracks** 51:21

**create** 46:4

**created** 25:18
61:21 68:15

**credits** 20:12

**crimes** 9:4

**criminal** 13:14

**cross** 3:4
90:24 93:19
103:16

**current** 10:21
20:14 29:17
80:4 88:22
89:3,21 111:2

**currently** 9:6
15:11 19:3

88:22,25
110:23
113:9,13
114:5

**Curry** 85:18

**curse** 26:1

**cut** 72:4,5

**cylindrical**
58:16

---

D

**DADE** 119:3
120:3

**Dakota** 19:20

**damage** 12:2
14:12,14,15
32:3 38:8
39:2 42:15,22
43:22 46:9,17
47:2,13 49:21
51:7,9,22,23
52:14,16
53:15 54:8
55:2,6,9,12
56:1,4,11,19,
23 57:2,4
59:14,25
60:4,7
61:8,11,15
62:4 68:5
69:16 75:7
76:3 85:2
87:5,15 95:9
99:5,13
100:17,20
105:10,14

**damaged** 41:16
99:15
117:20,21

**damages** 13:3



31:7,13 35:12
46:5 52:3
54:24 56:18
59:21 60:23
62:12 66:5
68:18,20,25
73:2 74:12
79:13 81:12
84:16
87:11,13
99:9,12
100:1,8,13,16
104:4 106:4,8
117:23

**Daniel** 1:5
5:18

**date** 10:12,20
29:2,14,21
32:8,12,18,20
33:19,20
36:16 48:23
74:22 90:21
91:1,9,13,18
104:25

**dated** 101:4

**dates** 29:15

**day** 22:1 31:19
35:2 81:23
88:20 106:24
119:16
120:8,9

**days** 18:23
35:2

**deal** 79:9

**dealing** 7:23
48:9 50:20
75:15 111:14

**debonded** 51:2

**debris**

42:17,18
56:12
68:5,17,20,25

**debut** 16:7

**dec** 93:3

**decided** 16:20

**decides** 118:1

**decision** 111:8

**deck**
28:18,19,24
29:9,17 32:16
87:20

**decking** 37:15

**declined**
110:14

**deem** 14:7
20:19

**defend** 97:5

**Defendant** 1:10
2:7 11:2,15
12:18 29:20
66:22,23
67:24 69:20
70:9,24 73:16
76:5 77:15
78:13 81:13
85:14 87:18
89:13 90:5
92:17

**Defendants**
69:6 70:2
81:16

**Defendant's**
4:6 23:21
25:10,14
26:10
67:20,25
69:20 70:9

80:5 85:10,11
108:6

**defense**
16:19,21
22:17
24:3,6,10,16
80:17 97:5,10
107:24 108:3

**deference** 7:1

**definitely**
43:17

**degrees** 74:9

**delay** 40:5

**DeMint** 28:6
62:21,25
63:3,18
78:1,2,5
86:7,16

**DeMint's** 99:8

**denied** 87:2,4
98:8

**denying** 85:7

**depending**
50:17

**depends** 30:10
42:12

**depo** 92:3

**deposed**
13:6,8,12,16,
20 14:17,25
94:19

**deposing**
106:15,21

**deposition**
1:15 4:4
5:1,23,25 6:3
22:15

24:14,15
26:7,19,20
64:25 65:19
67:3 70:22
76:16 81:23
83:12 89:23
90:21 95:24
96:2,6,7,15,1
8 98:15 99:25
114:19
115:4,7
118:20,21

**depositions**
65:12 89:19
96:4 97:4
98:5,6 113:18

**describe** 27:25

**description**
4:2 33:12

**designated**
32:9 110:11

**designation**
12:11 21:14

**designations**
20:18 21:16

**desk** 17:13
22:20 28:6
29:16,23 34:1
35:15
62:9,18,20
65:25
85:20,21,25
86:4,5,22

**despite** 50:5

**deterioration**
84:16

**determination**
30:8,12,17,21
,25



31:6,9,10,11
79:1

**determine** 31:4
37:14 38:3
41:2,15 47:1
52:1,3 79:15
98:24 101:20
103:19

**determined**
31:13 38:7
41:14

**determining**
100:3

**deviating**
84:13

**diagonal** 43:18

**didn't** 14:22
18:19 19:17
22:24 23:1,6
24:25 30:20
33:19 36:10
37:7 39:16
40:2 48:11
49:25 53:3
61:16 64:1
66:4 69:25
72:5 73:20
74:17 96:18
97:25 98:9
106:1 108:8
110:7 112:17
115:13

**difference**
85:6 100:18

**different** 16:2
19:11 54:11
72:22 74:10
100:16
103:14,21
115:14

**differently**
99:22

**difficult** 7:2
57:18 64:15

**difficulties**
54:20 65:23

**digitally**
119:7

**diminished**
12:4

**direct** 3:3 5:7
11:2 45:18
57:3 76:1
86:10,16

**directed**
35:11,12,13
38:12 68:6
85:20

**direction**
38:13 43:18
56:18 99:13

**directional**
99:15

**directionality**
55:7

**directions**
99:8,18

**directive**
75:7,24

**directives**
75:17 85:22

**directly** 15:19
75:24 76:4,7
77:22 78:13
112:24,25

**Director**
67:2,11,19,21
82:18,20,21,2

2
**Directors**
77:20

**disagreement**
88:6

**disciplinary**
87:25

**disclose** 12:22

**discontinue**
90:17

**discuss** 104:5
115:22

**discussed** 62:3
71:10 97:23
100:8

**discussion**
14:10 23:23
36:15 43:15
64:23 65:17
70:20 76:14
79:11 97:2,16
98:4 115:2,21

**discussions**
89:4 98:13

**disgruntled**
83:2

**dishonesty** 9:4

**dislodged**
42:21 43:4,7
46:14 55:5

**displaced**
43:5,8,24
46:24
47:5,9,12

**displacement**
56:6

**dispute** 89:21

**disputed** 82:13

**disruption**
42:11

**distances** 7:23

**documentation**
99:18

**documenting**
52:12

**documents**
25:1,5,12,13,
14,18 27:7,11
77:10 92:8
93:14 113:2

**doesn't** 21:25
31:22 54:21
100:21 101:25
102:1

**dogs** 8:15

**Dominion** 11:22

**done** 17:9,15
27:19 33:2
34:25 40:19
51:20 90:12
91:3,10 92:2
104:2 107:7
112:9 115:1
116:3

**don't**
7:7,10,15,21
8:11,20 9:21
10:11,19
11:13,24
18:4,5,25
20:2 31:8,22
33:3 36:16
37:6 39:24
40:9 44:7,22
46:4 49:6
51:17



52:11,12,17
53:3,5,21
57:1,14,18
62:1 65:15
67:7 70:17
71:19 73:9,23
74:21 78:7
80:19
87:3,17,25
88:21,23
89:3,5,22
90:8,12
91:15,24
97:1,20,24
98:19
101:7,9,14
102:1
103:15,20
106:6 107:22
109:11
112:12,22
115:15,23
117:12,13
118:12,16

**door** 64:19

**Dorbett** 63:22
66:2,3

**D-O-R-B-E-T-T**
63:24

**down** 6:19
14:13 33:7
42:18 51:1
52:8,24 53:13
65:13 81:10
85:7,16
111:18

**downslope**
37:13

**dozen** 15:4
16:2

**drawing** 56:20

**drip** 42:18

**drive** 26:3
44:24

**driver** 13:13

**driver's** 6:11

**drives** 25:25

**drop** 18:3
23:14

**drugs** 8:25

**DSX** 102:14,16

**duces** 26:19
77:3

**due** 38:23
41:1,9 51:18
56:6 84:22
88:22 114:15

**dues** 18:22

**duly** 5:6 120:8

**during** 17:3
22:4 26:9
33:5 36:17
38:14 39:7,20
40:23 56:7
74:14

**duties** 12:19
27:25 71:14
72:25

**duty** 69:17

───────────
E
───────────

**each** 53:25

**earlier** 48:1
87:21 99:4
105:10 114:21
116:10

**easier** 52:1

**east**
38:4,13,15
41:20 44:1
46:15,21
79:21

**easy** 109:16

**eaves** 42:19
50:19

**edge** 42:18
47:11

**education**
17:20 18:23
20:12

**efficient**
95:15 111:9

**eight** 13:23

**either** 50:24
67:2 70:9
72:9 76:22
89:1 109:1

**elaborate**
115:22

**elect** 20:25

**electronically**
25:21,23
102:14

**elements** 84:18

**eliminate**
81:16

**Elite** 108:18
109:1 110:13
113:1,15
115:24 117:3

**else** 23:9 34:7
36:12 49:21
63:21 64:5,8

68:1 70:24
71:12 85:13
86:8

**e-mail** 77:4
78:2 91:23
92:8

**e-mails**
22:17,19 23:1
76:21
77:14,17,21
78:10 114:20

**employed** 9:6
11:13
15:10,14
64:13 77:22
112:1,22

**employee** 10:3
11:2 15:22
16:5 73:10
76:4 93:24
119:11,12

**employees** 73:8
75:25
86:10,16 97:4

**employer** 27:21
80:3,4

**employment**
15:5,7 112:18

**end** 17:1 44:17
64:17 65:9
66:10 75:5
111:6

**ending** 90:23
91:2,7

**engage** 78:14
85:14

**engineer**
105:20,24
106:1,8,10



engineering
  21:18 45:1,3

engineers
  37:21

enjoyable
  118:16

enough 58:6
  75:3 82:25
  94:11
  117:13,22

enter 91:22
  107:21,23
  108:5

entered 27:1
  45:8 105:17
  108:7

entering 59:18

entire 36:15

entitled 27:4

enumerated
  27:5,6

equipment 12:5

Erie 11:22

Esquire 2:3,8
  3:3,5,6

essentially
  88:5

establish
  44:23

Estero 39:9
  44:24

estimate 13:3
  22:22 28:11
  31:7,12
  60:3,8,20,22
  68:6,15,22
  69:7,18,19,22

70:11 74:21
79:6 81:17
82:15,16 90:5
95:14
106:10,13
114:11,12
117:21,22
118:6

estimates
  73:4,6 79:2
  105:2,5,12

estimation 8:2

Estimator
  103:4

ethical 103:9

evasion 49:25

event 42:3
  49:23 50:13
  55:24

events 66:16

every 9:24
  75:8 87:5

everybody 14:2
  117:14

everyone 113:4

everything
  10:5 25:16
  63:14,15
  65:22 68:23
  96:13 112:25

evidence 37:1
  38:8 39:2
  40:18 42:14
  43:5,10,22
  46:17 47:13
  49:25
  51:21,23
  52:14,15
  53:14 54:8

55:1,4 56:19
60:7 61:7
73:3 77:15
81:10 85:2
87:17 101:14
103:16

evidenced
  81:21

evidentiary
  103:23

exact 8:3
  10:12,20
  22:22 23:7
  26:12 36:16
  74:22 77:17
  78:1,23
  79:4,5,7 93:2
  94:16 98:8

exactly 39:25
  51:19 57:21
  84:10 88:2

exam 26:20

examination
  3:1,3,4,6 5:7
  90:24 93:19
  116:11

examined
  103:16

examining
  95:14

example 41:4,8
  42:12 97:11
  98:1

excavators
  12:6

exceeds 42:6

exception 16:4

exceptions

17:10

exhibit 4:2
  26:17 27:1,4
  45:6,8,13
  59:9,14
  101:18
  102:2,3
  107:22,25
  108:3,5,6

exhibits 4:1
  91:23 101:7

exist 27:8,11

existing 36:10

exit 16:20

Exp 120:16

expected 97:6

expense 94:22
  95:5

experience
  71:22

expert
  13:16,20
  14:6,7,12
  20:19
  21:14,15

expire 18:16

explain 6:21
  95:11

exposed 43:1
  46:25 84:18

expound 66:25

extended 87:10

extension 60:8

extensive 15:8

extent 8:25
  42:13



exterior 28:10
  39:12 42:17

_____
F
_____

facing 79:24

fact 37:14
  50:5,8,11,12
  67:8 81:4,12

factor 48:12

factors 41:10
  42:16

failed 87:18

failure 18:18
  85:5

fair 75:3
  78:15 94:11
  96:25 98:14
  99:6

faith 72:25
  84:12

falling 88:11

false 63:4
  66:7,8,17
  68:8 73:15
  75:16 76:2,20
  82:2 83:13
  99:24 118:5

falsified
  102:9,17

familiar 29:15
  107:19

Family 1:8
  5:17 92:21
  93:4 94:8

far 32:4 63:14
  67:22 71:7
  84:23

Farm 21:3

fast 111:9

fastened 37:14
  41:5,10 43:20
  48:6 50:9,10

fastener 43:19
  50:6

fastening
  48:10 50:3,4

February 27:17
  31:20 32:14
  33:23 34:23
  35:17 84:1
  99:18

Federal 14:25

fee 21:1 73:7
  90:1
  94:14,20,21,2
  2 95:2,3,6,22
  96:3,5,19
  97:10 98:11

fees 21:2
  94:19

feet 7:24

felonies 9:4

felt 70:25
  71:8,13

few 91:22
  106:25

fictitious
  9:14 10:18

field 5:16
  7:20 11:5
  12:15,18
  14:8,23 17:15
  20:20 25:6
  27:14,20
  32:20 34:14

64:4 65:24
72:24
73:4,6,8 80:3
83:2,4
96:10,15 97:3
98:9
101:4,11,16
102:10
110:12,19
113:25
114:2,4

fight 39:12

file 23:7
  25:10 37:6
  77:18 88:14

filed 5:19
  17:15

files 102:15

fill 114:22

filtered 85:16

final 79:1

finally 14:10
  79:1 84:8
  97:23

finances 83:22

financial
  114:15 116:20

financially
  119:14

find 38:24
  42:17 48:11
  55:1 86:18
  105:9

fine 104:19,20
  118:2

fines 88:3

finger 47:24

fingers
  37:21,23,25

finish 6:24

finished 90:23

fire 73:9

firm 2:3
  11:7,9 16:4
  22:21 36:2,4
  37:4 61:2,6
  75:18 77:20
  84:3 85:12
  86:14,22
  88:15 90:1
  94:15 108:19
  115:10

firmly 49:19

firms 16:3
  73:11 75:21
  76:20 83:9

first 5:5 6:6
  15:9,12 17:5
  22:18 27:14
  28:18 29:1
  31:16 44:11
  45:15,16
  55:17 71:5
  74:18 96:16
  98:16 100:20
  111:12

five 27:5,6
  44:12 85:20
  107:14

five-minute
  64:21

FL 2:4,9

flattering
  56:16

flood 98:5



Florida
  1:2,19,25
  9:13
  10:1,9,13
  14:3,5 15:17
  17:1,8 18:9
  19:7,23 20:10
  44:25 107:18
  119:2,6,21
  120:2,7,15

flushing 53:8

flying 56:13

focus 53:3
  55:17

follow 116:4

followed 29:15
  84:8

following
  29:21 32:20
  88:5,11

follows 5:6

follow-up
  90:10

footfall
  100:13,17

footfall/
  mechanical
  100:16,20

force 37:20
  87:16

forces 37:17

foregoing
  119:8

forever 10:16

forgetting
  13:17 21:5

form 12:21

35:20 60:1,15
61:3,17 63:6
65:6 66:19
68:3,12 69:11
70:12 71:1,15
72:15
73:17,22
74:25 75:19
76:6,25 78:16
80:23,25
81:20 82:8
83:6 87:7
90:6 103:18
104:11

former 80:3

Fort 39:9

forth 22:20
  23:21

forward 58:18

found 34:5
  58:21
  100:11,12
  105:10 106:8

four 35:2
  42:11 75:8,11

fourth 115:24

fragments 52:2

frankly 117:12

fraudulent
  78:15

free 89:25
  97:7
  109:14,17

frequently
  94:17

from
  9:20,21,25
  11:14,21 14:2

16:14 22:17
26:11 28:5
29:9 30:20
34:1,23 36:1
37:7 39:2
40:15 41:19
48:11 52:8
53:13 56:12
58:1,15 59:18
61:5 65:16
68:6,22
75:23,24
76:4,22
77:17,19,21
78:5,13 79:6
80:14
85:14,16 88:5
93:16 95:3
96:16 97:18
98:15 99:16
102:16 104:24
106:9,11
108:10 109:12
115:18 116:13

front 99:16
  100:12 103:25
  104:1,20

FSIC 94:5,6,10
  99:4 100:15
  108:25 113:23
  114:3 115:17

FSIC's 35:22

full 6:8 23:20
  30:4 50:22
  69:23 70:10

fun 106:24

further 33:12
  46:5 78:24,25
  90:9 93:10
  118:11 119:10

————————————
         G
————————————

garage 34:5
  55:13,17,18,1
  9 57:20,22
  58:3,11
  68:5,18,20,25
  79:14,20,21

garbage 68:17

gated 39:10

gave 72:12
  80:17

general 14:8
  21:19,21,22
  22:22 23:5
  34:23 49:25
  98:3

Generally 28:2

gentleman 28:7
  39:25 85:24
  86:2

get 5:13
  11:1,14 17:22
  19:19 22:14
  23:6,20 31:3
  38:17,21 40:3
  43:3 50:18
  54:19 57:5,10
  77:6,11
  80:13,22
  82:13
  84:5,6,12
  91:10,15
  92:19 97:25
  101:7 105:1
  107:12,15,16
  108:24
  109:22,23
  112:24
  113:1,2



117:17,21,22

**getting** 6:10
7:5 45:20
95:14 111:21

**GG** 120:15

**giant** 83:8

**Gina** 2:8 3:5
63:11 69:13
72:9 80:24
90:9 93:11
101:6 111:22
112:4

**girl** 85:19

**give** 69:1
74:21 85:21
89:5 92:2,7

**given** 5:23
32:8 36:8
50:8 65:22
85:10

**glad** 90:25

**go** 5:22 6:1,14
7:9 15:6,10
16:10 17:23
30:9 31:4
33:11 45:5,15
53:25 57:15
58:18,21,23
59:13 65:21
67:1 68:7
72:24 95:20
98:9,20 103:1
104:22 105:14
108:14 112:16
116:6

**goes** 10:9
35:21 52:4
90:16

**going** 5:22,24

6:14,25
7:14,17 9:22
11:21 12:20
15:8 17:10
21:9 26:17,18
38:17,18 40:2
42:5 45:6
49:24 52:7
56:8,14
57:4,19 58:22
66:25
71:2,3,4,12,1
8,19 72:8,15
74:8,25 81:22
82:4
84:4,9,17
88:23
90:11,15,16,1
7,23
91:2,6,10,13,
22 93:14,16
95:5,12 97:2
98:4 100:5
101:8,19,21
104:2,3,4,10
106:24
107:21,23
109:19 113:6
116:6
117:5,18,20,2
2

**golly** 118:15

**gone** 61:25
62:7 71:6
76:18

**good** 5:9 8:18
33:8 54:2
58:5 72:25
84:12 87:23
115:12 118:2

**gotten** 34:6

63:13

**grant** 39:24

**grapevine**
110:19

**great** 48:2
54:17 74:18

**greatly** 77:12

**gross** 98:10
106:12

**groups** 99:14

**GSABATINO@CHAR
TWELL.COM**
2:10

**guess** 7:22
12:15 14:17
17:5,21 19:25
25:2 26:1
30:19 48:4
77:8 86:13
88:11 103:20
108:20 110:18
112:23

**guideline**
74:10
75:4,6,9

**guidelines**
12:23

**gutter** 56:13

**guy** 117:14

**guys** 23:23
104:9

**guy's** 70:16

————————

H

**had** 17:16
18:2,11 20:21
23:9,14 26:19

29:22
34:2,6,25
38:22 48:10
59:23
65:22,24
66:3,9 69:5
74:9 77:25
82:12,16,25
83:10,22
85:25 86:6
89:24,25
94:4,22 104:6
105:20 106:2
114:2,7

**hag** 20:21

**hail** 14:12,14
15:23

**half** 79:23

**halfway** 50:21

**hand** 58:8
115:24 119:16
120:9

**handle**
11:15,16,19
12:2 72:25
90:14

**handled** 74:12
113:3

**handling** 6:3
26:9 27:21
36:18 72:22
73:12 74:18
75:22

**hands** 47:20
50:5

**hang** 84:5

**happen** 80:4

**happened** 36:17
37:4 51:19



84:11 110:18

**happens** 7:9
55:25

**hard** 19:18
24:23 25:24
26:3 57:9
84:10

**Harold** 6:8

**has** 10:18
51:14 53:17
81:15,18
86:16,17
88:9,15 98:4
102:16 108:25
112:8 115:17
118:22

**have** 8:19
9:3,21 10:7
13:5,8,22
14:20 15:3
16:14 18:9,19
19:8,10
20:6,7,11,17
21:15,18
23:23 24:5,18
25:9,13
26:2,3,4,10,1
4,21 28:20
29:20 31:22
32:16 33:3
34:9,14 38:11
39:11,25
40:11,13 44:8
45:19
48:5,19,21,22
49:6 50:21
51:1 52:17
53:2,25 55:25
56:1,3,4,11
58:4 59:25
60:5

61:10,14,16
63:15 65:10
67:7,8
69:17,21,23
71:13,24
72:10,18
73:23 74:21
76:21 77:4,8
78:4,10,12,21
80:9,11,12,17
83:16 85:18
86:23
87:10,17,25
88:14,16,21
89:1,3,4,14,1
8
90:9,10,17,19
,21
91:13,16,17,2
2,23,24 93:10
94:18 95:22
96:5 97:1,20
98:20 100:6
101:3,22
102:9,15
103:6,15,20,2
1,24
104:1,3,24
105:7,9
106:2,3,4,9
107:2,6
109:10
110:10,25
111:2,24
112:17,21
113:9,12,15,1
8,20
114:2,14,18
115:15
116:4,20
117:7,9
118:11,12,16

**haven't** 20:1

21:7 62:3,6

**having** 5:5
56:22 98:13
103:13,22
105:3 113:3

**Hawaii** 20:5

**he** 12:23 23:15
24:25 28:6
29:24
35:16,18,24
39:23,24
40:1,2,3
62:14
63:3,7,25
64:11
67:8,9,21,22
72:2
101:24,25
102:4
112:1,8,10,12
,14,15,17

**head** 6:17

**hear** 7:15 8:22
9:1 23:3 64:1
70:4 72:6
80:14

**heard**
115:8,13,14
116:2

**heavy** 12:5

**held** 18:6
21:21 64:23
65:17 70:20
76:14 115:2

**he'll** 118:18

**help** 23:17
97:4

**helps** 80:18

**her** 24:22

**here** 5:15,25
13:17 23:17
27:4 45:22
46:12
47:4,5,19
48:15
49:2,6,15
51:11,13
52:6,20 53:4
54:4,10,11
57:1 59:8
108:23 109:8
111:19 117:1

**hereby** 119:6

**here's** 72:7

**he's** 57:20
64:4,12 67:19
71:20 103:13
112:4,5,9

**Hey** 16:23 33:8
81:22 110:19

**highest** 17:20
38:14

**highlight** 52:7

**highlighting**
46:22 59:9

**highly** 7:8

**him** 12:21 28:9
33:2,3 35:23
36:1 63:8
67:9
71:18,20,23
72:2,9 78:2
92:12 101:23
103:16,21
108:12
111:23,25
112:8



877.291.3376
www.UCRinc.com

hip 42:20
  49:18 50:21
  51:4 56:7
  79:24
his 63:23 64:3
  71:22,24 72:3
  85:18 108:11
  112:8
history 15:6
hit 40:6 56:15
  103:1,2
HOA 39:11
hold 17:25
  19:17 25:13
  48:13 92:17
  103:12
holding 26:1
hole 50:6
Holingsworth
  70:16 85:18
HOLLYWOOD 2:4
home 12:1
  17:6,9,14
  20:9
homeowner
  114:24
Homestead 17:8
honestly 39:24
  52:11
horizontal
  43:15
horrible 48:10
hour 8:12
  18:22 56:14
  90:1
  96:1,9,14
  97:8,12,14,18

98:15
hourly 94:20
  96:13
hours 26:8
  95:13
house 26:3,4
  58:1,3
huge 103:22
human 50:4
hundreds 65:14
hurricane
  15:12,17 17:6
  18:6 32:11
  34:6 38:12
  39:3 40:16,23
  41:16 42:21
  48:19 55:25
  56:23 59:21
  74:14,15,16,1
  7
hybrid 95:3,23

———————
I
IA 15:22 16:4
  22:21 36:2,4
  73:11 75:21
  77:20 83:8
  84:3 86:21
IAUA 21:9
Idaho 14:3
  19:16
idea 48:17
  51:16 106:2
ignored 63:7
ignoring 73:2
I'll 7:11 33:8
  64:9 77:8,12

95:15
I'm 5:22,23,24
  6:14,25
  7:14,16 8:18
  9:15 10:13,23
  12:13,20
  13:17 20:2
  21:4,5 22:25
  24:8 26:17
  27:3,13
  29:4,14,15
  30:15 42:16
  44:15,22
  45:6,20
  46:6,19,22
  47:23 48:2
  49:18 51:11
  52:7 53:7,24
  57:1,5,11,20
  58:22 59:9
  60:20,25
  63:9,25
  65:6,7,10,25
  66:25 67:7,17
  68:17,19 69:9
  70:3 71:12,18
  72:7,8,15,22
  73:24 74:25
  78:8
  80:12,14,24
  81:22 82:4
  86:9,22
  88:2,8,13,21
  89:7,9
  90:9,11,15,16
  91:10,13,22,2
  3
  93:2,14,15,16
  94:8,9 95:15
  96:23 97:13
  98:2
  99:20,21,24
  100:5,23

101:11,19,21
  103:18
  104:2,3,4,10,
  11,21 105:3
  106:16,21,22,
  24
  107:13,19,21,
  23 108:13
  109:5,15
  110:9
  111:9,13
  112:22 113:6
  114:1,24
  115:1
  116:3,5,8
  117:5,8,18
immoral 80:8
impact 43:3
  50:22 51:23
  54:14 55:6
impacts
  42:17,18,23,2
  4
impartial
  114:11
impossible
  56:1
improper 48:11
improperly
  98:8
INC 1:9
incentive
  116:20
inch 42:6
inches
  46:1,3,23
  49:7,8
include 60:8
  61:24 62:2,6



63:18 64:5
70:10
73:2,15,20,24
76:20 78:6,20
81:17 82:2
96:4 118:5

**included** 60:20
69:21 75:6
106:4

**includes** 62:8

**including**
81:11 82:1

**incorporated**
9:9 92:22

**incorrect** 32:5
62:23 63:1
80:10

**incriminating**
89:6

**independent**
11:7,8,12
15:15,16,23
16:4,8,9 17:4
18:1,7 19:1,4
34:15 37:3
61:2,6
73:7,12 75:18
76:19 85:12
86:14 87:22
88:15 107:12

**INDEX** 3:1 4:1

**Indiana** 19:21

**indicate** 60:4

**indicated**
65:24 66:9
76:23 83:10

**indication**
61:10,14

**Indirectly**
66:12 79:11

**individually**
14:24

**industry**
15:7,10

**influence** 8:24

**information**
12:22 31:22
80:18 83:13
104:24 115:25

**in-house** 17:13

**initial** 95:21
110:20

**initially**
30:13,15
35:14

**initials** 93:7

**inks** 59:6

**inputs** 52:4

**inserted** 62:8

**inspect** 13:2
28:9 94:13
105:21

**inspected**
33:21

**inspecting**
98:22

**inspection** 6:3
11:5 28:8,9
30:5,23 31:4
33:16
34:9,10,15,21
36:21
39:6,7,21
40:7 45:2,4
48:11 62:13

100:9 105:21

**inspections**
33:2 34:20,24
35:6

**installation**
48:12

**installed** 41:7
84:20

**installment**
21:1

**instance** 112:7

**instances**
72:23 73:25

**instruct**
35:18,23
67:25 68:21
71:19 72:9
101:23

**instructed**
37:3
60:13,16,19,2
2 61:1 63:17
64:5
68:9,10,16
69:6
70:1,8,23
71:7 85:14
99:4 100:1
108:25 109:1
118:5

**instructing**
78:14 80:7

**instruction**
79:5

**instructions**
6:15 69:20
72:12 75:15
76:1,18 81:15
89:6

**insurance** 1:8
5:17 13:9
16:20 29:10
33:25 68:9
71:22 75:17
76:19
92:13,21
93:3,5 94:9
110:12 111:24
112:15

**insured**
28:3,13,16
29:2 31:16
32:17,25
33:14,24
34:2,4
39:18,21,23
61:19 69:18
73:3 81:12
113:21 114:5

**insured's**
32:17 33:24
39:22 78:9

**intend** 8:11

**intentionally**
7:9

**intentions**
60:25

**interchangeabl
y** 94:8

**interest** 109:6
114:9,15

**interested**
119:14

**interesting**
106:3

**interim** 82:22

**interior** 28:10
31:8 32:3



40:4 45:16
55:8,11 59:25
60:3 74:12
79:13
87:11,15 99:1
104:4
105:10,14

**interrupt**
14:22

**into** 22:14
27:2 31:3
33:11 35:21
38:21 45:9
73:12 74:23
81:10 108:7
111:18,25

**introduce**
108:2

**investigation**
39:20

**investigative**
117:11

**invoice** 25:3

**invoiced** 97:22

**involve** 71:3
107:17

**involved** 45:1
70:19 88:25
90:4 106:1
113:14,16,19,
20 117:3

**involvement**
86:23 106:25
108:18
114:13,14
115:18

**involving**
14:14

**Irma** 17:7

32:11,12 34:6
38:12,13 39:3
40:6,16,24
41:16 48:20
49:23 55:25
56:24 59:21
74:14,15,16,1
8

**isn't** 60:19

**issue** 82:11
83:25 84:11
112:3

**issued** 40:19

**issues** 41:13
48:10 83:22
103:23 105:3

**items** 58:12
68:5 81:17
118:6

**it's** 5:15,19
7:2,7 8:2,3
9:11,14,22
10:10 11:20
14:19 15:8
16:3,25
19:8,18 22:2
23:2 26:1,23
37:11,12,18,1
9 39:9 40:25
41:2 43:19
46:3,14,21
47:6,7 48:3
49:16 50:4,11
51:14
52:1,16,24
53:7,8,13,20
54:17
56:10,14,17
57:9,19,23,25
58:2,19 64:17
65:8 66:23

67:17
69:14,17 71:2
72:1 78:23
79:11,22,23,2
4 84:10 89:18
90:22 91:2,6
92:21 95:12
96:13 97:12
99:12 100:21
101:14
104:16,17,18,
20 106:2
111:5 112:1
114:9 115:9
117:20,21

**itself** 42:24

**I've** 12:12
13:4,12,16,17
14:4 17:15
18:2,3,6
26:23 58:11
64:18 86:18
90:23 91:7
107:7 109:11
115:13

---

### J

**jacks** 42:25

**janitor** 10:5

**January** 83:25

**JD** 17:21

**Jeff** 64:9 66:3
67:9,15

**Jersey** 19:22

**job** 12:11 58:6

**jog** 79:23

**John** 2:3 3:3,6
5:9 92:5
107:21

110:4,6

**Johns** 86:20

**JOHNT@JTLWFIRM
.NET** 2:5

**Josh** 28:6
35:15 62:21
78:1 86:7,16
92:4 99:8

**JRB** 26:2

**judicial** 1:1
5:20

**just** 5:12,24
6:6,14 7:4,9
8:13,16 9:22
10:9,13 11:11
12:12,15 13:2
14:2,8
15:6,23
18:3,16 22:8
23:24 24:24
33:5,7 34:23
36:3 37:21
40:13,14
41:5,20 44:15
48:1,10
49:16,19
51:19 52:17
53:17,24
54:12 55:16
56:10 57:9,21
58:5 65:7,20
70:3 71:5,17
72:17 75:8,13
78:9 79:22
80:7 81:4
82:3 83:1
84:5,8,9 87:4
90:5 92:7,12
93:11 94:6
96:23 97:13
98:2 99:2



100:19
101:6,21
102:1,19,21
104:2,6,21
107:17
108:4,23
109:14 110:17
111:7,20
112:2,20
113:3 114:21
115:14 116:4
117:17

_____

K

Kansas 20:6

keep 14:24
  20:2 25:24
  40:14 81:5
  93:4

kept 25:18
  84:11

keys 23:16

kids 8:15

kind 15:6
  17:16 18:16
  19:18 20:16
  26:1 27:23
  31:4 32:21
  35:5 47:19
  49:14 52:19
  53:10,24
  54:19 57:21
  59:6 60:20
  65:7,21 84:3
  92:25 110:18
  117:14

knew 33:2
  105:20 114:22

know 7:1,10,22
  8:1,13,14,16

9:25 10:25
14:8,11,17
15:6
17:4,16,19
19:10 27:23
31:8 32:15
33:13,15
34:12,19
35:2,6 37:6
39:9,14,18
40:2,6,11,13
43:4,13 45:3
46:23 48:4,10
49:6,24 50:9
51:17,18
53:5,21
54:7,9 55:14
57:2 58:8
59:23 62:3
67:22
71:19,20,21
72:19 73:9
74:13,21
75:16
77:11,12
80:2,5
83:5,10,11,12
84:23 85:4,11
86:16,17
87:1,3 88:16
89:11 90:12
91:17
93:12,17
97:20,24
98:19 100:8
101:7,9,13,14
102:1 103:11
104:16
105:18,24
106:1,6
107:22 109:25
115:10,20

knowing 110:13

knowledge
  40:15

knows 72:2
  101:15,24
  117:14

_____

L

lag 7:2

land 56:8

language
  62:8,10,15

large 50:1
  81:4,7,13,19
  94:24

last 6:7 8:21
  10:19 15:20
  22:23 23:6
  63:23 64:1
  67:16,21
  70:18 110:18
  115:21 118:3

later 68:16
  98:9

law 2:3,8
  15:21
  16:11,17,18
  17:10,22
  115:10

lawsuits
  107:13

lawyers 89:23
  115:12

lead 42:24

least 8:12
  40:15 42:2
  78:21 99:14

leave 91:14,17

leaving 70:3

led 53:8

Lee 1:2 5:19
  85:25

leeward 49:11
  52:16,21
  55:20,22
  56:1,11,16,23
  58:2

left 38:6
  49:12 65:1
  103:6

legal 88:22,25
  93:2

lengthy 14:11
  89:18

less 54:5
  95:15

lets 9:25

let's 16:10
  21:2 28:19
  34:8,23 45:15
  57:18 59:13
  64:20 68:7
  71:5 74:1
  76:12 81:9
  114:13,23

letters 4:7
  12:12 26:2
  76:21
  107:22,23
  108:12

level 17:20
  85:17 94:23

levers 42:8

license 6:11
  16:9 18:11
  19:2,7,17,18,



19 20:23
21:25 22:13
86:17,18
87:22 88:9

**licensed**
19:4,10 72:24
102:10

**licenses** 17:25
18:2,7,9 19:1
21:22 88:10

**lie** 82:4

**life** 24:22

**lifetime** 20:23

**lift**
35:11,14,19,2
5
36:7,14,18,24
37:4,12,23
38:4,8,24
39:2 40:22
41:8,12,17,22
,23
42:4,5,7,10,1
3 45:19,23
46:4 48:1
49:2,3 79:20
99:8,15

**lifted** 32:2
46:2 47:22
55:5

**lifting** 48:3

**likely** 7:8
41:11,21
56:3,11

**limit** 71:17

**limited** 66:21
93:17

**line** 104:6

113:7

**list** 11:20
20:6 23:20
65:11 71:2
83:8

**listed** 94:20

**little** 5:22
6:1 7:21
16:10,19
22:14 26:2
28:19 31:15
41:19 52:6
65:21 75:13
77:6 79:23
90:16 109:5

**live** 9:24

**lives** 40:1

**LLC** 1:5
9:11,16 10:10
107:3

**LLP** 2:8

**located** 57:22

**location** 38:20
50:17

**locked** 103:3

**locksmith**
23:15

**lodged** 88:10

**log** 26:10
104:18

**long** 10:7,18
11:20 15:20
19:5 71:2
74:8,24 90:16
98:18,20

**longer** 30:16

**look** 16:20

19:8 45:17
57:25 58:9,14
103:21

**looked** 40:11
54:12 84:19

**looking** 34:16
35:7 41:19
42:14,15,16,2
3 43:12 44:15
45:22 46:12
47:4 48:14
51:12 54:3,10
57:1,11 58:3
99:20
101:9,10,11,1
5 102:2 104:9

**looks** 32:21
33:1 49:2
51:15 52:7,10
57:23,25
58:1,8,11,19,
25 59:9,12,14
97:13 109:7

**loose** 50:2
56:7

**loss** 11:10
16:6 22:19,22
23:5 28:18
29:1,2,14,21
31:16 32:3,8
33:5 36:5
55:9,17
63:22,25
64:2,12 65:4
66:10,22
77:18 93:25
94:12,24
95:1,7,16
96:17 98:10
99:5 105:21
106:13 107:11

110:23 117:10

**losses** 107:17

**lost** 111:21

**lot** 12:12
13:24 14:9,25
35:6 43:14
52:1 54:18
111:8

**lots** 14:5
37:21

**loud** 6:16

**Louisiana**
15:18,24
18:14,15
19:24 21:22
22:11

**LSU** 17:24

**LTP** 21:10

─────────
M
─────────
**mad** 80:12,21

**Madam** 63:9
91:21

**made** 25:18
26:10 32:19
33:1 62:14
63:7 65:2
68:9 82:3
100:7 111:8

**Magdela** 70:17
85:19

**Magdela's**
70:18

**mail** 96:21

**mails** 78:13

**Main** 11:21

**Maine** 18:4



19:22

**maintain** 18:18

**maintained**
39:11,13

**maintaining**
39:18

**make** 5:24 7:4
24:22,24
30:21 31:5
39:17 57:18
65:21
68:10,11 69:7
80:3 84:4
90:22 91:1
92:19 95:15
116:25

**making** 30:8,11
39:12 112:3

**man** 33:8

**management**
17:14

**manager** 17:15
22:21 64:4
84:2 85:17

**managers** 70:15
75:11,25
77:18 85:9,12

**manually** 103:3

**manufactured**
37:19

**many** 14:16
15:3 18:2
34:20,24
44:6,14 46:1
47:8 73:19
90:3 93:15
97:17,21
100:22

**March** 30:22
33:18,23
34:24 101:5

**Marine** 16:18

**Maritime** 16:18

**mark** 26:17
45:6

**marked** 26:23
100:6

**matter** 5:17
11:6 30:2
87:5 98:24
113:10

**matters**
89:14,17

**Matthews** 82:15

**may** 12:20
39:25 42:10
50:21 52:10
53:2 71:24

**maybe** 7:23
25:5 29:12
72:3 109:6

**me** 6:11,24
7:10,11,15
8:13,16 11:1
12:9 13:19
15:2,22
16:5,7 18:21
19:11,12 20:8
23:3,17,25
24:8,22
28:2,4,6
29:4,17
30:7,14,24
31:23
34:3,12,19
35:13
36:6,18,23

39:5,17
44:3,18
45:5,14,18,22
47:8 49:5
50:23 52:5,19
54:22 55:24
57:3,5,15,23
58:5,9,21
62:22 63:23
64:18 67:16
69:1
74:20,21,22
77:5,6,11
78:3,24
81:4,5
82:12,17
83:19 84:14
89:5,22
91:15,17
92:1,6,7,8,10
,19 93:12
94:3 95:11
96:20 99:23
100:24
102:16,18
104:1
106:14,15,17
109:3,17,19,2
0,21 112:24
113:5
115:16,23
117:14 118:2
120:6

**mean** 11:13
14:22 17:12
23:18 24:21
32:24 35:1,3
36:15
38:11,12
39:16
40:19,25
42:4,12 43:17
44:15 48:15

50:3 56:12
57:16 60:6
64:16 65:9
66:13 67:11
72:16 78:23
79:11,20,22
81:25 82:2
85:16 89:18
92:5 94:9
100:21,22
104:24
106:6,18
111:7,8,13,18
114:9

**means** 111:23

**meant**
112:12,14

**measurement**
7:25 44:12
49:6 99:17

**measuring**
36:14

**mechanical**
50:2,4
100:13,17
102:25

**mechanically**
41:10 43:19

**medications**
8:21

**meet** 22:20,21

**meeting** 28:9
111:13 114:24

**member** 9:15,16

**mentioned** 34:4
59:23
114:21,23

**messages**



77:16,19 78:5

met 111:12

metal 43:1
47:6 53:6
58:13 59:4

meters 7:24

method 49:17

Mexico 19:20

Meyers 39:10

MIAMI 2:9

Michigan 19:21

middle 30:22
72:6

might 48:5
58:9 85:18
105:4

Mike 70:16
85:18

miles 56:14

mine 108:9

Minnesota
19:21

Minor 28:8

minute 92:10

missing
43:5,25
52:9,11,15

Mississippi
19:23

Missouri 20:6

misstated
100:19

mistake 29:13

mitigation

73:3

modifications
75:7

modified 43:1

money
81:5,7,13,19
111:9

Montana 10:15
19:16

month 35:3

months 16:1
84:5,6
97:17,21

more 13:5 14:1
27:3 35:5
38:22 41:20
42:2,12 53:17
54:5 67:10
79:19 83:1
86:13 95:9
101:22 109:25

morning 5:9
8:21 23:14

Morris 82:21

mortar 41:4,8
50:3,10

most 11:20,21
12:15 25:24
39:11 43:3

mostly 56:6

mountain 65:13

move 90:13
101:1 104:12

much 26:6
40:10 41:15
69:3 94:12
96:9,10

97:2,16

multiple 63:2
102:17

Mutual 11:22

my 5:9,15
6:8,24
7:11,15 8:22
9:1 12:12
14:21 15:12
22:21
23:13,15,16
25:2,24
26:2,3,4
30:25 32:20
37:23 44:15
47:24 48:11
50:14 52:19
54:7,9
62:8,16 64:19
65:11 68:6
70:4 77:9
80:10 81:21
82:16 86:13
89:20,22 90:1
91:7,16,24
94:23 98:6
99:2,23,25
102:16
103:2,5,7
104:18,21
105:12 106:21
108:23
110:14,19
113:7
114:11,12,20,
21,22 116:8
118:1
119:9,16
120:9

myself 9:8
85:23

N

Nachreiner
64:9 66:3
67:9

N-A-C-H-R-E-I-
N-E-R 64:10

name 5:9 6:7,8
9:14 10:18
12:13 26:2
36:3 63:23
67:16
70:16,18 78:9
85:18
92:13,19
108:11 113:19

named 28:7
34:1 92:17

names 11:25
85:9

Naples 39:9

narrative
73:15 75:16

Nationwide
21:4

nature 89:21

near 53:12

necessarily
50:14 99:9

necessary
91:18

need 6:21
8:10,13,16
33:11 76:9
77:9 90:19
92:4 98:11
101:20 103:19
112:2



**needed** 19:25
78:25

**needs** 101:17

**negative** 6:18

**neglected**
39:14

**negotiating**
65:12 96:21

**neighborhood**
39:10

**neighbor's**
56:13

**Nevada** 14:4
19:17

**never** 29:18,24
84:7 89:24,25
104:16,17
115:8,13,14
116:14,16,17

**new** 9:24,25
16:25
19:20,21,22
65:15 75:9
82:19
90:21,25
91:1,8,18

**next** 8:19
52:19 53:9
71:12

**night** 8:21

**Niles** 86:3

**N-I-L-E-S** 86:3

**no** 1:3 6:20,21
8:23 9:2,5
10:21 11:17
16:22 18:24
19:3,15 21:17
24:2,8

25:8,11
29:11,22,25
30:6,16 32:3
33:4,11 39:16
40:18 41:6
44:19 48:18
50:2,5 51:10
52:21 54:25
56:2 57:14
60:9,16 61:13
62:12 63:11
70:6 71:11
73:18 76:3
77:25 79:4
81:14,21 82:7
84:20 86:15
87:8 88:4,13
93:10 95:10
96:23 98:17
99:7
100:8,22,25
104:8
106:2,19,21,2
3 109:3
111:7,18
112:7
114:6,17
115:8
116:19,20
118:10,11
120:15

**nobody** 101:15

**nodding** 6:17

**None** 94:17

**non-resident**
19:19

**nor** 88:13
112:21 115:15
119:12,13

**Nora** 118:1

**Normally** 49:22

**north** 19:20,22
38:22

**northeast** 18:5

**northward**
38:19

**nose** 37:13

**not** 7:9 8:3
10:25 11:2
12:8,21 15:22
18:10 19:3
20:25 21:17
24:8,11,13,17
,22 25:4,5
28:14 29:15
30:25 33:15
35:12,18,23,2
5 36:1,7,20
37:4,9,25
38:5 39:23
41:2 42:6
45:3,20 46:4
47:3,10,21,24
48:3,5,9
49:10,19
50:9,14,21
51:10 53:23
54:17 55:16
57:5 58:5,6
60:10,13,14,2
2,25
61:11,19,20
64:20 65:2
67:10,17
68:1,13,19
69:9,12
70:1,3,10,23,
25
71:8,13,20,23
72:9,12 73:16
75:21 78:7,20

79:12 81:17
82:1,4,5,6,24
84:9,23
86:9,13,22,25
88:13,21
89:7,9
90:11,23
91:2,6
93:2,24
96:4,13 97:12
98:2
99:5,7,24,25
100:5
101:14,19,21,
23
102:15,20,23
103:21
104:4,9,22
105:19,23
106:2,21
107:17
109:1,3
110:9,13,24
111:3
112:1,22
113:10,11
114:1
115:9,16,20
116:23
117:16,20,25
119:10

**Notary** 1:25
119:5,21
120:15

**notations**
26:10

**note** 39:16

**notes** 22:22
23:7 26:11
32:20 33:3,22
34:1,3,9,16
35:7 77:19



119:9

**nothing** 34:7

**notice** 4:4
22:18 26:18
28:18 29:1
31:16 32:4
55:16,17

**notification**
28:5

**noting** 52:13

**now** 15:11
20:5,9 21:10
26:22 37:10
74:23 88:21
91:13 92:2
95:4
101:16,20
103:13 104:8
107:13 112:21
114:4,25

**nowhere** 78:4

**number** 5:20
19:7 21:12
30:1 32:6
41:9 48:14
57:11,17
107:7 112:9
113:18

**numbering**
29:16 44:11

————————
O
————————

**oath** 8:8 72:19
120:1

**object**
12:20,21
35:20 58:16
59:4 62:11
71:4 72:15

74:25 82:8
104:11

**objected** 80:24

**objecting** 65:6
103:18

**Objection**
60:1,15
61:3,17 63:6
66:19 68:3,12
69:11 70:12
71:1,15
73:17,22
75:19 76:6,25
78:16 80:23
81:20 83:6
87:7 90:6

**observations**
42:1 54:23
61:25 62:4
68:2

**observe** 43:24
55:8,11 66:4
84:15

**observed**
62:4,12 69:15
76:3 81:11
87:11 100:8

**obtain** 104:12

**obviously** 7:21
11:14 51:1
80:2 88:11
89:11

**occasionally**
32:21

**occasions** 63:2
102:17

**occur** 37:16

**occurred** 33:23

66:16 118:8,9

**occurring** 8:7
74:14

**October** 93:23
96:16

**off** 18:3 23:14
44:1,7 46:14
47:7,12 49:24
64:23 65:1,17
70:4,20 76:14
84:3 90:15
115:2

**offense** 8:20

**official** 18:17

**off-ridge**
42:25

**Oh** 15:2 63:13
110:8,21
118:15

**Ohio** 19:21

**okay** 5:12
6:4,5,10,14,2
2 7:5,12,18
8:4,5 9:3,19
10:7,13,17,21
,25 11:8,18
12:1,7,9,14,2
5
13:1,4,8,11,1
9,25 14:16
15:2,5,12
16:10,14,17
17:3,9,19
18:14,20
19:4,7,15
20:11 21:11
22:7,10,14
23:8
24:1,3,5,10,1
8,21

25:4,9,12,17,
21
26:6,9,14,17,
22
27:10,14,18,2
3 28:12,23
29:1,19
30:4,7
31:1,12,15,21
,24 32:8,14
33:4,10,16
34:8,12,18
35:4,13
36:20,23
37:7,10,24
38:2,7,24
39:5,20
40:5,22 41:25
42:14
43:9,21,24
44:6,21
45:5,13
46:1,6,12,16
47:1,4,18,23
48:9,13,19,24
49:9,13,20
50:8,15
51:5,8,11,25
52:5,23
53:1,4,9,12,1
4,17,21,24
54:16
56:3,9,19
57:1
58:4,21,22,23
59:3,13,17
60:6,18
61:10,21,24
62:2,6
63:13,16
64:22
65:1,6,7
66:9,24 67:19



69:14
70:7,8,14
74:1,20
75:10,14 76:8
77:2,8
78:4,12 79:5
80:1,20 81:2
82:5 83:16
84:14,21 85:1
86:23
87:4,13,22
88:15,19
89:5,10,17
90:3,19
91:18,21
92:9,15,23
93:6,9,13,21
94:3,11,16,19
95:8,11,18,20
,24
96:5,9,12,14,
15 97:17
98:12,18,22
99:2,11,20
100:5,11,18,2
1,23,24
101:1,2,3,19
102:5,9
103:8,10
105:8,13,14,1
8,24
107:1,5,9,20
108:4,16,25
109:4,10,21
110:10,16,22
111:10,16
113:6,17,20
114:7,13,18
115:5,17
116:1,3,17,24
**Oklahoma** 20:5
**Old** 11:22

**oldest** 11:21

**on** 1:16 2:2,7
5:12,16,18,24
6:10,21
11:1,5
12:5,10
14:1,11,17
17:1 20:5,17
22:18 24:8
25:24 26:4,22
27:16,23
28:13,16,18,2
4 29:1 31:10
32:3,14,18,19
,22,23 33:19
34:3,4
36:19,24
37:13,17
38:2,3,4,5,24
39:12
40:2,14,22
41:17,24,25
42:5,11,12
43:3,16,25
44:1,15
45:4,7,10,18,
19,22
46:6,11,12,15
,19,21
47:4,10,15,16
,20,23
48:3,6,13,25
49:10,11,13,1
7 50:6,17,23
51:4,10,24
52:4,6,12,16
53:2,3
54:12,14,22
55:13,16,17
56:1,4,11,16,
18
57:4,19,23,25
58:2,8,10,12

59:8,10,14
60:12,25 61:8
63:2 64:3
65:11,22
66:25 67:18
69:19 71:10
72:10,13
73:14 74:8,19
75:22
77:10,17 78:7
79:4,12,20
80:13,22
81:11
82:13,17,19,2
0
84:3,5,8,17,2
3 86:9,24
87:12 90:20
91:24 92:17
94:13,14,20
95:5,6,12
97:24,25
98:4,8,11,20,
23,25
99:5,9,13,16,
18 100:1,3
101:1,4,14
102:7,17
103:2,7,12,17
104:7,8,10,18
105:2 106:8
107:13,14,16,
23 108:11,24
110:12
111:1,6,13,14
113:10,13
114:13 115:10
116:9,21
117:4 120:8
**once** 21:1
27:25 98:5
**one** 16:4 17:12

18:2,11 22:23
27:20 31:19
34:19 35:5,7
41:5,10,11,17
42:4,8,9
52:8,11 64:18
69:1 71:3
73:14 78:1
79:19,22
81:10,23 83:9
85:23
86:7,16,18
92:10,12,17
95:25 98:25
100:11 101:22
103:22
104:14,15
105:6,7
113:14 117:9
118:1
**ones** 75:15
87:23
**ongoing** 89:19
110:25
**only** 11:15
18:15 28:17
36:11 41:17
42:5,10 50:10
69:25 73:14
75:22 77:25
95:12
104:14,15
105:7 109:15
116:24 117:3
**opening**
79:12,16
87:14
**openings** 79:19
**opinion** 50:14
**opinions** 68:2



opportunity
25:9 26:20
28:20

opposed 41:12
95:5

opposing 23:9
107:15 116:14

opposite 55:23

oral 74:10

order 1:19
22:15 46:4
118:19 120:7

Oregon 11:10
14:3 19:16

O-R-E-G-O-N
11:11

original 68:24
96:3 114:10

originally
10:15

other
11:16,17,18,2
3 18:25 19:1
21:6,15,19
23:8 29:9,22
40:3 41:13,23
42:14 47:25
50:3 63:18
66:14,15
68:8,14,16
70:16 71:3,10
72:11,13
75:22 77:20
78:12 83:4
85:12,13 86:2
88:17 89:14
101:16 104:3
112:15
113:3,14

114:20
118:7,10

others 13:17
21:4 35:5

our 7:20 54:20
104:11

out 6:16 11:10
14:25 15:25
16:6 22:8
23:17
25:16,22 30:9
33:8 34:2
35:5 39:23
44:16 45:5
50:9,10 54:24
56:18 72:4,5
82:16 85:4
88:11 92:18
95:13 98:24
112:16 117:13

outcome 114:15

outside 13:9
17:15 24:2
41:8

over 7:3 14:19
15:17 21:1
24:25 25:1,5
49:7 53:8
56:13,15
61:25 62:7
71:6
74:2,3,4,5,6,
7 75:12,13
76:18 90:7
92:8
93:11,13,14
97:2 98:4
100:6 101:21
104:17 105:4

over-viewing

58:6

owe 81:4,7
117:13

owed 106:13

owes 81:13

owing 81:18

own 21:25 22:3
42:1
114:11,12

owned 10:7

owner 64:12

———————————
              P
———————————

P.A 2:3

p.m 1:17 33:18
118:20

page 3:2 4:2
5:25 27:4
28:18,20,24
29:17 32:16
44:17
45:18,22
46:12 47:4,18
48:15,25
49:13 51:12
52:6
53:4,17,25
54:3,11
57:1,17,23,24
59:8,13,14
87:20 93:3

pages 29:9
44:14,20

paid 16:5,7
82:25 84:5
94:12,14
95:8,25
96:1,6,9,14
97:11,14,18,2

3 98:14
109:10,22,23

paint 58:17
59:1

paragraphs
27:5,7

parent 9:15

part 23:6
30:25 60:11
64:1 90:2

partial 31:10
52:10

particular
14:7 20:20
25:6 27:18
34:18 35:8
36:17 42:6
43:12 46:11
52:18 60:12
102:24

parties 1:18
76:22
119:11,12

partners 82:18

pass 84:6

passed 38:17

past 46:4

path 85:7

pattern 43:12
51:6 56:6

patties 41:8

Paul 19:9

pay 18:21
20:22
82:12,17 84:9
89:22 97:3
98:9,11,18


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

payers 110:5

paying 20:25
82:6,19,20
97:7 115:16

payment 25:2
73:4 82:11
84:1 97:25
109:12

payments 65:12

peg 57:20
58:10,25

pending 31:10
111:2

people 16:25
75:24 85:10
111:14 114:21

per 44:16
96:1,9,14
97:14,18
98:15 99:15

perfect 10:7
12:17 76:13
93:6,9 117:24

performing
11:5 21:19

perhaps 31:11
41:18

peril 84:23,24
85:6

perils 69:16

period
28:21,23
29:5,12 75:12
98:21

permit 40:19

personally
109:3

pertinences
42:24

Peterson 97:11

phone 26:4
32:6 77:19
79:3 91:24

photo 4:5
22:21 44:17
45:5 46:13
53:19 59:5
99:17

photograph
44:8,14
45:13,17,19,2
3 46:13
47:5,11,18
48:14,15,24,2
5 51:11,12
52:6,12,13
53:4,25
54:1,3,17
57:3,11,16
59:8

photographed
49:17

photographs
34:16
37:1,5,8
44:3,6,12
49:13 57:3
58:1,7

photos 50:1
58:10,18,22,2
4 99:14

pick 90:20

picture 45:23
47:9 58:12

pictures 45:14

piece 57:21

pinky 47:24

PL 94:4

place 33:17,19
41:21 51:16
53:22 85:11
96:4

placed 50:6

places 39:11

Plaintiff
1:6,16 2:2
17:2 117:4

Plaintiffs
105:19 109:8
115:6

Plaintiff's
4:3 27:1 45:8
96:1

PLAN 21:10

plant 59:6

Play 67:3

please 8:20
57:14 67:16
71:16 109:20
117:6

PLS 93:25
94:2,4 98:16
111:4

plumbing 42:25
53:7,8

plus 43:18
75:23

point 18:11
28:12 29:19
30:15 33:7,13
45:7 46:4
50:10 53:20
61:5 84:9

85:23 90:8
91:14 96:22
97:14

pointed 85:4

policies 12:22
35:22

policy
28:18,21,23
29:5,12,16,20
30:5
61:11,15,16
87:16,19

policyholder
108:20,21
109:22,23,25
112:6

policyholders
73:1 84:13
113:4

portals 25:15

portion 89:20

position 52:2
67:23

positions
17:12,14

positive 67:18

possible 56:17

pound 37:12

pounds 37:23

powder 51:15

practice 16:17

practiced
16:11

practices
72:22

prejudice 40:7



prep 22:15

preparation
24:13

prepare 6:2
22:16 24:15
28:10 97:5

prepared 27:10
105:25

preparing 26:7
73:24

prepping 78:8

presence 41:9

present 39:23

presented
26:23

presidents
85:13

pressure 48:3

pretty 15:8
39:10 40:10
42:21 48:2
55:21

previously
113:22

primarily 12:5
15:24 38:15
66:23

primary 38:13

print 25:16,22
44:16,17
103:1,2

printer 70:4

prior 6:10
23:10
24:13,15 25:9
26:20 30:5
31:19

48:16,22
49:23 51:14
75:6 83:22
95:5 114:19
115:6

privately
14:17

privilege
104:18

privileged
25:1,2,5
35:21 100:6

probably
10:11,19
13:22 14:1
15:4 16:2,6
17:17 26:8
33:3 34:13
56:14 71:3,4
75:5 107:13
111:12,19
114:23
117:6,20,21

problem 10:21
19:15 33:4
41:6 44:19
64:20 70:6
103:9,13

procedures
12:23 35:22

proceedings
119:8

process 70:19
111:5

processes
72:22

produce 37:23

Productions
9:16,17

professional
17:25 19:1

promise 93:4

proper 71:9
83:25 92:19

property 11:10
12:1 13:2
17:6,10 30:9
36:5
39:8,14,19,21
44:22 45:4
63:22,25
64:2,12,13
65:4 66:10,22
77:18 93:8,25
94:12,25
95:14 96:17
98:23
105:10,14
110:23

protected
52:24

provide 6:25
13:3 29:17
77:3,10 79:13
83:13,19
87:19 97:6
102:18 118:4

provided 29:18
44:12 73:3
80:16 89:14
94:15

provider 13:9
76:19

providing 7:17

proximity
38:23

prying 37:17

public 1:25

108:19,21,22
119:6,21
120:15

pull 45:5 78:9

pulling 70:4
92:11

purposes 11:5
27:24 116:21

pursuant 1:19
120:7

put 5:12 62:16
65:2 66:4
74:1 90:15
100:19

putting 47:20
48:2 75:15

—————————
Q

quantify 84:10

question 6:25
7:7,10,15,16
52:19 54:7
64:15
71:12,19 72:8
77:9 86:13
92:12 96:25
99:2 100:2
101:3,22
102:12 104:22
105:9
106:16,23
109:5 114:1,7
116:9,13
118:3

questioning
5:14 71:17
91:7 104:7
113:7

questions 6:16



7:9 8:20,22
9:1 13:5 39:6
81:23 90:9
91:16
93:11,15
96:19 104:3
118:11

**quick** 76:10

**quicker** 109:25

**quite** 89:11
92:24 117:12

—————————
R
**rain** 105:16

**rains** 35:2

**randomly** 27:19

**ranks** 17:17

**rate**
96:13,20,21,2
2,24

**reached** 82:16
84:2,8

**read** 118:13

**reading**
118:16,21

**ready** 91:19

**really** 18:5
27:3 28:17
33:11 37:18
40:2 53:3
54:21 58:6
73:23 74:24
97:1,20
109:16 117:12

**re-ask** 72:8

**reason** 8:11
18:17 27:18
34:18 35:4,8

36:6 44:10
69:25 80:9,21
108:8 118:7

**reasons** 36:9
118:10

**recall** 34:19
44:7 55:21
68:13 86:25

**receive** 29:9
30:4

**received** 20:17
21:15 22:19
27:16 28:5
32:22 109:11

**recent** 11:21
110:17

**recently** 11:20

**recognize**
32:12 85:5

**recollection**
34:15 52:18

**recommendation**
30:9

**record** 5:13
6:7,10 7:5
8:3 11:1
24:25 27:2
35:21 36:3
40:14 45:9
64:24
65:18,22
70:21 76:15
90:20 94:7
102:21 103:13
104:8 108:7
115:3 119:9

**recorded** 33:14
61:19

**records** 25:24

98:20

**recuse** 115:17

**redact** 83:13

**RE-DIRECT** 3:6
116:11

**reduced** 38:18

**refer** 82:23
94:6

**referred** 47:25

**regard** 10:17
13:19 24:6,12
25:12 46:16
48:14 49:9
55:18 60:6
65:1 67:3
68:7,11,20
71:22 76:2,17
84:14 89:10
92:13,23 93:6
116:5,13
117:2

**regarding** 34:9
63:4 77:22
80:3 90:4
104:7 114:19
116:14

**regards** 14:6
27:6 50:24
65:2 66:15
67:24 69:19
78:18 86:4
92:16 118:3

**registered**
9:13

**registration**
9:15

**regularly**
107:10

**reinstate**
18:21

**related** 24:11
32:11 41:3
59:21 66:11
71:16 72:1
78:10 79:16
82:5

**relates** 72:17

**relationship**
107:2,5
111:3,11,22
112:8,9,18,21
114:16 115:15

**relative**
119:10,12

**relayed** 28:4

**relevant** 15:7

**remaining**
65:10

**remains** 67:23

**remember**
10:12,19
11:24 21:17
35:7 36:16
39:25 46:20
52:11,12 53:3
70:18 94:16
99:3 110:22

**remotely** 1:18
2:6,11 120:6

**removal**
68:5,17,21,25

**remove** 37:7
68:22 79:1,5
118:6

**removed** 68:6



removing 73:4

repair 48:16
69:21 106:7
117:22

repaired 48:17
53:20

repairs 32:7
51:14,16 52:4
53:22 106:10

repeatedly
29:23

rephrase
7:11,16

replacement
69:22,24
70:10

report 22:21
28:11
44:8,14,17
45:14,17
61:21
62:8,15,17
63:19 64:6
65:3 66:4
68:7,8
73:16,21
76:20 78:6,21
99:20
100:5,15,19
101:4,12,17
102:7,9,16,17
,24
103:1,5,14,15
,16,24
104:1,5,7,9,1
4,15 106:5
119:7

reported 1:24
29:2 31:21,24
32:1,8 55:15

Reporter 1:24
6:19 7:5
63:9,11,15
91:22 92:1
119:1,5,21
120:14

reporting 40:5

reports 66:17
102:15
103:6,21,22
104:10,12,13,
23

represent 24:8
107:15

representation
13:9

representative
28:4,7 32:18
33:24 70:10

representative
s 67:25 68:10
69:6,21 70:2
81:16

represented
71:21 113:22

representing
24:7 113:21
114:5

reprogram
23:16

request 78:24

requested
30:16 87:21

requests 27:8
63:7 65:2
78:20,21

require 21:25

required

20:7,11

requiring
20:22

resend 108:13

reserve 77:9
103:19

reserved
116:10

reserving
104:11,21
116:8

residence
59:18 84:15

resident 10:16

residential
20:21 21:23
22:12

resolution
84:2

respond 41:5
63:3

responded
22:17 29:24

respondent
26:13

responses 6:18

responsibiliti
es 12:19 22:4
27:25

responsive
27:8

rest 10:1

restate
7:11,16

restroom 76:10

result

49:20,21
51:7,9 55:9
56:23 59:21

resumed 64:25
65:19 70:22
76:16 115:4

retained 11:4
12:10 88:16
105:20 112:14

retainer 24:5

revenge
80:13,22

review 23:25
25:10
26:15,20
28:15

reviewed
22:18,19,21
23:6 28:17
32:16

reviewers
77:18

reviewing 26:7

reviews 17:15

revocations
88:3

ridge 41:20
42:20 44:2
46:15 47:7,12
49:16,18,23
51:4 53:13
56:7,15

right 6:6,24
7:14
8:17,19,24
9:6 13:4
15:5,20
16:1,10
17:17,19



20:4,7,9,16
21:10 27:3
28:19 30:14
31:3 34:8
35:4 38:4
39:5,15 41:11
44:7 46:8,21
48:13,24
53:9,10
54:10,16 55:8
57:9,15,20
58:2,11,24
59:10,16
63:14 65:20
72:7 77:9
88:21 90:8
91:12 92:9
93:10
101:16,20
104:12,21
107:13 114:24
116:8
118:3,18

**Rivas** 1:24
118:19
119:5,21
120:5,14

**Rod** 1:15 3:2
5:1,4 12:24
93:22
103:12,24
108:16,17
120:6

**Rodney** 6:8

**role** 64:3

**roof** 20:21
30:24 31:10
32:9 36:19,24
38:3
40:14,16,20
41:18,24

42:15,19,24
43:20,25
44:4,12 45:15
46:2,11
48:6,9
50:18,20,25
51:4,6,10
52:25 53:12
54:24 56:14
59:10,18
60:6,8,14,17,
19,23 61:8
69:21,22,23
70:10
79:10,13
81:11,18
82:13
84:15,24 85:2
87:10,14
99:6,10,16
100:1,4
105:17,25
106:9 117:5

**roofer** 21:24

**roofers** 111:15

**roofing** 14:8,9
21:19,21
22:1,3,10,12
43:1 54:23
73:5

**roofs** 13:24
14:1,12 27:21
36:10
41:4,5,7
74:11,12
85:24

**Rookery** 44:24

**R-O-O-K-E-R-Y**
44:24

**row** 47:5

**rows** 53:13

**rule** 22:2
54:24

**rules** 5:25

**run** 8:15 28:12
76:9
111:18,24

**Ryan** 85:18

———————————

S

**S.E** 2:9

**Sabatino** 2:8
3:5 12:20
16:23 22:24
23:1,3
24:22,24
35:20 60:1,15
61:3,17 62:11
63:6 65:6
66:19 68:3,12
69:11,14
70:12
71:1,4,15
72:15
73:17,22
74:25 75:19
76:6,9,13,25
78:16
80:14,23
81:1,20 82:8
83:6 87:7
90:6,11,19
91:4,6,10,15,
21 92:4,9,14
93:13,20 95:8
101:11,19
102:4,6,23
103:24
104:14,18
105:4,7,8
107:21

108:1,4,10,15
,17
110:3,6,8,10
112:5 113:6
115:5 117:8
118:12

**safe** 26:4 58:7

**said** 6:15 9:17
14:4 16:11
18:23 19:10
23:5 29:6
30:15 32:15
43:4 46:20
59:24 61:21
65:8 67:6
78:19
84:1,4,9
85:23 95:4,6
99:7,8
100:22,24,25
106:10

**sales** 111:14

**same** 5:24 7:1
22:3 40:16
47:15 52:6
66:16
79:21,24 84:6
104:9 110:12
114:7

**sample** 99:14

**sandstorm**
13:23

**sandwich** 72:6

**sat** 95:24

**satisfied**
36:13

**saw** 31:8 87:12
110:14

**say** 6:20 8:2



```
14:16 17:4
26:6 29:5
31:16,17
32:24
34:20,23,24
38:7,10,11
39:8,13 42:2
44:11 47:9
51:6,19 56:10
57:15 63:10
67:11 73:19
74:2 78:15
80:6 81:25
83:1 88:8
90:3 95:24
97:17 98:14
101:25
110:3,6
114:14 115:14
118:1
saying 63:12
  106:6 111:22
  112:5
says 32:3 93:3
  100:20 110:19
schedule 28:8
  33:16 73:7
  89:20
  91:13,18
  94:14
  95:2,3,6,22
  96:3 97:10
  98:11
schedules
  94:21
scheduling
  22:18 23:24
  24:2,11 33:6
  91:1,8 96:19
school 15:21
```

```
17:11,23
scope 31:13
  60:11,14,16,1
  9 69:25 99:5
  100:1
scoped 68:24
  82:14
scoping 99:9
screen
  26:22,24
  44:15 45:11
  57:6 91:25
  92:6
screen-share
  26:18 57:13
  58:22
screw 50:5,9
screwed 51:1
scribbled
  32:21
SDII 45:1
Sean 70:17
S-E-A-N 70:17
search 78:9
second 41:5
  48:13 64:18
  69:1 85:17
  92:18
securely 48:6
Security 1:8
  5:17 92:21
  93:1,4 94:8
see 26:22,25
  28:20 33:8
  45:10
  47:16,19
  49:25
```

```
52:11,25
54:19
57:2,4,6,19
58:7 64:19
78:7 80:19
100:7,11
103:9,12
108:13,23
113:19 114:23
117:18
seeing 49:14
  56:13,19
seem 80:19
seems 23:4
  50:19 85:5
self-employed
  9:8
send 22:24
  23:1 92:5,7
  93:11 96:20
  108:15,16
senior 94:24
sent 22:20
  78:19 93:13
  98:24 108:12
separate 26:11
September 29:3
  119:16 120:9
series 58:1
  75:4
serve 109:9
  110:15 111:1
served 110:11
services 1:5
  5:18 11:4
  32:5,6,25
  43:2 88:17
  107:3,12
```

```
108:23 113:1
116:14,15,18,
21
setting 65:8
settings 103:4
settle 80:18
settled 14:11
  84:12 98:9
settlement
  89:4
seven 13:23
  47:10,11
several 11:17
  13:16 36:8,9
  42:16 45:16
  46:23 72:23
SFR 1:5 5:17
  32:5,25
  106:25 107:2
  109:1,10,18
  110:11 111:11
  112:4,13,16,1
  9,24
  113:10,14,16
  114:14,16
  115:6,18
  116:14,15,18,
  21 117:4
shadow 54:19
shaking 6:17
share 26:24
  92:5,8
sharing 57:6
sheathing
  37:15
sheet 4:5 45:6
shelf 58:13,16
```

**she's** 86:21

**shifted** 32:2

**shingle** 74:11

**shiny** 59:4

**short** 8:14
13:18 64:23
65:17 70:20
76:14 115:2

**shortly** 34:5
40:11

**should** 59:25
60:4 106:3,4

**show** 7:1 41:8
42:5,10 48:4
49:17 50:2
54:21 114:20

**showed** 6:11
97:9

**showing** 41:23
42:1
46:1,3,13
47:19 48:2
49:19
99:12,17

**shows** 51:17

**side** 17:2
52:22 55:23
57:19
58:2,8,11
72:10 108:21
109:8,25
117:4

**sides** 109:9

**sign** 51:18
102:23

**signature**
101:4
102:7,11,14,1

6,25
103:2,5,7

**signed** 24:5
74:19

**significant**
89:20

**signing** 118:21

**similar** 49:14

**simple** 97:12

**simply** 80:7
101:25

**since** 16:3
17:10 31:12
34:7 71:20
77:8

**single** 87:5

**sir** 8:23
9:2,18 10:5
16:13,16 30:6
32:12 45:25
46:8 48:18
59:12 60:9
88:4

**sit** 96:6,9
97:4 98:15

**situation**
34:14 104:10
112:23

**SIU** 17:13

**six** 42:2 63:7
65:2 75:8
78:19,20,21
107:14

**slight** 75:7

**slipping** 75:6

**slope**
38:4,5,6,10,1

1,25 40:22
41:16,17,18,2
4 44:1
46:6,8,15,19,
21 47:15,21
49:10,11,12
52:16,20,21
55:18,19,20,2
2,23,25
56:1,4,5,11,1
2,15,16,23
58:2,20
79:21,22,23,2
5 99:12,13,15
100:12

**slopes** 99:16

**slow** 110:5

**Slowly** 109:24

**small** 11:23

**snider** 73:5
82:15

**Snovel**
86:15,19

**S-N-O-V-E-L**
86:15

**sole** 9:16 10:3

**solely** 66:21

**sole-
proprietor**
9:10

**solid** 18:22

**some** 12:4,5,11
17:12,13 18:3
19:11 25:23
30:15 35:2
41:12
50:10,17
51:15,18

53:19,20
54:19 55:15
57:20
58:10,16,17
65:12,22
74:10 75:5
76:1 79:2
84:7 91:14
94:20
97:10,14
100:7 107:10
108:8 111:1

**somebody** 9:21
51:24

**someone** 52:3
110:3

**something**
10:11 25:15
35:3 49:21
57:7 59:24
63:10,12 70:4
73:20 74:13
80:13 82:1
89:6 100:14
101:8 110:3,6

**sometime** 10:19
67:22

**sometimes** 7:1
8:14 42:17,20

**somewhat**
116:24

**Somewhere**
30:22 35:1

**Sonia** 1:5 5:18

**soon** 110:14

**sorry** 22:25
29:5 44:22
46:19 47:23
51:12 53:7,24


877.291.3376
www.UCRinc.com

63:9,25 65:25
67:7 68:17
69:3,13 80:24
88:8 106:22
114:1 115:1

**sort** 14:13
24:20 58:16
84:7

**sound** 112:4

**sounds** 15:7

**source** 38:14

**south** 15:18,24
19:20,23
38:15

**southeast**
107:18

**southern** 38:15

**southwest**
107:18

**space** 46:23

**speak** 24:11
115:5

**speaking** 15:5
98:3

**Specialist**
11:10 36:5
63:22 64:2,12
65:5 66:10,22
77:18 94:1,13
95:1 96:17
110:23

**specific** 85:25

**specifically**
7:20 65:3
68:21 75:15
76:2 80:20

**specifics**

24:19

**specified**
14:13

**speculate** 7:22

**speeds** 50:18

**spell** 6:7
63:23 64:9
67:16

**spelling** 86:9

**spelt** 11:11

**spend** 8:12
95:13

**spent** 26:6
89:11,22

**spider** 43:16

**split** 90:1

**spread** 117:13

**spreadsheet**
73:24 89:18

**staff** 85:21

**stain** 59:10

**stains** 34:4,5

**stand** 93:7

**Standard** 37:12

**standardized**
37:12,18

**standing** 87:23

**stands** 37:11

**start** 15:9
71:6 74:17,23
75:1 90:18
93:15,16,21,2
2,23

**started** 5:13
15:21 17:6,18

20:22 82:19
97:7 98:5
111:18 112:8

**starting** 75:5
83:25

**starts** 44:11

**state** 1:25 6:6
9:13 10:2
11:11
14:3,21,23
15:19 16:6
18:15 19:19
20:9 21:3,4
80:20 94:7
100:7,15
119:2,6,21
120:2,15

**stated** 61:18
90:20 98:12
99:4

**statement**
33:14 61:19
62:22
63:1,4,5,18
65:3 66:4,7,8
76:3,20
78:6,20 82:3
118:6

**statements**
66:17 68:8
75:16 80:2
99:24 100:7

**States** 18:3
19:11,12

**statutory**
69:17 72:24

**stay** 39:12

**stepped** 14:1
22:8

**stepping** 51:24

**sticks** 35:5

**still** 8:7 22:1
31:9 50:11
64:13,14
65:4,14 67:23
70:4 87:23
89:19 96:21
97:25 98:19
110:23,25
111:1,2 113:6
116:8

**stop** 42:18
57:5 81:24
83:11 109:19

**stopped** 82:20
96:24 97:15

**store** 25:21

**stored** 25:23
26:3
102:14,25

**storm** 38:14,17
40:12 48:22
50:16,22
56:8,18 79:15

**storm-created**
79:12

**storm-related**
79:18

**story** 84:6

**street** 2:4,9
10:23 11:21
47:16

**strong-arming**
73:11

**struck** 40:17

**structure**



28:10 93:3

**stuff** 17:11
65:15 79:6
117:15

**style** 92:20
99:13

**subjected**
50:22

**subpoenaed**
77:2

**subsequent**
23:23

**sued** 14:24

**Suite** 2:4,9
10:23

**sum**
81:4,7,13,19
117:5

**summer** 67:22

**sunlight** 54:19

**supposed** 20:23
114:24

**Supreme** 1:19
120:7

**sure** 5:23,24
6:8 7:4 21:4
24:24 39:12
57:5,8 60:25
65:21 69:4
77:13 80:14
84:4 86:9,22
88:9 90:9
91:20 92:1,19
93:2 102:19
116:7,25

**surface** 42:11
59:7 84:18

**suspensions**
88:3

**switched** 21:1

**sworn** 5:6 8:7
120:8

**system** 54:23

**systemic** 85:5

―――――――――

T

**take** 6:19
8:10,14,20
9:22 33:17,19
44:6 45:14
50:1 61:19
64:19,20
65:15 76:10
77:6 84:4
92:10 96:2
98:6 104:19

**taken** 1:16
30:19 54:18
102:16

**takes** 89:20

**taking** 4:4
26:19

**talk** 7:3
23:9,12,17
28:19 31:15
34:8 94:3

**talked** 21:7,15
23:13,15,18
60:7

**talking** 58:25
89:23 97:22
98:2 101:24

**tape** 99:17

**tarp** 32:9

**tarps** 65:10

**TAS** 37:11

**TAS106** 36:10
37:10 38:2
42:7

**tasked** 30:8,11
31:5 98:22

**team** 17:16

**tear**
84:16,17,22
85:8

**technical**
65:23

**tecum** 26:19
77:3

**tell** 9:20,22
19:11,12
30:20
31:23,24 33:4
35:16,24
36:20 56:17
62:25 67:6
98:23 109:21
110:21

**telling** 81:22
82:1 83:12
109:17

**Tennessee**
19:22

**termed** 31:9

**terminate**
111:3,6

**terms** 5:25
47:19 62:3
66:17 76:18
83:2,12,22
85:10 89:1
94:7 112:18

**test**

35:11,14,19,2
5
36:7,10,19,24
37:4,10,11,16
,19 38:2
41:17,22
42:5,10 45:24
48:1 49:2,3
99:9

**tested** 48:7

**testified** 5:6
14:20 15:3
74:23 105:9
116:5

**testify** 25:6
27:10 51:8
99:22 101:8
116:20

**testifying**
81:9 88:6
89:12 92:24
102:2
103:14,15
109:20 110:9

**testimony** 7:18
8:7 14:6
23:10,19
25:10 80:10
81:15
89:11,14
92:23 99:3,4
102:24
118:4,5

**testing** 37:11
45:19

**tests** 36:14
99:16

**Texas** 9:20,21
10:14,16
13:22,24



14:5,6,24
21:22,25
22:1,2 26:3

**text** 77:19

**texted** 23:21

**than** 14:1 19:1
21:6 23:8
29:22 35:5
40:3 42:2
50:3 52:3
63:18 65:22
68:17 71:10
79:19 83:1
95:16 99:22
100:17 101:16
113:14 114:20
118:7

**thank** 8:18
18:23,24 57:9
113:7

**Thanks** 64:22

**that** 5:15
6:13,15,19,21
7:1,12,16
8:1,3,6,16,21
,25 10:11,18
11:3,8,12,18,
24 12:6 13:17
14:10 15:20
16:5,14
17:11,22
18:25
19:8,10,12
20:5,19
21:2,7,14,17
22:2,5,6,8,19
23:8
24:3,9,11,21,
24,25
25:15,18,23
26:11,12,20

27:8,16
28:6,24
29:4,12,14,17
,19,20,22
30:16,18,19,2
3
31:3,8,16,17,
19,22,23
32:12,18
33:3,5,7,15,1
9,20,23
34:3,5,13
35:3,16
36:1,16,17
37:1,13,22
38:2,8,11,12,
14,24
39:2,15,17,18
40:1,7,16,18,
21,22,25
41:4,7,8,9,12
,15,17,20,21,
24
42:2,5,7,10,2
1 43:2
44:7,14,23
45:3,10,20,23
46:1,2,4,6,13
,16,24
47:12,13
48:2,3,4,5,7,
9
49:5,11,17,19
,20,21
50:1,2,5,7,8,
9,11,12,15,23
51:14
52:12,14,18,2
0,21,25
53:2,5,6,18,1
9 54:11,12,14
55:4,13,14,16
,19

56:1,4,13,22
57:6
58:6,8,12,18,
19
59:4,5,9,20,2
4
60:4,11,24,25
61:5,10,14,20
,24,25
62:2,6,8,10,1
2,14,16,22,25
63:4,7,18
64:5,9,17
65:2,8,9,10,1
4,24
66:4,7,8,9,10
,13,16,18,21,
25
67:7,9,14,18,
23
68:1,9,11,13,
15,19,24
69:1,7,10,19,
22
70:1,3,14,24,
25
71:4,7,8,13,2
3
72:2,12,13,22
73:3,4,5,16,2
0,23 74:11,14
75:12,23
76:1,3,4,23
77:2,3,20,25
78:6,9,10,15,
19,20 79:3,6
80:2,5,6,7,8,
9,12,14,16,17
,18,19,21
81:4,5,10,12,
13,18,25
82:2,13,14,17
,25

83:4,10,11,21
84:11,22,24
85:1,4,7,9,14
,20,24
86:2,5,16,17,
25
87:1,6,9,11,1
7,19,24
88:1,3,8,13,1
5 89:13,14
90:1,2,3,20,2
2 91:2
92:11,25
93:17
94:1,4,7,25
95:2,4,9,13,2
2
96:3,4,7,19,2
0,21,23
97:1,3,6,15,1
8,23
98:7,12,13,14
,20
99:4,6,8,9,22
,23,25
100:2,7,11,14
101:14,20
102:6,14,24,2
5 103:4,14,15
104:3,16,25
105:10,18,20,
22,24
106:2,10,13,1
7 107:11,14
108:12,19,20
109:8,11,15,1
8
110:11,13,14,
17,20,21
111:12,23
112:3,4,5,12,
19,20
113:4,5,9



114:7,21,24
115:10,16,20,
21 116:9,25
117:15
118:5,16
119:6,8,10
120:6

**that's** 8:12
9:13 11:10
16:20 18:15
21:10 23:20
31:2 34:7
35:6 37:19,22
41:14,21
42:21 46:22
47:21,24
48:1,7,16
49:18,24
50:21 52:21
53:5 54:5,13
56:5,8
57:19,20,22
58:5 59:5,17
60:20 64:15
69:15 71:2
74:18,24
78:25 80:9
81:21
82:2,5,22
84:18,23
87:13,18
88:1,2 95:19
96:24 99:7
100:16,24
103:5,22
104:19 105:2
110:17
115:9,24
116:2
117:2,6,17,22
118:2,7,9

**their** 11:24

28:17 37:21
50:17 52:2
60:25 68:10
70:2 72:24
81:16 84:12
85:20 94:13
97:4,5 108:24
111:14,15
113:19

**them** 9:22
11:14 14:25
18:21 20:2,25
25:22 26:3,4
32:19,22,23,2
4 46:4 64:14
65:14,16
73:10
74:17,19
75:12 77:7,12
78:19
80:12,16,18,2
1,22 81:18,22
82:4,5,7,11,1
2,19,20
83:10,11,12,2
3 84:11 85:20
86:7
88:7,12,19,22
,24
89:2,24,25
94:18 97:10
103:7
107:14,15,17,
19
108:2,5,13,15
,16 109:12,13
110:21,25
111:1,2,8,12,
14,18
112:1,2,22,23
113:11
115:14,15,16

**themselves**
22:5 75:18

**then** 5:13
6:3,20
15:17,24
16:1,19 17:17
26:4 28:10
31:3 32:4
35:12,18
42:23 50:23
53:9 56:15
58:18 59:13
60:18,19 71:5
74:20 75:1
84:6,8
91:16,17
95:14
97:7,9,10,14,
24 98:7,8
106:9 116:5

**there** 13:17,23
14:9 15:18
18:6 19:17
25:23 27:18
29:20 33:8,11
34:18 35:4,7
36:6,8,14
38:4,7
40:2,3,16,18,
23 41:4,7
42:10,20
43:4,12,14
45:3
47:1,5,11
50:2,11
51:3,6
52:2,8,9,10
53:9 55:14
58:10,25
59:10 61:7
68:8 69:23
70:15,24 71:7

72:4,5,11,23
75:4,9 76:3
77:16,17,21
79:15,24
83:1,8,24
84:7
85:2,4,12,19
87:16 94:20
95:13 97:2
101:6 103:1,9
106:1,8,9
108:14 109:6
112:16 114:10
115:10,13,21
118:10

**therefore** 73:6
91:1

**there's** 11:23
18:6
21:4,9,12
31:9 34:7
50:5,6 53:19
58:6,15 65:13
79:12 83:8
84:17
103:14,15
104:8,14,15,2
2

**Thereupon** 5:3
27:1 45:8
64:23 65:17
70:20 76:14
108:6 115:2

**these** 7:20
8:19
27:6,8,10
32:20 34:13
39:11 50:1,24
51:6,16,21
54:18 57:2
58:10,24
65:12 75:14



77:11 78:8
79:2 80:2
81:23 86:10
98:13 101:7
103:6 104:12

**they** 9:25
14:7,10 15:21
16:7 17:1
18:21 20:22
21:1 22:5
24:8 27:11
28:2 30:20
32:21 34:2,6
36:7,13,18,20
37:6 38:18
39:11
43:11,14
47:10
49:14,19,23
50:2,16 51:2
56:7,8 57:18
60:11 65:11
68:15,16,21
70:18,24
71:7,13,23
72:2,12,23
73:5,11
75:21,23
76:23 77:14
78:23 79:3
80:7,9,10,11,
12,18,20
81:4,5,7,8,25
82:13,15,17,1
9,20,22
84:3,4,9,13,1
9,20,24 85:7
86:13 87:4,23
88:14,16
89:19,21 90:1
94:21 95:3
97:3,6,7,9
98:11,18

103:6 106:2,4
107:8,11
108:1,8,19,22
110:5 111:6,7
112:10,23
113:2,18
115:12,16,22,
23 117:13

**thing** 28:17
71:9 101:16

**things** 5:12
12:6 43:2
66:17 76:18
78:9 80:8
82:1,2 83:13
106:25 110:25
116:9

**think** 8:11
11:13 13:18
14:10 16:19
17:19 18:2,17
20:16 21:10
33:7 36:17
39:18 44:22
45:6,16 46:20
47:6 58:4,21
62:1 63:11
72:1 85:17
86:21
88:22,23
101:17 103:18
107:13,24
108:2 109:11
110:13
111:21,22
112:2,25
116:3

**thinking** 20:3

**third** 27:4
52:8

**this** 6:4 8:21

11:1,5
12:8,9,10,17
13:19
15:2,7,10
17:20 20:8,17
22:1 23:14
24:12
25:17,19 26:9
27:24 28:3,10
30:1,7,11,14
34:12,15,19,2
1
35:5,7,13,21
36:6,17,23,24
37:25 38:3,22
40:13,14
41:10,11 42:3
43:25 44:3,21
45:4,7,22
46:6,9,11,16,
19 47:6,9,15
48:4,6,17
49:9 50:1,8
51:4,10,19
52:5,6,11,13,
16,20
53:12,14,24
54:8,11,22,24
55:9,24 56:20
59:13 60:12
61:8,11,22
64:3 66:11,16
67:3,24
71:3,6,10,16,
17,22
72:3,14,17
73:14,24
74:1,8,13,20
76:2 77:22,23
78:7,14 79:1
80:1,6 81:11
82:17 83:11
84:14,15,24

85:14 86:24
87:1,5
88:16,20
89:12,15
90:4,8,21
92:9,17
96:18,22
97:25
98:2,23,24,25
101:3,8
102:11,22,23
103:12,19
104:7,24
105:2,13,21,2
5 106:24
107:24 113:14
114:15,19
115:6 116:22
117:5 119:16
120:9

**those** 6:18
10:8 12:1
13:11 18:3
22:4 25:13,21
26:2,14 29:15
31:13 34:5
36:9 37:5,7
38:19 43:3,18
45:6 47:21
50:25 51:1
53:21 57:13
66:15 69:16
71:24 73:2,25
75:17 76:1,22
77:3,5,10
78:18,21
79:9,18 82:16
83:14,16,19,2
1 85:22 89:17
93:7 94:7,17
99:18 104:11
116:9



though 8:6
    10:25 19:17
    41:10 48:2
    63:14 105:14
thought 59:24
    60:4 110:8
three 35:1
    37:23 43:18
    46:3 47:25
    53:13 70:15
    84:5 93:14
    95:13
three-finger
    48:1 49:3
three-minute
    76:10
threshold 42:7
through 5:22
    6:1,14 11:7
    15:6,21 17:17
    25:14 31:4
    37:1 41:20
    45:21 53:25
    78:1 79:6
    84:5 88:16
    91:16 105:17
    110:19 111:23
    113:1,15
tile 13:24
    14:1,9,12
    16:5 27:21
    37:13,14,17,2
    0 41:4,7
    42:6,7,8,11,1
    5,24
    46:2,14,16,22
    ,24 47:20,25
    48:3,16,17
    49:9,16,18
    50:7,20,21,24

    51:14,24
    52:8,9,10,15,
    18 53:9
    54:6,11,23
    74:11 85:24
    99:16,17
    100:12
tiles 32:2,3
    40:20
    42:2,11,20
    43:4,5,7,8,9,
    10,13,16,25
    47:6,8,21
    48:4 49:23,25
    50:17,25
    51:1,4,7,9
    53:2 55:5,6
    56:7,12 84:19
    99:15
time 7:23 15:9
    17:5,12
    18:2,11 20:23
    22:3,5 26:6
    27:20 28:12
    29:19 30:15
    33:9,13 34:21
    40:6 66:9
    68:16 73:24
    75:12
    82:18,21 83:9
    89:12,21,22
    90:18 93:17
    94:22 95:5
    97:22,23 98:6
    113:19
    117:3,9
    118:16
timeframe
    51:18
times 13:16
    14:16 15:3
    22:2 73:14,19

    74:2,4,6
    78:19 85:20
title 12:11
titled 101:16
TNE 94:22
    95:12 96:4
today 5:16
    6:11,15 7:21
    8:7 22:16
    23:10 26:15
    27:7,12 61:25
    80:15 89:11
    90:21,23
    91:11 93:18
    95:25 96:7
    103:2 104:25
    118:4
today's 6:2
    22:15 26:7
together 57:21
    77:7
told 36:7,18
    62:16,18 66:3
    67:2,9 70:24
    71:13,23
    72:2,12
    82:7,11 83:10
    100:15
Tolley 2:3
    3:3,6 5:8,9
    12:25 13:4
    16:24 17:3
    23:5 25:4
    27:3 35:24
    45:10 60:2,18
    61:4,18
    63:9,13,16,17
    64:20
    65:1,7,20
    66:21 68:4,14

    69:15
    70:14,23
    71:5,18
    72:7,11,18
    73:19 74:1
    75:10,20
    76:8,12,17
    77:2 78:18
    80:24 81:2
    82:10 83:7
    87:9 90:8
    92:7,11,15,16
    93:10
    101:6,13,23
    102:5,21
    103:12
    104:6,16,21
    107:24
    108:2,8,13
    110:7,9
    111:20 112:7
    115:9
    116:4,8,12
    118:11,13,18
tomorrow 24:23
ton 34:13
took 17:12
    33:14 44:3
    51:16 52:19
    53:22 82:15
tool 37:19,25
top 46:24
    47:4,18 48:24
    50:25 52:6
    53:12 57:23
    58:12,16
    59:4,5,8
tops 50:19
total 69:2
touched 20:17



27:23

**touching**
47:24,25

**town** 34:2
39:24 40:1

**track** 20:2

**tractors** 12:6

**trade** 21:20

**training** 20:18

**transcribe**
119:8

**transcript**
118:19 119:9

**translation**
111:21

**transmitted**
34:3

**traveling** 20:3

**treating** 73:7
97:3

**tree** 58:15

**trial** 15:3

**true** 68:1
73:21 109:18
119:9

**trust** 18:18

**truth** 67:6
80:16 118:7,9

**truthful** 7:18

**truthfully**
72:19

**try** 6:16,24
7:1 19:14
26:18 62:25
80:21 90:15

91:10 117:5

**trying** 57:21
80:13 84:12
89:19 96:23
108:13

**tumble** 56:15

**Tumbleweed**
9:16,17 10:9

**Tumbling**
9:16,17 10:9

**turn** 24:25
25:1 95:4
100:6 101:21
105:4

**turned** 104:17

**turning** 25:4

**TWENTIETH** 1:1

**Twenty-eight**
19:6

**two** 4:7 16:1
27:20 42:6
44:11,16
49:7,8,13
58:18 70:15
75:13 76:22
81:10 99:14
103:20 104:22
107:22,23

**TYLER** 2:4

**type** 7:24
12:11 16:17
21:19 43:21
51:15 62:4
66:16 77:14
78:14 85:15
89:13 90:4
99:5 107:5

**types** 50:24

81:23 103:21

**typical** 39:9

**typically**
34:13

---

U

**uh-huh** 6:17

**ultimately**
87:1

**umbrella** 92:25

**um-hum** 6:17
18:13

**umpire** 98:7
107:16
109:9,24
115:19
117:10,18

**unable** 86:18

**unbonded**
49:16,22
50:13,16
51:4,7,9

**uncertain** 34:6

**uncomfortable**
70:25 71:8

**under** 5:20
8:8,24 19:18
22:12 42:7
49:8
58:2,9,19
72:19,21

**underlayed**
46:25

**underlayment**
47:2

**underneath**
47:6

**underpay** 73:6

**undersigned**
120:5

**understand**
7:7,10 8:6,22
9:1,25 86:12
96:23 102:1
103:20

**understanding**
5:15 92:25
99:23,25
108:23 114:1

**understood**
6:23
7:6,13,17,19

**undertaking**
95:21

**underwriting**
39:17

**underwritten**
93:4

**unethical** 80:8

**unhappy** 111:7

**United** 93:8

**unless** 18:5
92:4 103:3

**unrelated** 72:1

**unreturned**
78:2

**until** 15:10
16:7 74:17
90:23 91:2,7
98:16

**up** 7:21 11:23
15:10 16:7
17:1 18:5,6
19:8 29:15



40:11 44:17
50:21 65:8,15
77:15 78:10
82:12 83:11
84:8 88:19
89:4,20 92:11
98:6 114:20
116:5 117:5

**UPC** 12:23
27:22
67:4,10,12
75:23,25
77:20,22 81:5
83:9 84:7
85:21 86:10
88:5,9,23
89:1 92:24,25
93:3,6,22,24
94:6,25 96:14
97:2,19
98:8,14,23
103:6 104:25
106:13 108:25
115:17 118:5

**UPC's** 29:16
35:21 111:8

**uplift** 37:16

**upon** 62:12
73:7 94:21
100:9

us 7:8 40:3
60:12 84:4
85:21 86:1
97:6

**USAA** 21:4

**use** 37:21 73:5
107:11

**used** 14:21,22
16:24 37:24
77:20 82:15

102:16

**using** 94:7

**usually** 50:16
56:5,17 80:2

**Utah** 19:20

─────────
        V
─────────
**VA** 65:11

**valley** 15:1
42:25
52:17,24
79:23

**valleys** 43:2

**value** 12:5
95:7

**varied** 94:21

**variety** 18:1
19:11 21:8
37:22 51:3
77:16 107:17

**various** 21:3
25:24 77:17
85:20 107:13

**vary** 38:20
43:13,14,17

**varying** 50:18
74:9

**velocity** 38:19

**vent** 44:2
46:15
47:6,7,12
53:8

**vents** 42:24,25
52:8

**verbatim** 104:5

**verify** 29:22

**version** 53:18

**versus** 43:15

**vertical** 43:15
54:5

**vertically**
100:12

**vested** 114:14

**via** 2:6,11
92:8 113:2

**vice** 85:13

**Victoria**
86:15,19

**VIDEOTAPED** 5:1

**violation** 22:9
71:14

**Virginias**
19:22

**Virtual** 65:11

**visible** 53:20

**visual** 40:19
42:1

**vs** 1:7

─────────
        W
─────────
**wait** 9:22

**waive**
118:13,17,18

**waived** 118:22

**walk** 93:16

**want** 7:4,11,22
15:6 22:14
30:20 31:15
44:16 65:20
71:21 80:1
89:5,22 90:22
91:12 93:15

94:6 99:24
116:25
118:13,19

**wanted** 24:24
28:2,6 60:11
76:23
108:10,11

**Washington**
14:2,4 19:16

**wasn't** 22:8
39:14,18
60:11 62:16
71:9 112:17

**water** 32:3
34:4 55:8,11
56:19 57:2,4
59:10,14,17
87:14

**way** 14:3 29:22
36:13 37:18
40:8 66:11
73:23 74:1,11
80:19
81:12,18
82:5,11 101:6
112:3 116:21
117:17

**we** 6:21 7:4
13:2 14:24
15:9 20:16
21:7 22:12
24:13 31:3
33:7 36:13
37:22 38:22
42:17,23
47:25 48:14
49:5,14 51:12
53:24
54:3,12,19
60:22 62:2,6
65:1,8 74:9



78:25
82:12,16,17,2
4,25
84:1,4,6,8,11
85:25 90:21
91:1,8,15
92:3 94:22
96:21 97:24
100:3,8
101:1,7,14
103:15,18,20
104:6,16,19,2
4 105:1
108:14 111:20
112:2

**weaknesses**
24:19

**wear**
84:16,17,22
85:7

**web** 43:16

**week** 110:18
115:21

**weeks** 75:8

**Welcome** 10:1

**we'll** 5:13 6:1
8:14 31:3
91:17

**went** 15:17,25
24:2 97:7
110:21

**were** 11:4
12:9,10,17,18
13:2,11,20,24
15:9,14
22:5,19 25:5
27:14,19,25
30:11,16
32:14 33:7
34:5

36:8,9,13
37:22 38:3
39:21 40:10
41:2 42:2
43:5 48:5
50:1 51:1,2,7
54:18,23 55:6
60:18,22
62:12,18 65:8
68:2,6,8 69:6
70:1,15,18
72:23
73:15,20
74:12
75:4,17,21
79:18 82:24
83:4,8
84:4,20
85:19,24
86:5,10
89:15,17 90:4
94:12 96:9,14
97:3,14,18
98:23
99:8,18,25
104:9 105:18
106:8,10
107:8 108:12
111:7 112:10
113:21 114:4
115:19

**we're** 5:24
7:22 8:6
44:22 45:7
48:9 57:4
65:14 84:9
88:23 90:17
92:2 93:17
95:25 96:7
102:2 103:22
107:22 111:21
116:25

**Were** 41:15
45:1 47:1
55:1 60:13
62:14 63:17
79:18 83:1
105:21

**We're** 54:2

**weren't** 31:5
36:13 100:3

**west** 38:17,22
49:12 52:22

**we've** 21:14
27:23 33:2
60:6 61:25
65:21,22
71:6,10 76:18

**what** 6:2 10:21
11:18 12:18
13:11,20
14:10 15:10
16:17 17:22
19:7 20:8
21:24
22:15,23 23:6
24:10,21
26:11
28:20,23
29:2,5,6 30:1
31:24 32:1,15
36:3,9,12
37:4,10
38:3,12
40:2,10
41:14,25
42:14 43:9
44:21 45:18
46:13 47:18
48:14 49:14
51:12 52:3
53:5,6
54:3,14

55:4,14,18,22
60:20
62:4,6,10
64:3,16 65:9
66:13 67:8
68:2,21,24
69:16
71:6,10,12,23
72:7 74:22,23
77:14
80:11,20 82:2
87:12
88:1,2,6
89:17 93:7
94:19 96:5
98:10,23 99:7
100:19,23,24
101:9,15,24
104:10
105:3,13
106:6
107:5,22
108:1,17,23
110:1,2
111:23
112:12,14
115:22 116:5
118:8,9

**whatever** 7:24
8:10 72:10

**what's** 17:20
33:8 100:18

**whatsoever**
40:8 45:2

**when** 9:21
12:9,17 13:20
15:21 16:20
17:4 23:15,17
25:17 27:14
30:9,19,20
31:16,17
32:14,24



33:16
35:16,18,24
37:16 38:7,10
40:16 41:19
42:15 48:17
51:16,19 52:2
53:21 55:24
57:15 58:18
67:11 77:11
78:8 81:25
82:21,22 83:1
84:10,19
91:8,17 92:2
93:21 94:6
95:3
96:15,16,23,2
4 97:9
98:6,15,22
99:11 103:1
109:15,24
111:10 112:7

**whenever** 93:11

**where**
13:13,14,24
17:17 19:25
53:20 55:11
56:8 57:22
65:8 72:23
79:18 84:3,9
90:21 107:8
112:10
113:14,16,18,
21,22 114:2,4

**whether** 22:6
24:13 42:6
79:12 97:2
101:21
104:8,22
105:19 113:10
115:18

**which** 9:15
29:23 32:5

34:2 38:4,21
55:6 57:3
65:12 67:8
70:19 75:12
84:7 85:17
89:21
94:14,21,22
95:4,6 98:10
100:12
105:6,16
107:17

**while** 15:18
77:6 91:1
92:11

**whining**
82:23,24

**WHISLER** 2:3

**Whistler**
115:8,9,11

**who** 5:16 9:6
11:8 23:12,14
28:3 31:21
35:13 39:25
61:1 62:20
63:21
64:8,11,19
67:14 70:8,14
75:24 83:4
86:2,5 101:13
117:12

**whole** 23:20
67:6

**why** 27:18
34:18
35:4,8,10
36:6 50:15
53:3 60:10,24
69:25 74:19
91:15 103:22

**wife** 23:13

114:22

**will** 6:19
8:3,11
19:8,14 20:19
28:7 32:6
33:1,4 42:23
43:2 54:17
67:7 77:6
90:25 92:9
94:7 103:2
107:24 108:2
112:24 118:17

**willing** 18:21

**wind** 14:14
15:24 21:10
35:12 37:17
41:1,3,9,12,2
1 42:22 46:8
49:23 50:18
51:7,9 55:7
62:12 66:5
84:25
99:12,13,15
100:8
106:9,11

**W-I-N-D** 21:10

**wind-created**
87:14

**wind-related**
87:13

**winds**
38:14,18,19

**windshield**
58:15

**windstorm**
14:15 38:8
42:15
43:6,10,22
46:9,17 47:13
48:5 49:20

50:12 51:21
52:14,15
53:14 54:8,24
55:2 59:20
60:7
61:8,11,14
76:3 85:2

**windward**
38:5,10,24
40:22 46:6,19
47:15 49:10
52:20
55:19,23,25
56:12,15
58:20 79:21

**Wisconsin**
11:11,24
19:21

**with** 5:13
7:2,20,23
10:1,17
13:12,19 14:6
16:4,5
17:6,10
22:5,20,21
23:9,21
24:3,6,11,16
25:12 26:18
27:6,7 28:8
29:4,16,17,24
30:8,11 31:5
32:4,6,17
33:1 34:14
36:13
40:10,20,23
41:8 43:13
44:9,17,18
46:9,16 47:8
48:9,13,16
49:5,9
50:12,20,23
53:2 54:20



55:6,18 56:22
58:17,22
59:17,20 60:6
62:22 64:18
65:1,4,25
66:15 67:3,24
68:1,7,11,20
69:1,5,9,19
70:25
71:6,8,21,22
72:25 73:16
75:7,15,21
76:2,17 77:22
78:1,18 79:9
80:16 82:18
83:23,25
84:2,3,14,16
85:1 86:4,23
87:6,19
88:6,11,22,23
,24
89:1,10,15,23
,24,25 90:1
92:2,12,16,23
93:6 94:4
95:7 97:5
98:22 99:17
100:13 102:11
103:3,13
104:2,4
105:3,16
106:25
107:2,10,19
108:18 110:25
111:2,4,11,14
112:8,19,22
113:2,7,10
114:14,16,18,
24 115:6,16
116:3,5,13
117:2,3
118:2,3
119:13

**without** 34:15
35:7 45:20
69:19 73:10
102:2

**witness** 3:2
5:5
13:1,14,15
16:25 22:25
23:2,4
64:18,22
69:13 72:5
75:3 82:9
90:15,25
91:5,8,12,20
101:8 104:7
105:6 116:7
118:15,22
119:16 120:9

**Wood** 86:3

**W-O-O-D** 86:3

**word** 110:18

**work** 9:8 11:24
14:21,22
15:25
17:13,15
18:4,5 40:19
64:14 65:4
74:19 88:19
89:24,25
94:22,23 96:4
97:18
109:1,7,14
110:23
112:4,6,22
113:4 115:15
117:2

**worked**
15:16,18 16:2
17:14,16
68:14 75:12
93:25 97:21

113:11,22
116:17,25

**working** 15:15
67:4 74:17
81:5 83:9
84:11 86:14
93:21,22
96:16 98:6,16
107:2,5
109:15,17
111:10,13,22
112:2,8,9,13,
21 113:10,13
115:15

**worse** 34:6
50:19

**would** 8:21,25
12:21 13:22
15:22 16:14
17:4
26:6,10,12
29:4,20
31:8,20
34:20,24
37:23
38:5,8,11,15,
21 39:7,13,17
40:11 41:11
42:1,20
45:19,23
46:25 47:8,9
48:4,7
49:5,11
50:10,12 51:1
52:21 53:14
56:10,22 60:4
67:10
69:21,23
72:16,17
73:9,19
74:2,16
80:3,21 82:17

84:6,7 86:21
88:14
90:3,13,19,20
92:1
95:6,8,16,21,
25 96:1 97:17
99:9
102:17,21
106:9
108:1,4,20
109:19 111:24
112:16 113:16
118:15

**wouldn't** 67:3
106:13

**wow** 15:2 67:5

**wrapping** 65:14

**write** 60:22
69:18

**writing** 36:18
67:10 74:10
76:22 78:4,22
79:6 83:14

**wrong** 99:24

**wrote** 31:7,12
60:3 73:5
95:9

_____

X

**Xactimate**
102:15

_____

Y

**yeah** 17:12
18:6,15,25
20:2 40:25
43:7 47:7
58:19 64:20
76:12 79:11
92:7,14 93:2



877.291.3376
www.UCRinc.com

107:19 114:9

**year** 10:19
15:25 16:12
74:22 98:5,12

**yearly** 21:1

**years** 10:10,11
13:23
18:7,8,22
19:6 20:3
75:13

**yes** 5:11
6:20,21 8:9
9:14,18
10:5,15 11:7
13:7,10
16:13,16 17:8
18:1,19 19:14
20:15 21:21
22:12 23:11
24:4 25:20
26:5,12,25
28:22 30:13
31:25 32:12
33:21 34:17
35:9 36:25
37:2 38:13
39:1 41:14
42:4 43:14
44:1 45:12,25
46:8,18,21,25
47:14,16 48:8
49:1 53:11,19
55:3,10 56:21
59:2,12,19
60:3 62:5,19
63:15,20 64:7
66:12,20
67:13,21
69:17,23
70:13 72:21
76:7 77:24
78:17 79:8,17

80:9 81:1
82:4 83:3,15
85:4 86:12
87:12,16,25
88:18 89:16
94:2 95:21
96:8 97:16
98:25 102:13
106:20 107:4
112:21

**yesterday**
23:22

**York** 9:24,25
16:25 19:21

**Yorker** 9:24

**you**
6:2,6,11,15,2
0,25
7:1,3,7,10,11
,15,16,17,22
8:1,6,10,11,1
3,14,16,18,20
,24
9:3,6,9,17,20
,21,22,25
10:3,7,25
11:1,4,13,14,
15,16,18
12:2,9,10,17,
24
13:5,8,19,20
14:7,8,11,16,
17,20,22
15:2,3,6,9,10
,14 16:11,17
17:4,5,16,22,
23,25
18:9,16,23,24
,25
19:8,10,11,12
,25
20:7,8,11,14,

17,19,22
21:15,18
22:2,10,15,24
23:1,3,5,6,8,
9,12,17,20,23
24:5,7,10,15,
18,21
25:5,9,13,17,
18,21
26:6,10,11,14
,18,22
27:7,14,19,24
,25
28:12,15,20
29:4,5,9,12,1
9
30:4,7,9,11,1
4,16,20
31:4,5,12,24
32:14,15,16,2
4
33:4,8,13,16,
23,24,25
34:9,12,14,18
,19,20,24,25
35:2,5,13,16,
18,25
36:6,7,20,23
37:1,7,24
38:2,3,7,10,1
1,12,21,24
39:5,7,9,12,1
4,18 40:6,11
41:2,15
42:1,5,7,10,1
4 43:4,13,24
44:3,6,8,9
45:1,10,14,15
,17,18,22
46:20,23
47:1,8,9,16,1
9 48:4,10
49:5,6,24

50:8,18,23
51:8,18
52:5,19,25
53:6,10,21
54:7,9,19,22,
24
55:1,8,11,24,
25 56:3,10,17
57:2,3,5,9,13
,15,16,25
58:8,14,18,22
59:23,24
60:2,13,18
61:1,4,7,10,1
4,18,21
62:3,14,18,22
,25
63:10,17,23
64:5,9,13,16
65:2,3,4,8,9,
24
66:3,4,9,13
67:7,8,11,16,
25
68:4,10,11,14
,15,16,21,24
69:1,5,6,9,15
,16,21,25
70:1,5,8,24,2
5
71:7,8,13,16,
19,20
72:1,5,9,10,1
2,16,18,19
73:9,15,16,19
,20,24
74:2,13,20,21
75:1,16,20
76:21,23
77:3,4,8,10,1
1,12
78:4,12,14,19
,21 79:15



80:1,4,5,6,7,
8,21,24
81:2,7,10,13,
19,25
82:1,2,3,6,10
83:1,2,4,7,10
,11,12,14,16,
19,22
84:9,14,15
85:1,4,11,14
86:5,23
87:1,4,5,9,11
,19
88:16,19,25
89:1,2,5,14
90:3,9,13
91:12,16,17,1
8 92:1,2,5
93:7,11,21,22
,25
94:3,4,12,16
95:4,8,9,21,2
4,25
96:5,6,9,14,1
6,19,20
97:13,17,21,2
3
98:7,12,14,15
,18,23
99:4,25
100:2,7,11,14
,15,19,22,23,
24
102:9,17,18,1
9,20,23
103:1,9,24,25
104:9
105:9,10,13,1
8,19,21,24
106:6,15,16,1
7,21,24
107:2,6
108:2,23,25

109:1,10,13,1
9,25
110:6,8,10,11
,20,22
111:3,6,10
112:7,20,24
113:7,9,11,13
,20,21,22
114:4,14,18
115:5,17,18,2
2
116:3,5,6,9,2
0,21,24
118:4,5,13

**you'll** 80:14

**your**
6:1,3,7,11,21
,25 8:7,22,25
10:1,3,21
11:4 12:19
13:9 15:5,7
17:3,5,20
19:7 20:8
22:14
23:10,18
25:6,10,12
26:9,14,22,23
27:11,25
30:5,23 31:4
33:22
34:8,9,16
35:7 36:21
37:7,24
39:6,7,12,20
40:6,7,15
42:1 44:8
45:5,10,17,18
47:20 54:22
56:14 57:6
60:7 62:3,15
63:4,18 64:6
65:3 66:4,9

68:2,7,8
71:14,17
72:10,13
73:15,21
75:16 76:20
78:6,20 79:6
81:15,17
87:22
88:6,9,10,11,
17 89:11
90:13 91:23
92:5,23,25
94:15,19
96:2,5,15,20
98:15 99:3,20
100:5,15
101:4
102:6,15,24
105:21
106:16,25
108:17 109:15
111:3,6,10
112:14
114:13,16
117:2 118:4,6

**you're** 5:15
7:17 10:25
11:1,13 27:10
38:17 41:19
42:15 43:12
50:20 56:13
58:3,24 81:9
84:19 88:1
91:3 92:11
95:12 98:22
101:9,10,13,1
5,24 103:14
106:6
109:7,17
111:21 112:3
113:10 114:4
117:20,21,25

**yourself** 25:13
61:7 115:18

**you've** 5:23
14:16 17:9
18:11 19:4,13
20:4 26:19
49:22 63:13
74:23 85:9
88:6 89:11
92:24 98:13
116:14,17,24
117:3

Z

**zero** 69:7

**Zoom** 2:6,11
7:2 8:7

**zoomed** 52:5
53:17



**EXHIBIT "F"**

```
                IN THE CIRCUIT COURT OF THE
            20TH JUDICIAL CIRCUIT IN AND FOR
                   LEE COUNTY, FLORIDA

                 CASE NO. 20-CA-007831



SFR SERVICES LLC A/A/O
PAUL BEZJAK AND RITA BEZJAK,

      Plaintiff,

vs.

FAMILY SECURITY INSURANCE
COMPANY, INC.,

      Defendant.
_____/




            DEPOSITION OF THEODORE FIOCATI

          TAKEN ON BEHALF OF THE PLAINTIFF

                 JANUARY 18, 2022
               2:00 P.M. TO 3:54 P.M.

            ALL PARTIES APPEARED REMOTELY
                      PURSUANT TO
          FLORIDA SUPREME COURT ORDER AOSC20-23




REPORTED BY:
DAGNE MARVIN, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
```



877.291.3376
www.UCRinc.com

**Page 2**

1                     APPEARANCES OF COUNSEL
2  ON BEHALF OF THE PLAINTIFF:
3      JOHN TOLLEY, ESQUIRE
       THE WHISLER LAW FIRM, P.A.
4      1909 TYLER STREET, SUITE 501
       HOLLYWOOD, FLORIDA 33020
5      561-245-4703
       JTOLLEY@WHISLERLAWFIRM.COM
6      (REMOTELY VIA ZOOM)
7  ON BEHALF OF THE DEFENDANT:
8      CINDY L. CUMBERBATCH, ESQUIRE
       LEWIS, BRISBOIS, BISGAARD & SMITH,LLP
9      401 E. JACKSON STREET, SUITE 3400
       TAMPA, FLORIDA 33602
10     813-739-1900
       CINDY.CUMBERBATCH@LEWISBRISBOIS.COM
11     (REMOTELY VIA ZOOM)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                     INDEX OF EXHIBITS
2  EXHIBIT        DESCRIPTION          PAGE
3    A      NOTICE OF TAKING DEPOSIITON     25
4    B      FIRST NOTICE OF LOSS      26
5    C      FIELD ADJUSTER PHOTO REPORT      33
6    D      ZERO DOLLAR ESTIMATE      51
7    E      TEXT MESSAGE         55
8    F      DENIAL LETTER         63
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1                     INDEX OF EXAMINATION
2  WITNESS:  THEODORE FIOCATI
                                    PAGE
3  DIRECT EXAMINATION
       BY JOHN TOLLEY, ESQUIRE          5
4
   CROSS EXAMINATION
5      BY CINDY CUMBERBATCH, ESQUIRE      74
6  RE-DIRECT EXAMINATION
       BY JOHN TOLLEY, ESQUIRE          79
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1      VIDEOTAPED DEPOSITION OF THEODORE FIOCATI
2              JANUARY 18, 2022
3  Thereupon:
4          THEODORE FIOCATI
5  was called as a witness, and after having been first
6  duly sworn, testified as follows:
7              DIRECT EXAMINATION
8  BY MR. TOLLEY:
9      Q   Thank you, Madam Court Reporter.  As the Court
10 Reporter said, we're here on the case of SFR, Paul and
11 Rita Bezjak v. Family Security Insurance Company.
12     Mr. Fiocati, it's my understanding that you
13 were the field adjuster or independent adjuster
14 regarding this claim, correct?
15     A   Yes, that's correct.
16     Q   Okay.  And as we sit here today, do you have
17 any documentation provided to you by the insurance
18 company in furtherance of preparing for your depo today?
19     A   I have my documents that I had from the claim
20 that I -- all my documents.
21     Q   Okay.  So, you actually physically retained
22 documents from this claim in particular, correct?
23     A   Yes, digital on my computer and my handwritten
24 notes.
25     Q   Okay.  I'm going to go through -- and I'm sure



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

6

1  you've given a deposition before.  I'm going to go
2  through some ground rules before we get started.  And
3  then, we're going to talk about the notice of taking
4  deposition duces tecum and we're going to go from there,
5  okay?
6      A.   Okay.
7      Q.   All right.  So, you know, please answer all
8  questions out loud so the Court Reporter can take down
9  what is said.  Try to avoid nodding or shaking of the
10 head, even though we're on Zoom or um-hums or uh-huhs as
11 the Court Reporter won't be able to take down as that --
12 as affirmative or negative response, okay?
13     A.   Okay.  Yes.
14     Q.   Try to let me finish asking a question before
15 providing your answer.  I'm going to try to show you
16 that same difference as well.  But the Court Reporter
17 can't take down both of us at once, okay?
18     A.   Okay.
19     Q.   All right.  If you don't understand a
20 question, just say so and I'll rephrase or restate my
21 question for you better to understand, all right?
22     A.   All right.  Understood.
23     Q.   And then also, you know, we are on Zoom.  And
24 sometimes we have these technical difficulties where
25 maybe my words get cut up because of the lag or

7

1  something like that.
2           If that happens, just tell me you didn't hear
3  my question and I'll restate the question, okay?
4      A.   Okay.
5      Q.   And I might have to do that for you as well,
6  just depending on, you know, depending on the internet
7  service as we go through, all right?
8      A.   Sure, understand.
9      Q.   If you need to take a break for any reason, or
10 a short recess, we'll go ahead and do that.  The only
11 thing I ask that is if I'm in the middle of a question
12 or you're in the middle of an answer that you either,
13 you know, finish up your answer or I ask the question,
14 you finish that answer and we'll move on, you know, to
15 the recess, okay?
16     A.   Okay.
17     Q.   I have to ask these next couple questions,
18 please don't take offense, but they're dealing with
19 competency and ability to testify today.
20          Did you take any medications last night or
21 this morning that would affect your ability to hear or
22 understand my questions?
23     A.   No.
24     Q.   Are you under the influence of any drugs or
25 alcohol to the extent that it would affect your ability

8

1  to hear or understand my questions?
2      A.   No.
3      Q.   Are you represented by an attorney here today?
4      A.   No.
5      Q.   Let's see here.  All right.  That's pretty
6  much it for the ground rules that we're going to set
7  out.  I need to go through your background a little bit.
8  You know, what is your current employment?
9      A.   I am an independent adjuster, appraiser, and
10 self-employed.
11     Q.   Okay.  Where are you self-employed?
12     A.   My company is Bonita Claims Service,
13 Incorporated in Bonita Springs, Florida.
14     Q.   Okay.  And how long have you owned that
15 company?
16     A.   Around 2018.
17     Q.   Okay.  And as a result of getting employed by
18 Bonita's -- I think you said as Bonita Claims, do you
19 have contracts with companies like FKS or other types of
20 agreements where you work for independent adjusting
21 firms on behalf of carriers?
22     A.   Yes, adjusting firms.  Yes.
23     Q.   Okay.  And in this case, when did you become
24 involved in this matter?
25     A.   I'd have to look at my report and see when I

9

1  received the claim.
2      Q.   Sure.  Actually, that brings up a good point.
3  If you need to refer to anything to refresh your
4  recollection, go ahead and just let me know you're doing
5  that and I'll give you as much time as you need, okay?
6      A.   Okay.  Sounds good.  Yes, it was May 28th, 2020.
7      Q.   Okay.  All right.  So, going back to your
8  self-employment, what were the type of independent
9  adjusting firms you worked with?  What were those names?
10     A.   Let's see.  Calibrated Insurance Services,
11 Team One Adjusting, Parker Loss Consultants.
12     Q.   What about FKS?
13     A.   Oh, I'm sorry, FKS, um-hum.
14     Q.   Okay.  And how long did you do work for FKS?
15     A.   I started the end of 2019.
16     Q.   Okay.  Until present day or have you
17 terminated your relationship with them?
18     A.   Until present day.
19     Q.   Okay.  And during the course of your self-
20 employment working for these different types of firms,
21 what carriers did you work for?
22     A.   Let's see, UPC and Citizens, Frontline,
23 Heritage, that to name a few of them.
24     Q.   Okay.  During the pendency of this claim, who
25 employed your business to act as the field adjuster?



Fiocati, Theodore   01-18-2022

10

1     A    FKS Insurance Services.
2         Q    Okay.  Do you know when you first received
3    that request?
4     A    Yeah, May 28th, 2020.
5         Q    Okay.  Who from FKS reached out to you about
6    this matter?
7     A    I'm not sure.  I get the assignment that comes
8    through XactAnalysis.  And then, I get an e- mail
9    notification that I got a claim.  So, I'm not exactly
10   sure who it came from.  It was from FKS.
11        Q    Okay.  While working this claim, did you have
12   a direct supervisor at FKS?
13    A    I'm not really sure.  I know there's an
14   examiner when we upload our documents, it goes to an
15   examiner.  I can't remember who that was on this claim.
16        Q    Okay.  Any point in time while working for
17   FKS, were you ever introduced to a person by the name of
18   Kendall Robnett and it's R-O-B-N-E-T-T, I believe, Madam
19   Court Reporter?
20    A    Yes.
21        Q    Okay.  And who is Kendall Robnett?
22    A    I believe she's the manager of the UPC claims.
23        Q    And when you say she's a manager, she's the
24   manager for FKS handling the UPC claims on behalf of
25   FKS, right?

11

1     A    Yes, I believe so.
2         Q    And at any point in time, did you receive any
3    direction by Ms. Robnett regarding how you would handle
4    this claim or any other UPC claims?
5         MS. CUMBERBATCH:  Objection.  That would be
6    work product claim -- privilege information.
7         MR. TOLLEY:  I'm not asking him for the
8    content of that yet.  I'm just asking if he ever
9    did receive any direction from her.
10        Q    (By Mr. Tolley) But -- so, I guess let's break
11   it down into two questions so.  Mr. Fiocati, without
12   going into what the actual directions were in this
13   particular claim or other UPC claims, did you ever
14   receive any direction from Mrs. Robnett?
15    A    Nothing from this claim.
16        Q    Okay.  What about other claims?
17        MS. CUMBERBATCH:  I would object to that as
18   well.  That would go into claims handling of other
19   claims or general claims handling practices.
20        Q    (By Mr. Tolley) And Mr. Fiocati, I don't want
21   to know what those orders were.  I just want to know if
22   you've ever received any direction from Ms. Robnett in
23   any UPC claim.
24    A    I would say yes.
25        Q    Okay.  And during your time working this

12

1    claim, did you have a position with FKS?
2     A    Just a field adjuster -- I'd say independent
3    field adjuster.  I didn't work directly for them, I
4    mean, 1099.
5         Q    Got you.  Did they ever have you do any type
6    of managerial roles or supervisory roles at all with
7    them?
8     A    No.
9         Q    Okay.  Before we continue on with FKS, I want
10   to go back a little bit through your background.  So, you
11   know, you said that you started your company in 2018.
12   What were you doing prior to that?
13    A    I was still a claims adjuster, but I also had
14   a construction business.  I'm originally from the Kansas
15   City area, Overland Park, Kansas and I was a licensed
16   contractor there.
17        Q    Okay.  Have you ever been a licensed
18   contractor in the State of Florida?
19    A    No.
20        Q    Okay.  When did you start doing work in
21   Florida?
22    A    Right after Irma -- right after Hurricane
23   Irma.
24        Q    And so fair to say that prior to 2017, you
25   were not working in Florida, right?

13

1     A    That'd be fair.  Yes.
2         Q    Okay.  And then starting in -- I guess, end of
3    September or some time in September of 2017 to present
4    day, you've been working in Florida?
5     A    Yes, correct.
6         Q    Okay.  And are you a licensed adjuster in the
7    State of Florida?
8     A    Yes, I am.
9         Q    Okay.  Is that your home state?
10    A    Yes.
11        Q    Okay.  When did Florida become your home
12   state, in 2017?
13    A    Yes, it became my home state in 2018.  I was
14   licensed before -- in 2009, I was a non-resident.  And
15   then when I moved here, I had it switched to a resident.
16        Q    Okay.  What is your oldest adjusting license?
17   What state does that come from?
18    A    It would be Texas and I got it in 2006.
19        Q    Okay.  Prior to 2006, did you do any type of
20   adjusting or handle any type of insurance claims?
21    A    No.
22        Q    Okay.  So, since 2006, you've been licensed in
23   Texas and in Florida.  Any other licenses?
24    A    Yes, I had licenses in some other states,
25   Louisiana, Minnesota, Oklahoma, maybe Mississippi.  I



877.291.3376
www.UCRinc.com

14

1 didn't use them. So, I just kind of let them go.
2    Q   Got you. Besides being a licensed adjuster,
3 do you have any other type -- I would assume you have a
4 general contracting license in Missouri, but any other
5 licenses?
6    A   I don't have my contractor license. I gave
7 that up when I moved so, no other licenses.
8    Q   Besides the contracting license, do you have
9 any licenses that you used to have that you no longer
10 have anymore that we haven't discussed?
11    A   The -- yeah, the contractor license and then
12 some of the adjusting licenses I mentioned in Minnesota
13 and Oklahoma and Louisiana.
14    Q   Okay. But you've never been a licensed
15 engineer or anything like that, right?
16    A   No.
17    Q   Okay. Have you ever been a licensed roofer?
18    A   No.
19    Q   Okay. And what is your highest level of
20 education?
21    A   High school graduate.
22    Q   Did you go to any type of college at all?
23    A   A semester of junior college.
24    Q   Okay. Do you know what your major was back
25 then?

15

1    A   Oh, gosh. No.
2    Q   Let me ask you this. Did it have anything to
3 do with like building or engineering or anything like
4 that?
5    A   No, It didn't.
6    Q   Okay. And any complaints, suspensions,
7 disciplinary actions, expulsions, or terminations of any
8 professional licenses?
9    A   No.
10    Q   Okay. And are you current on your continuing
11 education credits for Florida?
12    A   Yes, I am.
13    Q   Okay. Besides your background in contracting,
14 do you have any background in engineering, plumbing,
15 roofing or any other type of trade?
16    A   No.
17    Q   Okay. All right. Let me go through a little
18 bit about -- oh, did I ask you for your current business
19 address?
20    A   It's my home address. I think you have that
21 with the subpoena.
22    Q   Okay. Is that what you're currently
23 registered with your registered agent on Sunbiz?
24    A   Yes.
25    Q   Okay. And is that the easiest address to

16

1 reach you if we need a subpoena you for any Trial
2 testimony or anything like that?
3    A   Yes, correct.
4    Q   Have you ever been deposed before?
5    A   Yes.
6    Q   How many times?
7    A   I'll say over 30. I'm not exactly sure.
8    Q   Okay. And that brings up a good point. If
9 you need to guess or speculate or something like that as
10 to a number because I know, especially with these type
11 of claims, there's distances and, you know, sometimes
12 you guys inspect thousands of claims in one year.
13        So, if you need to just let us know, it's an
14 estimation or approximation and we'll go ahead and take
15 that answer as it is, okay?
16    A   Okay.
17    Q   All right. Have you ever testified at Trial?
18    A   No, I haven't.
19    Q   Okay. Have you ever been deposed outside of
20 this type of industry, like an insurance industry, you
21 know, as maybe a witness to a car accident or a divorce
22 proceeding or something?
23    A   No.
24    Q   Okay. All right. How many years have you
25 handled claims with UPC?

17

1    A   It would be since the end of 2019. I'm not
2 exactly sure when.
3    Q   And did you only handle claims for UPC when
4 FKS retained you or did you handle any claims for UPC on
5 behalf of any other adjusting firms?
6    A   It was only FKS.
7    Q   Okay. So, fair to say all of your involvement
8 with UPC would have been related strictly to FKS,
9 correct?
10    A   Yes, correct.
11    Q   Okay. And what did you do in order to prepare
12 for your deposition today?
13    A   I reviewed my documents, report, photo sheet,
14 the handwritten notes. And then I just spoke with the
15 Defense Counsel.
16    Q   Okay. What did you and Defense Counsel speak
17 about?
18    A   I let her know all the documents I had. Just
19 talked about some of the inspection who I met with, so
20 my inspection findings. I can't remember too much else.
21    Q   Okay. Did you guys talk about the strengths
22 and weaknesses of this case?
23    A   No, not that I know of.
24    Q   Okay. And when you say you reviewed the
25 documents. What documents would you have created during



Fiocati, Theodore   01-18-2022

18

1  the -- and I -- again, I don't want to go into the
2  contents yet, but what are the names of the documents
3  that you would have created or did create regarding this
4  claim?
5      A   Okay.  I'll give you a list of everything I
6  have.  My general loss report, photo sheet, it has all
7  my photos, the estimate.  I'm trying to think what else.
8  And I have my scope notes, my handwritten notes and
9  then, I do have my original JPEG photos.
10         And then I also have the assignment details
11 that came with the assignment through XactAnalysis and
12 declarations page.  I didn't create those.
13     Q   Okay.  The dec page, you didn't create, right?
14     A   Exactly.
15     Q   It'd be pretty impressive if you could create
16 the dec page and adjust the claim so.
17         Okay.  So, those are all the documents you
18 have in your possession and all the documents that would
19 be under your understanding that you either created or
20 received in this matter, right?
21     A   Yes.
22     Q   Okay.  Did you ever have access to the log
23 notes or do you have a copy of the log notes in this
24 claim?
25     A   I don't have a copy of them.

19

1      Q   Okay.  And before we get into some of the
2  documents themselves, I want to ask you who would have
3  been your contact person regarding this claim for FKS?
4      A   I don't remember.  I'll say it would be the
5  examiner who sends them on to UPC.  I don't know who it
6  was.
7      Q   When you say the examiner, do you mean a desk
8  examiner for UPC or do you mean an examiner for FKS?
9      A   FKS.
10     Q   Okay.  And who was your direct supervisor at
11 FKS at the time you're handling this matter?
12     A   I really don't remember.  I know -- you know,
13 Kendall Robnett, she wasn't -- I didn't -- she wasn't
14 my -- like immediate contact person or something like
15 that.  So, I don't know.  I don't know who else it would
16 have been.
17     Q   Well, and you had mentioned XactAnalysis
18 before.
19     A   Um-hum.
20     Q   Isn't it true that you can sign on to
21 XactAnalysis and access log notes?
22     A   Yes.
23     Q   Okay.  Is it possible for you to do that if
24 you have to determine who was your supervisor at the
25 time of you handling this claim?

20

1      A   I don't know if it shows the supervisor, but
2  it shows -- I believe it shows the examiner, who the
3  examiner was.
4      Q   Okay.  Could you do that for us then?
5      A   Sure.  Dave Pluimer, it's P-L-U-I-M-E-R.
6      Q   And what was his position?
7      A   Reviewer.
8      Q   Okay, reviewer.
9      A   Um-hum.
10     Q   And are there any notes about anybody else who
11 either inputted notes or had some type of role in this
12 matter regarding FKS?
13     A   Let's see.  There is Julika J-U-L-I-K-A Reiher
14 R-E-I-H-E-R.
15     Q   And that person would also be up with FKS,
16 correct?
17     A   Correct.
18     Q   And what was that person's role or position?
19     A   I'm not sure if she assigned it to Dave, I
20 guess.
21     Q   Okay.  Anybody else from FKS input any notes
22 or had a role in this matter?
23     A   Nothing I have.  No.
24     Q   Okay.  Does it indicate who from UPC was
25 directly involved in this matter?

21

1      A   Yes, I have Christopher Merritt as the desk
2  adjuster.
3      Q   Could you spell the last name for the Court
4  Reporter please?
5      A   M-E-R-R-I-T-T.
6      Q   Okay.  Anybody else from UPC?
7      A   Nothing that I have.
8      Q   Okay.  And did you have direct communication
9  with Mr. Merritt?
10     A   I don't have -- nothing that I know of as far
11 as like phone call or anything like that.  It looks like
12 there is an e-mail basically about -- there was
13 something with the claim number change or something.
14     Q   Got you.  But it was -- you obviously didn't
15 have to go through the reviewer to discuss the matter
16 with him is kind of more of my question.
17     A   Oh, he can send e-mails through the system.
18     Q   Okay.  And --
19     A   And I can if, you know, If I wanted to.
20     Q   Right.  And Dave, the reviewer, I can't
21 pronounce his last name.  What was his role on this
22 matter?  What was he supposed to be doing?
23     A   Dave, basically, when I send up a report, it
24 goes to the examiner.  It will be uploaded in the
25 XactAnalysis and it goes to the examiner.



Fiocati, Theodore   01-18-2022

22

1        They review it to see if -- just basically to
2   see, but, you know, for information -- like mainly
3   information is correct as far as admin information and
4   stuff like that.  And then, once they approve it, they
5   send it on to UPC.
6        Q   So, is the reviewer above you in terms of
7   like, he's a supervisor, is he on the same page, or does
8   he work for you?  How does that work?
9        A   Well, with FKS, I don't know.  But I guess
10  you'd say they're above me, because I'm sending it to
11  them.
12       Q   Okay.  So, would the reviewer have the ability
13  to change your report in this case, if they needed to?
14       A   I believe they could, yes.
15       Q   Okay.  Would you have been notified if they
16  change your report or is that something you wouldn't
17  know?
18       A   I'm not sure if I, you know, would
19  automatically get notified.  I'm not sure about that.
20       Q   Okay.  Is there a way that you can review the
21  report that you submitted and the report they submitted
22  to the carrier and see if there's any differences?
23       A   I think I only have the one report anyway.  I
24  don't know.  I only have the one report, so.
25       Q   Looking at the report, do you notice any

24

1   anything regarding this particular case?
2        A   Nothing I'm aware of.  No.
3        Q   Okay.  Any indication -- without going into
4   the claim notes what they say, any indication that Dave
5   noted that there were any changes made to the report or
6   any errors that he found on the report?
7        A   I did have to change the -- I didn't have the
8   correct carrier on it.  I probably had UPC and it was
9   FSIC.
10       Q   Okay.  FSIC is subsidiary of UPC, correct?
11       A   Yes.
12       Q   Okay.  And let me ask you this, just in regard
13  to -- were you ever trained by FKS at all in regard to
14  handling claims?
15       A   No.
16       Q   Do you handle any other carriers for FKS other
17  than UPC or was it strictly and exclusively UPC?
18       A   Heritage.
19       Q   And then, obviously, you were talking about
20  Family Secure -- I think its Family Security Insurance.
21  That's a subsidiary of UPC, correct?
22       A   As far as I know, yes.
23       Q   Okay.  So, handling that claim would have been
24  the same as handling UPC's claim, correct?
25       A   Yes.

23

1   changes or would that have been the report that you had
2   yourself?
3        A   I believe it's the report I had.
4        Q   Okay.  And I don't have that report because
5   it's been claimed as privileged by the Carrier.  But do
6   you know when you submitted that report to the reviewer
7   to then forward to the Carrier?
8        A   June 16th, 2020.
9        Q   And are you updated as to when he submits that
10  to the Carrier?
11       A   I don't know if I was or not.
12       Q   Okay.
13       A   I know sometimes you do get notices, but you
14  don't always get notices.
15       Q   Okay.  Looking at -- you know, and again, like
16  we said before, if you don't recall or don't remember,
17  you can certainly look at the log notes or whatever
18  other notes you got here.
19          So, were there any entries indicating that
20  they had forwarded that report to the Carrier?
21       A   Yes.
22       Q   Okay.  Do you know what date that was?
23       A   June 18th, 2020.
24       Q   And would you have taken any direction from
25  Dave at all in this case?  Did he ever direct you to do

25

1        Q   Okay.  Are you aware of what the reported date
2   of loss was on this matter?
3        A   I have to look at my report.
4        Q   Yeah.  No problem.
5        A   September 10th, 2017.
6        Q   Okay.  That would have been consistent with
7   Hurricane Irma, correct?
8        A   Yes, correct.
9        Q   And do you know when the claim was reported to
10  the Carrier?
11       A   I don't know if I have that information.
12       Q   Okay.  You would receive the first notice of
13  loss in this case, right?
14       A   What I get is the assignment detail sheet
15  through XactAnalysis is what I print off and it has all
16  the information on it.  I guess, you can call it the
17  first notice of loss.
18       Q   Okay.  Let's --
19          MR. TOLLEY:  Madam Court Reporter, Exhibit A,
20  I'm going to mark the Notice of Taking Deposition
21  Duces Tecum.
22          (Thereupon, Plaintiff's Exhibit A was entered
23  into the record.)
24       Q   (By Mr. Tolley) And I'm going to share my
25  screen here with you, Mr. Fiocati, right?



Fiocati, Theodore    01-18-2022

26

1    A    Yes, correct.
2    Q    All right.  Mr. Fiocati, you should have
3    received the notice of taking deposition that was e-
4    filed on September 29th, 2021.  Do you recognize this
5    document as Exhibit A?
6    A    Yes.
7    Q    Okay.  And included in the exhibit were
8    regarding Schedule A documents.  Did you have an
9    opportunity to review those?
10   A    Yes.
11   Q    Okay.  And obviously subject entered by the
12   Court, did you collect and review these documents prior
13   to your deposition today?
14   A    I believe so.
15   Q    Okay.  And you're prepared to testify
16   regarding the documents to the best of your ability
17   today, correct?
18   A    Yes.
19   Q    Okay.  I now want to mark as Exhibit B, what I
20   have titled as "First Notice of Loss."
21       (Thereupon, Plaintiff's Exhibit B was entered
22       into the record.)
23   Q    (By Mr. Tolley)  All right.  So, I'm showing
24   you what's been marked as Exhibit B.
25       Do you recognize this document?  It's titled

27

1    "First Notice of Loss" and it looks like it has the
2    policy information and other loss details.  Do you
3    recognize that?
4    A    I -- no, a lot of the information is what I
5    have on that XactAnalysis sheet, but I don't have that,
6    no.
7    Q    Okay.  On that XactAnalysis sheet, does it
8    indicate when they reported the date of loss?
9    A    It has the date received May 21st, 2020.  I
10   don't know if that's the report date or not.
11   Q    Okay.  And you would agree with me that was
12   sometime after Irma, right?
13   A    Oh, yeah, yes.
14   Q    Okay.  And you would agree with me that
15   obviously, it wasn't reported right after Irma.  So, it
16   would be considered kind of a delayed reporting or a
17   failure to promptly notice, right, by the Carrier?
18   A    Late reported, yes.
19   Q    Okay.  Late reported, you said?
20   A    Yes, later -- yeah, I guess.
21   Q    Okay.  All right.  And with regard to late
22   reported Hurricane Irma claims, did you handle those any
23   differently than you would handle one that was reported
24   closer in time to Irma?
25       MS. CUMBERBATCH:  Objection, form.

28

1    Q    (By Mr. Tolley)  You can answer.
2    A    I know my assignment for these or this one was
3    to document damage, turn in photos and a report and turn
4    it into the desk adjuster through FKS for them to
5    determine coverage or anything like that.  And then, they
6    will let us know if an estimate was needed.
7    Q    Okay.  Let me ask you this.  When you were
8    assigned to this claim, were you allowed to determine a
9    cause of loss if you could determine one by UPC?
10   A    I wasn't assigned to do cause of loss.  But if
11   I was provided some information or knew something, I
12   would definitely forwarded that to -- I mean, you know,
13   kind of photos or anything like that, I would definitely
14   reported that to the Carrier.
15   Q    Okay.  So, in this case, though, it's your
16   testimony that you were not assigned to determine the
17   cause of loss, correct?
18   A    Correct.
19   Q    Okay.  Were you instructed on what to say
20   regarding a potential cause of loss regarding this
21   claim?
22       MS. CUMBERBATCH:  Objection, that'd be work
23       product, privilege information.  And do not answer
24       that question.
25   Q    (By Mr. Tolley)  Okay.  And Mr. Fiocati, you had

29

1    indicated before that you're not represented by
2    Ms. Cumberbatch or her firm.  You know, she's objecting
3    to a privilege here.  You can, you know, answer the
4    question.  You can decide not to answer the question.
5    That's up to you.
6        Obviously, if you don't answer a question,
7    we'll have to file, you know, appropriate motions
8    regarding whether or not you should have answered the
9    question.
10   A    Okay.  I understand.  Can you please -- I'm
11   sorry, can you please ask that again?  I forgot what you
12   asked.
13   Q    Sure.  With regard to this particular claim,
14   since you said you were not instructed to determine the
15   cause of loss, did you ever comment on the cause of
16   loss?  What it was or what it wasn't or if you could
17   determine it or not?
18   A    No, I didn't give an opinion on the -- whether
19   it was or wasn't wind damage or Irma damage.
20   Q    Okay.  And did you do anything that would help
21   you determine what the cause of loss would have been in
22   this case?
23       MS. CUMBERBATCH:  Form, you may answer.
24   A    I was -- mainly just did a visual inspection.
25   Q    (By Mr. Tolley)  We had the deposition of the



877.291.3376
www.UCRinc.com

Fiocati, Theodore   01-18-2022

30

1  Defendant's corporate representative last week and they
2  had indicated that you would certainly be able to
3  determine the cause of loss, if you could.
4       Is that your understanding of what your role
5  was in this case?
6       A   I mean, if I knew for sure, I would definitely
7  say something, that's for sure.
8       Q   Okay.  And in this case, can you say what the
9  cause of loss is?
10      A   No.
11      Q   Did you ever indicate that this damage that
12 you observed was due to Hurricane Irma or wind damage?
13      A   No, I didn't.
14      Q   Did you ever indicate that the damage observed
15 in this claim was due to wind damage at all?
16      A   No.
17      Q   Did you ever definitively rule out wind damage
18 in this case?
19      A   No.
20      Q   All right.  So, you said you got involved on
21 May 28th, I believe it was?
22      A   Yes.
23      Q   Okay.  What did you do after becoming involved
24 in this matter?
25      A   I contacted the contractor or the public

31

1  adjuster.  I'm not sure which one I talked to.  And
2  scheduled the inspection with them.
3       And then, when I completed the inspection, but
4  nobody was present.  The contractor, they did not plan
5  on being there, they scheduled the solo inspection.
6       Q   Okay.  And then the Insureds, they didn't live
7  in Florida, right, full time?
8       A   I don't know for sure, but I believe so.
9       Q   Okay.  And so that would be one of the reasons
10 why maybe they weren't at the inspection, right?
11      A   Yes.
12      Q   And then with regard to this inspection, only
13 exterior damages were being claimed, correct?
14      A   Yes.
15      Q   Okay.  So, that would be a reason why maybe
16 the contractor didn't need to be present, because you
17 were only going to be working on the roof?
18      A   Yes, correct, the exterior.
19      Q   Okay.  So, after you made those calls, did you
20 do anything else before your inspection?
21      A   Nothing I know of.
22      Q   Okay.  Did you pull any building reports or
23 permit reports or learn the age of the roof or the age
24 of the home at all?
25      A   No, I didn't pinpoint anything.

32

1       Q   And you had said that the Carrier provided the
2  dec page.  Did you review the dec page for any coverage
3  information?
4       A   I don't believe so.
5       Q   Okay.  And in this matter, you are not allowed
6  to make a coverage determination, correct?
7       A   No.
8       Q   Okay.  And when you say, no, it means, no, you
9  are not allowed to make a coverage determination, right?
10      A   No -- yeah.  Yes, I was -- I did not.  That
11 was not part of my assignments to do the coverage
12 determination.
13      Q   Okay.  Just sometimes when we say, no, it
14 sounds like the other way around.  So, I just want to
15 make sure we're clear on the record.
16      All right.  So then, when did you inspect this
17 loss?
18      A   On June 1st, 2020.
19      Q   What did you do during the inspection?
20      A   I know I inspected the exterior around the
21 elevations, sides of the house.  And then, the roof --
22 got on the roof and inspected the roof.
23      Q   Prior to your assignment of this place, was
24 FKS aware that you were not a licensed engineer?
25      A   I advised -- I imagined so, I never talked

33

1  about it but --
2       Q   Okay.  Fair to say though that you never
3  submitted a license to them in any way showing that
4  you're a professional engineer, right?
5       A   Exactly, yes.
6       Q   Okay.  And fair to say that they knew you're
7  an independent adjuster and that was pretty much it,
8  right?
9       A   Yes.
10      Q   Okay.  And also same question with regard to a
11 licensed roofer, you were obviously not a licensed
12 roofer at the time and you never presented yourself as a
13 licensed roofer, right?
14      A   Correct.  Yes.
15      Q   Okay.  So, when you walked around the sides of
16 the house, did you see any damage?
17      A   I don't have any notes that I saw any damage
18 on the elevations what I call.
19      Q   Okay.  And I'm going to mark as Exhibit C, the
20 Field Adjuster Photo Report.
21      (Thereupon, Plaintiff's Exhibit C was entered
22 into the record.)
23      Q   (By Mr. Tolley) Do you see that document?  It's
24 20 pages long.
25      A   Yes, I do.



877.291.3376
www.UCRinc.com

Fiocati, Theodore   01-18-2022

34

1    Q   Okay.  And this is your photos that you took
2  during your inspection on June 1st, right?
3    A   It looks like it.
4    Q   Okay.  Obviously, yours does not have these
5  little black boxes on the right hand side?
6    A   Yes, mine doesn't have those.
7    Q   Okay.  And looking through these photographs
8  and looking at those notes, any notes indicate that you
9  observed damage to the exterior of the property?
10   A   Nothing on the elevations.  No.
11   Q   Okay.  And you do see here on Paragraph Number
12  6, they actually have hurricane, I guess, a shutter to
13  block off the patio here?
14   A   Yes.
15   Q   Okay.  And are those hurricane impact windows?
16   A   I don't know for sure.
17   Q   And you wouldn't know if any of these screens
18  are replaced, right, after Irma?
19   A   No, I don't have any information on that.
20   Q   All right.  So, let's go to the tiles
21  here.  And for instance, right here on Number 8, we can
22  see just in the corner here, here's a corner chipped
23  tile.  Are you aware of the concept of wind chatter?
24   A   Yes.
25   Q   Okay.  And what is wind chatter in your

36

1    Q   Got you.  Okay.  All right.  So, we'll keep
2  going down here.  And this Photograph Number 9, is that
3  an overview?
4    A   One second.  Yes, that's an overview too.
5    Q   And do you indicate in this photograph there's
6  any tile damage?
7    A   No.
8    Q   Okay.  You would agree with me that it does
9  appear that there are several corner chipped tiles on
10  this slope as well, right?
11   A   Yes, I agree.
12   Q   Okay.  In fact, it looks like we have at least
13  one, two, three, four of them, right?
14   A   Yes.
15   Q   Okay. All right. Number 10, this is more
16  zoomed in. I would assume this is not an overview,
17  right?
18   A   Exactly.  It's a picture of a cracked tile --
19  chipped tile.
20   Q   Okay.  You indicated here that there's tile
21  damage?
22   A   Yes.
23   Q   Okay.  And is that what you were instructed to
24  indicate when it comes to observing tiles being damaged?
25   A   Just any damage I saw, any cracks, I was --

35

1  understanding?
2    A   The wind making the tiles move up and down
3  basically.
4    Q   Okay.  And as a result of that result in
5  corner chip cracking, right?
6    A   Possible, yes.
7    Q   Okay.  And that's because where the corner is
8  on these tiles is the interlock.  So, it's the thinnest
9  piece of the tile, right?
10   A   Yes, it is.
11   Q   Okay.  And so, I highlighted there's a chipped
12  tile here on Photograph Number 8 at the bottom.  There's
13  one up towards the ridge.  And then, there's even one
14  over here on the other slope as well.
15       Were you able to determine what caused these
16  damages?
17   A   No, I wasn't.
18   Q   And does your photo indicate that there's
19  broken tiles on this slopes?
20   A   At that particular photo, no, but it does on
21  other photos.
22   Q   Okay. Why didn't you indicate in this
23  photograph that there was tile damage to these three
24  tiles?
25   A   It's just more of an overview photo.

37

1  document any cracks I saw basically.
2    Q   No, but I guess my question is, when you
3  indicate tile damage here, is that your phrasing that
4  you use or were you instructed to use that phrase?
5    A   While I -- cracked tile what I call it.
6    Q   Got you. Okay. Got you. And you would agree
7  that it -- well, let me ask you this.
8        Is this cosmetic damage or is this actual
9  physical damage to the roof?
10       MS. CUMBERBATCH:  Form.
11   A   There is a crack on that tile.
12   Q   (By Mr. Tolley) So, are you aware if it's
13  cosmetic or if it's affecting the functionality of this
14  roof?
15   A   I don't have an opinion on that.
16   Q   Okay.  Can you rule out wind damage looking at
17  this photo?
18   A   No.
19   Q   Okay.  All right.  And now, I think on 11, we
20  were looking at a more zoomed in photograph, I think it
21  was 9, right?
22   A   Yes.
23   Q   Okay.  And here, we can see a lot more.
24  Actually, it looks like we got one, two, three -- we've
25  actually got pieces as well in the valley, right -- in



877.291.3376
www.UCRinc.com

Fiocati, Theodore   01-18-2022

38

1 the slope, right?
2   A   Yes, correct.
3   Q   Okay.  Any ideas what caused this?
4   A   No, I didn't give an opinion on it.
5   Q   Can you rule out wind damage?
6   A   No.
7   Q   Okay.  All right.  Number 12, is this an
8 overview?
9   A   Yes, it's an overview.
10   Q   Okay.  And you would agree with me though that
11 there are several cracked tiles in here, right?
12   A   Yes, I agree.
13   Q   Okay.  And in fact, looking in the middle, it
14 looks like the third slope down from the top here and
15 looking almost -- I think it's about two tiles before
16 the -- I forget what these are called.  It's not a
17 ridge.  It's a hip.  There appears to be a slip tile as
18 well, right?
19   A   Yes, correct.
20   Q   Any ideas what caused that slip tile?
21   A   No.
22   Q   Could you rule out wind damage?
23   A   No, I can't.
24   Q   Okay.  Looking at, you know, all the photos
25 that we've gone through, did you ever indicate to the

39

1 Carrier that this was related to wear and tear of the
2 roof?
3   A   No, I didn't.
4   Q   Did you ever tell the Carrier or note to the
5 Carrier that these damages were related to faulty
6 mechanical design?
7   A   No.
8   Q   Did you ever tell them that they were the
9 result of deterioration?
10   A   No.
11   Q   All right.  Let me keep going.  13, I think
12 we're looking at that same slope ridge hip area, but
13 just the top of it, right?
14   A   Yes, correct.
15   Q   Okay.  And again, we've got a chipped and
16 slipped tile here.  You can't rule out wind damage,
17 right?
18   A   That's correct.
19   Q   And you know, obviously, you've been doing
20 these things, you said since 2006 in Texas, right?
21   A   Yes.
22   Q   Okay.  And so fair to say that, you know,
23 you've been doing this for a long time, you've probably
24 inspected thousands of roofs, you'd be qualified to
25 determine if this was wind damage or not, right?

40

1   A   Yes.
2   Q   Okay.  And even with those qualifications, you
3 can't rule it out here, right?
4   A   No.
5   Q   Looking at it now, do you have an opinion as
6 to whether or not that was caused by wind or you can't
7 make that opinion?
8   A   No, I can't.  I don't have an opinion.
9   Q   What typically causes these tiles to slip that
10 are mechanically fastened?
11   A   I'm not sure.
12   Q   Okay.  Looking here at 14, we've got some
13 more -- it looks like some more specific damage.  We can
14 see here a couple cracked tiles, right?
15   A   Yes.
16   Q   And you can't rule out wind damage here
17 either, right?
18   A   No.
19   Q   Okay.  Sitting here today, can you opine as to
20 how this tile on the far right here got chipped?
21   A   No, I don't have an opinion on that.
22   Q   Okay.  And you don't have an opinion as to how
23 these other tiles in the photograph got cracked, right?
24   A   No.
25   Q   Let me ask you this.  I know I keep asking and

41

1 you can't rule out wind damage.  Is it possible wind
2 damaged that roof?
3       MS. CUMBERBATCH:  Objection, calls for
4 speculation.  You can answer.
5   Q   (By Mr. Tolley)  You can answer if you know.
6   A   It's possible.
7   Q   Okay.  And did you ever indicate to the
8 Carrier or to FKS that you completely ruled out wind
9 damage that this roof was not affected by wind damage?
10   A   No, I didn't.
11   Q   Okay.  Looking here at 15, we got a bunch of
12 tiles together here that kind of look like wind chatter
13 to me.
14       Is this consistent with wind chatter in your
15 opinion?
16   A   It's possible.
17   Q   Okay.  You can't rule it out though, right?
18   A   I can't rule it out.
19   Q   Okay.  Now, you know, you're obviously a
20 licensed adjuster and there certain ethical guidelines
21 and procedures that you have to comply with as a
22 licensed adjuster, right?
23   A   Yes.
24   Q   Okay.  So, if you couldn't determine if this
25 was covered or if this was caused by wind or if it



Fiocati, Theodore   01-18-2022

---

42

1  wasn't caused by wind, isn't it true that one of the
2  ethical guidelines is that you're supposed to kind of --
3  for lack of a better phrase tie goes to a runner that
4  you're supposed to sign on the side of the Insured and
5  extend coverage, right?
6      MS. CUMBERBATCH:  Form.  You can answer.
7      A  Yes, that's correct.  But I wasn't assigned
8  to -- for the coverage or anything on that.
9      Q  (By Mr. Tolley) Okay.  But I guess my question
10 is more, the ethical guidelines here that you travel
11 under with regard to your licensure, you would give the
12 benefit of the doubt to the Insured in a situation that
13 you couldn't come to a complete determination, right?
14     A  Yes.
15     Q  Okay.  And in this case, do you know if the
16 benefit of the doubt was given to the Insured?
17     MS. CUMBERBATCH:  Form.
18     A  I don't know.
19     Q  (By Mr. Tolley) Okay.  All right.  Let's keep
20 going through here.  We've got 16 again.  I guess, let
21 me ask you this to speed it up a little bit.
22     In all of these photos that we see the
23 cracked, broken, slipped tiles, you can't tell us if
24 wind damage did not contribute, right?
25     MS. CUMBERBATCH:  Form.  You can answer.

---

43

1      A  That's correct.
2      Q  (By Mr. Tolley) And you can't tell us if wind
3  did contribute to this damage, right?
4      A  Correct.
5      Q  Okay.  And all of these photographs, you never
6  once indicated to the insurance company that on this
7  roof, you saw wear and tear damages, right?
8      A  Yes, I didn't say that.
9      Q  You never indicated to the insurance company
10 that you noticed marring or deterioration, right?
11     A  Yes, I never did.
12     Q  Okay.  And at any point in time, did you tell
13 the Carrier that you couldn't determine what happened to
14 this roof because of the length of time between
15 Hurricane Irma and the date that you inspected?
16     A  No.
17     Q  I'm sorry.  I think you cut out there.  Did
18 you say, no?
19     A  Yes.
20     Q  Okay.  So, I'm just going to re-ask the
21 question because I want to make sure we have it right on
22 the record.
23     At no point in time, did you tell the
24 insurance Carrier that you couldn't determine what
25 happened to this roof because of the length of time

---

44

1  between Hurricane Irma and the date of your inspection,
2  correct?
3      A  Correct.
4      Q  Okay.  And, you know, going back to that, that
5  requirement that you have through your licensure, did
6  you ever tell UPC because you couldn't determine what
7  did or did not cause these damages, they should give the
8  benefit of the doubt to the Insured and extend coverage?
9      A  I didn't say that.  No.
10     Q  Okay.  Why not?
11     A  I don't know.
12     Q  Looking back on it, do you believe that the
13 benefit of the doubt should have been given to the
14 Insured in this matter?
15     A  It's hard to say.  I guess, the benefit of the
16 doubt could have been given to him.  Yes.
17     Q  Okay.  I'm just going to keep going through
18 these couple photos because -- and let me ask you this
19 on 18.  I'm assuming that's your truck in the driveway?
20     A  Yes.
21     Q  Okay.  And that's your ladder, right?
22     A  Yes.
23     Q  Okay.  And, I did want to talk about this 23.
24 The other house is pretty close.
25     Did you observe the other house and come to

---

45

1  any opinions as to wind damage on this roof related to
2  the other house?
3      A  I don't remember anything on that.
4      Q  Okay.  Were you made aware of any prior
5  repairs on this roof?
6      A  No, I wasn't.
7      Q  Okay.  And were you made aware of any prior
8  damage to the property as a result of Irma?
9      A  I don't have any notes of any.  No.
10     Q  Okay.  On 38, any idea what caused that crack
11 in the tile?
12     A  No, I don't know.
13     Q  Okay.  Did you ever tell the insurance company
14 that you believed any of these damages were related to
15 thermal expansion or contraction?
16     A  No.
17     Q  Did you ever tell the insurance company that
18 you believe these damages were related to foot traffic?
19     A  No.
20     Q  All right.  After your inspection, what did
21 you do next?
22     A  I completed a report, my photo sheet and then,
23 uploaded it to XactAnalysis and it went to the Carrier
24 and that was it.  That was all my involvement.
25     Q  Did you have any conversations with any of the

---



Fiocati, Theodore   01-18-2022

46

1  contractors for the Insured or the Insured themselves?
2     A   Not that I know of, no.
3     Q   Okay.  Fair to say I guess the only
4  conversation you would have had regarding those parties
5  would have been with the contractor to schedule the
6  inspection, right?
7     A   That's all I know of, yes.
8     Q   Okay.  Now, your general loss report.
9        MR. TOLLEY:  Actually let's do this.  We've
10 been on for about an hour.  Let's take till
11 3 O'clock, use the restroom, grab some water, stuff
12 like that.  We'll be right back, okay?
13       THE WITNESS:  Okay.  Sounds good.
14       (Thereupon, a short discussion was held off
15       record.)
16       (Deposition resumed.)
17    Q   (By Mr. Tolley) All right.  Mr. Fiocati,
18 before we get into the general loss report, I want to go
19 back.  And we had talked a little bit about, you know,
20 your ethical duties as an adjuster.
21       And that if there's a, you know, basically, if
22 there's a tie it goes to the runner, if you can't tell
23 the benefit of the doubt it should go to the Insured,
24 right?
25    A   Yes.

47

1     Q   Okay.  And I know you said in this case you
2  weren't tasked with determining coverage, but you would
3  agree with me that you did receive the dec page from the
4  Carrier, correct?
5     A   Yes.
6     Q   Okay.  And you would agree with me that being
7  a licensed adjuster, you know, one of the trades of
8  adjusting is looking to see if there is what we deem to
9  be covered damage as opposed to non- covered damage,
10 right?
11    A   Yes.
12    Q   Okay.  So now, in this matter, if you had the
13 ability to make a coverage decision and based on the
14 fact that, you know, we just talked about your ethical
15 guidelines, would you have extended coverage in this
16 matter?
17       MS. CUMBERBATCH:  Form.  You can answer if you
18       understand the question.
19    A   I'm not sure.  I do not.
20    Q   (By Mr. Tolley) Well, you had said before that
21 you don't know what caused the damage, but you couldn't
22 rule out wind damage, right?
23    A   Yes, correct.
24    Q   Okay.  And you had said before that one of
25 your ethical obligations of being a licensed adjuster

48

1  here in the State of Florida is that if you can't make a
2  determination like that, you can't rule it out.
3        You can't say it was caused by that the --
4  obviously the benefit of the doubt would go to the
5  Insured, right?
6     A   Yes.
7     Q   Okay.  So, in this case, the benefit of the
8  doubt should have gone to the Insured and the coverage
9  should have been extended, right?
10    A   I -- you know, I could have put -- maybe
11 wrote -- I wouldn't make the coverage decision either
12 way, but I would have -- could have wrote an estimate
13 for the roof though.
14    Q   Okay.  And in this case, you didn't write an
15 estimate for the roof damages, right?
16    A   No.
17    Q   And that's because you were instructed not to
18 write estimate for damages, correct?
19    A   We were -- yeah, we were instructed to just
20 turn in the report and photos, documentation.  And then,
21 once the Carrier reviewed, made coverage decision, they
22 could ask us for an estimate.  And then, we would do an
23 estimate or I would do an estimate.
24    Q   Okay.  But my question was more so, do you
25 have the ability to make a coverage determination in

49

1  this matter.
2        And given the line of questioning that we just
3  went over because you couldn't make a decision or you
4  couldn't definitively rule out wind damage, you would
5  have given the benefit of the doubt to the Insured and
6  extended coverage if that was up to you, right?
7     A   If I was making a coverage decision, yes.
8     Q   Okay.  Now, you had said that you submitted
9  a -- I think you called it a general loss report, right?
10    A   Yes.
11    Q   Okay.  And in that general loss report, you
12 actually indicated that you were deferring to the desk
13 adjuster with regard to an estimate, correct?
14    A   Yes.
15    Q   Okay.  And prior to going out there, you had
16 been instructed on these UPC late reported Hurricane
17 Irma claims, not to draft an estimate for damages,
18 correct?
19       MS. CUMBERBATCH:  Objection, that'll be
20       claim -- privilege, excuse me, work product, not
21       claims handling.
22       MR. TOLLEY:  Okay.
23       MS. CUMBERBARCH:  So, I will instruct him not
24       to answer that.
25    Q   (By Mr. Tolley) Okay.  And Mr. Fiocati,



Fiocati, Theodore   01-18-2022

50

1 obviously, you're not represented by Ms. Cumberbatch,
2 you can decide whether or not you want to answer that
3 question or invoke some type of privilege.
4       MS. CUMBERBATCH:  And to be clear, my
5   objection is because that privilege rests with the
6   Defendant, Mr. Fiocati.
7   A   Yes, correct.  No estimate until asked for one
8 from the Carrier.
9       Q   (By Mr. Tolley) Okay.  And in this matter, you
10 indicated that you did draft an estimate, correct?
11       A   I did not draft an -- a repair.  I know one
12 was -- yeah, uploaded $0 estimate, but not a repair
13 estimate.  No.
14       Q   I'm sorry, I apologize.  There was an estimate
15 absolutely no damages underneath that, correct?
16       A   Yes, correct.
17       Q   Okay.  And I know that in this depo, we've
18 been kind of saying UPC, but obviously, this was a
19 Family Security Insurance Company claim, correct?
20       A   Yes.
21       Q   But like we established before, if it was UPC
22 or Family Security since they're subsidiary, you were
23 handling it just as if it was a UPC claim, correct?
24       A   Yes.
25       Q   Okay.

52

1   A   I'm not sure.
2       MS. CUMBERBATCH:  Form.  You can answer if you
3   understand.
4   A   I'm not sure.  As far as I know, It was just
5 reviewed once.
6       Q   (By Mr. Tolley) Okay.  And you had said before
7 that if it was your call, you would have written an
8 estimate for scope of damages, right?
9       A   Yes.
10       Q   Okay.  And in this claim, obviously, this is
11 not an estimate for scope of damages, correct?
12       A   Correct.
13       Q   Okay.  And it's got your name on it though,
14 right?  So, you're the one that created this?
15       A   Yes.
16       Q   Okay.  Why did you put your name on it if you
17 didn't agree with this?
18       A   It -- Yeah, I don't know.
19       Q   Was it because you were instructed to create
20 an estimate like this?
21       A   Yes.
22       Q   Okay.  Who were you instructed by?
23       A   It was through FKS.
24       Q   Do you know who gave that instruction?
25       A   No, I don't.

51

1       MR. TOLLEY:  I'd like to mark it as exhibit
2   and Madam Court Reporter, I think we're on D.
3       THE COURT REPORTER:  Correct.
4       (Thereupon, Plaintiff's Exhibit D was entered
5       into the record.)
6       Q   (By Mr. Tolley) Okay.  I don't want to call it
7 an estimate, but the document that appears to be a zero
8 estimate.
9       All right.  And Mr. Fiocati, can you see this
10 document?
11       A   Yes, I can.
12       Q   Okay.  And this was the document that UPC
13 asked you to create, correct?
14       A   Yes.
15       Q   Okay.  And looking at this document, although
16 it appears to look like an estimate, there's absolutely
17 no line items underneath it, correct?
18       A   That is correct.
19       Q   Okay.  And there's no amount, right?
20       A   Yes, correct.
21       Q   Now, did you ever create an estimate with the
22 scope of damages?
23       A   No, I didn't.
24       Q   Okay.  How many times was this particular
25 exhibit audited?

53

1       Q   And sitting here today, obviously, you agree
2 with the scope of -- well, there is no scope, but you
3 disagree with this estimate, correct?
4       A   Yes.
5       Q   Okay.  In the general loss report, did you
6 make any comments with regard to causation of damages?
7       A   No, I didn't give an opinion one way or the
8 other, I mean as to what caused it or didn't cause it.
9       Q   Okay.  Did you indicate the number of cracked
10 tiles or missing tiles by slope?
11       A   Yes, I did.
12       Q   Okay.  And how many tiles did you notate were
13 cracked or missing?
14       A   I'm going to pull up my report.
15       Q   No problem.
16       A   I have -- I did it by front, right, rear, and
17 left.  So, on the front slope, which is multiple slopes,
18 I have 23 cracked tiles and then some -- just -- some
19 different color tiles along the sidewalk in the garage.
20 I don't know if they were replaced or not.
21       And then on the right slope, 13 cracked tiles
22 and 4 slipped tiles and then -- no, I'm sorry, not
23 slipped tiles, replaced tiles -- 13 cracked tiles, 4
24 replaced tiles.
25       And then on the rear slope, 6 cracked tiles



Fiocati, Theodore   01-18-2022

54

1  and some slipped tiles, not a number.  And then, left
2  slope, 26 cracked tiles.
3      Q    Okay.  And so, fair to say there were numerous
4  slopes that had cracked or missing tiles, right?
5      A    Cracked tiles, yes, yes.
6      Q    Okay.  And, you know, obviously, in this
7  matter, you know you were requested not to scope or
8  diagram this loss, right?  You were requested merely to
9  photograph your general loss report indicate the
10  number of cracked tiles or missing tiles by slope,
11  right?
12      A    Yes, correct.
13      Q    Were you instructed to simply state that you
14  cannot determine the cause of loss and forward it to the
15  desk adjuster for further handling?
16          MS. CUMBERBATCH:  Objection, Work product
17      privilege, claims handling privilege document.  And
18      that's privileged to be held by the Defendant in
19      this matter.  So, I'll instruct him not to answer
20      that.
21      Q    (By Mr. Tolley) Mr. Fiocati?
22      A    Did I have to answer that?
23      Q    You can make that decision.  Ms. Cumberbatch
24  is obviously objected, but she's not your Counsel. She's
25  claiming some type of privilege over that information.

55

1  It's up to you.  I can't give you legal advice.
2      A    Yes.  Yes, I did mention that.  Yes.
3      Q    Okay.  And the instructions that you were
4  given regarding that, that was not a direct instruction
5  from UPC.  That was a direct instruction from FKS,
6  correct?
7      A    Correct.
8      Q    Okay.  And FKS, they were making that
9  instruction on all UPC or Family Security Insurance
10  claims, correct?
11      A    As far as I know, yes.
12      Q    Okay.  So, in this matter, essentially, FKS
13  wouldn't allow you to actually come to a cause of loss
14  even if you could, right, a determination -- I'm sorry,
15  determination as the cause of loss.
16      A    We weren't given an opinion -- we just weren't
17  given an opinion on it.  No.
18      Q    Got you.
19          MR. TOLLEY:  All right. I want to introduce
20      Exhibit E.  I believe it is, Madam Court Reporter?
21          THE COURT REPORTER:  Correct, yes.
22          (Thereupon, Plaintiff's Exhibit E was entered
23          into the record.)
24      Q    (By Mr. Tolley) Okay.  A text message, I'm
25  going to share it with you, Mr. Fiocati.

56

1      Have you ever seen these text messages before?
2  And if you need me to zoom in, I can zoom in for you.
3      A    That's fine.  Yeah, I don't know if I have
4  seen that or not.
5      Q    Okay.  In this text message, it references a
6  phone call that Kendall, FKS adjuster manager is going
7  to have with people at 04:00 p.m., the next day
8  regarding UPC late reported Irma claims.
9      Do you remember being on a phone call around
10  04:00 -- I don't know the exact date, but it would have
11  been around 4:00 p.m., with Kendall and other adjusters
12  regarding late reported Irma claims.
13          MS. CUMBERBATCH:  Objection, form.  Calls for
14      speculation.  You can answer the question if you
15      understand it.
16      A    I was on a call, but I don't know time -- or
17  if it's regarding this one, but yes, I was on a call.
18      Q    (By Mr. Tolley) Okay.  Do you remember
19  approximately when that call was like, in a date or even
20  a quarter or month of the year?  You just have to answer
21  out loud.  I know you're shaking your head no, but.
22      A    No, I'm trying to think so I --
23      Q    Oh, Okay.  Okay.  Do you know who -- so, but
24  you're obviously recalled being on a call regarding late
25  reported Irma claims, right?

57

1      A    Yes.
2      Q    Okay.  And looking at this text message, it
3  talks about what you're supposed to do with late
4  reported Irma claims.  You would agree with me that
5  Kendall -- there was a person named Kendall that was an
6  FKS adjuster manager, correct?
7      A    Yes.
8      Q    Okay.  And on that call, do you know who else
9  was on that phone call?
10      A    No, I don't.
11      Q    And obviously, Kendall was on the phone call,
12  right?
13      A    On the one I was on, yes.
14      Q    Okay.  And my understanding is Kendall was
15  employed with FKS, correct?
16      A    Yes, as far as I know.  Yes.
17      Q    What did Kendall instruct you with regard to
18  late reported Irma claims?
19      A    Basically, the -- to document damages and
20  the -- you know, not do an estimate until asked for one,
21  the cause and origin.
22      Q    When you say cause and origin, what do you
23  mean by that?
24      A    To not comment on that or give an opinion on
25  that.



877.291.3376
www.UCRinc.com

Fiocati, Theodore   01-18-2022

58

1   Q   Was your understanding that these types of
2   claims, these late reported Irma claims were going to be
3   denied by the Carrier?
4   A   No.
5   Q   Okay.  And, you know, we're obviously sitting
6   here to give you a chance to read through the text
7   message.  So, if you want to take a moment to read
8   through it, I want to ask you a couple questions about
9   its topics as opposed to the conversation that you had
10  with Kendall's topics, all right?
11  A   Okay.
12  Q   You just let me know when you're done, okay?
13  A   Okay.  I think I'm ready.
14  Q   Okay.  The conversation that's discussed in
15  this text messages, is that similar to the conversation
16  that you had with Kendall and the other adjusters that
17  we were just discussing?
18  A   As far as the estimate and the, you know,
19  noting how many cracked tiles. So, it'll be similar,
20  yes.
21  Q   Okay.  And with regard to this text message
22  chain and you said it before, that you were not on it,
23  correct?
24  A   I don't believe so.
25  Q   Okay.  All right.  And with regard to this

59

1   text message chain and it basically indicates that
2   Hurricane Irma claims that are late reported are going
3   to be denied, correct?
4   A   Yes.
5   Q   Okay.  And are you aware that this claim was
6   denied as well?
7   A   No, I wasn't aware until, you know, I'm
8   assuming it was.  You know, now, but I wasn't, no.
9   Q   Okay.  And I'll show you the denial letter in
10  a couple minutes, but did you have any involvement with
11  the denial of this claim?
12  A   No.
13  Q   Did UPC ever call you and ask any questions
14  before they denied this claim about the case itself?
15      MS. CUMBERBATCH:  Objection, that would be --
16      MR. TOLLEY:  And I don't -- right.  And Cindy,
17  I don't want to know the content.  I just want to
18  know if they did call you.
19  A   Not that I remember. I don't remember
20  anything.
21  Q   (By Mr. Tolley) Any log notes that would have
22  indicated you just got off a call with them or something
23  like that?
24  A   I don't have anything on that.  No.
25  Q   Okay.  And you said that your conversation

60

1   with Kendall was consistent in terms of not scoping
2   damage, but just merely photographing and indicating in
3   your general loss report the number of cracked and
4   missing tiles, right?
5   A   Yeah, Documented damages is what I understood.
6   Q   And it was also consistent with saying that
7   you couldn't come to a determination as to a cause of
8   loss, right?
9   A   Yes.
10  Q   Okay.  And fair to say that the instructions
11  in this text message, I mean, obviously, we're just
12  talking about the adjuster's ethical guidelines. These
13  types of instructions would violate those ethical
14  guidelines, right?
15  A   Yeah, possibly.
16  Q   I mean, well, if they're just going to deny
17  claims without factual causes of loss, I mean, that
18  would be a violation, right?
19  A   Yes.
20  Q   Okay.  And then down here, it talks about, you
21  know, good news, you got -- basically they'll pay the
22  adjuster's fees or you saw that part, right?
23  A   Yes.
24  Q   Okay.  You know, with regard to pay, how were
25  you compensated with regard to these claims?

61

1   A   It's on a fee schedule -- tiered fee schedule.
2   Q   And essentially, I guess the more you write
3   for the estimate, the more money you get?
4   A   Yes, correct.
5   Q   Okay.  But isn't it true that you also have a
6   cap of how much you can write, right?
7   A   A cap of how much you can write?
8   Q   Yeah.  So, my understanding is that you're
9   depending on what level of field adjuster you're limited
10  on the amount of money you can write an estimate.  Is
11  that fair to say?
12  A   I'm not sure about that.  No.
13  Q   Okay.  Fair to say, though, that you really
14  had no incentive with writing a high estimate since you
15  were instructed not to write an estimate, right?
16  A   Yeah, what is -- yeah, what -- instructed not
17  to - I wasn't writing an estimate, yes.
18  Q   Okay.  So, If they were paying you on this
19  claim and it looks like on other late reported Irma
20  claims, how would you be paid if you weren't writing an
21  estimate?
22      MS. CUMBERBATCH:  Form.  You can answer if you
23  understand the question.
24  A   If you're not writing an estimate, well, still
25  there's the minimum fee then it goes up from there.



Fiocati, Theodore   01-18-2022

62

1    Q   (By Mr. Tolley) Got you.  What was the minimum
2  fee on this case?
3    A   Well I know I made $193.38.
4    Q   Okay.  Fair to say in this claim and in others
5  like this, you would not be writing an estimate, right?
6    A   That's correct.
7    Q   Okay.  And so, if you can't write for damages,
8  then you would never get into those other tiers where
9  your amount goes up, because you're writing for, you
10  know, large damages, right?
11        MS. CUMBERBATCH:  Form.
12    A   Yeah, that would be correct.  Yes.
13    Q   (By Mr. Tolley) Okay.  And on this case, this
14  was your understanding of why you handled this case the
15  way you did is because of the conversation that you had
16  with Kendall and the FKS managers, right?
17    A   Yes.
18    Q   Okay.  And how many claims would you say that
19  you handled regarding late reported Irma claims for UPC
20  or their subsidiaries?
21    A   I'm not sure.
22    Q   Would you say over 100 or less than 100?
23    A   I'll probably say over 100.
24    Q   Okay.  And obviously, you were on that call
25  with other adjusters, right?

63

1    A   Yes, I believe so.  Yeah.
2    Q   Okay.  And so, those other adjusters were
3  given the same orders that you were given, correct?
4    A   Correct.
5    Q   Okay.  I want to go ahead and mark as
6  Exhibit F, the Denial Letter.
7        (Thereupon, Plaintiff's Exhibit F was entered
8        into the record.)
9    Q   (By Mr. Tolley) While I'm pulling that up,
10  would you say you did over 500 of these types of cases
11  for FKS?
12    A   No.
13    Q   So, somewhere between 100 and 500?
14    A   Much further down.  Yeah, nowhere near 500.
15    Q   Do you have an estimate as to the maximum you
16  would have handled for them?
17    A   No, but it just doesn't seem like it was at,
18  you know, towards 500.
19    Q   Got you.  Let me ask you this.  Did you deal
20  with any Irma claims that were -- you know, and we're
21  talking about for FKS on behalf of UPC or their
22  subsidiaries, where they were timely reported and
23  reopened at a later time?
24    A   Yes, I believe so.
25    Q   Okay.  And it was your understanding that you

64

1  have to do the same exact thing that you were doing on
2  these claims, right?
3        MS. CUMBERBATCH:  Form.
4    A   I believe so.
5    Q   (By Mr. Tolley) Okay.  And I can show you.
6  I'll just bring it back up real quick.  Exhibit E, it
7  does address over here, you know, the reopening of
8  originally timely reported claims.
9    A   Okay.  I see that.
10    Q   So now, reviewing that, is that your
11  understanding even those type of cases where it was
12  timely reported and then reopened on a later time?
13    A   Yes.
14    Q   Okay.  And, you know, obviously, you were one
15  of the many adjusters that were on that phone call.  Do
16  you have an approximation as to how many claims FKS
17  handles for UPC or their subsidiaries?
18    A   No, I don't.
19    Q   Okay.  You think it would be a couple thousand?
20    A   I have no idea.
21    Q   Okay.  All right.  Let me go ahead and pull up
22  Exhibit F here.  And this is the denial letter.  You had
23  no involvement in the drafting of this, correct?
24    A   No, I didn't.
25    Q   As far as your records indicate, you had no

65

1  involvement in the decision at all, right?
2    A   Correct. I don't know about that at all. Yeah.
3    Q   Okay.  I want to, you know, go to Paragraph 2
4  here.  And you never recommended an engineer to go out
5  there, right?
6    A   No, I didn't.
7    Q   And you never recommended a roofer to go out
8  there, right?
9    A   No.
10    Q   Okay.  Or even a general -- you basically
11  never recommend anybody else to go out there, right?
12    A   Correct.
13    Q   Okay.  So, fair to say, as far as you're
14  aware, you're the only person that was, you know, the
15  only person that was eyes and ears on the property for
16  UPC or their subsidiary, correct?
17    A   Yes, correct.
18    Q   Okay.  In Paragraph 2, they indicate that they
19  recently received the inspection report coming from FKS
20  and an independent adjusting firm retained to inspect
21  the subject property.  And it indicates that the
22  inspecting adjuster observed damage to the roof.
23        You would agree with me that you did observe
24  damage to the roof, correct?
25    A   Yes, correct.



Fiocati, Theodore   01-18-2022

66

1    Q   Okay.  It goes on to indicate that they were
2  advised that there was lack of maintenance, wear and
3  tear, deterioration on the roof.  You never told UPC
4  that -- I'm sorry, Family Security Insurance Company or
5  UPC that, correct?
6    A   No, I didn't.
7    Q   You never indicated that in your report
8  either, correct?
9    A   No.
10    Q   Okay.  As far as you're concerned, there
11  should be no documentation with your name on it,
12  indicating that there was a lack of maintenance, wear
13  and tear or deterioration of the property, correct?
14    A   Correct, as far as I know.
15    Q   Okay.  So, fair to say then that if the
16  Carrier was making those observations that would not
17  have come from you, correct?
18    A   Correct.
19    Q   Any idea why they would say that the
20  inspecting adjuster observed those signs of damages?
21        MS. CUMBERBATCH:  Objection, calls for
22    speculation.
23    Q   (By Mr. Tolley) You can answer.
24    A   No.
25    Q   Okay.  The next paragraph talks about the

67

1  inability of UPC to determine what the damage happened
2  from because of the delay in reporting, okay.
3        You never told the Carrier or FKS that you
4  couldn't determine what happened because of the delay in
5  reporting, correct?
6    A   That was -- I'm reviewing my report.
7    Q   Yeah, no problem.  And if you need me to, I
8  can repeat the question as well.
9    A   Yeah.  Can you repeat that question?
10    Q   Sure.  At any point in time, did you tell the
11  Carrier or FKS that you couldn't determine the cause of
12  loss because of the delay in reporting?
13    A   Yes, something similar to that in my report.
14    Q   Okay.  And what did you indicate then?
15    A   I was unable to determine the cause of loss in
16  that passage of time.
17    Q   Now, going back to that instruction by FKS.
18  When you indicated that in your report, did you indicate
19  that because you truly couldn't determine the cause of
20  loss or did you indicate that because you were
21  instructed to do that by FKS and the Carrier?
22    A   That was part of the instructions.
23    Q   Okay.  When you say part of the instructions,
24  you mean that the reason why that's in there is because
25  of the instruction, right?

68

1    A   Yes.
2    Q   Okay.  That's not your true opinion on this
3  case, correct?
4    A   Yeah, I just -- no, I didn't know what caused
5  it anyway, but no, that was because of that.  Yes.
6    Q   Okay.  And when they claim that they've been
7  prejudiced in that investigation, you were not
8  prejudiced in your inspection of the property because of
9  the delay in reporting, correct?
10    A   I'm not sure if it was or not.
11    Q   Okay.  But you never would have told them that
12  you were prejudiced, right?
13    A   No.
14    Q   Okay.  And in fact, the real reason why you
15  couldn't determine the cause of loss is because they
16  didn't allow you to, correct?
17    A   Yeah, I didn't know either way, one way or the
18  other I'd like to say.
19    Q   Okay.  Down here, they reference some policy
20  language that, you know, based on the context of the
21  letter they're saying is on, you know, what you
22  observed.  You never observed or indicated that there
23  was wear, tear, marring, or deterioration, correct?
24    A   No.
25    Q   You never indicated you observed the

69

1  mechanical breakdown, correct?
2    A   No.
3    Q   A latent defect was never observed?
4    A   No, I never indicated that.
5    Q   Okay.  In fact, the rest of Subsection B here
6  inherent vice, you didn't observe any conditions like
7  that, correct?
8    A   I didn't give any comments or opinion on that.
9  No.
10    Q   Okay.  Did you give any comments or opinions
11  with regard to Section F here settling, shrinking,
12  bulging, or any of those other ones?
13    A   No.
14    Q   Okay.  And then, it talks about in here,
15  faulty, inadequate, defective.  And then, it lists B, C,
16  and D, goes into design, workmanship, materials,
17  maintenance, all of those phrases here.
18        Did you ever indicate to the insurance Carrier
19  or FKS that you observed any of these types of signs of
20  damage?
21    A   No, I didn't.
22    Q   Did you ever observe any evidence of constant
23  repeated seepage or leakage of water?
24    A   No, I didn't give any comment on that.
25    Q   And with regard to the rain, snow, sleet or



Fiocati, Theodore   01-18-2022

70

1  dust to the interior of the building, you would have
2  never authored that opinion because you didn't inspect
3  the interior, right?
4     A  Yes, correct.
5     Q  Okay.  They also indicate that you observed
6  some type of signs of existing damages.  What existing
7  damages did you observe, if any?  And let me make this
8  clear that predate the policy's inception.
9     A  I didn't give any mention on that.
10    Q  Okay.
11    A  -- mentioned the repaired tiles and that was
12 about wind.
13    Q  Okay.  So, fair to say looking at those
14 exclusions that we just went over, they clearly did not
15 base those exceptions or exclusions under your
16 observations or opinions, correct?
17    A  Correct.
18    Q  Okay.  And the only one that would have even
19 been close would have been the prompt notice.  And that
20 was only related to your instructions that were given to
21 you, correct?
22    A  Yes.
23    Q  Okay.  And, you know, talking a little bit
24 about those instructions, did it make you feel
25 uncomfortable to follow those instructions?

71

1     A  Yeah, I thought -- well, I thought I was --
2  just documented damages and everything was getting taken
3  care by the -- you know, file handlers.  That was kind
4  of where I was at with it.  I thought we were just
5  getting eyes and ears for the in house desk adjusters.
6     Q  Obviously, that turned out to be true,
7  correct?
8     A  Correct.
9        MR. TOLLEY:  Okay.  Give me about 10, 15
10 minutes -- give me about 10 minutes.  Let's come
11 back at 03:42, okay?
12       THE WITNESS:  Okay.
13       (Thereupon, a short discussion was held off
14       record.)
15       (Deposition resumed.)
16    Q  (By Mr. Tolley) Okay.  Mr. Fiocati, I want to
17 go back a little bit to that phone call.  Who initiated
18 that phone call?  Was that Kendall?
19    A  It's been a long time ago as far as I
20 remember, yes.
21    Q  Okay.  And could you spell her last name for
22 the record?
23    A  I'm sorry, her last name?
24    Q  Yes.
25    A  It's Robnette.  I think its spelled

72

1  R-O-B-N-E-T-T-E.  I'm not so sure.
2     Q  Okay.  Were there any other supervisors or
3  managers on the call other than Ms. Robnette?
4     A  I don't know.
5     Q  Okay.  But you do recall that there were other
6  adjusters on the call, right?
7     A  Yes, it seemed like it was.  Yes.
8     Q  Okay.  So, fair to say that you weren't the
9  only adjuster being instructed this.  It was, you know,
10 essentially, the FKS adjusters handling, UPC, and
11 subsidiary of UPC claims, correct?
12    A  Yes.
13    Q  And you don't recall what year this
14 conversation was had?
15    A  It would have been 2020, but I don't know.  I
16 don't know the month or anything like that.
17    Q  Okay.  All right.  So, fair to say, after you
18 got this instruction in 2020, obviously, they were your
19 superiors or managers, you follow these instructions,
20 correct?
21    A  Correct.
22    Q  And that would have been on all of these UPC
23 late reported Irma claims or, you know, timely reported
24 but reopened claims, correct?
25       MS. CUMBERBATCH:  Objection, calls for

73

1  speculation.
2     A  Yeah, I was going to say, It's not every one.
3     Q  (By Mr. Tolley) Okay.  But the ones that you
4  handle, I mean.
5     A  Well, I mean even that.
6     Q  Okay.  Do you know if Kevin Wisniewski, that's
7  W-I-S-N-I-E-W-S-K-I was on that call?
8     A  I don't know.
9     Q  Okay.  Do you know how many adjusters FKS had
10 handling UPC or subsidiary claims?
11    A  No, I don't.
12    Q  Okay.  Now, knowing that, you know, this case,
13 and others like have ended in a denial, do you feel like
14 the right thing was done on this claim?
15    A  Yeah, I'm not sure about that.
16    Q  Well, given, you know, the ethical obligations
17 of the Carrier and adjusters and things like that, that
18 we've already gone over and knowing your testimony, you
19 know, fair to say that this claim should have been
20 covered, right?
21    A  That's like, you know that's --
22       MS. CUMBERBATCH:  Objection, form.
23    A  -- cause and origin.  But like we said
24 earlier, we talked about earlier about the benefit of
25 that one, the Insured, I would say, yes.



Fiocati, Theodore   01-18-2022

74

1    Q   (By Mr. Tolley) Okay. Did you receive the
2    instructions like you did for Ms. Robnette on that phone
3    from anybody else at FKS?
4        A   Not that I'm aware of. I don't know.
5        Q   Okay. Did anybody at UPC ever directly
6    contact you with regard to those instructions?
7        MS. CUMBERBATCH: Objection. That'll will
8    call -- that would go to claims handling procedures
9    and will be work product.
10       I'll instruct him not to answer. I understand
11   as we discussed earlier that's up to you,
12   Mr. Fiocati, whether you would decide to answer
13   that question.
14       A   Okay. Not that I'm aware of. I don't
15   remember any.
16       MR. TOLLEY: Okay. I have no further
17   questions. Ms. Cumberbatch, do you have any
18   follow-up?
19       MS. CUMBERBATCH: I do.
20       MR. TOLLEY: Okay.
21       MS. CUMBERBATCH: I'll try to be brief.
22       CROSS EXAMINATION
23   BY MS. CUMBERBATCH:
24       Q   Again, for the record, my name is Cindy
25   Cumberbatch. I am Defense Counsel here on behalf of

75

1    Family Security Insurance Company, but we've been using
2    UPC interchangeably as we've discussed, Family Security
3    is a subsidiary of UPC.
4        So, we will continue in that fashion, when I
5    say UPC, I will mean Family Security.
6        A   Okay.
7        Q   Let's see. You testified extensively about
8    whether you could determine a cause of loss regarding
9    the damage you observed on the roof tiles. And is it
10   fair to say that you -- just because you could not
11   determine that there was not wind damage, it does not
12   mean that you also could not determine that there -- let
13   me rephrase that.
14       You could not definitively say one way or the
15   other, whether there was damage to the roof at the
16   insured property that we're discussing today. Is that
17   correct?
18       A   That's correct. Yes, I couldn't say one way
19   or the other whether it was or wasn't wind damage.
20       Q   Okay. And irrespective of how you felt about
21   how this claim should be handled, it was not up to you
22   ultimately to make that claim determination as you were
23   just there to document damage, correct?
24       A   That's correct.
25       Q   Okay. Approximately, how many roofs have you

76

1    inspected or roof claims have you adjusted during your
2    time as an adjuster?
3        A   It's hard to say, but over 2000.
4        Q   All right. And I know that you testified that
5    you did not tell Family Security that the damage was a
6    result of wear, tear, and deterioration and faulty
7    design, but you also did not tell them that either,
8    correct?
9        A   That's correct.
10       Q   Okay. You were not retained as an expert to
11   opine on causation or determine the cause of loss for
12   this claim, correct?
13       A   Correct.
14       Q   Okay. When you were asked about whether
15   coverage should have been afforded for this claim, did
16   you review the entire policy with regard to this claim?
17       A   No.
18       Q   Okay. So, is it fair then to say that you are
19   not aware of all policy provisions that would affect
20   whether coverage should have been afforded for this
21   claim?
22       A   That's correct.
23       Q   It's kind of a little bit of both regarding
24   the estimate that was introduced as Exhibit D, excuse
25   me. Did you prepare an estimate for this claim?

77

1        A   When I say $0 estimate, yes, but not any kind
2    of estimate that have repairs in it. No.
3        Q   Okay. To your knowledge, how was that $0
4    estimate prepared for this claim?
5        A   Well, all the information sent in Xactimate
6    and then when we -- excuse me, when we mark it
7    completed, it all gets uploaded and then an estimate
8    goes up with it. It'll go up there automatically no
9    matter what. And then, all the documents go too.
10       Q   Okay. So, even though your name may be
11   attached to it, you didn't actually prepare that
12   estimate. Is that correct?
13       A   That's correct. It comes out of the system.
14       Q   Regarding the text message that was introduced
15   as Exhibit E, I believe you testified that you did not
16   recall seeing that text message prior to today's
17   deposition. Is that correct?
18       A   That's correct. I don't recall seeing it.
19       Q   So, you can't tell us today who sent that text
20   message?
21       A   No, I can't.
22       Q   So, And you also cannot tell us to whom that
23   message was sent?
24       A   No.
25       Q   Okay. So, you really can't tell whether



Fiocati, Theodore   01-18-2022

78

1  that's a valid text message?
2     A   No.
3     Q   And you also don't know when that, suppose
4  text message was sent.  So, you don't know if that would
5  have actually applied to your handling of this claim at
6  all.  Is that correct?
7     A   Correct.
8     Q   And to be clear, you're not testifying on
9  behalf of FKS.  Is that true?
10    A   On behalf of FKS?
11    Q   Correct.
12    A   No.
13    Q   So, I'll rephrase just to be clear, that you
14 are not testifying on behalf of FKS today, correct?
15    A   No, correct.
16    Q   Do you have any knowledge of the specific
17 relationship or correspondence, I will say between FKS
18 and UPC with regard to handling claims?
19    A   No, I don't.
20    Q   Okay.  So, you acted in line with the
21 instructions you were given to simply document damage
22 that you observed, as you've testified here today,
23 correct?
24    A   Yes, correct.
25    Q   You are not aware of whether there was a

79

1  change to your report that you uploaded to the -- I
2  believe you said the XactAnalysis system?
3     A   Yeah.  So, I'm not aware of any changes to it.
4     Q   Okay.  So, as we sit here today, you included
5  in your report the damage that you did observe for this
6  claim?
7     A   Yes, I did.
8     Q   Okay.  And then, it was up to Family Security
9  to determine whether coverage would have been afforded
10 based on your observation as well as what other factors
11 may have -- excuse me, what other policy provisions
12 would have been applicable for this claim.  Is that your
13 understanding?
14    A   Yes, that's my understanding.
15        MS. CUMBERBATCH:  I don't believe I have any
16 other questions.  Thank you again for your time.
17        MR. TOLLEY:  I just have two follow-up.
18        THE WITNESS:  Okay.
19             RE-DIRECT EXAMINATION
20 BY MR. TOLLEY:
21    Q   So, first, with regards to the validity of the
22 text message, you know, obviously you saw the text
23 message and indicated that it came from Kendall an FKS
24 adjuster manager, correct?
25    A   I did see that on there, yes.

80

1     Q   Okay.  And you had a very similar conversation
2  with Kendall, who was an FKS adjuster manager on a phone
3  conference regarding late reported Irma claims, correct?
4     A   Correct.
5     Q   Okay.  So, the content of those text messages
6  would be consistent with the phone call that you were a
7  part of, correct?
8     A   Some of them, yes.
9     Q   Okay.  Including the part about not scoping,
10 you know, not writing for damages in an estimate and
11 stating that you couldn't determine a cause of loss,
12 correct?
13    A   Correct.
14    Q   Okay.  And then, the last thing was discussed
15 was your report and whether or not anything was changed.
16        Obviously, you haven't seen the report that
17 was submitted to the Carrier, correct?
18    A   Yeah, I don't know -- I don't know if I have
19 or not.  Yeah.
20    Q   Okay.  And you definitely didn't observe any
21 reports that are in possession of Ms. Cumberbatch,
22 correct?
23    A   No.
24    Q   Okay.  So, fair to say that, as far as you're
25 aware, you submitted your report what you have in your

81

1  possession is true and accurate.
2        What others may have in their possession could
3  have been changed, could've not been changed.  You're
4  not aware of that, right?
5     A   That's correct.
6        MR. TOLLEY:  Okay.  I have no further
7  questions.  Mr. Fiocati, do you want to read or
8  waive?  And if you need --
9        THE WITNESS:  I'd like to reserve a right to
10 read it or whatever.  So, yes, read.
11        (Deposition concluded at 03:54 p.m.)
12        (Reading and signing of the deposition by the
13        witness has been reserved.)
14
15
16
17
18
19
20
21
22
23
24
25



82

1               CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF PALM BEACH
4
5      I, Dagne Marvin, Court Reporter and Notary Public
6  for the State of Florida, do hereby certify that I was
7  authorized to and did digitally report and transcribe
8  the foregoing proceedings, and that the transcript is a
9  true and complete record of my notes.
10     I further certify that I am not a relative,
11  employee, attorney or counsel of any of the parties, nor
12  am I a relative or employee of any of the parties'
13  attorneys or counsel connected with the action, nor am I
14  financially interested in the action.
15
        Witness my hand this 21st day of January, 2022.
16
17
18
19
20
21
    _____
    DAGNE MARVIN, COURT REPORTER
22  NOTARY PUBLIC, STATE OF FLORIDA
23
24
25

84

1  DATE:   JANUARY 21, 2022
   TO:    Theodore Fiocati
2  C/O
       Cindy L. Cumberbatch, Esquire
3      Lewis Brisbois Bisgaard & Smith, LLP
       401 E Jackson Street Ste 3400
4      Tampa, FL 33602-5874
   IN RE:   SFR Services, LLC/Paul & Rita Bezjak vs.
   Family Security Ins
5
6  CASE NO: 20-CA-007831
7
   Dear Mr. Fiocati,
8
       Please take notice that on January 18, 2022, you
9  gave your deposition in the above-referenced matter.  At
   that time, you did not waive signature.  It is now
10  necessary that you sign your deposition.  You may do so
   by contacting your own attorney or the attorney who took
11  your deposition and make an appointment to do so at
   their office.  You may also contact our office at the
12  below number, Monday - Friday, 9:00 AM - 5:00 PM, for
   further information and assistance.
13     If you do not read and sign your deposition within
   thirty (30) days, the original, which has already been
14  forwarded to the ordering attorney, may be filed with
   the Clerk of the Court.
15     If you wish to waive your signature, sign your name
   in the blank at the bottom of this letter and promptly
16  return it to us.
17  Very truly yours,
18  Dagne Marvin, Court Reporter
   Universal Court Reporting
19  (954)712-2600
20
   I do hereby waive my signature.
21
22
23  _____
   Theodore Fiocato
24  Cc: via transcript:
                   John Tolley, Esquire
25

83

1               CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF PALM BEACH
4
5      I, Dagne Marvin, the undersigned authority, certify
6  that Theodore Fiocati, appeared before me remotely
7  pursuant to Florida Supreme Court Order AOSC20-23 and
8  was duly sworn on the 18th day of January, 2022.
9
       Witness my hand this 21st day of January, 2022.
10
11
12
13
14
15
    _____
16  DAGNE MARVIN, COURT REPORTER
   NOTARY PUBLIC, STATE OF FLORIDA
17  Commission No.: GG 363392
   Commission Exp:  AUGUST 7, 2023
18
19
20
21
22
23
24
25

85

1                   ERRATA SHEET
2  I wish to make the following changes, for the following
   reasons:
3
   PAGE NO.  LINE NO.
4
5  _____ _____ CHANGE_____
6          REASON_____
   _____ _____ CHANGE_____
7
8          REASON_____
   _____ _____ CHANGE_____
9
10         REASON_____
   _____ _____ CHANGE_____
11
12         REASON_____
   _____ _____ CHANGE_____
13
14         REASON_____
   _____ _____ CHANGE_____
15
16         REASON_____
   _____ _____ CHANGE_____
17
18         REASON_____
   _____ _____ CHANGE_____
19
20         REASON_____
   _____ _____ CHANGE_____
21
22         REASON_____
   _____ _____ CHANGE_____
23
24         REASON_____
25  SIGNATURE          DATE



| $ | |
|---|---|

**$0** 50:12
  77:1,3

**$193.38** 62:3

| 0 | |
|---|---|

**03:42** 71:11

**03:54** 81:11

**04:00** 56:7,10

| 1 | |
|---|---|

**10** 36:15
  71:9,10

**100** 62:22,23
  63:13

**1099** 12:4

**10th** 25:5

**11** 37:19

**12** 38:7

**13** 39:11
  53:21,23

**14** 40:12

**15** 41:11 71:9

**16** 42:20

**16th** 23:8

**18** 1:17 5:2
  44:19 84:8

**18th** 23:23
  83:8

**1909** 2:4

**1st** 32:18 34:2

| 2 | |
|---|---|

**2** 65:3,18

**2:00** 1:17

**20** 33:24

**2000** 76:3

**2006**
  13:18,19,22
  39:20

**2009** 13:14

**2017** 12:24
  13:3,12 25:5

**2018** 8:16
  12:11 13:13

**2019** 9:15 17:1

**2020** 9:6 10:4
  23:8,23 27:9
  32:18
  72:15,18

**2021** 26:4

**2022** 1:17 5:2
  82:15 83:8,9
  84:1,8

**2023** 83:17

**20-CA-007831**
  1:3 84:6

**20TH** 1:1

**21** 84:1

**21st** 27:9
  82:15 83:9

**23** 44:23 53:18

**25** 4:3

**26** 4:4 54:2

**28th** 9:6 10:4
  30:21

**29th** 26:4

| 3 | |
|---|---|

**3** 46:11

**3:54** 1:17

**30** 16:7 84:13

**33** 4:5

**33020** 2:4

**33602** 2:9

**33602-5874**
  84:4

**3400** 2:9 84:3

**363392** 83:17

**38** 45:10

| 4 | |
|---|---|

**4** 53:22,23

**4:00** 56:11

**401** 2:9 84:3

| 5 | |
|---|---|

**5** 3:3

**5:00** 84:12

**500**
  63:10,13,14,1
  8

**501** 2:4

**51** 4:6

**55** 4:7

**561-245-4703**
  2:5

| 6 | |
|---|---|

**6** 34:12 53:25

**63** 4:8

| 7 | |
|---|---|

**7** 83:17

**74** 3:5

**79** 3:6

| 8 | |
|---|---|

**8** 34:21 35:12

**813-739-1900**
  2:10

| 9 | |
|---|---|

**9** 36:2 37:21

**9:00** 84:12

**954)712-2600**
  84:19

| A | |
|---|---|

**A/A/O** 1:5

**ability**
  7:19,21,25
  22:12 26:16
  47:13 48:25

**able** 6:11 30:2
  35:15

**about** 6:3 9:12
  10:5 11:16
  15:18
  17:17,19,21
  20:10 21:12
  22:19 24:19
  33:1 38:15
  44:23
  46:10,19
  47:14 57:3
  58:8 59:14
  60:12,20
  61:12 63:21
  65:2 66:25
  69:14
  70:12,24
  71:9,10
  73:15,24
  75:7,20 76:14



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

80:9

**above** 22:6,10

**above-**
  **referenced**
  84:9

**absolutely**
  50:15 51:16

**access** 18:22
  19:21

**accident** 16:21

**accurate** 81:1

**act** 9:25

**acted** 78:20

**action**
  82:13,14

**actions** 15:7

**actual** 11:12
  37:8

**actually** 5:21
  9:2 34:12
  37:24,25 46:9
  49:12 55:13
  77:11 78:5

**address**
  15:19,20,25
  64:7

**adjust** 18:16

**adjusted** 76:1

**adjuster** 4:5
  5:13 8:9 9:25
  12:2,3,13
  13:6 14:2
  21:2 28:4
  31:1 33:7,20
  41:20,22
  46:20 47:7,25
  49:13 54:15

56:6 57:6
61:9 65:22
66:20 72:9
76:2 79:24
80:2

**adjusters**
  56:11 58:16
  62:25 63:2
  64:15 71:5
  72:6,10
  73:9,17

**adjuster's**
  60:12,22

**adjusting**
  8:20,22
  9:9,11
  13:16,20
  14:12 17:5
  47:8 65:20

**admin** 22:3

**advice** 55:1

**advised** 32:25
  66:2

**affect** 7:21,25
  76:19

**affected** 41:9

**affecting**
  37:13

**affirmative**
  6:12

**afforded**
  76:15,20 79:9

**after** 5:5
  12:22
  27:12,15
  30:23 31:19
  34:18 45:20
  72:17

**again** 18:1
  23:15 29:11
  39:15 42:20
  74:24 79:16

**age** 31:23

**agent** 15:23

**ago** 71:19

**agree** 27:11,14
  36:8,11 37:6
  38:10,12
  47:3,6 52:17
  53:1 57:4
  65:23

**agreements**
  8:20

**ahead** 7:10 9:4
  16:14 63:5
  64:21

**alcohol** 7:25

**all** 1:18 5:20
  6:7,19,21,22
  7:7 8:5 9:7
  12:6 14:22
  15:17
  16:17,24
  17:7,18
  18:6,17,18
  23:25 24:13
  25:15 26:2,23
  27:21
  30:15,20
  31:24 32:16
  34:20 36:1,15
  37:19 38:7,24
  39:11
  42:19,22 43:5
  45:20,24
  46:7,17 51:9
  55:9,19
  58:10,25

64:21 65:1,2
69:17
72:17,22
76:4,19
77:5,7,9 78:6

**allow** 55:13
  68:16

**allowed** 28:8
  32:5,9

**almost** 38:15

**along** 53:19

**already** 73:18
  84:13

**also** 6:23
  12:13 18:10
  20:15 33:10
  60:6 61:5
  70:5 75:12
  76:7 77:22
  78:3 84:11

**although** 51:15

**always** 23:14

**am** 8:9 13:8
  15:12 74:25
  82:10,12,13
  84:12

**amount** 51:19
  61:10 62:9

**answer** 6:7,15
  7:12,13,14
  16:15 28:1,23
  29:3,4,6,23
  41:4,5
  42:6,25 47:17
  49:24 50:2
  52:2 54:19,22
  56:14,20
  61:22 66:23
  74:10,12



877.291.3376
www.UCRinc.com

answered 29:8

any 5:17
  7:9,20,24
  10:16
  11:2,4,9,14,2
  2,23 12:5
  13:19,20,23
  14:3,4,9,22
  15:6,7,14,15
  16:1 17:4,5
  20:10,21
  22:22,25
  23:19,24
  24:3,4,5,6,16
  27:22 31:22
  32:2
  33:3,16,17
  34:8,17,19
  36:6,25 37:1
  38:3,20 43:12
  45:1,4,7,9,10
  ,14,25 53:6
  59:10,13,21
  63:20 66:19
  67:10
  69:6,8,10,12,
  19,22,24
  70:7,9 72:2
  74:15,17 77:1
  78:16 79:3,15
  80:20
  82:11,12

anybody
  20:10,21 21:6
  65:11 74:3,5

anymore 14:10

anything 9:3
  14:15 15:2,3
  16:2 21:11
  24:1 28:5,13
  29:20
  31:20,25 42:8

45:3 59:20,24
72:16 80:15

anyway 22:23
  68:5

AOSC20-23 1:19
  83:7

apologize
  50:14

appear 36:9

APPEARANCES
  2:1

appeared 1:18
  83:6

appears 38:17
  51:7,16

applicable
  79:12

applied 78:5

appointment
  84:11

appraiser 8:9

appropriate
  29:7

approve 22:4

approximately
  56:19 75:25

approximation
  16:14 64:16

area 12:15
  39:12

around 8:16
  32:14,20
  33:15 56:9,11

ask 7:11,13,17
  15:2,18 19:2
  24:12 28:7

29:11 37:7
40:25 42:21
44:18 48:22
58:8 59:13
63:19

asked 29:12
  50:7 51:13
  57:20 76:14

asking 6:14
  11:7,8 40:25

assigned 20:19
  28:8,10,16
  42:7

assignment
  10:7 18:10,11
  25:14 28:2
  32:23

assignments
  32:11

assistance
  84:12

assume 14:3
  36:16

assuming 44:19
  59:8

attached 77:11

attorney 8:3
  82:11
  84:10,14

attorneys
  82:13

audited 51:25

AUGUST 83:17

authored 70:2

authority 83:5

authorized
  82:7

automatically
  22:19 77:8

avoid 6:9

aware 24:2
  25:1 32:24
  34:23 37:12
  45:4,7 59:5,7
  65:14 74:4,14
  76:19 78:25
  79:3 80:25
  81:4

─────────
        B
back 9:7 12:10
  14:24 44:4,12
  46:12,19 64:6
  67:17
  71:11,17

background 8:7
  12:10
  15:13,14

base 70:15

based 47:13
  68:20 79:10

basically
  21:12,23 22:1
  35:3 37:1
  46:21 57:19
  59:1 60:21
  65:10

BEACH 82:3
  83:3

became 13:13

because 6:25
  16:10 22:10
  23:4 31:16
  35:7
  43:14,21,25
  44:6,18 48:17



49:3 50:5
52:19 62:9,15
67:2,4,12,19,
20,24
68:5,8,15
70:2 75:10

**become** 8:23
13:11

**becoming** 30:23

**before**
6:1,2,14 12:9
13:14 16:4
19:1,18 23:16
29:1 31:20
38:15 46:18
47:20,24
50:21 52:6
56:1 58:22
59:14 83:6

**behalf** 1:16
2:2,7 8:21
10:24 17:5
63:21 74:25
78:9,10,14

**believe**
10:18,22 11:1
20:2 22:14
23:3 26:14
30:21 31:8
32:4 44:12
45:18 55:20
58:24 63:1,24
64:4 77:15
79:2,15

**believed** 45:14

**below** 84:12

**benefit**
42:12,16
44:8,13,15
46:23 48:4,7

49:5 73:24

**Besides** 14:2,8
15:13

**best** 26:16

**better** 6:21
42:3

**between** 43:14
44:1 63:13
78:17

**Bezjak** 1:5
5:11 84:5

**Bisgaard** 2:8
84:3

**bit** 8:7 12:10
15:18 42:21
46:19 70:23
71:17 76:23

**black** 34:5

**blank** 84:15

**block** 34:13

**Bonita**
8:12,13,18

**Bonita's** 8:18

**both** 6:17
76:23

**bottom** 35:12
84:15

**boxes** 34:5

**break** 7:9
11:10

**breakdown** 69:1

**brief** 74:21

**bring** 64:6

**brings** 9:2
16:8

**Brisbois** 2:8
84:3

**broken** 35:19
42:23

**building** 15:3
31:22 70:1

**bulging** 69:12

**bunch** 41:11

**business** 9:25
12:14 15:18

_____

C

**C/O** 84:2

**Calibrated**
9:10

**call** 21:11
25:16 33:18
37:5 51:6
52:7
56:6,9,16,17,
19,24
57:8,9,11
59:13,18,22
62:24 64:15
71:17,18
72:3,6 73:7
74:8 80:6

**called** 5:5
38:16 49:9

**calls** 31:19
41:3 56:13
66:21 72:25

**came** 10:10
18:11 79:23

**can** 6:8 19:20
21:17,19
22:20 23:17
25:16 28:1
29:3,4,10,11

30:8 34:21
37:16,23 38:5
40:13,19
41:4,5
42:6,25 47:17
50:2 51:9,11
52:2 54:23
56:2,14
61:6,7,10,22
64:5 66:23
67:8,9

**cannot** 54:14
77:22

**can't** 6:17
10:15 17:20
21:20 38:23
39:16
40:3,6,8,16
41:1,17,18
42:23 43:2
46:22
48:1,2,3 55:1
62:7
77:19,21,25

**cap** 61:6,7

**car** 16:21

**care** 71:3

**carrier** 22:22
23:5,7,10,20
24:8 25:10
27:17 28:14
32:1 39:1,4,5
41:8 43:13,24
45:23 47:4
48:21 50:8
58:3 66:16
67:3,11,21
69:18 73:17
80:17

**carriers** 8:21



9:21 24:16

**case** 1:3 5:10
8:23 17:22
22:13 23:25
24:1 25:13
28:15 29:22
30:5,8,18
42:15 47:1
48:7,14 59:14
62:2,13,14
68:3 73:12
84:6

**cases** 63:10
64:11

**causation** 53:6
76:11

**cause**
28:9,10,17,20
29:15,21
30:3,9 44:7
53:8 54:14
55:13,15
57:21,22 60:7
67:11,15,19
68:15 73:23
75:8 76:11
80:11

**caused** 35:15
38:3,20 40:6
41:25 42:1
45:10 47:21
48:3 53:8
68:4

**causes** 40:9
60:17

**Cc** 84:24

**certain** 41:20

**certainly**
23:17 30:2

**CERTIFICATE**
82:1 83:1

**certify**
82:6,10 83:5

**chain** 58:22
59:1

**chance** 58:6

**change** 21:13
22:13,16 24:7
79:1
85:4,6,8,10,1
2,14,16,18,20
,22

**changed** 80:15
81:3

**changes** 23:1
24:5 79:3
85:2

**chatter**
34:23,25
41:12,14

**chip** 35:5

**chipped** 34:22
35:11 36:9,19
39:15 40:20

**Christopher**
21:1

**Cindy** 2:8 3:5
59:16 74:24
84:2

**CINDY.CUMBERBA
TCH@LEWISBRIS
BOIS.COM** 2:10

**CIRCUIT** 1:1

**Citizens** 9:22

**City** 12:15

**claim**

5:14,19,22
9:1,24
10:9,11,15
11:4,6,13,15,
23 12:1
18:4,16,24
19:3,25 21:13
24:4,23,24
25:9 28:8,21
29:13 30:15
49:20
50:19,23
52:10
59:5,11,14
61:19 62:4
68:6 73:14,19
75:21,22
76:12,15,16,2
1,25 77:4
78:5 79:6,12

**claimed** 23:5
31:13

**claiming** 54:25

**claims** 8:12,18
10:22,24
11:4,13,16,18
,19 12:13
13:20
16:11,12,25
17:3,4 24:14
27:22
49:17,21
54:17 55:10
56:8,12,25
57:4,18 58:2
59:2 60:17,25
61:20
62:18,19
63:20
64:2,8,16
72:11,23,24
73:10 74:8

76:1 78:18
80:3

**clear** 32:15
50:4 70:8
78:8,13

**clearly** 70:14

**Clerk** 84:14

**close** 44:24
70:19

**closer** 27:24

**collect** 26:12

**college**
14:22,23

**color** 53:19

**come** 13:17
42:13 44:25
55:13 60:7
66:17 71:10

**comes** 10:7
36:24 77:13

**coming** 65:19

**comment** 29:15
57:24 69:24

**comments** 53:6
69:8,10

**Commission**
83:17

**communication**
21:8

**companies** 8:19

**company** 1:9
5:11,18
8:12,15 12:11
43:6,9
45:13,17
50:19 66:4



75:1

**compensated**
60:25

**competency**
7:19

**complaints**
15:6

**complete** 42:13
82:9

**completed** 31:3
45:22 77:7

**completely**
41:8

**comply** 41:21

**computer** 5:23

**concept** 34:23

**concerned**
66:10

**concluded**
81:11

**conditions**
69:6

**conference**
80:3

**connected**
82:13

**considered**
27:16

**consistent**
25:6 41:14
60:1,6 80:6

**constant** 69:22

**construction**
12:14

**Consultants**
9:11

**contact**
19:3,14 74:6
84:11

**contacted**
30:25

**contacting**
84:10

**content** 11:8
59:17 80:5

**contents** 18:2

**context** 68:20

**continue** 12:9
75:4

**continuing**
15:10

**contracting**
14:4,8 15:13

**contraction**
45:15

**contractor**
12:16,18
14:6,11 30:25
31:4,16 46:5

**contractors**
46:1

**contracts** 8:19

**contribute**
42:24 43:3

**conversation**
46:4
58:9,14,15
59:25 62:15
72:14 80:1

**conversations**
45:25

**copy** 18:23,25

**corner** 34:22

35:5,7 36:9

**corporate** 30:1

**correct**
5:14,15,22
13:5 16:3
17:9,10
20:16,17 22:3
24:8,10,21,24
25:7,8
26:1,17
28:17,18
31:13,18 32:6
33:14 38:2,19
39:14,18 42:7
43:1,4 44:2,3
47:4,23 48:18
49:13,18
50:7,10,15,16
,19,23
51:3,13,17,18
,20 52:11,12
53:3 54:12
55:6,7,10,21
57:6,15 58:23
59:3 61:4
62:6,12
63:3,4 64:23
65:2,12,16,17
,24,25
66:5,8,13,14,
17,18 67:5
68:3,9,16,23
69:1,7
70:4,16,17,21
71:7,8
72:11,20,21,2
4
75:17,18,23,2
4
76:8,9,12,13,
22
77:12,13,17,1

8
78:6,7,11,14,
15,23,24
79:24
80:3,4,7,12,1
3,17,22 81:5

**correspondence**
78:17

**cosmetic**
37:8,13

**could** 18:15
20:4 21:3
22:14 28:9
29:16 30:3
38:22 44:16
48:10,12,22
55:14 71:21
75:8,10,12,14
81:2

**couldn't** 41:24
42:13
43:13,24 44:6
47:21 49:3,4
60:7
67:4,11,19
68:15 75:18
80:11

**could've** 81:3

**counsel** 2:1
17:15,16
54:24 74:25
82:11,13

**COUNTY** 1:2
82:3 83:3

**couple** 7:17
40:14 44:18
58:8 59:10
64:19

**course** 9:19



Court
  1:1,19,24  5:9
  6:8,11,16
  10:19  21:3
  25:19  26:12
  51:2,3
  55:20,21
  82:5,21
  83:7,16
  84:14,18

coverage 28:5
  32:2,6,9,11
  42:5,8  44:8
  47:2,13,15
  48:8,11,21,25
  49:6,7
  76:15,20  79:9

covered 41:25
  47:9  73:20

crack 37:11
  45:10

cracked 36:18
  37:5  38:11
  40:14,23
  42:23
  53:9,13,18,21
  ,23,25
  54:2,4,5,10
  58:19  60:3

cracking 35:5

cracks 36:25
  37:1

create
  18:3,12,13,15
  51:13,21
  52:19

created 17:25
  18:3,19  52:14

credits 15:11

CROSS 3:4
  74:22

CUMBERBARCH
  49:23

Cumberbatch
  2:8  3:5
  11:5,17  27:25
  28:22  29:2
  37:10  41:3
  42:6,17,25
  47:17  49:19
  50:1,4  52:2
  54:16,23
  56:13  59:15
  61:22  62:11
  64:3  66:21
  72:25  73:22
  74:7,17,19,21
  ,23,25  79:15
  80:21  84:2

CUMERBATCH
  29:23

current 8:8
  15:10,18

currently
  15:22

cut 6:25  43:17

———————

D

Dagne 1:24
  82:5,21
  83:5,16  84:18

damage 28:3
  29:19
  30:11,12,14,1
  5,17  33:16,17
  34:9  35:23
  36:6,21,25
  37:3,8,9,16
  38:5,22

39:16,25
  40:13,16
  41:1,9  42:24
  43:3  45:1,8
  47:9,21,22
  49:4  60:2
  65:22,24  67:1
  69:20
  75:9,11,15,19
  ,23  76:5
  78:21  79:5

damaged 36:24
  41:2

damages 31:13
  35:16  39:5
  43:7  44:7
  45:14,18
  48:15,18
  49:17  50:15
  51:22  52:8,11
  53:6  57:19
  60:5  62:7,10
  66:20  70:6,7
  71:2  80:10

date 23:22
  25:1
  27:8,9,10
  43:15  44:1
  56:10,19  84:1
  85:25

Dave 20:5,19
  21:20,23
  23:25  24:4

day 9:16,18
  13:4  56:7
  82:15  83:8,9

days 84:13

deal 63:19

dealing 7:18

Dear 84:7

dec 18:13,16
  32:2  47:3

decide 29:4
  50:2  74:12

decision 47:13
  48:11,21
  49:3,7  54:23
  65:1

declarations
  18:12

deem 47:8

defect 69:3

defective
  69:15

Defendant 1:10
  2:7  50:6
  54:18

Defendant's
  30:1

Defense
  17:15,16
  74:25

deferring
  49:12

definitely
  28:12,13  30:6
  80:20

definitively
  30:17  49:4
  75:14

delay
  67:2,4,12
  68:9

delayed 27:16

denial 4:8
  59:9,11  63:6



64:22 73:13

**denied** 58:3
59:3,6,14

**deny** 60:16

**depending** 7:6
61:9

**depo** 5:18
50:17

**deposed**
16:4,19

**DEPOSIITON** 4:3

**deposition**
1:15 5:1
6:1,4 17:12
25:20 26:3,13
29:25 46:16
71:15 77:17
81:11,12
84:9,10,11,13

**DESCRIPTION**
4:2

**design** 39:6
69:16 76:7

**desk** 19:7 21:1
28:4 49:12
54:15 71:5

**detail** 25:14

**details** 18:10
27:2

**deterioration**
39:9 43:10
66:3,13 68:23
76:6

**determination**
32:6,9,12
42:13 48:2,25
55:14,15 60:7
75:22

**determine**
19:24
28:5,8,9,16
29:14,17,21
30:3 35:15
39:25 41:24
43:13,24 44:6
54:14
67:1,4,11,15,
19 68:15
75:8,11,12
76:11 79:9
80:11

**determining**
47:2

**diagram** 54:8

**didn't** 7:2
12:3 14:1
15:5 18:12,13
19:13 21:14
24:7 29:18
30:13
31:6,16,25
35:22 38:4
39:3 41:10
43:8 44:9
48:14 51:23
52:17 53:7,8
64:24 65:6
66:6
68:4,16,17
69:6,8,21,24
70:2,9 77:11
80:20

**difference**
6:16

**differences**
22:22

**different** 9:20
53:19

**differently**
27:23

**difficulties**
6:24

**digital** 5:23

**digitally** 82:7

**direct** 3:3 5:7
10:12 19:10
21:8 23:25
55:4,5

**direction**
11:3,9,14,22
23:24

**directions**
11:12

**directly** 12:3
20:25 74:5

**disagree** 53:3

**disciplinary**
15:7

**discuss** 21:15

**discussed**
14:10 58:14
74:11 75:2
80:14

**discussing**
58:17 75:16

**discussion**
46:14 71:13

**distances**
16:11

**divorce** 16:21

**document**
26:5,25 28:3
33:23 37:1
51:7,10,12,15
54:17 57:19

75:23 78:21

**documentation**
5:17 48:20
66:11

**documented**
60:5 71:2

**documents**
5:19,20,22
10:14
17:13,18,25
18:2,17,18
19:2
26:8,12,16
77:9

**doesn't** 34:6
63:17

**DOLLAR** 4:6

**done** 58:12
73:14

**don't** 6:19
7:18 11:20
14:6 18:1,25
19:4,5,12,15
20:1 21:10
22:9,24
23:4,11,14,16
25:11 27:5,10
29:6 31:8
32:4 33:17
34:16,19
37:15
40:8,21,22
42:18 44:11
45:3,9,12
47:21 51:6
52:18,25
53:20
56:3,10,16
57:10 58:24
59:16,17,19,2



4 64:18 65:2
72:4,13,15,16
73:8,11
74:4,14 77:18
78:3,4,19
79:15 80:18

**doubt** 42:12,16
44:8,13,16
46:23 48:4,8
49:5

**down** 6:8,11,17
11:11 35:2
36:2 38:14
60:20 63:14
68:19

**draft** 49:17
50:10,11

**drafting** 64:23

**driveway** 44:19

**drugs** 7:24

**duces** 6:4
25:21

**due** 30:12,15

**duly** 5:6 83:8

**during** 9:19,24
11:25 17:25
32:19 34:2
76:1

**dust** 70:1

**duties** 46:20

———————
E
———————
**earlier** 73:24
74:11

**ears** 65:15
71:5

**easiest** 15:25

**education**
14:20 15:11

**either** 7:12
18:19 20:11
40:17 48:11
66:8 68:17
76:7

**elevations**
32:21 33:18
34:10

**else** 17:20
18:7 19:15
20:10,21 21:6
31:20 57:8
65:11 74:3

**e-mail** 21:12

**e-mails** 21:17

**employed** 8:17
9:25 57:15

**employee**
82:11,12

**employment** 8:8
9:20

**end** 9:15 13:2
17:1

**ended** 73:13

**engineer** 14:15
32:24 33:4
65:4

**engineering**
15:3,14

**entered** 25:22
26:11,21
33:21 51:4
55:22 63:7

**entire** 76:16

**entries** 23:19

**ERRATA** 85:1

**errors** 24:6

**especially**
16:10

**Esquire** 2:3,8
3:3,5,6
84:2,24

**essentially**
55:12 61:2
72:10

**established**
50:21

**estimate** 4:6
18:7 28:6
48:12,15,18,2
2,23 49:13,17
50:7,10,12,13
,14
51:7,8,16,21
52:8,11,20
53:3 57:20
58:18
61:3,10,14,15
,17,21,24
62:5 63:15
76:24,25
77:1,2,4,7,12
80:10

**estimation**
16:14

**ethical** 41:20
42:2,10 46:20
47:14,25
60:12,13
73:16

**every** 73:2

**everything**
18:5 71:2

**evidence** 69:22

**exact** 56:10
64:1

**exactly** 10:9
16:7 17:2
18:14 33:5
36:18

**EXAMINATION**
3:1,3,4,6 5:7
74:22 79:19

**examiner**
10:14,15
19:5,7,8
20:2,3
21:24,25

**exceptions**
70:15

**exclusions**
70:14,15

**exclusively**
24:17

**excuse** 49:20
76:24 77:6
79:11

**exhibit** 4:2
25:19,22
26:5,7,19,21,
24 33:19,21
51:1,4,25
55:20,22
63:6,7
64:6,22 76:24
77:15

**EXHIBITS** 4:1

**existing** 70:6

**Exp** 83:17

**expansion**
45:15

**expert** 76:10



**expulsions**
15:7

**extend** 42:5
44:8

**extended** 47:15
48:9 49:6

**extensively**
75:7

**extent** 7:25

**exterior**
31:13,18
32:20 34:9

**eyes** 65:15
71:5

———————
F
———————

**fact** 36:12
38:13 47:14
68:14 69:5

**factors** 79:10

**factual** 60:17

**failure** 27:17

**fair** 12:24
13:1 17:7
33:2,6 39:22
46:3 54:3
60:10
61:11,13 62:4
65:13 66:15
70:13 72:8,17
73:19 75:10
76:18 80:24

**Family** 1:8
5:11 24:20
50:19,22 55:9
66:4 75:1,2,5
76:5 79:8
84:5

**far** 21:10 22:3
24:22 40:20
52:4 55:11
57:16 58:18
64:25 65:13
66:10,14
71:19 80:24

**fashion** 75:4

**fastened** 40:10

**faulty** 39:5
69:15 76:6

**fee** 61:1,25
62:2

**feel** 70:24
73:13

**fees** 60:22

**felt** 75:20

**few** 9:23

**field** 4:5 5:13
9:25 12:2,3
33:20 61:9

**file** 29:7 71:3

**filed** 26:4
84:14

**financially**
82:14

**findings** 17:20

**fine** 56:3

**finish** 6:14
7:13,14

**Fiocati** 1:15
3:2 5:1,4,12
11:11,20
25:25 26:2
28:25 46:17
49:25 50:6
51:9 54:21

55:25 71:16
74:12 81:7
83:6 84:1,7

**Fiocato** 84:23

**firm** 2:3 29:2
65:20

**firms** 8:21,22
9:9,20 17:5

**first** 4:4 5:5
10:2 25:12,17
26:20 27:1
79:21

**FKS** 8:19
9:12,13,14
10:1,5,10,12,
12:1,9
17:4,6,8
19:3,8,9,11
20:12,15,21
22:9 24:13,16
28:4 32:24
41:8 52:23
55:5,8,12
56:6 57:6,15
62:16
63:11,21
64:16 65:19
67:3,11,17,21
69:19 72:10
73:9 74:3
78:9,10,14,17
79:23 80:2

**FL** 84:4

**Florida**
1:2,19,25
2:4,9 8:13
12:18,21,25
13:4,7,11,23
15:11 31:7

48:1
82:2,6,22
83:2,7,16

**follow** 70:25
72:19

**following** 85:2

**follows** 5:6

**follow-up**
74:18 79:17

**foot** 45:18

**foregoing** 82:8

**forget** 38:16

**forgot** 29:11

**form** 27:25
29:23 37:10
42:6,17,25
47:17 52:2
56:13 61:22
62:11 64:3
73:22

**forward** 23:7
54:14

**forwarded**
23:20 28:12
84:14

**found** 24:6

**four** 36:13

**Friday** 84:12

**from** 5:19,22
6:4 10:5,10
11:9,14,15,22
12:14 13:17
20:21,24 21:6
23:24 38:14
47:3 50:8
55:5 61:25
65:19 66:17
67:2 74:3



79:23

**front** 53:16,17

**Frontline** 9:22

**FSIC** 24:9,10

**full** 31:7

**functionality**
37:13

**further** 54:15
63:14 74:16
81:6 82:10
84:12

**furtherance**
5:18

---
G

**garage** 53:19

**gave** 14:6
52:24 84:9

**general** 11:19
14:4 18:6
46:8,18
49:9,11 53:5
54:9 60:3
65:10

**get** 6:2,25
10:7,8 19:1
22:19
23:13,14
25:14 46:18
61:3 62:8

**gets** 77:7

**getting** 8:17
71:2,5

**GG** 83:17

**give** 9:5 18:5
29:18 38:4
42:11 44:7
53:7 55:1

57:24 58:6
69:8,10,24
70:9 71:9,10

**given** 6:1
42:16
44:13,16
49:2,5
55:4,16,17
63:3 70:20
73:16 78:21

**go** 5:25 6:1,4
7:7,10 8:7
9:4 11:18
12:10 14:1,22
15:17 16:14
18:1 21:15
34:20
46:18,23 48:4
63:5 64:21
65:3,4,7,11
71:17 74:8
77:8,9

**goes** 10:14
21:24,25 42:3
46:22 61:25
62:9 66:1
69:16 77:8

**going** 5:25
6:1,3,4,15
8:6 9:7 11:12
24:3 25:20,24
31:17 33:19
36:2 39:11
42:20 43:20
44:4,17 49:15
53:14 55:25
56:6 58:2
59:2 60:16
67:17 73:2

**gone** 38:25
48:8 73:18

**good** 9:2,6
16:8 46:13
60:21

**gosh** 15:1

**grab** 46:11

**graduate** 14:21

**ground** 6:2 8:6

**guess** 11:10
13:2 16:9
20:20 22:9
25:16 27:20
34:12 37:2
42:9,20 44:15
46:3 61:2

**guidelines**
41:20 42:2,10
47:15
60:12,14

**guys** 16:12
17:21

---
H

**had** 5:19 12:13
13:15,24
17:18 19:17
20:11,22
23:1,3,20
24:8 28:25
29:25 30:2
32:1 46:4,19
47:12,20,24
49:8,15 52:6
54:4 58:9,16
61:14 62:15
64:22,25
72:14 73:9
80:1

**hand** 34:5
82:15 83:9

**handle** 11:3
13:20 17:3,4
24:16
27:22,23 73:4

**handled** 16:25
62:14,19
63:16 75:21

**handlers** 71:3

**handles** 64:17

**handling** 10:24
11:18,19
19:11,25
24:14,23,24
49:21 50:23
54:15,17
72:10 73:10
74:8 78:5,18

**handwritten**
5:23 17:14
18:8

**happened**
43:13,25
67:1,4

**happens** 7:2

**hard** 44:15
76:3

**has** 18:6 25:15
27:1,9 81:13
84:13

**have** 5:16,19
6:24 7:5,17
8:14,19,25
9:16 10:11
12:1,5,17
14:3,6,8,9,10
,17
15:2,14,20
16:4,17,19,24
17:8,25



18:3,6,8,9,10
,18,22,23,25
19:2,16,24
20:23
21:1,7,8,10,1
5
22:12,15,23,2
4 23:1,4,24
24:7,23
25:3,6,11
26:2,8,20
27:5
29:7,8,21
33:17
34:4,6,12,19
36:12 37:15
40:5,8,21,22
41:21 43:21
44:5,13,16
45:9,25
46:4,5 47:15
48:8,9,10,12,
25 49:5 52:7
53:16,18
54:22
56:1,3,7,10,2
0 59:10,21,24
61:5 63:15,16
64:1,16,20
66:17 68:11
70:1,18,19
72:15,22
73:13,19
74:16,17
75:25
76:1,15,20
77:2 78:5,16
79:9,11,12,15
,17 80:18,25
81:2,3,6
**haven't** 14:10
16:18 80:16

**having** 5:5
**he** 11:8
21:17,22
22:7,8
23:9,25 24:6
**head** 6:10
56:21
**hear** 7:2,21
8:1
**held** 46:14
54:18 71:13
**help** 29:20
**her** 11:9 17:18
29:2 71:21,23
**here** 5:10,16
8:3,5 13:15
23:18 25:25
29:3
34:11,13,21,2
2 35:12,14
36:2,20
37:3,23
38:11,14
39:16
40:3,12,14,16
,19,20
41:11,12
42:10,20 48:1
53:1 58:6
60:20 64:7,22
65:4 68:19
69:5,11,14,17
74:25 78:22
79:4
**hereby** 82:6
84:20
**here's** 34:22
**Heritage** 9:23
24:18

**he's** 22:7
**high** 14:21
61:14
**highest** 14:19
**highlighted**
35:11
**him** 11:7 21:16
44:16 49:23
54:19 74:10
**hip** 38:17
39:12
**his** 20:6 21:21
**HOLLYWOOD** 2:4
**home**
13:9,11,13
15:20 31:24
**hour** 46:10
**house** 32:21
33:16
44:24,25 45:2
71:5
**hurricane**
12:22 25:7
27:22 30:12
34:12,15
43:15 44:1
49:16 59:2

—————————
I
—————————
**I'd** 8:25 12:2
51:1 68:18
81:9
**idea** 45:10
64:20 66:19
**ideas** 38:3,20
**I'll** 6:20 7:3
9:5 16:7 18:5
19:4 54:19

59:9 62:23
64:6 74:10,21
78:13
**I'm** 5:25
6:1,15 7:11
9:13
10:7,9,13
11:7,8 12:14
16:7 17:1
18:7 20:19
22:10,18,19
24:2 25:20,24
26:23 29:10
31:1 33:19
40:11
43:17,20
44:17,19
47:19 50:14
52:1,4
53:14,22
55:14,24
56:22 58:13
59:7 61:12
62:21 63:9
66:4 67:6
68:10 71:23
72:1 73:15
74:4,14 79:3
**imagined** 32:25
**immediate**
19:14
**impact** 34:15
**impressive**
18:15
**inability** 67:1
**inadequate**
69:15
**INC** 1:9
**incentive**



61:14

**inception** 70:8

**included** 26:7
79:4

**Including** 80:9

**Incorporated**
8:13

**independent**
5:13 8:9,20
9:8 12:2 33:7
65:20

**INDEX** 3:1 4:1

**indicate** 20:24
27:8 30:11,14
34:8 35:18,22
36:5,24 37:3
38:25 41:7
53:9 54:9
64:25 65:18
66:1
67:14,18,20
69:18 70:5

**indicated** 29:1
30:2 36:20
43:6,9 49:12
50:10 59:22
66:7 67:18
68:22,25 69:4
79:23

**indicates** 59:1
65:21

**indicating**
23:19 60:2
66:12

**indication**
24:3,4

**industry** 16:20

**influence** 7:24

**information**
11:6 22:2,3
25:11,16
27:2,4
28:11,23 32:3
34:19 54:25
77:5 84:12

**inherent** 69:6

**initiated**
71:17

**input** 20:21

**inputted** 20:11

**Ins** 84:5

**inspect** 16:12
32:16 65:20
70:2

**inspected**
32:20,22
39:24 43:15
76:1

**inspecting**
65:22 66:20

**inspection**
17:19,20
29:24
31:2,3,5,10,1
2,20 32:19
34:2 44:1
45:20 46:6
65:19 68:8

**instance** 34:21

**instruct** 49:23
54:19 57:17
74:10

**instructed**
28:19 29:14
36:23 37:4
48:17,19
49:16

52:19,22
54:13
61:15,16
67:21 72:9

**instruction**
52:24
55:4,5,9
67:17,25
72:18

**instructions**
55:3 60:10,13
67:22,23
70:20,24,25
72:19 74:2,6
78:21

**insurance** 1:8
5:11,17 9:10
10:1 13:20
16:20 24:20
43:6,9,24
45:13,17
50:19 55:9
66:4 69:18
75:1

**insured**
42:4,12,16
44:8,14
46:1,23
48:5,8 49:5
73:25 75:16

**Insureds** 31:6

**interchangeabl
y** 75:2

**interested**
82:14

**interior**
70:1,3

**interlock** 35:8

**internet** 7:6

**into**
11:11,12,18
18:1 19:1
24:3 25:23
26:22 28:4
33:22 46:18
51:5 55:23
62:8 63:8
69:16

**introduce**
55:19

**introduced**
10:17 76:24
77:14

**investigation**
68:7

**invoke** 50:3

**involved** 8:24
20:25
30:20,23

**involvement**
17:7 45:24
59:10 64:23
65:1

**Irma** 12:22,23
25:7
27:12,15,22,2
4 29:19 30:12
34:18 43:15
44:1 45:8
49:17
56:8,12,25
57:4,18 58:2
59:2 61:19
62:19 63:20
72:23 80:3

**irrespective**
75:20

**isn't** 19:20



42:1 61:5

**It'd** 18:15

**items** 51:17

**it'll** 58:19
  77:8

**its** 24:20 58:9
  71:25

**it's** 5:12
  10:18 15:20
  16:13 20:5
  23:3,5 26:25
  28:15 33:23
  35:8,25 36:18
  37:12,13
  38:9,15,16,17
  41:6,16 44:15
  52:13 55:1
  56:17 61:1
  71:19,25 73:2
  76:3,23

**itself** 59:14

---

J

**Jackson** 2:9
  84:3

**January** 1:17
  5:2 82:15
  83:8,9 84:1,8

**John** 2:3 3:3,6
  84:24

**JPEG** 18:9

**JTOLLEY@WHISLE
  RLAWFIRM.COM**
  2:5

**JUDICIAL** 1:1

**Julika** 20:13

**J-U-L-I-K-A**
  20:13

**June** 23:8,23
  32:18 34:2

**junior** 14:23

**just** 6:20
  7:2,6 9:4
  11:8,21 12:2
  14:1 16:13
  17:14,18 22:1
  24:12 29:24
  32:13,14
  34:22 35:25
  36:25 39:13
  43:20 44:17
  47:14 48:19
  49:2 50:23
  52:4 53:18
  55:16 56:20
  58:12,17
  59:17,22
  60:2,11,16
  63:17 64:6
  68:4 70:14
  71:2,4
  75:10,23
  78:13 79:17

---

K

**Kansas**
  12:14,15

**keep** 36:1
  39:11 40:25
  42:19 44:17

**Kendall**
  10:18,21
  19:13 56:6,11
  57:5,11,14,17
  58:16 60:1
  62:16 71:18
  79:23 80:2

**Kendall's**
  58:10

**Kevin** 73:6

**kind** 14:1
  21:16 27:16
  28:13 41:12
  42:2 50:18
  71:3 76:23
  77:1

**knew** 28:11
  30:6 33:6

**know** 6:7,23
  7:6,13,14 8:8
  9:4 10:2,13
  11:21 12:11
  14:24
  16:10,11,13,2
  1 17:18,23
  19:5,12,15
  20:1 21:10,19
  22:2,9,17,18,
  24
  23:6,11,13,15
  ,22 24:22
  25:9,11 27:10
  28:2,6,12
  29:2,3,7
  31:8,21 32:20
  34:16,17
  38:24
  39:19,22
  40:25 41:5,19
  42:15,18
  44:4,11 45:12
  46:2,7,19,21
  47:1,7,14,21
  48:10
  50:11,17
  52:4,18,24
  53:20 54:6,7
  55:11
  56:3,10,16,21
  ,23
  57:8,16,20

**Kevin** continued...

58:5,12,18
  59:7,8,17,18
  60:21,24
  62:3,10
  63:18,20
  64:7,14
  65:2,3,14
  66:14
  68:4,17,20,21
  70:23 71:3
  72:4,9,15,16,
  23
  73:6,8,9,12,1
  6,19,21 74:4
  76:4 78:3,4
  79:22
  80:10,18

**knowing**
  73:12,18

**knowledge** 77:3
  78:16

---

L

**lack** 42:3
  66:2,12

**ladder** 44:21

**lag** 6:25

**language** 68:20

**large** 62:10

**last** 7:20
  21:3,21 30:1
  71:21,23
  80:14

**late**
  27:18,19,21
  49:16
  56:8,12,24
  57:3,18 58:2
  59:2 61:19
  62:19 72:23



80:3

**latent** 69:3

**later** 27:20
63:23 64:12

**LAW** 2:3

**leakage** 69:23

**learn** 31:23

**least** 36:12

**LEE** 1:2

**left** 53:17
54:1

**legal** 55:1

**length**
43:14,25

**less** 62:22

**let's** 8:5
9:10,22 11:10
20:13 25:18
34:20 42:19
46:9,10 71:10
75:7

**letter** 4:8
59:9 63:6
64:22 68:21
84:15

**level** 14:19
61:9

**Lewis** 2:8 84:3

**license** 13:16
14:4,6,8,11
33:3

**licensed**
12:15,17
13:6,14,22
14:2,14,17
32:24
33:11,13

41:20,22
47:7,25

**licenses**
13:23,24
14:5,7,9,12
15:8

**licensure**
42:11 44:5

**limited** 61:9

**line** 49:2
51:17 78:20
85:3

**list** 18:5

**lists** 69:15

**little** 8:7
12:10 15:17
34:5 42:21
46:19 70:23
71:17 76:23

**live** 31:6

**LLC** 1:5

**LLC/Paul** 84:5

**LLP** 84:3

**log** 18:22,23
19:21 23:17
59:21

**long** 8:14 9:14
33:24 39:23
71:19

**longer** 14:9

**look** 8:25
23:17 25:3
41:12 51:16

**looking** 22:25
23:15 34:7,8
37:16,20
38:13,15,24

39:12 40:5,12
41:11 44:12
47:8 51:15
57:2 70:13

**looks** 21:11
27:1 34:3
36:12 37:24
38:14 40:13
61:19

**loss** 4:4 9:11
18:6
25:2,13,17
26:20
27:1,2,8
28:9,10,17,20
29:15,16,21
30:3,9 32:17
46:8,18
49:9,11 53:5
54:8,9,14
55:13,15
60:3,8,17
67:12,15,20
68:15 75:8
76:11 80:11

**lot** 27:4 37:23

**loud** 6:8 56:21

**Louisiana**
13:25 14:13

———————
M
———————
**Madam** 5:9
10:18 25:19
51:2 55:20

**made** 24:5
31:19 45:4,7
48:21 62:3

**mail** 10:8

**mainly** 22:2
29:24

**maintenance**
66:2,12 69:17

**major** 14:24

**make** 32:6,9,15
40:7 43:21
47:13
48:1,11,25
49:3 53:6
54:23 70:7,24
75:22 84:11
85:2

**making** 35:2
49:7 55:8
66:16

**manager**
10:22,23,24
56:6 57:6
79:24 80:2

**managerial**
12:6

**managers** 62:16
72:3,19

**many** 16:6,24
51:24 53:12
58:19 62:18
64:15,16 73:9
75:25

**mark** 25:20
26:19 33:19
51:1 63:5
77:6

**marked** 26:24

**marring** 43:10
68:23

**Marvin** 1:24
82:5,21
83:5,16 84:18

**materials**



69:16

**matter** 8:24
10:6 18:20
19:11
20:12,22,25
21:15,22 25:2
30:24 32:5
44:14
47:12,16 49:1
50:9 54:7,19
55:12 77:9
84:9

**maximum** 63:15

**may** 9:6 10:4
27:9 29:23
30:21 77:10
79:11 81:2
84:10,11,14

**maybe** 6:25
13:25 16:21
31:10,15
48:10

**me** 6:14 7:2
9:4 15:2,17
22:10 24:12
27:11,14 28:7
36:8 37:7
38:10 39:11
40:25 41:13
42:21 44:18
47:3,6 49:20
56:2 57:4
58:12 63:19
64:21 65:23
67:7 70:7
71:9,10 75:13
76:25 77:6
79:11 83:6

**mean** 12:4
19:7,8 28:12
30:6 53:8

57:23
60:11,16,17
67:24 73:4,5
75:5,12

**means** 32:8

**mechanical**
39:6 69:1

**mechanically**
40:10

**medications**
7:20

**mention** 55:2
70:9

**mentioned**
14:12 19:17
70:11

**merely** 54:8
60:2

**Merritt** 21:1,9

**M-E-R-R-I-T-T**
21:5

**message** 4:7
55:24 56:5
57:2 58:7,21
59:1 60:11
77:14,16,20,2
3 78:1,4
79:22,23

**messages** 56:1
58:15 80:5

**met** 17:19

**middle** 7:11,12
38:13

**might** 7:5

**mine** 34:6

**minimum** 61:25
62:1

**Minnesota**
13:25 14:12

**minutes** 59:10
71:10

**missing**
53:10,13
54:4,10 60:4

**Mississippi**
13:25

**Missouri** 14:4

**moment** 58:7

**Monday** 84:12

**money** 61:3,10

**month** 56:20
72:16

**more** 21:16
35:25 36:15
37:20,23
40:13 42:10
48:24 61:2,3

**morning** 7:21

**motions** 29:7

**move** 7:14 35:2

**moved** 13:15
14:7

**much** 8:6 9:5
17:20 33:7
61:6,7 63:14

**multiple** 53:17

**my**
5:12,19,20,23
6:20,25
7:3,22
8:1,12,25
13:13 14:6
15:20
17:13,20

18:6,7,8,9
19:14 21:16
25:3,24 28:2
32:11 37:2
42:9 45:22,24
48:24 50:4
53:14 57:14
61:8 67:6,13
74:24 79:14
82:9,15 83:9
84:20

---
N
---

**name** 9:23
10:17 21:3,21
52:13,16
66:11
71:21,23
74:24 77:10
84:15

**named** 57:5

**names** 9:9 18:2

**near** 63:14

**necessary**
84:10

**need** 7:9 8:7
9:3,5
16:1,9,13
31:16 56:2
67:7 81:8

**needed** 22:13
28:6

**negative** 6:12

**never** 14:14
32:25 33:2,12
43:5,9,11
62:8
65:4,7,11
66:3,7 67:3
68:11,22,25



69:3,4 70:2

**news** 60:21

**next** 7:17
45:21 56:7
66:25

**night** 7:20

**no** 1:3 7:23
8:2,4 12:8,19
13:21
14:7,9,16,18
15:1,5,9,16
16:18,23
17:23 20:23
24:2,15 25:4
27:4,6 29:18
30:10,13,16,1
9 31:25
32:7,8,10,13
34:10,19
35:17,20 36:7
37:2,18
38:4,6,21,23
39:3,7,10
40:4,8,18,21,
24 41:10
43:16,18,23
44:9
45:6,9,12,16,
19 46:2 48:16
50:7,13,15
51:17,19,23
52:25
53:2,7,15,22
55:17
56:21,22
57:10 58:4
59:7,8,12,24
61:12,14
63:12,17
64:18,20,23,2
4,25 65:6,9
66:6,9,11,24

67:7
68:4,5,13,24
69:2,4,9,13,2
1,24 73:11
74:16 76:17
77:2,8,21,24
78:2,12,15,19
80:23 81:6
83:17 84:6
85:3

**nobody** 31:4

**nodding** 6:9

**non** 47:9

**non-resident**
13:14

**nor** 82:11,13

**not** 10:7,9,13
11:7 12:25
16:7 17:1,23
20:19
22:18,19
23:11 27:10
28:16,23
29:1,4,8,14,1
7 31:1,4
32:5,9,10,11,
24 33:11 34:4
36:16 38:16
39:25 40:6,11
41:9 42:24
44:7,10 46:2
47:19 48:17
49:17,20,23
50:1,2,11,12
52:1,4,11
53:20,22
54:1,7,19,24
55:4 56:4
57:20,24
58:22 59:19
60:1

61:12,15,16,2
4 62:5,21
66:16
68:2,7,10
70:14 72:1
73:2,15
74:4,10,14
75:10,11,12,1
4,21
76:5,7,10,19
77:1,15
78:8,14,25
79:3
80:9,10,15,19
81:3,4 82:10
84:9,13

**Notary** 1:25
82:5,22 83:16

**notate** 53:12

**note** 39:4

**noted** 24:5

**notes** 5:24
17:14 18:8,23
19:21
20:10,11,21
23:17,18 24:4
33:17 34:8
45:9 59:21
82:9

**nothing** 11:15
20:23 21:7,10
24:2 31:21
34:10

**notice** 4:3,4
6:3 22:25
25:12,17,20
26:3,20
27:1,17 70:19
84:8

**noticed** 43:10

**notices**
23:13,14

**notification**
10:9

**notified**
22:15,19

**noting** 58:19

**now** 26:19
37:19 40:5
41:19 46:8
47:12 49:8
51:21 59:8
64:10 67:17
73:12 84:9

**nowhere** 63:14

**number** 16:10
21:13
34:11,21
35:12 36:2,15
38:7 53:9
54:1,10 60:3
84:12

**numerous** 54:3

————————
○
————————

**OATH** 83:1

**object** 11:17

**objected** 54:24

**objecting** 29:2

**objection** 11:5
27:25 28:22
41:3 49:19
50:5 54:16
56:13 59:15
66:21 72:25
73:22 74:7

**obligations**
47:25 73:16



**observation**
79:10

**observations**
66:16 70:16

**observe** 44:25
65:23 69:6,22
70:7 79:5
80:20

**observed**
30:12,14 34:9
65:22 66:20
68:22,25
69:3,19 70:5
75:9 78:22

**observing**
36:24

**obviously**
21:14 24:19
26:11 27:15
29:6 33:11
34:4 39:19
41:19 48:4
50:1,18 52:10
53:1 54:6,24
56:24 57:11
58:5 60:11
62:24 64:14
71:6 72:18
79:22 80:16

**O'clock** 46:11

**off** 25:15
34:13 46:14
59:22 71:13

**offense** 7:18

**office** 84:11

**oh** 9:13
15:1,18 21:17
27:13 56:23

**okay**

5:16,21,25
6:5,6,12,13,1
7,18
7:3,4,15,16
8:11,14,17,23
9:5,6,7,14,16
,19,24
10:2,5,11,16,
21 11:16,25
12:9,17,20
13:2,6,9,11,1
6,19,22
14:14,17,19,2
4
15:6,10,13,17
,22,25
16:8,15,16,19
,24
17:7,11,16,21
,24
18:5,13,17,22
19:1,10,23
20:4,8,21,24
21:6,8,18
22:12,15,20
23:4,12,15,22
24:3,10,12,23
25:1,6,12,18
26:7,11,15,19
27:7,11,14,19
,21
28:7,15,19,25
29:10,20
30:8,23
31:6,9,15,19,
22 32:5,8,13
33:2,6,10,15,
19
34:1,4,7,11,1
5,20,25
35:4,7,11,22
36:1,8,12,15,
20,23

37:6,16,19,23
38:3,7,10,13,
24 39:15,22
40:2,12,19,22
41:7,11,17,19
,24
42:9,15,19
43:5,12,20
44:4,10,17,21
,23
45:4,7,10,13
46:3,8,12,13
47:1,6,12,24
48:7,14,24
49:8,11,15,22
,25
50:9,17,25
51:6,12,15,19
,24
52:6,10,13,16
,22 53:5,9,12
54:3,6
55:3,8,12,24
56:5,18,23
57:2,8,14
58:5,11,12,13
,14,21,25
59:5,9,25
60:10,20,24
61:5,13,18
62:4,7,13,18,
24 63:2,5,25
64:5,9,14,19,
21
65:3,10,13,18
66:1,10,15,25
67:2,14,23
68:2,6,11,14,
19 69:5,10,14
70:5,10,13,18
,23
71:9,11,12,16
,21

72:2,5,8,13,1
7 73:3,6,9,12
74:1,5,14,16,
20 75:6,20,25
76:10,14,18
77:3,10,25
78:20
79:4,8,18
80:1,5,9,14,2
0,24 81:6

**Oklahoma** 13:25
14:13

**oldest** 13:16

**on** 1:16 2:2,7
5:10,23
6:10,23
7:6,14 8:21
10:15,24 12:9
15:10,23 17:4
19:5,20 21:21
22:5,7 24:6,8
25:2,16 26:4
27:5,7 28:19
29:15,18
30:20 31:5,17
32:15,18,22
33:18
34:2,5,10,11,
19,21
35:8,12,14,19
,20 36:9
37:11,15,19
38:4 40:20,21
42:4,8
43:6,21
44:12,19
45:1,3,5,10
46:10 47:13
49:16 51:2
52:13,16
53:17,21,25
55:9,17



877.291.3376
www.UCRinc.com

56:9,16,17,24
57:8,9,11,13,
24 58:22
59:24
61:1,9,10,18,
19 62:2,13,24
63:21
64:1,12,15
65:15
66:1,3,11
68:2,20,21
69:8,24 70:9
72:3,6,22
73:7,14
74:2,25 75:9
76:11
78:8,10,14
79:10,25 80:2
83:8 84:8

**once** 6:17 22:4
43:6 48:21
52:5

**one** 9:11 16:12
22:23,24
27:23 28:2,9
31:1,9 35:13
36:4,13 37:24
42:1 47:7,24
50:7,11 52:14
53:7 56:17
57:13,20
64:14 68:17
70:18 73:2,25
75:14,18

**ones** 69:12
73:3

**only** 7:10
17:3,6
22:23,24
31:12,17 46:3
65:14,15

70:18,20 72:9

**opine** 40:19
76:11

**opinion** 29:18
37:15 38:4
40:5,7,8,21,2
2 41:15 53:7
55:16,17
57:24 68:2
69:8 70:2

**opinions** 45:1
69:10 70:16

**opportunity**
26:9

**opposed** 47:9
58:9

**order** 1:19
17:11 83:7

**ordering** 84:14

**orders** 11:21
63:3

**origin**
57:21,22
73:23

**original** 18:9
84:13

**originally**
12:14 64:8

**other** 8:19
11:4,13,16,18
13:23,24
14:3,4,7
15:15 17:5
23:18 24:16
27:2 32:14
35:14,21
40:23
44:24,25 45:2
53:8 56:11

58:16 61:19
62:8,25 63:2
68:18 69:12
72:2,3,5
75:15,19
79:10,11,16

**others** 62:4
73:13 81:2

**our** 10:14
84:11

**out** 6:8 8:7
10:5 30:17
37:16 38:5,22
39:16 40:3,16
41:1,8,17,18
43:17 47:22
48:2 49:4,15
56:21
65:4,7,11
71:6 77:13

**outside** 16:19

**over** 16:7
35:14 49:3
54:25
62:22,23
63:10 64:7
70:14 73:18
76:3

**Overland** 12:15

**overview** 35:25
36:3,4,16
38:8,9

**own** 84:10

**owned** 8:14

_____
        P
_____
**P.A** 2:3

**p.m** 1:17
56:7,11 81:11

**page** 3:2 4:2
18:12,13,16
22:7 32:2
47:3 85:3

**pages** 33:24

**paid** 61:20

**PALM** 82:3 83:3

**paragraph**
34:11 65:3,18
66:25

**Park** 12:15

**Parker** 9:11

**part** 32:11
60:22
67:22,23
80:7,9

**particular**
5:22 11:13
24:1 29:13
35:20 51:24

**parties** 1:18
46:4 82:11,12

**passage** 67:16

**patio** 34:13

**Paul** 1:5 5:10

**pay** 60:21,24

**paying** 61:18

**pendency** 9:24

**people** 56:7

**permit** 31:23

**person** 10:17
19:3,14 20:15
57:5 65:14,15

**person's** 20:18

**phone** 21:11
56:6,9



57:9,11 64:15
71:17,18 74:2
80:2,6

photo 4:5
17:13 18:6
33:20
35:18,20,25
37:17 45:22

photograph
35:12,23
36:2,5 37:20
40:23 54:9

photographing
60:2

photographs
34:7 43:5

photos 18:7,9
28:3,13 34:1
35:21 38:24
42:22 44:18
48:20

phrase 37:4
42:3

phrases 69:17

phrasing 37:3

physical 37:9

physically
5:21

picture 36:18

piece 35:9

pieces 37:25

pinpoint 31:25

place 32:23

Plaintiff
1:6,16 2:2

Plaintiff's
25:22 26:21

33:21 51:4
55:22 63:7

plan 31:4

please 6:7
7:18 21:4
29:10,11 84:8

Pluimer 20:5

P-L-U-I-M-E-R
20:5

plumbing 15:14

PM 84:12

point 9:2
10:16 11:2
16:8 43:12,23
67:10

policy 27:2
68:19
76:16,19
79:11

policy's 70:8

position 12:1
20:6,18

possession
18:18 80:21
81:1,2

possible 19:23
35:6
41:1,6,16

possibly 60:15

potential
28:20

practices
11:19

predate 70:8

prejudiced
68:7,8,12

prepare 17:11
76:25 77:11

prepared 26:15
77:4

preparing 5:18

present
9:16,18 13:3
31:4,16

presented
33:12

pretty 8:5
18:15 33:7
44:24

print 25:15

prior 12:12,24
13:19 26:12
32:23 45:4,7
49:15 77:16

privilege 11:6
28:23 29:3
49:20 50:3,5
54:17,25

privileged
23:5 54:18

probably 24:8
39:23 62:23

problem 25:4
53:15 67:7

procedures
41:21 74:8

proceeding
16:22

proceedings
82:8

product 11:6
28:23 49:20
54:16 74:9

professional
15:8 33:4

prompt 70:19

promptly 27:17
84:15

pronounce
21:21

property 34:9
45:8 65:15,21
66:13 68:8
75:16

provided 5:17
28:11 32:1

providing 6:15

provisions
76:19 79:11

public 1:25
30:25 82:5,22
83:16

pull 31:22
53:14 64:21

pulling 63:9

pursuant 1:19
83:7

put 48:10
52:16

——————————
Q
——————————

qualifications
40:2

qualified
39:24

quarter 56:20

question
6:14,20,21
7:3,11,13
21:16 28:24



29:4,6,9
33:10 37:2
42:9 43:21
47:18 48:24
50:3 56:14
61:23 67:8,9
74:13

**questioning**
49:2

**questions** 6:8
7:17,22 8:1
11:11 58:8
59:13 74:17
79:16 81:7

**quick** 64:6

———————
R

**rain** 69:25

**RE** 84:5

**reach** 16:1

**reached** 10:5

**read** 58:6,7
81:7,10 84:13

**Reading** 81:12

**ready** 58:13

**real** 64:6
68:14

**really** 10:13
19:12 61:13
77:25

**rear** 53:16,25

**re-ask** 43:20

**reason** 7:9
31:15 67:24
68:14
85:5,7,9,11,1
3,15,17,19,21

,23

**reasons** 31:9
85:2

**recall** 23:16
72:5,13
77:16,18

**recalled** 56:24

**receive**
11:2,9,14
25:12 47:3
74:1

**received** 9:1
10:2 11:22
18:20 26:3
27:9 65:19

**recently** 65:19

**recess** 7:10,15

**recognize**
26:4,25 27:3

**recollection**
9:4

**recommend**
65:11

**recommended**
65:4,7

**record** 25:23
26:22 32:15
33:22 43:22
46:15 51:5
55:23 63:8
71:14,22
74:24 82:9

**records** 64:25

**RE-DIRECT** 3:6
79:19

**refer** 9:3

**reference**

68:19

**references**
56:5

**refresh** 9:3

**regard**
24:12,13
27:21 29:13
31:12 33:10
42:11 49:13
53:6 57:17
58:21,25
60:24,25
69:11,25 74:6
76:16 78:18

**regarding** 5:14
11:3 18:3
19:3 20:12
24:1 26:8,16
28:20 29:8
46:4 55:4
56:8,12,17,24
62:19 75:8
76:23 77:14
80:3

**regards** 79:21

**registered**
15:23

**Reiher** 20:13

**R-E-I-H-E-R**
20:14

**related** 17:8
39:1,5
45:1,14,18
70:20

**relationship**
9:17 78:17

**relative**
82:10,12

**remember** 10:15

17:20 19:4,12
23:16 45:3
56:9,18 59:19
71:20 74:15

**remotely** 1:18
2:6,11 83:6

**reopened** 63:23
64:12 72:24

**reopening** 64:7

**repair**
50:11,12

**repaired** 70:11

**repairs** 45:5
77:2

**repeat** 67:8,9

**repeated** 69:23

**rephrase** 6:20
75:13 78:13

**replaced** 34:18
53:20,23,24

**report** 4:5
8:25 17:13
18:6 21:23
22:13,16,21,2
3,24,25
23:1,3,4,6,20
24:5,6 25:3
27:10 28:3
33:20 45:22
46:8,18 48:20
49:9,11
53:5,14 54:9
60:3 65:19
66:7
67:6,13,18
79:1,5
80:15,16,25
82:7

**reported** 1:24



25:1,9
27:8,15,18,19
,22,23 28:14
49:16
56:8,12,25
57:4,18 58:2
59:2 61:19
62:19 63:22
64:8,12 72:23
80:3
**Reporter** 1:24
5:9,10
6:8,11,16
10:19 21:4
25:19 51:2,3
55:20,21
82:1,5,21
83:16 84:18
**reporting**
27:16
67:2,5,12
68:9 84:18
**reports**
31:22,23
80:21
**representative**
30:1
**represented**
8:3 29:1 50:1
**request** 10:3
**requested**
54:7,8
**requirement**
44:5
**reserve** 81:9
**reserved** 81:13
**resident** 13:15
**response** 6:12

**rest** 69:5
**restate** 6:20
7:3
**restroom** 46:11
**rests** 50:5
**result** 8:17
35:4 39:9
45:8 76:6
**resumed** 46:16
71:15
**retained** 5:21
17:4 65:20
76:10
**return** 84:16
**review** 22:1,20
26:9,12 32:2
76:16
**reviewed**
17:13,24
48:21 52:5
**reviewer**
20:7,8
21:15,20
22:6,12 23:6
**reviewing**
64:10 67:6
**ridge** 35:13
38:17 39:12
**right**
6:7,19,21,22
7:7 8:5 9:7
10:25
12:22,25
14:15 15:17
16:17,24
18:13,20
21:20
25:13,25

26:2,23
27:12,15,17,2
1 30:20
31:7,10
32:9,16
33:4,8,13
34:2,5,18,20,
21 35:5,9
36:1,10,13,15
,17
37:19,21,25
38:1,7,11,18
39:11,13,17,2
0,25
40:3,14,17,20
,23 41:17,22
42:5,13,19,24
43:3,7,10,21
44:21 45:20
46:6,12,17,24
47:10,22
48:5,9,15
49:6,9
51:9,19
52:8,14
53:16,21
54:4,8,11
55:14,19
56:25 57:12
58:10,25
59:16
60:4,8,14,18,
22 61:6,15
62:5,10,16,25
64:2,21
65:1,5,8,11
67:25 68:12
70:3 72:6,17
73:14,20 76:4
81:4,9
**Rita** 1:5 5:11
84:5

26:2,23
**Robnett**
10:18,21
11:3,14,22
19:13
**R-O-B-N-E-T-T**
10:18
**Robnette** 71:25
72:3 74:2
**R-O-B-N-E-T-T-**
**E** 72:1
**role**
20:11,18,22
21:21 30:4
**roles** 12:6
**roof** 31:17,23
32:21,22
37:9,14 39:2
41:2,9
43:7,14,25
45:1,5
48:13,15
65:22,24 66:3
75:9,15 76:1
**roofer** 14:17
33:11,12,13
65:7
**roofing** 15:15
**roofs** 39:24
75:25
**rule** 30:17
37:16 38:5,22
39:16 40:3,16
41:1,17,18
47:22 48:2
49:4
**ruled** 41:8
**rules** 6:2 8:6
**runner** 42:3


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

46:22

_____

S

said 5:10 6:9
8:18 12:11
23:16 27:19
29:14 30:20
32:1 39:20
47:1,20,24
49:8 52:6
58:22 59:25
73:23 79:2

same 6:16 22:7
24:24 33:10
39:12 63:3
64:1

saw 33:17
36:25 37:1
43:7 60:22
79:22

say 6:20 10:23
11:24 12:2,24
16:7 17:7,24
19:4,7 22:10
24:4 28:19
30:7,8
32:8,13
33:2,6 39:22
43:8,18
44:9,15 46:3
48:3 54:3
57:22 60:10
61:11,13
62:4,18,22,23
63:10 65:13
66:15,19
67:23 68:18
70:13 72:8,17
73:2,19,25
75:5,10,14,18
76:3,18 77:1

78:17 80:24

saying 50:18
60:6 68:21

schedule 26:8
46:5 61:1

scheduled
31:2,5

school 14:21

scope 18:8
51:22 52:8,11
53:2 54:7

scoping 60:1
80:9

screen 25:25

screens 34:17

second 36:4

Section 69:11

Secure 24:20

Security 1:8
5:11 24:20
50:19,22 55:9
66:4 75:1,2,5
76:5 79:8
84:5

see 8:5,25
9:10,22 20:13
22:1,2,22
33:16,23
34:11,22
37:23 40:14
42:22 47:8
51:9 64:9
75:7 79:25

seeing
77:16,18

seem 63:17

seemed 72:7

seen 56:1,4
80:16

seepage 69:23

self 9:19

self-employed
8:10,11

self-
employment
9:8

semester 14:23

send 21:17,23
22:5

sending 22:10

sends 19:5

sent
77:5,19,23
78:4

September 13:3
25:5 26:4

service 7:7
8:12

Services 1:5
9:10 10:1
84:5

set 8:6

settling 69:11

several 36:9
38:11

SFR 1:5 5:10
84:5

shaking 6:9
56:21

share 25:24
55:25

she 19:13
20:19

seen 56:1,4

sheet 17:13
18:6 25:14
27:5,7 45:22
85:1

she's 10:22,23
29:2 54:24

short 7:10
46:14 71:13

should 26:2
29:8 44:7,13
46:23 48:8,9
66:11 73:19
75:21
76:15,20

show 6:15 59:9
64:5

showing 26:23
33:3

shows 20:1,2

shrinking
69:11

shutter 34:12

side 34:5 42:4

sides 32:21
33:15

sidewall 53:19

sign 19:20
42:4
84:10,13,15

signature
84:9,15,20
85:25

signing 81:12

signs 66:20
69:19 70:6

similar
58:15,19



67:13 80:1

**simply** 54:13
78:21

**since** 13:22
17:1 29:14
39:20 50:22
61:14

**sit** 5:16 79:4

**sitting** 40:19
53:1 58:5

**situation**
42:12

**sleet** 69:25

**slip** 38:17,20
40:9

**slipped** 39:16
42:23
53:22,23 54:1

**slope** 35:14
36:10 38:1,14
39:12
53:10,17,21,2
5 54:2,10

**slopes** 35:19
53:17 54:4

**Smith** 84:3

**SMITH,LLP** 2:8

**snow** 69:25

**solo** 31:5

**some** 6:2
13:3,24 14:12
17:19 19:1
20:11 28:11
40:12,13
46:11 50:3
53:18 54:1,25
68:19 70:6

80:8

**something** 7:1
16:9,22 19:14
21:13 22:16
28:11 30:7
59:22 67:13

**sometime** 27:12

**sometimes** 6:24
16:11 23:13
32:13

**somewhere**
63:13

**sorry** 9:13
29:11 43:17
50:14 53:22
55:14 66:4
71:23

**sounds** 9:6
32:14 46:13

**speak** 17:16

**specific** 40:13
78:16

**speculate** 16:9

**speculation**
41:4 56:14
66:22 73:1

**speed** 42:21

**spell** 21:3
71:21

**spelled** 71:25

**spoke** 17:14

**Springs** 8:13

**start** 12:20

**started** 6:2
9:15 12:11

**starting** 13:2

**state** 1:25
12:18
13:7,9,12,13,
17 48:1 54:13
82:2,6,22
83:2,16

**states** 13:24

**stating** 80:11

**Ste** 84:3

**still** 12:13
61:24

**Street** 2:4,9
84:3

**strengths**
17:21

**strictly** 17:8
24:17

**stuff** 22:4
46:11

**subject** 26:11
65:21

**submits** 23:9

**submitted**
22:21 23:6
33:3 49:8
80:17,25

**subpoena** 15:21
16:1

**Subsection**
69:5

**subsidiaries**
62:20 63:22
64:17

**subsidiary**
24:10,21
50:22 65:16
72:11 73:10

75:3

**SUITE** 2:4,9

**Sunbiz** 15:23

**superiors**
72:19

**supervisor**
10:12
19:10,24 20:1
22:7

**supervisors**
72:2

**supervisory**
12:6

**suppose** 78:3

**supposed** 21:22
42:2,4 57:3

**Supreme** 1:19
83:7

**sure** 5:25 7:8
9:2
10:7,10,13
16:7 17:2
20:5,19
22:18,19
29:13 30:6,7
31:1,8 32:15
34:16 40:11
43:21 47:19
52:1,4 61:12
62:21 67:10
68:10 72:1
73:15

**suspensions**
15:6

**switched** 13:15

**sworn** 5:6 83:8

**system** 21:17
77:13 79:2



T

take 6:8,11,17
 7:9,18,20
 16:14 46:10
 58:7 84:8

taken 1:16
 23:24 71:2

taking 4:3 6:3
 25:20 26:3

talk 6:3 17:21
 44:23

talked 17:19
 31:1 32:25
 46:19 47:14
 73:24

talking 24:19
 60:12 63:21
 70:23

talks 57:3
 60:20 66:25
 69:14

Tampa 2:9 84:4

tasked 47:2

Team 9:11

tear 39:1 43:7
 66:3,13 68:23
 76:6

technical 6:24

tecum 6:4
 25:21

tell 7:2
 39:4,8 42:23
 43:2,12,23
 44:6 45:13,17
 46:22 67:10
 76:5,7
 77:19,22,25

terminated
 9:17

terminations
 15:7

terms 22:6
 60:1

testified 5:6
 16:17 75:7
 76:4 77:15
 78:22

testify 7:19
 26:15

testifying
 78:8,14

testimony 16:2
 28:16 73:18

Texas 13:18,23
 39:20

text 4:7 55:24
 56:1,5 57:2
 58:6,15,21
 59:1 60:11
 77:14,16,19
 78:1,4 79:22
 80:5

than 24:17
 27:23 62:22
 72:3

Thank 5:9
 79:16

that
 5:12,19,20
 6:11,16
 7:1,2,5,10,11
 ,12,14,21,25
 8:6,14
 9:2,5,23
 10:3,7,9,15
 11:5,8,17,18

12:11,12,24
13:9,17
14:7,9,10,15
15:4,20,22,25
16:2,8,9,15
17:23
18:3,11,18,19
19:15,20,23
20:4,15,18
21:7,10,11
22:4,8,16,19,
20,21
23:1,4,6,9,19
,20,22
24:4,5,6,23
25:6,11 26:3
27:3,5,7,11,1
4,23
28:5,12,13,14
,16,24
29:1,11,20
30:2,4,11,14
31:9,15
32:1,10,24
33:2,3,6,7,17
,23 34:1,8,19
35:4,18,20,23
36:2,8,9,20,2
3
37:3,4,7,11,1
5 38:10,20,25
39:1,5,8,12,2
2 40:6,7,9,21
41:2,8,9,12,2
1
42:1,2,3,8,10
,12,22
43:6,8,10,13,
15,24
44:4,5,9,12
45:3,10,14,17
,24
46:2,12,21

47:3,6,14,20,
24 48:1,2,3
49:2,6,8,11,1
2,24
50:2,5,10,15,
17 51:7,12,18
52:7,14,24
54:4,13,20,22
,23,25
55:2,3,4,5,8
56:4,6,19
57:4,5,8,9,23
,24,25
58:1,9,15,16,
22
59:1,2,5,15,1
9,21,23,24,25
60:6,10,17,22
61:5,8,11,12,
13
62:12,15,18,2
4
63:3,9,20,25
64:1,9,10,15
65:2,14,15,18
,21,23
66:1,2,4,5,7,
12,15,16,19
67:3,6,9,11,1
3,16,17,18,19
,20,21,22,24
68:5,6,7,11,2
0,22
69:4,7,8,19,2
4
70:2,5,8,9,11
,14,18,19,20
71:3,6,17,18
72:5,8,16,22
73:3,5,7,12,1
5,17,19,25
74:2,4,8,13,1
4


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
75:4,10,11,12
,13,16,22
76:4,5,7,18,1
9,24
77:2,3,11,12,
14,15,16,17,1
9,22
78:3,4,6,9,13
,22
79:1,5,12,23,
25
80:6,11,16,21
,24 81:4
82:6,8,10
83:6
84:8,9,10
```

**that'd** 13:1
28:22

**that'll** 49:19
74:7

**that's** 5:15
8:5 24:21
27:10 29:5
30:7 35:7
36:4 39:18
42:7 43:1
44:19,21 46:7
48:17 54:18
56:3 58:14
62:6 67:24
68:2 73:6,21
74:11
75:18,24
76:9,22
77:13,18 78:1
79:14 81:5

**their** 62:20
63:21 64:17
65:16 81:2
84:11

**them** 9:17,23

```
12:3,7 14:1
18:25 19:5
22:11 28:4
31:2 33:3
36:13 39:8
59:22 63:16
68:11 76:7
80:8
```

**themselves**
19:2 46:1

**then** 6:3,23
10:8 13:2,15
14:11,25
17:14 18:9,10
20:4 22:4
23:7 24:4
28:5
31:3,6,12
32:16,21
35:13 45:22
48:20,22
53:18,21,22,2
5 54:1 60:20
61:25 62:8
64:12 66:15
67:14
69:14,15
76:18
77:6,7,9 79:8
80:14

**Theodore** 1:15
3:2 5:1,4
83:6 84:1,23

**there** 6:4
12:16
20:10,13
21:12 22:20
23:19 24:5
31:5 35:23
36:9 37:11
38:11,17
41:20 43:17

```
47:8 49:15
50:14 53:2
54:3 57:5
61:25
65:5,8,11
66:2,10,12
67:24 68:22
72:2,5
75:11,12,15,2
3 77:8 78:25
79:25
```

**there's** 10:13
16:11 22:22
35:11,12,13,1
8 36:5,20
46:21,22
51:16,19
61:25

**Thereupon** 5:3
25:22 26:21
33:21 46:14
51:4 55:22
63:7 71:13

**thermal** 45:15

**these** 6:24
7:17 9:20
16:10 26:12
28:2
34:4,7,17
35:8,15,23
38:16 39:5,20
40:9,23 42:22
43:5 44:7,18
45:14,18
49:16 56:1
58:1,2
60:12,25
63:10 64:2
69:17,19
72:19,22

**they** 12:5

```
22:1,4,13,14,
15,21 23:20
24:4 27:8
28:5 30:1
31:4,5,6,10
33:6 34:12
39:8 44:7
48:21 53:20
55:8 59:14,18
61:18 63:22
65:18 66:1,19
68:6,15,19
70:5,14 72:18
```

**they'll** 60:21

**they're** 7:18
22:10 50:22
60:16 68:21

**they've** 68:6

**thing** 7:11
64:1 73:14
80:14

**things** 39:20
73:17

**think** 8:18
15:20 18:7
22:23 24:20
37:19,20
38:15 39:11
43:17 49:9
51:2 56:22
58:13 64:19
71:25

**thinnest** 35:8

**third** 38:14

**thirty** 84:13

**this** 5:14,22
7:21 8:23,24
9:24
10:6,11,15



11:4,12,15,25
15:2 16:20
17:22
18:3,20,23
19:3,11,25
20:11,22,25
21:21 22:13
23:25 24:1,12
25:2,13
26:4,25
28:2,7,8,15,2
0 29:13,22
30:5,8,11,15,
18,24 31:12
32:5,16,23
34:1 35:19,22
36:2,5,10,15,
16
37:7,8,13,17
38:3,7
39:1,23,25
40:20,25
41:9,14,24,25
42:15,21
43:3,6,14,25
44:14,18,23
45:1,5 46:9
47:1,12,15
48:7,14 49:1
50:9,17,18
51:9,12,15,24
52:10,14,17,2
0 53:3
54:6,8,19
55:12 56:5,17
57:2
58:15,21,25
59:5,11,14
60:11 61:18
62:2,4,5,13,1
4 63:19
64:22,23 68:2
70:7

72:9,13,18
73:12,14,19
75:21
76:12,15,16,2
0,25 77:4
78:5 79:5,12
82:15 83:9
84:15

**those** 9:9
11:21
18:12,17 26:9
27:22 31:19
34:6,8,15
40:2 46:4
60:13 62:8
63:2 64:11
66:16,20
69:12
70:13,15,24,2
5 74:6 80:5

**though** 6:10
28:15 33:2
38:10 41:17
48:13 52:13
61:13 77:10

**thought** 71:1,4

**thousand** 64:19

**thousands**
16:12 39:24

**three** 35:23
36:13 37:24

**through** 5:25
6:2 7:7 8:7
10:8 12:10
15:17 18:11
21:15,17
25:15 28:4
34:7 38:25
42:20 44:5,17
52:23 58:6,8

**tie** 42:3 46:22

**tiered** 61:1

**tiers** 62:8

**tile** 34:23
35:9,12,23
36:6,18,19,20
37:3,5,11
38:17,20
39:16 40:20
45:11

**tiles** 34:20
35:2,8,19,24
36:9,24
38:11,15
40:9,14,23
41:12 42:23
53:10,12,18,1
9,21,22,23,24
,25
54:1,2,4,5,10
58:19 60:4
70:11 75:9

**till** 46:10

**time** 9:5 10:16
11:2,25 13:3
19:11,25
27:24 31:7
33:12 39:23
43:12,14,23,2
5 56:16 63:23
64:12
67:10,16
71:19 76:2
79:16 84:9

**timely** 63:22
64:8,12 72:23

**times** 16:6
51:24

**titled**

26:20,25

**today** 5:16,18
7:19 8:3
17:12
26:13,17
40:19 53:1
75:16 77:19
78:14,22 79:4

**today's** 77:16

**together** 41:12

**told** 66:3 67:3
68:11

**Tolley** 2:3
3:3,6 5:8
11:7,10,20
25:19,24
26:23 28:1,25
29:25 33:23
37:12 41:5
42:9,19 43:2
46:9,17 47:20
49:22,25 50:9
51:1,6 52:6
54:21
55:19,24
56:18
59:16,21
62:1,13 63:9
64:5 66:23
71:9,16 73:3
74:1,16,20
79:17,20 81:6
84:24

**took** 34:1
84:10

**top** 38:14
39:13

**topics** 58:9,10

**towards** 35:13

 UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

63:18

**trade** 15:15

**trades** 47:7

**traffic** 45:18

**trained** 24:13

**transcribe**
82:7

**transcript**
82:8 84:24

**travel** 42:10

**Trial** 16:1,17

**truck** 44:19

**true** 19:20
42:1 61:5
68:2 71:6
78:9 81:1
82:9

**truly** 67:19
84:17

**try** 6:9,14,15
74:21

**trying** 18:7
56:22

**turn** 28:3
48:20

**turned** 71:6

**two** 11:11
36:13 37:24
38:15 79:17

**TYLER** 2:4

**type** 9:8 12:5
13:19,20
14:3,22 15:15
16:10,20
20:11 50:3
54:25 64:11

**types** 8:19
9:20 58:1
60:13 63:10
69:19

**typically** 40:9

————————

U

**uh-huhs** 6:10

**ultimately**
75:22

**um-hum** 9:13
19:19 20:9

**um-hums** 6:10

**unable** 67:15

**uncomfortable**
70:25

**under** 7:24
18:19 42:11
70:15

**underneath**
50:15 51:17

**undersigned**
83:5

**understand**
6:19,21
7:8,22 8:1
29:10 47:18
52:3 56:15
61:23 74:10

**understanding**
5:12 18:19
30:4 35:1
57:14 58:1
61:8 62:14
63:25 64:11
79:13,14

**understood**

6:22 60:5

**Universal**
84:18

**until** 9:16,18
50:7 57:20
59:7

**up** 6:25 7:13
9:2 14:7 16:8
20:15 21:23
29:5 35:2,13
42:21 49:6
53:14 55:1
61:25 62:9
63:9 64:6,21
74:11 75:21
77:8 79:8

**UPC** 9:22
10:22,24
11:4,13,23
16:25
17:3,4,8
19:5,8 20:24
21:6 22:5
24:8,10,17,21
28:9 44:6
49:16
50:18,21,23
51:12 55:5,9
56:8 59:13
62:19 63:21
64:17 65:16
66:3,5 67:1
72:10,11,22
73:10 74:5
75:2,3,5
78:18

**UPC's** 24:24

**updated** 23:9

**upload** 10:14

**uploaded** 21:24

45:23 50:12
77:7 79:1

**us** 6:17 16:13
20:4 28:6
42:23 43:2
48:22
77:19,22
84:16

**use** 14:1 37:4
46:11

**used** 14:9

**using** 75:1

————————

V

**valid** 78:1

**validity** 79:21

**valley** 37:25

**via** 2:6,11
84:24

**vice** 69:6

**VIDEOTAPED** 5:1

**violate** 60:13

**violation**
60:18

**visual** 29:24

**vs** 1:7 84:5

————————

W

**waive** 81:8
84:9,15,20

**walked** 33:15

**want** 11:20,21
12:9 18:1
19:2 26:19
32:14 43:21
44:23 46:18
50:2 51:6



55:19 58:7,8
59:17 63:5
65:3 71:16
81:7

**wanted** 21:19

**wasn't** 19:13
27:15 28:10
29:16,19
35:17 42:1,7
45:6 59:7,8
61:17 75:19

**water** 46:11
69:23

**way** 22:20
32:14 33:3
48:12 53:7
62:15 68:17
75:14,18

**we** 5:16
6:2,23,24 7:7
10:14 12:9
14:10 16:1
19:1 23:16
29:25 32:13
34:21 36:12
37:19,23,24
40:13 41:11
42:22 43:21
46:18,19
47:8,14
48:19,22 49:2
50:21 55:16
58:17 70:14
71:4 73:23,24
74:11 75:4
77:6 79:4

**weaknesses**
17:22

**wear** 39:1 43:7
66:2,12 68:23

76:6

**week** 30:1

**we'll** 7:10,14
16:14 29:7
36:1 46:12

**went** 45:23
49:3 70:14

**were** 5:13
9:8,9 10:17
11:12,21
12:12,25
23:19
24:5,13,19
26:7
28:7,8,16
29:14
31:13,17
32:24 33:11
36:23 37:4,20
39:5,8
45:7,14,18
48:17,19
49:12 50:22
52:19,22
53:12,20
54:3,7,8
55:3,8
58:2,17,22
60:24
61:15,18
62:24
63:2,3,20,22
64:1,14,15
66:1 67:20
68:7,12 70:20
71:4 72:5,18
75:22
76:10,14
78:21 80:6

**we're** 5:10
6:3,4,10 8:6

32:15 39:12
51:2 58:5
60:11 63:20
75:16

**Were** 28:19
35:15 45:4
54:13 72:2

**weren't** 31:10
47:2 55:16
61:20 72:8

**we've** 37:24
38:25 39:15
40:12 42:20
46:9 50:17
73:18 75:1,2

**what** 6:9 8:8
9:8,9,12,21
11:12,16,21
12:12
13:16,17
14:19,24
15:22
17:11,16,25
18:2,7
20:6,18
21:21,22
23:22 24:4
25:1,14,15
26:19 27:4
28:19
29:11,16,21
30:4,8,23
32:19 33:18
34:25 35:15
36:23 37:5
38:3,16,20
40:9 43:13,24
44:6 45:10,20
47:8,21 53:8
57:3,17,22
60:5 61:9,16
62:1

67:1,4,14
68:4,21 70:6
72:13 77:9
79:10,11
80:25 81:2

**whatever** 23:17
81:10

**what's** 26:24

**when** 8:23,25
10:2,14,23
12:20
13:11,15 14:7
17:2,3,24
19:7 21:23
23:6,9 25:9
27:8 28:7
31:3
32:8,13,16
33:15 36:24
37:2 56:19
57:22 58:12
67:18,23 68:6
75:4 76:14
77:1,6 78:3

**where** 6:24
8:11,20 35:7
62:8 63:22
64:11 71:4

**whether**
29:8,18 40:6
50:2 74:12
75:8,15,19
76:14,20
77:25 78:25
79:9 80:15

**which** 31:1
53:17 84:13

**while** 10:11,16
37:5 63:9

**WHISLER** 2:3



**who** 9:24
10:5,10,15,21
17:19
19:2,5,10,15,
24 20:2,10,24
52:22,24
56:23 57:8
71:17 77:19
80:2 84:10

**whom** 77:22

**why** 31:10,15
35:22 44:10
52:16 62:14
66:19 67:24
68:14

**will** 21:24
28:6 49:23
74:7,9 75:4,5
78:17

**wind** 29:19
30:12,15,17
34:23,25 35:2
37:16 38:5,22
39:16,25
40:6,16
41:1,8,9,12,1
4,25 42:1,24
43:2 45:1
47:22 49:4
70:12
75:11,19

**windows** 34:15

**wish** 84:15
85:2

**Wisniewski**
73:6

**W-I-S-N-I-E-W-**
**S-K-I** 73:7

**with** 7:18 8:19
9:9,17

12:1,6,9
15:3,21,23
16:10,25
17:8,14,19
18:11 20:15
21:9,13,16
22:9 25:6,25
27:11,14,21
29:13 31:2,12
33:10 36:8
38:10 40:2
41:14,21
42:11 45:25
46:5 47:2,3,6
49:13 50:5
51:21 52:17
53:2,3,6
55:25 56:7,11
57:3,4,15,17
58:10,16,21,2
5 59:10,22
60:1,6,24,25
61:14
62:16,25
63:20 65:23
66:11
69:11,25 71:4
74:6 76:16
77:8 78:18,20
79:21 80:2,6
82:13 84:14

**within** 84:13

**without** 11:11
24:3 60:17

**witness** 3:2
5:5 16:21
46:13 71:12
79:18 81:9,13
82:15 83:9

**won't** 6:11

**words** 6:25

**work** 8:20
9:14,21 11:6
12:3,20 22:8
28:22 49:20
54:16 74:9

**worked** 9:9

**working** 9:20
10:11,16
11:25 12:25
13:4 31:17

**workmanship**
69:16

**would** 7:21,25
11:3,5,17,18,
24 13:18 14:3
17:1,8,25
18:3,18
19:2,4,15
20:15
22:12,15,18
23:1,24 24:23
25:6,12
27:11,14,16,2
3 28:12,13
29:20,21
30:2,6
31:9,15
36:8,16 37:6
38:10 42:11
46:4,5
47:2,6,15
48:4,12,22,23
49:4 52:7
56:10 57:4
59:15,21
60:13,18
61:20
62:5,8,12,18,
22 63:10,16
64:19 65:23
66:16,19
68:11

70:1,18,19
72:15,22
73:25 74:8,12
76:19 78:4
79:9,12 80:6

**wouldn't** 22:16
34:17 48:11
55:13

**write** 48:14,18
61:2,6,7,10,1
5 62:7

**writing**
61:14,17,20,2
4 62:5,9
80:10

**written** 52:7

**wrote** 48:11,12

---

X

**XactAnalysis**
10:8 18:11
19:17,21
21:25 25:15
27:5,7 45:23
79:2

**Xactimate** 77:5

---

Y

**yeah** 10:4
14:11 25:4
27:13,20
32:10 48:19
50:12 52:18
56:3 60:5,15
61:8,16 62:12
63:1,14 65:2
67:7,9
68:4,17 71:1
73:2,15 79:3
80:18,19



**year** 16:12
  56:20 72:13

**years** 16:24

**yes** 5:15,23
  6:13 8:22 9:6
  10:20 11:1,24
  13:1,5,8,10,1
  3,24 15:12,24
  16:3,5 17:10
  18:21 19:22
  21:1 22:14
  23:21
  24:11,22,25
  25:8
  26:1,6,10,18
  27:13,18,20
  30:22
  31:11,14,18
  32:10
  33:5,9,14,25
  34:6,14,24
  35:6,10
  36:4,11,14,22
  37:22
  38:2,9,12,19
  39:14,21
  40:1,15 41:23
  42:7,14
  43:8,11,19
  44:16,20,22
  46:7,25
  47:5,11,23
  48:6
  49:7,10,14
  50:7,16,20,24
  51:11,14,20
  52:9,15,21
  53:4,11
  54:5,12
  55:2,11,21
  56:17
  57:1,7,13,16

  58:20 59:4
  60:9,19,23
  61:4,17
  62:12,17
  63:1,24 64:13
  65:17,25
  67:13 68:1,5
  70:4,22
  71:20,24
  72:7,12 73:25
  75:18 77:1
  78:24
  79:7,14,25
  80:8 81:10

**yet** 11:8 18:2

**you**
  5:9,12,16,17,
  21
  6:7,15,19,21,
  23
  7:2,5,6,9,12,
  13,14,20,24
  8:3,8,11,14,1
  8,20,23
  9:3,5,9,14,16
  ,21
  10:2,5,11,17,
  23 11:2,3,13
  12:1,5,10,11,
  12,17,20,24
  13:6,19
  14:2,3,8,9,17
  ,22,24
  15:2,10,14,18
  ,20
  16:1,4,9,11,1
  2,13,17,19,20
  ,24
  17:3,4,11,16,
  21,24,25
  18:3,5,13,15,
  17,19,22,23

  19:2,7,8,12,1
  7,20,23,24,25
  20:4
  21:3,8,14,19
  22:2,6,8,15,1
  6,18,20,21,25
  23:1,6,9,13,1
  5,16,17,18,22
  ,24,25
  24:12,13,16,1
  9
  25:1,9,12,16,
  25
  26:2,4,8,12,2
  4,25
  27:2,11,14,19
  ,22,23
  28:1,7,8,9,12
  ,16,19,25
  29:2,3,4,5,6,
  7,8,10,11,14,
  15,16,20,21,2
  3
  30:2,3,8,11,1
  2,14,17,20,23
  31:16,19,22
  32:1,2,5,8,16
  ,19,24
  33:2,11,12,15
  ,16,23
  34:1,8,11,17,
  23 35:15,22
  36:1,5,8,20,2
  3
  37:2,4,6,7,12
  ,16
  38:5,10,22,24
  ,25
  39:4,8,16,19,
  20,22
  40:2,5,6,16,1
  9,22,25
  41:1,4,5,7,8,

  17,19,21,24
  42:6,10,11,13
  ,15,21,23,25
  43:2,5,7,9,10
  ,12,13,15,17,
  18,23,24
  44:4,5,6,12,1
  8,25
  45:4,7,13,14,
  17,18,21,25
  46:4,19,21,22
  47:1,2,3,6,7,
  12,14,15,17,2
  0,21,24
  48:1,2,3,10,1
  4,17,24
  49:3,4,6,8,9,
  11,12,15
  50:2,9,10,22
  51:9,13,21
  52:2,6,7,16,1
  9,22,24
  53:1,2,5,9,12
  54:6,7,8,13,2
  3
  55:1,3,13,14,
  18,25
  56:1,2,9,14,1
  8,20,23
  57:4,8,17,20,
  22
  58:5,6,7,8,9,
  12,16,18,22
  59:5,7,8,9,10
  ,13,18,22,25
  60:7,20,21,22
  ,24,25
  61:2,3,5,6,7,
  10,13,14,18,2
  0,22
  62:1,5,7,8,9,
  14,15,18,19,2
  2,24



63:3,10,15,18,19,20,25
64:1,5,7,14,16,19,22,25
65:3,4,7,10,14,23
66:3,7,17,23
67:3,7,9,10,11,14,18,19,20,23,24
68:7,11,12,14,16,20,21,22,25
69:6,10,18,19,22
70:1,2,5,7,21,23,24
71:3,21
72:5,8,9,13,17,19,23
73:3,6,9,12,13,16,18,21
74:1,2,6,11,12,17
75:7,8,9,10,12,14,20,21,22,25
76:1,4,5,7,10,14,16,18,25
77:11,15,19,22,25
78:3,4,13,16,20,21,22,25
79:1,2,4,5,16,22
80:1,6,10,11,16,20,25
81:7,8
84:8,9,10,11,13,15

**you'd** 22:10
39:24

**your** 5:18 6:15
7:13,21,25
8:7,8
9:3,7,17,19,25 11:25
12:10,11
13:9,11,16
14:19,24
15:10,13,18,23 17:7,12
18:18,19
19:3,10,24
22:13,16
26:13,16
28:15 30:4
31:20 32:23
34:1,2,25
35:18 37:3
41:14 42:11
44:1,5,19,21
45:20 46:8,20
47:14,25
52:7,13,16
54:9,24 56:21
58:1 59:25
60:3 62:9,14
63:25
64:10,25
66:7,11 67:18
68:2,8
70:15,20
72:18 73:18
76:1 77:3,10
78:5
79:1,5,10,12,16 80:15,25
84:9,10,11,13,15

**you're** 7:12
9:4 15:22
19:11 26:15
29:1 33:4,6
41:19 42:2,4

50:1 52:14
56:21,24 57:3
58:12
61:8,9,24
62:9 65:13,14
66:10 78:8
80:24 81:3

**yours** 34:4
84:17

**yourself** 23:2
33:12

**you've** 6:1
11:22 13:4,22
14:14
39:19,23
78:22

---

Z

**zero** 4:6 51:7

**zoom** 2:6,11
6:10,23 56:2

**zoomed** 36:16
37:20



**EXHIBIT "G"**

IN THE CIRCUIT COURT OF THE
20TH JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA

CASE NO.: 20-CA-007448


SFR SERVICES L.L.C. A/A/O ANNETTE
ROBERSON AND LOUIS GIOIA,

     Plaintiff,

vs.

UNITED PROPERTY & CASUALTY
INSURANCE COMPANY

     Defendant.
_____/




VIDEOTAPED DEPOSITION OF LARI PISCITELLI
TAKEN ON BEHALF OF THE PLAINTIFF

JANUARY 20TH, 2022
2:00PM TO 4:05PM

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23




REPORTED BY:
BRANDY SPOUTZ, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



877.291.3376
www.UCRinc.com

2

```
 1        APPEARANCES OF COUNSEL
 2  ON BEHALF OF THE PLAINTIFF:
 3     JOHN TOLLEY, ESQUIRE
        JENNIFER JIMENEZ, ESQUIRE
 4     THE WHISLER LAW FIRM, P.A.
        1909 TYLER STREET, SUITE 501
 5     HOLLYWOOD, FLORIDA 33020
        561-245-4703
 6     JTOLLEY@WHISLERLAWFIRM.COM
        (REMOTELY VIA ZOOM)
 7
    ON BEHALF OF THE DEFENDANT:
 8
        ELIOT B. DEMPSEY, ESQUIRE
 9     CHARTWELL LAW
        1191 EAST NEWPORT CENTER DRIVER, PENTHOUSE SUITE H
10     DEERFIELD BEACH, FLORIDA 33442
        305-372-9044
11     EDEMPSEY@CHARTWELLLAW.COM
        (REMOTELY VIA ZOOM)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              INDEX OF EXHIBITS
 2  EXHIBIT        DESCRIPTION        PAGE
 3  A        NOTICE              14
 4  B        PHOTOS              24
 5  C        DENIAL LETTER          43
 6  D        ESTIMATE            32
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1         INDEX OF EXAMINATION
 2  WITNESS:  Lari Piscitelli
                            PAGE
 3  DIRECT EXAMINATION
      By John Tolley, Esquire        6
 4
    CROSS EXAMINATION
 5    By Eliot Dempsey, Esquire      52
 6  RE-DIRECT EXAMINATION
      By John Tolley, Esquire        78
 7
    RE-CROSS EXAMINATION
 8    By Eliot Dempsey, Esquire      82
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1     VIDEOTAPED DEPOSITION OF LARI PISCITELLI
 2              JANUARY 20, 2022
 3  THEREUPON:
 4        THE COURT REPORTER:  Okay.  We are now on the
 5     video record.  We are here today January 20th,
 6     2022.  The time is approximately 2:00 p.m.
 7        We are here for the videotaped deposition of
 8     Lari Piscitelli, in the matter of SFR Services
 9     L.L.C a/a/o Annette Roberson and Louis Gioia vs.
10     United Property & Casualty Insurance Company; Case
11     Number 20-CA-007448.
12        Pursuant to Florida Supreme Court Order
13     AOSC20-23, all parties are appearing remotely.
14     Court Reporter is Brandy Spoutz with Universal
15     Court Reporting.  Will Counsel please introduce
16     themselves for the record?
17        MR. TOLLEY:  Good afternoon.  On behalf of the
18     Plaintiff, my name is John Tolley.
19        MR. DEMPSEY:  On behalf of the Defendant,
20     Attorney Eliot Dempsey.
21        MR. TOLLEY:  And also, just for record
22     purposes, Jennifer Jimenez from Whisler Law Firm is
23     also present, but she is not conducting the
24     deposition today.
25              LARI PISCITELLI,
```



Piscitelli, Lari   01-20-2022

6

1  was called as a witness, and after having been first
2  duly sworn, testified as follows:
3          DIRECT EXAMINATION
4  BY MR. TOLLEY:
5      Q   Mr. Piscitelli, good afternoon.  As I said, my
6  name is John Tolley.  I'm the attorney for SFR Services
7  acting on behalf the Robersons in this matter. I'm going
8  to go ahead and give you some instructions for the
9  deposition before we get started.  At 2:13, we are going
10 to take a break for opposing counsel so he can attend
11 his hearing, and then we will jump right back on.  So I
12 think we will get through that and then probably take a
13 break.  Okay?
14     A   Yep.
15     Q   All right.  So today I ask that you answer all
16 questions out loud so that the Court Reporter can take
17 down what is said.  Try to say yes or no, and if you
18 need to, you can explain your answer further.  But avoid
19 answering with uh-huhs or uh-uhs or nodding or shaking
20 of the head.  Okay?
21     A   Yes.
22     Q   Try to let me finish asking my question before
23 providing your answer, and I'm going to try to show you
24 that same deference as well and let you finish your
25 answer before asking my next question.  I know sometimes

7

1  with Zoom we get a little bit of a lag, and if I do
2  that, I apologize in advance.  Okay?
3      A   Yes.
4      Q   If you don't understand a question that I ask
5  you, please rephrase or restate -- just ask me to
6  rephrase or restate the question.  Okay?
7      A   Yes.
8      Q   I think I messed that question up a little bit
9  there, but we got it.  I don't want you to guess today.
10 Obviously, if you need to tell us an approximation or an
11 estimation, just go ahead and tell us that you are going
12 to estimate or approximate and the record will be clear
13 that it is not an exact number.  Okay?
14     A   Yes.
15     Q   Okay.  Do you understand today that your
16 testimony is sworn to and under oath?
17     A   I do.
18     Q   Okay.  And if you need to take a break for any
19 reason, we will go ahead and take a short break or
20 recess.  Okay?  Just like I said, at 2:13 we are taking
21 a break.  All right?
22     A   No problem.
23     Q   All right.  And I'm going to ask the next
24 couple of questions just to make sure we have competency
25 at deposition.  Please don't take any offense.  These

8

1  are standard questions that are asked in every single
2  deposition.
3          Have you taken any medications last night or
4  this morning that would affect your ability to hear or
5  understand my questions?
6      A   No.
7      Q   Are you under the influence of any alcohol or
8  drugs to the extent that it would affect your ability to
9  hear or understand my questions?
10     A   No.
11     Q   Okay.  We have got a little bit of time, so I
12 am going to go through your background with you, but
13 that's pretty much all of our rules for the depo today.
14 Okay?
15     A   Yes.
16     Q   Where are you currently employed?
17     A   Self employed.
18     Q   What is the name of your company?
19     A   On Call Adjuster.
20     Q   And prior to working at On Call Adjuster,
21 where did you work?
22     A   Mid-America Claims Solutions.
23     Q   Obviously you had a chance to look at some of
24 the photos and your general loss report and stuff prior
25 to your deposition today.  Correct?  On this matter?

9

1      A   I did.
2      Q   Okay.  And during the handling of this matter,
3  were you working for Mid-America Claims?
4      A   I was.
5      Q   How long did you work for Mid-America Claims,
6  from what year to what year?
7      A   It was a few years, maybe four or five years.
8  I've been doing appraisals, nothing but appraisals for
9  the last two.  I want to say it was probably four years.
10 I worked on the Carrier side for about 13 years.
11     Q   Okay.  That was what I was going to ask.  But
12 with Mid-America, would you say it was somewhere around
13 2015 to 2020, would that be the five years?
14     A   Probably.
15     Q   Okay.
16     A   Probably, yes.
17     Q   Okay.  And while you were working for Mid-
18 America Claims, what was your role or position there?
19     A   Independent Adjuster.
20     Q   What were your duties and responsibilities
21 when you were an independent adjuster for Mid-America
22 Claims?
23     A   Inspect and report back to Mid-America with a
24 report, photos, and an estimate.
25     Q   Okay.  And did you have a direct supervisor at



**10**

1 Mid-America Claims?
2 A  I did.
3 Q  Who was the supervisor that you had?
4 A  There were several.  I think Cindy Bootier,
5 she was the first manager I had there.  Keith Kraft I
6 believe was the main guy that everybody reported to.
7 Q  Let's go ahead and do this.  Can you spell
8 Bootier and Kraft for the Court Reporter just so she has
9 the right spelling?
10 A  K-R-A-F-T for Kraft.  Bootier, B-O-O-T-I-E-R,
11 I believe.
12 Q  Okay.  And do you know who your supervisor was
13 when you were handling this claim?
14 A  I do not.
15 Q  Okay.
16 A  Keith is the President of claims, so he
17 overlooked everything.
18 Q  Okay.  So he would have been overlooking this
19 claim as well, right?
20 A  He would have probably seen every claim, I
21 think.  He was the President of claims.
22 Q  Got you.  And at Mid America Claims, when you
23 were the field adjuster, did you work for multiple
24 carriers or just one carrier?
25 A  Multiple.

**11**

1 Q  What were some of the carriers you worked for?
2 A  Olympus.  I think there was like ten.  Security
3 First.  Allstate.  Nationwide.  UPC.  I don't know who
4 else.  There was like ten on and off.
5 Q  Not a problem.  Obviously, UPC though, because
6 that was one of the providers you were working for in
7 this case, right?
8 A  Yes.  I did UPC for about nine months.
9 Q  Okay.  And did you have different instructions
10 from Mid-America Claims depending on what provider you
11 were handling a claim for?
12 A  Each Carrier had its own guidelines.
13 Q  And how would you learn about those
14 guidelines?
15 A  They would usually send them to us when we
16 picked up a new client.
17 Q  Okay.  So with regard to UPC and handling this
18 claim, were you made aware of their guidelines for the
19 purposes of this claim?
20 A  I was.
21 Q  Okay.  And before we get into that, what is
22 your educational background.
23 A  High school diploma, I did a little college.  I
24 actually went to college for the insurance to get my
25 license through University of Central Florida.

**12**

1 Q  Well, you obviously hold a professional
2 license.  So what are your professional licenses?
3 A  I am a licensed insurance adjuster in Florida,
4 North Carolina, South Carolina, Georgia, Alabama, and
5 Texas.
6 Q  How long have you been a licensed adjuster?
7 A  13 years.
8 Q  Any other professional licenses?
9 A  No.
10 Q  Any complaints, suspensions, revocations, or
11 anything like that against your license?
12 A  No, sir.
13 Q  I'm trying to be mindful of the time, so I'm
14 just going to ask you some very generic questions now
15 until we take our break at 2:13.  Okay?
16 So with regard to this deposition, what did
17 you do in order to prepare for today?
18 A  I reviewed the file.
19 Q  And what makes up the file?
20 A  Prelim report, a final report, a map and a
21 billing sheet.  And an email.
22 Q  What was the email?
23 A  Basically a work order to start the claim.  It
24 was basically from XactAnalysis.
25 Q  Okay.  Did you have any type of estimate, even

**13**

1 if it was zero line items?
2 A  I did not.
3 Q  And, you know, given that you don't work for
4 Mid-America Claims anymore, do you handle any cases on
5 behalf of UPC anymore?
6 A  Absolutely no.
7 Q  Okay.  And with regard to handling claims now,
8 do you only handle claims for the Insured?
9 A  No.  I work appraisals for both sides.
10 Q  Okay.  And with regard to, you know, UPC and
11 your work at Mid-America Claims, were you paid
12 differently depending on what carrier?
13 A  Yes.
14 Q  Okay.  How were you paid if it was a UPC
15 claim?
16 A  I believe it was a flat fee at the end.  It
17 was a floating fee at the beginning, and then a flat fee
18 towards the end.
19 Q  Do you know what it was in this case?
20 MR. DEMPSEY:  Objection.
21 Q  (By Mr. Tolley) That was an objection.
22 A  So, I think we billed $340, and 60% of that
23 was mine.
24 Q  Okay.  Do you have any outstanding financial
25 obligations to UPC or Mid-America Claims or did they



Piscitelli, Lari   01-20-2022

14

1  have any outstanding financial obligations to you?
2      A   Not at this time.
3      Q   Okay.  Other -- well, let me ask you.  Did you
4  talk to anybody today about your testimony?  Like your
5  attorneys or anything like that from the insurance
6  carrier?
7      A   I did get a call from -- I don't know if it
8  was -- was it you, Mr. Dempsey?  I got a call from his
9  office asking if I got notice and if I was coming to
10  this today.
11      Q   Okay.  Did anyone from UPC or Mid-America
12  Claims call you?
13      A   No.
14      Q   Okay.  All right.  And I would assume you
15  don't have access to UPC's log notes; correct?
16      A   I do not.
17      MR. DEMPSEY:  Objection.
18      Q   (By Mr. Tolley) Okay.  And I'm just going to
19  real quickly mark Exhibit A as the Notice of Taking
20  Deposition Duces Tecum and I'm going to share my screen
21  with you in a second.  Okay?  And I think we will take a
22  break after that.
23      (Thereupon, Plaintiff's Exhibit A was entered
24      into the record.)
25      Q   (By Mr. Tolley) There you go.  Can you see

15

1  that document?
2      A   Yes, sir.  And I take back on that last
3  question that you asked.  I might have access to it, but
4  I don't actually have a printout of logs.
5      Q   Got you.  Okay.  If you need to refresh your
6  recollection, is there the ability for you to be able to
7  log in and look at any of your entries?
8      A   Possibly.
9      Q   Okay.  We will tackle that.
10      A   I don't know if I still have access to that or
11  not.
12      Q   Let's go ahead and -- it's 2:12, so let's go
13  ahead and let Eliot log off and log onto his hearing
14  real quick.
15      MR. DEMPSEY:  And I appreciate that, Mr.
16  Tolley.  I'm going to leave this Zoom on and mute
17  myself.
18      (Thereupon, a short discussion was held off
19      record.)
20      (Deposition resumed.)
21      Q   (By Mr. Tolley) All right, Mr. Piscitelli.
22  Sorry about that.  So before we got off, I showed you
23  what I marked as Exhibit A.  And have you had an
24  opportunity to review this document?
25      A   Yes.

16

1      Q   Okay.  And the only documents in your
2  possession are the ones that you went over already in
3  our testimony; correct?
4      A   That is correct.
5      Q   Everything else would be with the insurance
6  company and you wouldn't have access to that; correct?
7      A   That is correct.
8      Q   Okay.  So before we were talking a little bit
9  about your experience and working for Mid-America
10  Claims, was it?
11      A   Yes.
12      Q   Okay.  How many files would you say you
13  handled for UPC through Mid-America Claims?
14      A   I want to say maybe 150 to 200.
15      Q   Okay.  And do you know when you were first
16  assigned to this claim?
17      A   Yeah.
18      Q   When was that?
19      A   Hold on a second.  I lost the folder.  It
20  appears I got that on 3/23/2020.
21      Q   Okay.  And what other documentation did you
22  receive when you were assigned to the claim?
23      A   Just a work order basically, email from
24  XactAnalysis.  Says instructions on it.
25      Q   And were you instructed on how to handle this

17

1  claim in any particular way?
2      A   This particular one, or all of them in
3  general?
4      Q   Well, let's start with this particular claim.
5      A   I did not talk to anybody prior to going out
6  to this particular claim.
7      Q   Okay.  So then let's talk about -- obviously
8  this was a claim for UPC that handled; correct?
9      A   That's correct.
10      Q   And it was a reported date of loss of
11  September 10, 2017?
12      A   That is correct.
13      Q   Okay.  And are you aware if the Carrier
14  determined this to be a late reported claim?
15      A   I believe so.
16      Q   Okay.  And that would just mean that the date
17  that they reported the claim was past September 10,
18  2017; correct?
19      MR. DEMPSEY:  Objection.  Form.
20      Q   (By Mr. Tolley) You can answer.
21      A   Correct.
22      Q   Okay.  And did you have an understanding of
23  how you were supposed to handle these claims, these late
24  reported Hurricane Irma claims?
25      MR. DEMPSEY:  Objection.  Form.



Piscitelli, Lari   01-20-2022

18

1    A    Yes.
2    Q    (By Mr. Tolley) And how were you supposed to
3  handle them?
4        MR. DEMPSEY: Objection. Form.
5    A    We were supposed to go out and photograph the
6  area, send in a report, and not write any estimates
7  because they were being denied for late reporting.
8        MR. DEMPSEY: Objection. Form.
9    Q    (By Mr. Tolley) Okay. So you were actually
10 instructed not to draft an estimate for claims like this
11 because of the late reporting; correct?
12       MR. DEMPSEY: Objection. Form.
13   Q    (By Mr. Tolley) You can answer.
14   A    Any and all Irma claims that we were writing
15 at this time, we were not supposed to write the word
16 damage, say the word damage, or write any estimates,
17 because they were being denied for late reporting.
18   Q    And was that with just UPC, or was that with
19 other providers that we have already discussed?
20   A    No, it was only UPC.
21   Q    Okay. And who gave you this instruction?
22       MR. DEMPSEY: Objection. Form.
23   A    We had a meeting at night and everybody was on
24 the meeting and it was verbally discussed. I believe
25 some people from UPC was there, but I can't tell you

19

1  exactly who was in the meeting. It was mostly
2  adjusters, and it was at night and they basically said
3  that they were going to deny everything for late
4  reporting and not to write the word damage, say the word
5  damage.
6        MR. DEMPSEY: Objection.
7    A    Or open coverage on any of them.
8    Q    (By Mr. Tolley) Okay. And do you know who
9  from Mid-America Claims was present at the meeting other
10 than the adjuster? Was any supervisors or managers?
11   A    Keith Kraft was the one who was heading the
12 meeting.
13   Q    And was this a phone call, was this in person,
14 how was this done?
15   A    It was like a Zoom call, but I don't know if
16 Zoom was even invented. It was, you know, it was an
17 online meeting.
18   Q    Do you remember approximately when this was?
19 What date or what year?
20   A    I do not. I mean, I didn't work for them but
21 for nine months, so it had to have been in 2020 I would
22 think. It was 2019 into 2020 I guess.
23   Q    Prior to your inspection in this case, right?
24   A    Yes.
25   Q    Okay. And you said Keith Kraft with Mid-

20

1  America was leading the meeting?
2    A    Yes.
3    Q    Okay. And was his instructions from him
4  himself, or do you know if they were from UPC?
5    A    He said this was directive from UPC. And
6  again, I believe -- again, it's been so long ago. I
7  can't say a hundred percent. But I believe there were
8  some UPC people there at the office.
9    Q    Were you instructed to indicate that you could
10 not determine a cause of loss?
11       MR. DEMPSEY: Objection. Form.
12   A    No. We were instructed to not say anything
13 about anything. So it wasn't really instructed not to
14 do anything specific to one file. They were denying
15 everything for late reporting. Just take pictures and
16 send over a report.
17   Q    (By Mr. Tolley) Okay. So basically, you were
18 to go out there and take photos and then that was it;
19 right?
20   A    Yes, sir.
21   Q    Okay. And did they kind of tell you that were
22 getting paid quicker if you were doing this?
23       MR. DEMPSEY: Objection. Form.
24   A    Not so much paid quicker. It was basically a
25 flat fee at that time. We were basically going to net

21

1  like $180 a claim or something like that.
2    Q    (By Mr. Tolley) Got you. If you did observe
3  wind damage to a roof, would you be able to tell UPC
4  that or you were instructed not to say that whatsoever;
5  right?
6    A    To my knowledge, we were not covering
7  anything. Don't say the word damage, don't write any
8  damages, just write a report, send along the photos,
9  don't label the photos with the word damage. But we
10 could use the words cracked tiles.
11   Q    Were you supposed to count the number of
12 cracked tiles and put it on your report?
13       MR. DEMPSEY: Objection. Form.
14   A    They didn't ask so much for that.
15   Q    (By Mr. Tolley) Okay. And in this case, when
16 did you inspect the property?
17   A    I inspected the property 3/25/2020.
18   Q    And so prior to this inspection, you would
19 have received these kind of marching orders from Mid-
20 America and UPC?
21       MR. DEMPSEY: Objection. Form.
22   A    That is correct.
23   Q    (By Mr. Tolley) And you said there were other
24 adjusters. Do you mean other independent adjusters who
25 would be handling claims on behalf of UPC on the call?



877.291.3376
www.UCRinc.com

Piscitelli, Lari   01-20-2022

22

1    A   Everybody that worked UPC claims for Mid-
2  America was in the meeting.
3        Q   Okay.  And could you estimate how many claims
4  you were handling for UPC at that time?
5        A   Because I was working so many carriers, it
6  would be hard to say.  In the nine -- in the eight or
7  nine months that I did it, I'd have to say there were
8  200 to 300, max 300 that I would think.
9        Q   Do you know how many adjusters they had
10  handling UPC claims only?
11       A   It wouldn't have been only.  I think everybody
12  handled everything.
13       Q   Got you.  Do you know how many adjusters were
14  handling UPC claims, an estimate?
15       A   I would think it would probably be anywhere
16  between 20 and 60 people in that room.  Mid-America is
17  pretty good size.
18       Q   And these instructions were particularly for
19  UPC or their subsidiaries?
20       MR. DEMPSEY:  Objection.  Form.
21       Q   (By Mr. Tolley) You can answer.
22       A   I don't know about any subsidiaries.  It was
23  directed at UPC.
24       Q   Okay.  What about like Family Security
25  Insurance Company, that's a subsidiary of UPC?  Do you

23

1  know anything about that?
2        A   Yeah.  I don't know if I ran any of them, per
3  se.  And I don't remember, I don't even remember that
4  being a part of UPC to be honest with you.
5        Q   And this directive by Mr. Kraft and whoever
6  else was there by UPC, that was for late reported Irma
7  claims; correct?
8        MR. DEMPSEY:  Objection.  Form.
9        A   That was for any Irma claims.
10       Q   (By Mr. Tolley) Any Irma claims?
11       A   Well, they were all late reported at the time
12  I got them.  It was '19.
13       Q   Oh, okay.  Right, right.  So you are saying
14  that at the time that they gave this instruction, if it
15  was an Irma claim, it was going to be deemed as late
16  reported?
17       MR. DEMPSEY:  Objection.  Form.
18       A   Yeah.  It started off a little different.  And
19  then as we went on, you know, we recommended engineers
20  at the beginning to do it and then they didn't want any
21  more engineers sent out.
22       Q   (By Mr. Tolley) And in this case, you never
23  recommended an engineer; correct?
24       A   No.  At that time, we have already been given
25  the directive that they were going to deny it for late

24

1  reporting.
2        Q   Okay.  So it didn't matter the circumstances.
3  If it was a late reported Hurricane Irma claim, you had,
4  you know, 70% of the roof is blown off by Irma, it was
5  going to be denied?
6        MR. DEMPSEY:  Objection.
7        A   It didn't matter.
8        Q   (By Mr. Tolley) Okay.  All right.  So let's
9  talk a little bit more about your inspection in this
10  claim.  Obviously you said you did that on March 25,
11  2020; correct?
12       A   Yes.
13       Q   So going out there, you knew that this claim
14  was going to be denied no matter what you observed;
15  right?
16       A   I did.
17       Q   Okay.  And I want to mark as Exhibit B the
18  photos that you took.
19       (Thereupon, Plaintiff's Exhibit B was entered
20       into the record.)
21       Q   (By Mr. Tolley) And I'm just going to share my
22  screen.  Just give me a minute because I'm not very --
23  you'd think I'd get a hang of this after a couple years,
24  but apparently I can't.  Although to be fair, I did just
25  get a new computer.  So --

25

1        A   It's just part of getting old.  I used to be
2  computer wizard.  Now I can't do the Twitter or anything
3  else.
4        Q   So here we go.  Here's Exhibit B.  Are these
5  the photographs that you took on March -- actually, it
6  looks like it says -- No, it says 25th of 2020?
7        A   Yeah.  That appears to be mine but redacted.
8        Q   Okay.  And do you have the unredacted version?
9        A   I do.
10       Q   Are you able to look at that one while we go
11  through these?
12       A   I sure can.
13       Q   Okay.  Now you were instructed obviously not
14  to come to an opinion as to a cause of loss in this
15  case; correct?
16       A   That's correct.
17       MR. DEMPSEY:  Objection.  Form.
18       Q   (By Mr. Tolley) You were instructed simply to
19  just take photographs and submit it to the desk
20  adjuster; correct?
21       MR. DEMPSEY:  Objection.  Form.
22       A   That is correct.
23       Q   (By Mr. Tolley) Okay.  So in this case, did
24  you come to any opinions looking at the photographs and
25  during your inspection as to whether or not Hurricane



26

1 Irma caused damage to this, or that is just something
2 you didn't do, even though -
3       MR. DEMPSEY:  Objection.  Form.
4    A   Well, after reviewing through my photos and my
5 report, I noticed that there was new tiles that had been
6 installed that didn't match.  The homeowner told me
7 in this case that he had it repaired.  There was
8 somebody in the neighborhood that was coming through and
9 he wanted to hurry up and get a temporary repair on it.
10 So there was some non-matching tiles up on the top of
11 the roof.  But he didn't have a receipt for that.
12    Q   (By Mr. Tolley) Got you.  And that was after
13 Hurricane Irma he indicated that he did that?
14    A   Yes.
15    Q   Okay.  And so you are obviously a licensed
16 adjuster; correct?
17    A   That is correct.
18    Q   And as a licensed adjuster, and anybody
19 adjusting claims that's licensed, they have a duty to
20 give a benefit of the doubt to the Insured; right?  If
21 you can't call whether damage is excluded or included?
22    A   Yep.
23    Q   And is that damage that if you had the
24 opportunity to, you would have determined that was, you
25 know, that was in the benefit of the Insured and that

28

1    Q   (By Mr. Tolley) Okay.  And I'll show you the
2 denial letter in a couple minutes.  But yeah, it was a
3 denied case.
4       Now sitting here and obviously knowing the
5 ethics of how a claim should be adjusted, and you being
6 a licensed adjuster, did UPC violate ethics by not
7 giving the benefit of the doubt when it came to those
8 tiles?
9       MR. DEMPSEY:  Objection.  Form.
10    A   My opinion would be that what they did wasn't
11 quite correct.
12    Q   (By Mr. Tolley) Okay.  And blanketly denying
13 claims no matter what, is that something that you can do
14 as a licensed adjuster?
15    A   No.
16    Q   Okay.  And that is what UPC was doing in
17 claims like this; correct?
18    A   Correct.
19    Q   And that's what they did in this particular
20 claim; correct?
21    A   Correct.
22    Q   Okay.  That's what I wanted to know.  I want
23 to stop here.  Photo page 11, the top photograph, is
24 that one of those tiles that you're talking about?
25    A   That is.  Yes.

27

1 was damage from Irma?
2       MR. DEMPSEY:  Objection.  Form.
3    A   I mean, there is clearly some non-matching
4 tile on this roof that appeared to be new, like it
5 didn't match and it was definitely freshly installed.  So
6 it definitely could have been missing, what the
7 homeowner said could have definitely been the truth.
8    Q   (By Mr. Tolley) And did you observe or make
9 any observations that what the homeowner said wasn't the
10 truth?
11       MR. DEMPSEY:  Objection.  Form.
12    A   I didn't notice anything that would justify
13 the Insured telling me a lie about any of this.
14    Q   (By Mr. Tolley) So do you think that in this
15 case, had you been able to estimate -- or had you been
16 able to come to an opinion as to cause of loss in this
17 case, you would have extended coverage due to those
18 tiles?
19       MR. DEMPSEY:  Objection.  Form.
20    A   It's a good possibility, yes.
21    Q   (By Mr. Tolley) And based on that knowledge --
22 and do you know if this case was denied?
23       MR. DEMPSEY:  Objection.  Form.
24    A   I do not.  Well, I'm sitting here in the
25 deposition.  I'd say yeah, it probably was denied.

29

1    Q   Okay.  And it's clearly the one that is not
2 the same color as the rest of the roof; correct?
3    A   Yes.  You can see there are some other ones,
4 that other one there was freshly glued back together as
5 well.  He said that they were just trying to tighten
6 everything up so it didn't leak.
7    Q   Okay.  And with regards to this discolored
8 tile and that freshly glued one, let's first talk about
9 the discolored one.  That's on the ridge or the hip;
10 right?
11    A   Yes, that's the hip.
12    Q   I'm sorry.  Go ahead.
13    A   That's the hip.
14    Q   And on the hips and the ridges, that's where
15 you are going to see these tiles debond because of wind;
16 right?
17    A   That's where they usually first start flying
18 off.  But again, I've seen them -- it just depends on
19 the wind gust and the way that they blow.  I can't --
20 you know, sometimes the ridges are still there and the
21 fields are blown off the edges.  And sometimes the hips
22 and the ridges are blown off and the fields are still
23 there.  Just depends on the gusts and which way it's
24 coming in.
25    Q   Yeah.  That makes sense.  I think what I'm



30

1  kind of asking is, you see a color here that is -- a
2  tile that is discolored.  You've got testimony from the
3  Insureds saying, you know, they did these spot repairs
4  after Irma.  Would that be something consistent with,
5  you know, a storm like Irma causing that tile to blow
6  off or be removed?
7        MR. DEMPSEY:  Objection.  Form.
8     A  Yes, sir.
9     Q  (By Mr. Tolley)  Okay. And then I think on
10 photo 13 -- or page 13, top photograph, you can see some
11 fresh glue in that one as well?
12    A  Yeah.  They laid down some tiles it appeared.
13    Q  And that's either the ridge or the hip?  I
14 don't think you can tell from the orientation.
15    A  That one's the ridge.
16    Q  Okay.  And same question.  You know, looking
17 at that, given the statements by the Insured, that would
18 be something that would be consistent with Hurricane
19 Irma damage?
20       MR. DEMPSEY:  Objection.
21    A  I can't really say that because the tile is
22 still there and it's been re-glued down.  But, you know,
23 with a hurricane, a lot of times the caps are the first
24 to come off.
25    Q  (By Mr. Tolley) Okay.  Fair enough.  So you

31

1  can't rule out Hurricane Irma, you can't say definitely
2  it was Hurricane Irma.  So in that instance, should the
3  benefit of the doubt have gone to the Insured and
4  coverage should have been extended for that tile?
5        MR. DEMPSEY:  Objection. Form.
6     A  Normally.
7     Q  (By Mr. Tolley) When you say normally, do you
8  mean in circumstances where the insurance company isn't
9  just denying claims because of late reporting; correct?
10       MR. DEMPSEY:  Objection. Form.
11    A  That is correct.
12    Q  (By Mr. Tolley) Okay.  And then you know, same
13 thing here page 14, top photograph, that's another hip
14 or is that the same hip that was missing before?
15    A  That's a good question.  It appears to be the
16 same one.
17    Q  Okay.  So I won't ask any more questions about
18 that.  I think we have covered that one as well. You can
19 see these as I scroll.  If you want to stop me.
20       18 we have another glue here. Is that
21 consistent with what the homeowner was telling you about
22 getting some repairs done after Irma?
23    A  Yes.
24    Q  Okay.  And it looks like we have quite a bit.
25 So all of these ones where we see these white glue

32

1  marks, would that be consistent with what the homeowner
2  was telling you when you went to your inspection?
3     A  Yes.
4     Q  Okay.  And the homeowner indicated that he did
5  these repairs right after Irma; right?
6     A  He said right after Irma, there was people in
7  the neighborhood.
8     Q  Okay.  All right.  I'll stop sharing that
9  screen.
10       Now, you obviously were tasked with taking
11 photographs and uploading those to the adjuster;
12 correct?
13    A  Yes.
14    Q  In this case, I do have a copy of the
15 estimate.  Let me go ahead and share my screen with you
16 on this one, that was provided.  But I don't think it's
17 your name here.
18       (Thereupon, Plaintiff's Exhibit D was entered
19       into the record.)
20    A  John Oden.  Not my estimate.
21    Q  (By Mr. Tolley) Who is John Oden?
22    A  He must be someone who works at UPC.
23    Q  It does have your name under estimator.  Do
24 you recognize this estimate in any way whatsoever?
25    A  It's not really an estimate.

33

1     Q  Right.  It's a zero line item estimate.
2     A  Right.
3     Q  But did you create this?
4     A  I might have.  I don't know if I created it.
5  It automatically comes in.  That's just the way that an
6  empty -- that's the way we will get the file.  So it
7  will already have my name and everything.  All I do is
8  when I uploaded my report, it probably generated this
9  and put it up there.
10    Q  Got you.  So obviously, I guess in looking at
11 the roof itself and if you had had the ability to, would
12 you have written an estimate for damages?
13       MR. DEMPSEY:  Objection. Form.
14    Q  (By Mr. Tolley) You can answer.
15    A  Yes.
16    Q  And what would you have written for?
17    A  Knowing what I know, that tile is
18 discontinued.  There is no way to make repairs to it. So
19 it would have had to have been replaced.
20    Q  Okay.  So you would have written an estimate
21 for a full roof replacement?
22    A  Yes, sir.
23    Q  Okay.  And did you notice damage on every
24 slope of the roof or most of the slopes?
25    A  I believe in my photos, a good portion of the



34

1 roof had cracks on it.  When I say a good portion, there
2 were sporadic tiles throughout the roofing system that
3 had cracks.
4     Q   Okay.  And obviously, we are in the State of
5 Florida that you can't replace more than 25% of your
6 roof without a full roof replacement in one calendar
7 year?
8     A   That's correct.
9     Q   Okay.  So looking at this estimate, obviously
10 you didn't write for a total roof replacement.  Would
11 that be because you were instructed not to by UPC?
12       MR. DEMPSEY:  Objection.  Form.
13    A   It would.
14    Q   (By Mr. Tolley) Okay.  And knowing that you
15 would have written for a full roof replacement but you
16 weren't allowed to, how did that make you feel?
17    A   I quit working daily claims because of UPC.
18    Q   And I kind of think it's self explanatory --
19    A   Thirteen years.  Thirteen years.  Thirteen
20 years I worked claims and never had to go through this.
21    Q   When you say you quit because of UPC, what
22 about UPC made you quit?
23    A   We weren't allowed to write any damages.
24 Everything was being denied.
25    Q   And when did you quit working for UPC -- or

36

1     A   He understands my being upset, his desk
2 adjusters were feeling the same way, but we were given a
3 directive and they expected us to follow it.
4     Q   Did you ever contact UPC directly, their desk
5 adjusters or managers, and indicate that you were
6 frustrated with this?
7       MR. DEMPSEY:  Objection.  Form.
8     A   No.
9     Q   (By Mr. Tolley) Why not?
10    A   Because I worked for Mid-America and direct
11 contact with the Carrier is frowned upon on all basis,
12 no matter who you are working for.
13       MR. DEMPSEY:  Can we take a break here,
14 please?
15       MR. TOLLEY:  Sure.  Are you going on your
16 hearing?
17       MR. DEMPSEY:  Yeah.  I am.
18       MR. TOLLEY:  Okay.  No problem.  Yeah.
19       MR. DEMPSEY:  All right.  I'll let you know as
20 soon as this is done.  Thank you.
21       (Thereupon, a short discussion was held off
22       record.)
23       (Deposition resumed.)
24    Q   (By Mr. Tolley) All right.  Mr. Piscitelli,
25 when we last left off, we were talking about your

35

1 with UPC?
2     A   Probably shortly after this.  I don't know the
3 exact date that I quit.  They asked me not to leave, but
4 I just couldn't take this anymore.
5     Q   How long would you say this was going on for
6 before you left?
7     A   Eight or nine months, shortly after I started
8 doing it.  I think after the first month of doing it.  I
9 believe it was closer to nine months.  The first month
10 of picking up the account, they weren't too bad.  And
11 then we had that meeting, they said that everything was
12 being denied.  So --
13    Q   Okay.  Did you ever indicate to any of the
14 managers or supervisors at Mid-America Claims that you
15 had problems with this?
16       MR. DEMPSEY:  Objection.  Form.
17    A   Absolutely.
18    Q   (By Mr. Tolley) Who did you indicate that to?
19    A   Keith Kraft.
20    Q   And do you have any documentation with regard
21 to that?
22    A   I don't know.  I don't think so.  I think most
23 of it was done over the phone.
24    Q   What did Mr. Kraft say, if anything, when you
25 would voice your opinions?

37

1 frustrations with the directives that were given by UPC
2 to Mid-America and then obviously to you.  And you had
3 indicated that you had spoken with Mr. Keith Kraft with
4 Mid-America Claims; correct?
5     A   Correct.
6     Q   And I guess you said he indicated that he
7 understood your feelings but that they were given a
8 directive and they were expected to follow it; correct?
9       MR. DEMPSEY:  Objection.  Form.
10    A   Correct.
11    Q   (By Mr. Tolley) Now, with regard to handling
12 these claims with UPC, did you ever have any discussions
13 about what to do with law and ordinance.  Whether or not
14 to put all damages under law and ordinance if the policy
15 didn't cover that?
16       MR. DEMPSEY:  Objection.  Form.  At this
17 point, I'm going to make a general objection.  This
18 entire deposition, Counsel for the Plaintiff has
19 sought to invade privileged areas, work product
20 privilege, and general claims handling processes.
21 The majority of questions here today are not only
22 improper, but a violation of privilege log and
23 general claims handling privileges.  And at this
24 point, we are going to object across the board to
25 everything that has been asked prior to this, and



Piscitelli, Lari   01-20-2022

38

1    frankly it seems like we are going to keep going
2    there from now on. We've got --
3        It may seem funny to you, Mr. Piscitelli.
4        THE WITNESS:  You just objected to everything.
5    That is kind of funny.  You objected to everything
6    that was said.
7        MR. DEMPSEY:  You seem to be enjoying yourself
8    here today.
9        THE WITNESS:  Oh, yeah.  I'm enjoying myself
10   because your customer depos me 50 times.  In 13
11   years, I've probably had five depositions.  So
12   yeah, it's definitely my fault here, sir.
13       MR. TOLLEY:  Okay, let's go ahead and -- make
14   our objection, Mr. Dempsey.  I'm going to also put
15   on the record that there was no motion for
16   protective order filed before yesterday at 4:20
17   p.m., that there has been -
18       MR. DEMPSEY:  Let me put on the record again,
19   you unilaterally set the depo one week ago.  We
20   filed our motion for protective order, we reached
21   out to your office and tried to get an agreed order
22   so we could proceed with the depo today.  You
23   refused to not only reschedule, you refused to
24   mutually coordinate.  I had a conflict at the time
25   of this depo.  And then in total disregard for both

39

1    the motion for protective order, the privilege log
2    and discovery, and general privileges and general
3    claims handling processes, you have sought to
4    invade all of that in your depo today.  So yes,
5    it's highly objectionable, and again -
6        MR. TOLLEY:  Mr. Dempsey, I let you lay your
7    objection.  If you could allow me just to lay my
8    record as well, that would be greatly appreciated.
9        It appears that my office on September 17,
10   2021, at approximately 12:58 p.m. reached out to
11   your office, CCing you as well as
12   chanson@chartwelllaw.com, ccooper@chartwelllaw.com,
13   parboleda@chartwell.com, requesting dates of
14   depositions for the field adjuster.  That email was
15   not responded to.  My office then followed up on
16   October 27, 2021, 2:16 p.m.  Same email address, no
17   response.  Our office then filed a unilaterally set
18   notice of deposition on January 10th, 2022.  My
19   understanding is no one from your office reached
20   out to reschedule the deposition in any way
21   whatsoever.
22       It wasn't until yesterday that we received a
23   motion for protective order at 4:21 p.m. that there
24   was any type of objection at any point in time to
25   this deposition.  In addition to that, my office

40

1    accommodated your conflict and allowed you to take
2    a break during the depo and go attend the hearing
3    that you conflicted with, so I'd like to just put
4    those on the record as well.
5    **Q    (By Mr. Tolley) All right, Mr. Piscitelli. So**
6    **I'm going to go on and keep asking you some questions**
7    **here.  So we left off about Mr. Kraft.**
8        **Now, we were talking about these directives**
9    **that UPC gave.  UPC gave these directives and that was**
10   **how you were supposed to adjust this particular claim as**
11   **a result of those directives; correct?**
12       MR. DEMPSEY:  Objection.
13   A    All UPC claims.
14   **Q    (By Mr. Tolley) So while it was a general**
15   **directive, it applied not only to all UPC claims, but in**
16   **particular, this specific claim; correct?**
17   A    That's correct.
18       MR. DEMPSEY:  Form.
19   **Q    (By Mr. Tolley) And I want to talk to you**
20   **about your general loss report that you have.  In your**
21   **general loss report, do you indicate any type of damages**
22   **to the property?**
23       MR. DEMPSEY:  Objection.  Form.  Again, this
24   is on the privilege log, this is a privileged
25   document.

41

1        THE WITNESS:  You made your objection.
2        MR. DEMPSEY:  I'm sorry, sir?
3        THE WITNESS:  You've already objected to everything,
4    you've already objected to everything.  You think
5    I'm having a good time because I like to be
6    depositioned.
7        So let me just explain something to you. What
8    they did to me would be like me telling you that
9    you're an attorney but you can't try any more cases
10   nor can you go after any more clients.  So yeah,
11   I'm having a really good time.  My 13 year career
12   has been ruined by this company.  So yeah, I'm
13   having a really good time.  If you don't see it in
14   my face because I smile on some of the other things
15   because I thought they were ridiculous, it's
16   because of your company that I'm sitting here
17   without doing daily claims anymore and trying to
18   help people. So yeah, having a really good time.
19       MR. DEMPSEY:  With all due respect, my job is
20   to represent my client and object when it's called
21   for.
22       MR. TOLLEY:  Here's what I think we should do
23   from this point.  Mr. Piscitelli, I'm going to ask
24   you questions, you just provide answers to my
25   questions.  You know, no side commentary from Mr.



Piscitelli, Lari   01-20-2022

42

1 Dempsey and Mr. Piscitelli.  We are just going to
2 get through this deposition, you know, and we are
3 going to get in and get out.  Okay?
4     THE WITNESS:  Yep.
5     **Q   (By Mr. Tolley) Okay.  So Mr. Piscitelli, the**
6 **last question that I asked you was with regard to your**
7 **general loss report.  Do you have a copy of that with**
8 **you?**
9     MR. DEMPSEY:  Objection.  Form.  Privileged.
10    **Q   (By Mr. Tolley) Do you have a copy of that**
11 **with you?**
12    A   I do.
13    **Q   Okay.  And in that report, do you notate any**
14 **damages whatsoever in your report?**
15    MR. DEMPSEY:  Objection.  Form.  Seeks to
16 evade privileged document.
17    A   My last section of my report on cause of loss
18 analysis says we noted cracked tiles and newer cap tiles
19 put on in a few areas.  I could not confirm any of that
20 was directly wind related, as they already were replaced
21 and we were told not to write any damages.
22    **Q   (By Mr. Tolley) And on any of the photographs,**
23 **did you write any damages whatsoever?  Like, you know,**
24 **any observations of damages?**
25    MR. DEMPSEY:  Objection.  Form.  Privilege.

43

1    A   Cracked tiles and newer tiles and repaired
2 tiles were annotated.
3    **Q   (By Mr. Tolley) And nowhere did you annotate**
4 **any type of opinions onto how those damages were present**
5 **at the property; correct?**
6    MR. DEMPSEY:  Form.
7    A   We were told not to write anything about
8 damages.
9    **Q   (By Mr. Tolley) Okay.  Even if you disagreed**
10 **and determined that there were damages; correct?**
11    MR. DEMPSEY:  Objection.  Form.
12    A   Correct.
13    **Q   (By Mr. Tolley) I'm going to mark as Exhibit C**
14 **the denial letter.**
15    (Thereupon, Plaintiff's Exhibit C was entered
16 into the record.)
17    **Q   (By Mr. Tolley) Can you see that document?**
18    A   I can.
19    **Q   Okay.  You have no -- after your inspection,**
20 **you submit your photograph and your general loss report**
21 **and that's it in regards to this claim; correct?**
22    A   That is correct.
23    **Q   Okay.  So you have no -- no one called you**
24 **about the denial letter, nobody asked any questions**
25 **about your observations or anything like that; right?**

44

1    A   That's correct.
2    MR. DEMPSEY:  Form.
3    **Q   (By Mr. Tolley) In regards to this**
4 **denial letter, have you ever seen it before?**
5    A   I think I lost you.
6    **Q   Sure.  Have you ever seen this denial letter**
7 **before?**
8    A   I have not.
9    **Q   Okay.  In this denial letter, UPC indicates**
10 **that they recently received the inspection report from**
11 **Mid-America Catastrophe Services and Adjusting Firm**
12 **retained to inspect the subject property.  And then they**
13 **indicate that the inspecting adjuster observed damage to**
14 **the roof and interior.  It goes on to say that based on**
15 **your inspection, our investigation determined that the**
16 **damages to your roof is related to a lack of**
17 **maintenance, wear and tear, and deterioration.**
18    **At any point in time, did you indicate to the**
19 **insurance company that the damages to the roof were as a**
20 **result of a lack of maintenance?**
21    MR. DEMPSEY:  Objection.  Form.
22    A   I believe that was part of my report, yeah.
23 That's just our blanketed statement that they set up for
24 us to use.
25    MR. DEMPSEY:  Objection.

45

1    **Q   (By Mr. Tolley) When you say blanketed**
2 **statement, what do you mean by that?**
3    MR. DEMPSEY:  Objection.  Form.
4    A   My final report comes pre-tokened by the
5 firms, and that was something that we were supposed to
6 say.
7    **Q   (By Mr. Tolley) Okay.  So the final report**
8 **actually has language in it that is suggested for you to**
9 **use?**
10    MR. DEMPSEY:  Objection.  Form.
11    A   Some of it was already pre-populated. Correct.
12    **Q   (By Mr. Tolley) Okay.  So with regard though**
13 **to determining that the damages were related to a lack**
14 **of maintenance, was that an opinion that you made, or**
15 **you just noted that there were repairs on the roof?**
16    MR. DEMPSEY:  Objection.
17    A   I noted that there was repairs on the roof.
18    **Q   (By Mr. Tolley) And wouldn't you agree with me**
19 **that if the Insured is repairing some things on the roof**
20 **they are maintaining it?**
21    MR. DEMPSEY:  Objection.  Form.
22    A   Yes.
23    **Q   (By Mr. Tolley) So in fact you observed**
24 **observations that were the opposite of a lack of**
25 **maintenance.  Right?**



Piscitelli, Lari   01-20-2022

46

1    A    Correct.
2        Q    And UPC still made you say there was a lack of
3    maintenance anyways; correct?
4        MR. DEMPSEY:  Objection.  Form.
5    A    Yes.
6        Q    (By Mr. Tolley) Okay.  They indicate that
7    there was damages to the roof related to wear and tear.
8    Did you ever opine that this roof was worn and torn?
9        MR. DEMPSEY:  Objection.  Form.
10    A    I did not.
11        Q    (By Mr. Tolley) And they indicate that there
12    was some type of deterioration.  Did you ever tell the
13    Carrier that this roof was deteriorated?
14    A    I did not.
15        Q    Lastly, they talk about in this fourth
16    paragraph down, a failure to promptly report.  And they
17    indicate that they were unable to determine the cause of
18    the claimed damages and therefore they were prejudiced
19    in their investigation.
20        Did you ever make that you were inspecting this
21    roof a couple years after Hurricane Irma, would that
22    have affected your ability to come to a coverage
23    determination?
24        MR. DEMPSEY:  Objection.  Form.
25    A    I'm sorry.  Repeat it again?

47

1        Q    (By Mr. Tolley) Sure.  Essentially what they
2    are saying is because it was so late reporting, they
3    couldn't determine what was happening, what happened to
4    the roof.  You were not allowed to determine what
5    happened to the roof; correct?
6        MR. DEMPSEY:  Objection.  Form.
7    A    That's correct.
8        Q    (By Mr. Tolley) So the length in time, would
9    that have impeded your ability to determine what caused
10    damage to the roof, or was it their directive that
11    caused you to not be able to determine what happened to
12    the roof?
13        MR. DEMPSEY:  Objection.  Form.
14    A    There was no reason to determine anything
15    because we weren't allowed to cover anything.
16        Q    (By Mr. Tolley) Did you have any directives on
17    law and ordinance coverage?
18        MR. DEMPSEY:  Objection.  Form.
19    A    No.  Again, if we are not allowed to write for
20    anything, there is no reason for coverages to be brought
21    up.
22        Q    (By Mr. Tolley) Okay.  Just give me moment,
23    Mr. Piscitelli.  I think I'm pretty much done.  Let me
24    just review my notes real quick.
25        I do have a couple of more questions for you

48

1    here. They have also claimed that the damages were not
2    covered due to a mechanical breakdown, latent defect,
3    inherent vice, or any quality in the property that
4    causes it to damage or destroy itself.
5        Did you ever make any observations during your
6    inspection or indicate in your general loss report that
7    you observed any of those type of damages?
8    A    I did not.
9        Q    They also indicated that the damages were
10    excluded because, and I'm going to try to be slow for
11    you Madam Court Reporter, settling, shrinkage, bulging,
12    or expansion, including resultant cracking of bulk
13    heads, pavements, patios, footings, foundations, walls,
14    floors, roofs, or ceilings.
15        Did you ever observe any of those conditions
16    at the property during your inspection?
17        MR. DEMPSEY:  Objection.
18    A    I did not.
19        Q    (By Mr. Tolley) They also indicated that the
20    damages were excluded because of faulty, inadequate, or
21    defective design, specification, workmanship, repair,
22    construction, renovation, remodeling, grading, or
23    compaction.
24        Did you observe any faulty and inadequate or
25    defective-type of damage like that described?

49

1    A    Not to my knowledge.  No.
2        Q    Did you observe any faulty, inadequate, or
3    defective materials used in those repairs in the
4    construction, the renovation, or the remodeling of this
5    home?
6        MR. DEMPSEY:  Objection.  Form.
7    A    I did not.
8        Q    (By Mr. Tolley) And as far as you were
9    concerned, the Insured did what they were supposed to do
10    to try to maintain the roof?
11    A    They made temporary repairs for sure.
12        Q    Okay.  And you asked the Insureds for a copy
13    of the receipts for those temporary repairs.  Right?
14    A    I did.
15        Q    Okay.  And they indicated that they didn't
16    have those, right?
17    A    That is correct.
18        Q    Okay.  Did that stop you from being able to
19    perform your inspection in any way whatsoever?
20    A    No, sir.
21        Q    You know, I want to talk to you a little bit
22    about, obviously, you know, cooler heads have now
23    prevailed and it was a little bit of a tense part there
24    in the deposition.  But you know, clearly you came in
25    here today and you have expressed what UPC did on this



Piscitelli, Lari   01-20-2022

50

1  claim and on other claims like this.
2        Do you have any financial motivation or
3  personal motivation to testify this way, or are you
4  testifying to the truth?
5        MR. DEMPSEY:  Objection.  Form.
6     A   Testifying to the truth.
7     Q   (By Mr. Tolley) And why are you testifying as
8  to the directives given to you by Mid-American Claims
9  regarding UPC's handling of these claims?
10    A   Again, I don't know how many deposition I've
11  been through.  After working for a company for nine
12  months, it's just out of hand, and it's still going on
13  today.  So I do appraisals for a living now, and I run
14  around quite a bit of these, and I'm still seeing the
15  same thing.  So it's just frustrating all day every day
16  when you have to take time out of your day every day to
17  re-explain yourself for stuff that wasn't your fault to
18  begin with.
19    Q   Got you.  So it's not having to do depositions
20  as to why you are testifying this way.  It's because you
21  felt like you weren't able to actually properly adjust
22  the claim and you have to explain that over and over?
23    A   I couldn't do my job, and I have to explain it
24  over and over.
25        MR. DEMPSEY:  I'm going to object to the prior

51

1  question as well.  He started before I could.
2     A   I have been in contact with the UPC legal
3  department telling them that I was sick of doing these
4  depositions and they should probably start doing the
5  right things.  Christi Campos is who I have been talking
6  to.
7     Q   (By Mr. Tolley) Okay.  Anybody else at UPC
8  other than Ms. Campos?
9     A   No.
10    Q   And, you know, you have no financial
11  motivation in terms of they don't owe you any money or
12  any outstanding things like that; correct?
13        MR. DEMPSEY:  Objection.  Form.
14    A   They did leading up to the depositions, but
15  they don't anymore.
16    Q   (By Mr. Tolley) Got it.  So they actually paid
17  you after you contacted legal?
18    A   The manager of the legal department called me
19  and asked me what it would take to quit bringing that
20  up, that they owed me money, and I said to pay my bill,
21  that they owed me for over a year.
22    Q   Okay.  Besides obviously having to explain
23  yourself in depositions regarding, you know, not being
24  able to do your job, is there any other reason why you
25  would testify to the directive that UPC gave you other

52

1  than the truth?
2        MR. DEMPSEY:  Objection.  Form.
3     A   Absolutely not.
4     Q   (By Mr. Tolley) Okay.  I have no further
5  questions.
6              CROSS EXAMINATION
7  BY MR. DEMPSEY:
8     Q   Good afternoon, Mr. Piscitelli.  This is
9  attorney Eliot Dempsey for the Defendant.  In
10  preparation for today's deposition, did you speak to
11  anybody?
12    A   You.
13    Q   Did you talk to anybody from Mr. Tolley's
14  office or Whisler Law Firm?
15    A   No.
16    Q   Did you talk to anybody from SFR Services,
17  LLC?
18    A   No.
19    Q   Did you receive any emails from Whisler Law
20  Firm, Mr. Tolley, or any other people at the law firm?
21    A   I believe notice of taking deposition came
22  through the mail and through my email.
23    Q   Did you receive any other emails?
24    A   I did not.
25    Q   Have you ever worked with Mr. Tolley or

53

1  Whisler Law Firm before?
2     A   I have not.
3     Q   Have you ever worked with SFR Services, LLC
4  before?
5     A   I have not.
6     Q   Do you have any financial or monetary
7  relationships between Whisler Law Firm or SFR Services,
8  LLC?
9     A   I do not.
10    Q   What is your highest level of education?
11    A   High school and some college.
12    Q   When you say some college, how much college do
13  you mean?
14    A   I went to Central Florida for insurance.
15  University of Central Florida.  UCF.
16    Q   How long did you go to UCF?
17    A   It was probably close to six months.  Dr.
18  Birzon.
19    Q   What does that mean, Dr. Birzon?
20    A   He was my teacher.  Insurance Studies.
21    Q   You only had one teacher, one class there?
22    A   Yep.  Insurance.
23    Q   For six months?  Did you complete the class?
24    A   Yes.
25    Q   Did get a grade?  Did you get a --



Piscitelli, Lari  01-20-2022

54

1    A    I got a license.
2    Q    **What license did you get?**
3    A    It was a 520 at the time.
4    Q    **And is that still current?**
5    A    Yes.
6    Q    **Have you ever had any complaints against your**
7    **license?**
8    A    I have not.
9    Q    **Suspensions?**
10   A    No.
11   Q    **Were you required to comply with ethical**
12   **requirements in order to maintain that license?**
13   A    Yes.
14   Q    **And what degree did you receive -- did you**
15   **receive a degree rather from UCF?**
16   A    Again, I received my Florida Adjuster's
17   License.
18   Q    **Okay.  So you do not have a college degree;**
19   **correct?**
20   A    I never said I did.  Correct?
21   Q    **Okay.  Have you received any training or**
22   **education in engineering?**
23   A    I have not.
24   Q    **Have you received any training or education in**
25   **meteorology?**

55

1    A    I have not.
2    Q    **Have you received any training or specialized**
3    **education in roofing?**
4    A    Yes.
5    Q    **Separate and apart from your license as an**
6    **adjuster?**
7    A    Yes.
8    Q    **What have you received?**
9    A    Multiple -- I don't have any certifications.
10   I've done multiple classes and ran multiple roofing
11   companies over the years.
12   Q    **What kind of classes?**
13   A    Roofing.  TPO.  Tile classes.  Basically
14   seminars on roof repairs.
15   Q    **And when you first became involved with this**
16   **claim, you were employed by who?**
17   A    Mid-America.
18   Q    **And you are no longer employed by Mid-America**
19   **Claims; correct?**
20   A    That is correct.
21   Q    **When did you -- when were you employed with**
22   **Mid-America Claims?  From when to when?  Mr. Piscitelli?**
23   A    I'm here.  I'm looking.
24   Q    **Okay.**
25   A    You are asking a specific question, so I'm

56

1    going to tell you the specific answer.  Looks like from
2    the end of '19 to -- I want to say '19 to '20.  Probably
3    just a little over a year.
4    Q    **The end of 2019 to the end of 2020; is that**
5    **correct?**
6    A    I think so.  I can't be positive.  I think I
7    left Frontline in 2019 as a staff adjuster, and I went -
8    - go ahead.
9    Q    **What were the circumstances surrounding your**
10   **departure from Frontline?**
11   A    They hired some people in from State Farm and
12   Allstate and wouldn't let us make any coverage
13   decisions.
14   Q    **Frontline you are saying wouldn't let you make**
15   **coverage decisions; correct?**
16   A    They wouldn't make any coverage decisions.
17   Q    **Okay.**
18   A    Not they wouldn't let me.  They wouldn't make
19   coverage decisions.  They just kept telling us to tell
20   people different things.
21   Q    **What years were you with Frontline?**
22   A    I was with them for four years.
23   Q    **Which you are saying 2015 to 2019; is that**
24   **correct?**
25   A    That sounds right.

57

1    Q    **And when you left, was it voluntarily or were**
2    **you terminated?**
3    A    I was volunteered.
4    Q    **You voluntarily resigned your position; is**
5    **that correct?**
6    A    Absolutely.
7    Q    **Okay.  So you quit Frontline because they**
8    **would not let you make coverage determinations; correct?**
9    MR. TOLLEY:  Objection to form.
10   A    Listen.  If you are going to say it, say it
11   right.  I've already repeated that twice.  They would
12   not make the coverage decisions.
13   Q    **(By Mr. Dempsey) Okay.  Why did that bother**
14   **you?**
15   A    Because people kept on calling and asking what
16   the status of their file was and I couldn't tell them
17   anything.  Well, I could.  But I could only tell them
18   what they told me to tell them.  Which was usually just
19   that it was still in review.
20   Q    **And what kind of company is Frontline?**
21   A    An insurance carrier.
22   Q    **And it bothered you that you were not able to-**
23   **-**
24   A    Answer the people's questions on coverage,
25   whether it was being covered or not covered.



Piscitelli, Lari   01-20-2022

58

1    Q    And at that time you were a direct employee of
2  Frontline, not an independent contractor; is that right?
3    A    That is correct.
4    Q    Prior to Frontline, where were you employed?
5    A    I was an independent.
6    Q    And what made you decide to cease your
7  independent practice and join Frontline?
8    A    They were a great company at the time.
9    Q    But in your opinion, they were not at the time
10 you left?
11   A    They are absolutely horrific now.
12   Q    What insurance carriers did you work with
13 before Frontline when you were independent?
14   A    In the State of Florida, most of them.
15   Q    What would you say is your opinion of most of
16 the insurance carriers in the State of Florida?
17       MR. TOLLEY:  Objection to form.
18   A    They were pretty good back then.
19   Q    (By Mr. Dempsey) So prior to 2015 they were
20 good in your opinion?
21   A    Well, Frontline was good up to the last year
22 when I was there, and then they just decided they didn't
23 know what to do with any of the claims, whether to pay
24 them or not pay them.  So I think they may have been in
25 financial trouble but they didn't say anything like that

59

1  to us.
2    Q    Okay.
3    A    They went from paying literally everything to
4  paying -- they didn't want to pay and they didn't want
5  to tell them they weren't going to pay.  They just
6  wanted to kick the can down the road and people wanted
7  to know the answer.  After 90 days, it gets a little
8  upsetting when you have 125 files on your desk and you
9  can't tell anybody anything.
10   Q    Were you happier when claims were being paid
11 and you could tell insureds that they were being paid
12 and have them satisfied, is that right?
13   A    I pretty much didn't care if you were paying
14 it or denying it.  But you have to tell them something.
15 If it's a legitimate denial, I don't care.  If it should
16 be denied, it should be denied.  But if you are just
17 going to kick the can down the road and tell them you
18 will call them back next month, and then you have the
19 same answer for them next month, that's unacceptable.
20   Q    All right.  And you said you handled several
21 hundred Irma claims.  Did you consider any to be
22 legitimate denials?
23   A    Absolutely.
24   Q    And so following Frontline you went to Mid-
25 America Claims.  When you were with Mid-America Claims,

60

1  that's when you were handling claims for United Property
2  & Casualty as an independent adjuster; is that correct?
3    A    Yes.
4    Q    And when you received the assignment for this
5  claim from Mid-America Claims on behalf of UPC, did you
6  speak to anyone at UPC?
7    A    No.
8    Q    Did you ever receive an email or a
9  communication from anyone at UPC regarding the handling
10 of the claim?
11   A    No.
12   Q    You stated that you were told to not write
13 damages and to deny.  Is that a fair assessment of your
14 testimony here today?
15   A    No.  I was told to not write the word damage,
16 not to write for any damages, that they were going to -
17 - again, I don't -- as an independent, we don't have
18 coverage decisions, we don't say whether it's covered or
19 not.  We write the damages and send it in to be
20 discovered by the desk adjuster who would then make the
21 coverage decision whether they wanted to pay it or not.
22 We were told that they were going to deny everything for
23 late reporting.
24   Q    Who told you that?
25   A    The meeting Keith Kraft and all the managers

61

1  had with us that night.
2    Q    And so Keith Kraft, he is an employee of Mid-
3  America Claims, right?
4    A    That is correct.
5        MR. TOLLEY:  I'm sorry, is it Heath or Keith?
6  Because I wrote down Keith.
7    A    Keith, K-E-I-T-H.
8    Q    (By Mr. Dempsey) And what managers were
9  present at this meeting?
10   A    I believe all of them.  Steve Turner, Cindi
11 Bootier, I believe everybody was there that worked for--
12   Q    These were all managers for Mid-America
13 Claims; correct?
14   A    That's correct.  And again, I believe someone
15 was there from UPC, but I couldn't say for sure.
16   Q    You believe there was somebody from UPC, but
17 you don't know who or for sure; correct?
18   A    That is exactly what I just stated.  Yes, sir.
19   Q    The only people you do know are Mid-America
20 Claims employees.  When was this meeting?
21   A    The date, I don't know the date.  It was at
22 night.
23   Q    It was at night, you don't recall when.  Was
24 this in 2017 shortly after Irma?
25   A    No.  I didn't work for them at that point.



Piscitelli, Lari   01-20-2022

62

1    Q   Okay.  Was this is 2018?
2    A   I believe it was 2019.
3    Q   Okay, so in --
4    A   2020 is when I did the claims.  I think 2019
5    is actually when the meeting occurred.  I can't say
6    exactly when.  I can't even say exactly when it was.  I
7    just know that we had a meeting and it was around 7:00
8    at night.
9    Q   In approximately 2019 which is two years after
10   Hurricane Irma; correct?
11   A   Correct.
12   Q   And where was this meeting?
13   A   Online.
14   Q   It was online on Zoom, is that right?
15   A   I said it wasn't Zoom at the time.  I don't
16   know what it was, but it was like a Zoom.
17   Q   Okay.
18   A   I don't know that Zoom existed at this point.
19   Q   How did you learn about this meeting or get
20   invited to this meeting?
21   A   They texted us or emailed us that we needed to
22   be at a meeting that night.
23   Q   Who would have texted you or emailed you?
24   A   Mid-America.
25   Q   Okay.  So this was a Mid-America meeting;

63

1    correct?
2    A   That is correct.
3    Q   Okay.  At this meeting, did you see any
4    documentation, paperwork, from United Property &
5    Casualty Insurance Company?
6    A   No.  It was basically a verbal meeting.  You
7    didn't see anything.
8    Q   Yeah.  So you received no documentation,
9    correspondence, or anything else from United Property &
10   Casualty in connection with this meeting; correct?
11   A   Correct.
12   Q   And you don't know whether or not you saw
13   anyone who was an official representative of United
14   Property & Casualty; correct?
15   A   It was a verbal meeting.  I didn't see
16   anybody.
17   Q   That's not what I asked.  You didn't see
18   anyone, so you don't know if there was anyone from
19   United Property; correct?
20   A   I've already stated that several times
21   throughout this meeting.  Yes.
22   Q   Did anyone at the meeting say that they were
23   an employee of United Property & Casualty?
24   A   I don't remember everything that was said that
25   night.  I was doing 60 claims a month at that time, so--

64

1    Q   Was this meeting before your involvement in
2    the claim that we are here for today?
3    A   Yes.
4    Q   Okay.  When you were hired, were you asked to
5    give a coverage determination?  When you were hired for
6    this claim rather?
7    A   No.  I was told just the opposite leading up
8    to this claim, that we are not to be doing anything with
9    coverage.
10   Q   Have you ever been instructed by United
11   Property & Casualty to provide a coverage determination?
12   A   I don't believe so.
13   Q   No.  Have you ever been a direct employee of
14   United Property & Casualty?
15   A   I have not.
16   Q   Okay.  Is it fair to say that you were hired
17   to observe the damages and investigate the claim;
18   correct?
19   A   I was hired to take photos and send in a
20   report.
21   Q   Okay.  Not to give any opinion as to
22   causation; correct?
23   A   Not to write the word damages.  Not to give
24   any opinions.
25   Q   No one asked for your opinion as to causation;

65

1    correct?
2    A   Nope.
3    Q   And you're not an engineer; correct?
4    A   I am not.
5    Q   So other than just your opinion from, I don't
6    know, visual observations, you don't really have a basis
7    for providing a coverage determination or an opinion
8    like an engineer would; correct?
9    A   I'm pretty sure I've been on quite a few more
10   roofs than any engineer in the state, but I'm not an
11   engineer.
12   Q   Okay.  You said that these days you are doing
13   appraisals; is that right?
14   A   That's correct.
15   Q   Do you make more money now or when you were
16   working as an independent adjuster?
17   A   Right about the same.
18   Q   Yeah.  And it was clear that you have some,
19   well, for lack of a better term, that you were
20   disgruntled I'd say as shown by your anger at some of my
21   frankly standard objections.
22       Do you have any personal problems with United
23   Property & Casualty?  Is there a reason for your anger
24   here today, frankly?
25       MR. TOLLEY:  Objection to form.



Piscitelli, Lari   01-20-2022

66

1   A   I'm pretty sure I triggered the anger when you
2   objected to everything that had already been said. And I
3   think you said you wanted to object to any future
4   questions as well.  You were --
5   **Q   (By Mr. Dempsey) I'm an attorney.**
6   A   That frustrated me.  And yes, I am upset with
7   UPC.  Again, I've worked claims for 13 years for some of
8   the biggest carriers and some of the smallest carriers
9   in the State.  And leading up to that point, I was a
10  pretty decent human being and enjoyed taking care of
11  customers.  But when you time after time and you call
12  the office and say listen, there is literally missing
13  tiles all over this, can I please write it, and you are
14  told no over and over again, it gets a little
15  disheartening.
16  **Q   That was not your job; correct?**
17  A   Pardon me?
18  **Q   That was not your job; correct?**
19  A   My job is to find if there is any damages and
20  write an estimate of damages --
21  **Q   Were you hired by United Property -**
22  A   Are you going to talk or am I going to talk?
23  If you are going to ask a question, please let me
24  answer.
25  MR. TOLLEY:  If we could just -- Yeah. Eliot,

67

1   if you could let him finish his answer -
2   MR. DEMPSEY:  Mr. Tolley, you don't represent
3   the deponent.
4   MR. TOLLEY:  I don't, but -
5   MR. DEMPSEY:  I'm asking the questions -
6   THE WITNESS:  If you want to keep on arguing,
7   I'm good to go all fucking day long.  Don't
8   interrupt me when I'm talking.  I don't interrupt
9   you.  You asked a question.  Let me finish the
10  answer.
11  MR. DEMPSEY:  Madam Court Reporter, if you
12  could please read back the last question, I was in
13  the process of asking it.
14  MR. TOLLEY:  Well, but I'm not representing
15  him, but I'm also trying to keep a clear record and
16  the Court Reporter is having a difficult time. If
17  we could just allow the witness to answer the
18  questions that are asked and then you can ask him
19  any question you want after that, we can do that.
20  There is no need for everyone to get upset, get
21  angry.  Let's perform this in a professional
22  manner.  Ask the questions, Mr. Dempsey, you know -
23  MR. DEMPSEY:  All due respect -
24  MR. TOLLEY:  Let's not talk over each other,
25  again, Mr. Dempsey.

68

1   MR. DEMPSEY:  I want you to stop so I can
2   continue my portion of the deposition.  Okay?
3   MR. TOLLEY:  So you can continue, but please
4   do not -
5   MR. DEMPSEY:  I don't need a speaking
6   objection.  Make your objection and then that's it.
7   MR. TOLLEY:  Mr. Dempsey, quite frankly, the
8   way you are handling this deposition requires some
9   type of order at some point.  You are talking over
10  the witness, and personally attacking the witness,
11  you are talking over me.  If you could please just
12  perform your job, ask the questions, let him
13  answer, we will continue going forward.  Thank you.
14  MR. DEMPSEY:  I'll try.  Okay.
15  **Q   (By Mr. Dempsey) Mr. Piscitelli, it was not
16  your job or part of your job description at United
17  Property & Casualty to provide coverage determination;
18  correct?**
19  A   No.  It was my job to find any damages and
20  write any damages that I find, normally.
21  **Q   That's not what I asked.  That's not what I
22  asked.**
23  A   On this claim, I was told not to cover any
24  damages.  So no, I was not to do any coverage decisions
25  on this loss.

69

1   **Q   Okay.  Following your inspection of the
2   property, what was your involvement of the claim next?**
3   A   None.
4   **Q   Did you write the denial letter?**
5   A   No.
6   **Q   Did you have any role whatsoever in the
7   coverage determination?**
8   A   No.
9   **Q   And it bothers you that nobody asked you for
10  your opinion; is that correct?**
11  A   No.
12  **Q   Okay.  So what bothered you about United
13  Property on this claim?**
14  A   It bothered me that we were told not to write
15  any damages that we found.
16  **Q   But that was only told to you by Mid-America
17  Claims; correct?**
18  A   Okay.  Can I finish the answer?
19  **Q   Okay.**
20  A   It bothered me that we weren't allowed to
21  write the word damages anywhere.  It bothered me that we
22  couldn't write any damages that we found, not matter
23  what we found.  So that's what bothered me, sir.
24  **Q   Okay.  And let me repeat.  That was only told
25  to you by Mid-America Claims; correct?**



Piscitelli, Lari  01-20-2022

70

1    A    Correct.
2    Q    You never heard that from United Property
3    either orally or in writing; correct?
4    A    Correct.
5    Q    So --
6    A    I also never had that with any of the other
7    carriers.  So none of the other carriers said that they
8    were going to -- you are insinuating that Mid-America
9    just told us to do this and not UPC.  Well, I worked
10   probably 10 different carriers at that time, and none of
11   them told us to do that.
12   Q    Okay.  You previously stated that Frontline
13   also would not allow you to make coverage decisions and
14   that upsetted you; correct?
15   A    No.  I said Frontline would not make -- they
16   would not make them themselves.  They would not make a
17   determination whether they wanted us to pay it or not
18   pay it.
19   Q    Okay.  So it's fair to say that you have been
20   upset twice in your career with insurance carriers.  Once
21   with Frontline when they did not make coverage
22   determinations to your liking, once with United Property
23   & Casualty because they didn't allow you to make
24   coverage determinations.  Isn't that correct?
25        MR. TOLLEY:  Objection to form.

71

1    A    False.  You are putting words in my mouth.  Do
2    you find something funny, sir?  Isn't that what you
3    asked me, now you're laughing.  Do you find something
4    funny?
5    Q    (By Mr. Dempsey) I'm trying to do my job here,
6    sir.
7    A    Yeah.  Keep on laughing.
8    Q    When you went to the property and inspected,
9    you noticed that there were tiles that were discolored;
10   correct?
11   A    I noticed that there were new tiles that did
12   not match.
13   Q    Okay.  And what was the age of those tiles?
14   A    They looked rather new.
15   Q    And you can't put a number on how new?
16   A    New.
17   Q    Do you know when those repairs were made?
18   A    He said he made them right after the storm.
19   Q    Okay.  Which would have been in 2017; correct?
20   A    I suppose so.  I didn't have a receipt or an
21   invoice for it, so I can't really tell you.
22   Q    What's the date that you were at the property?
23   A    The date I was at the property was 3/25/2020.
24   Q    What do you see as the date this claim was
25   reported to UPC?

72

1    A    I don't know what day they reported that on, I
2    don't get that information.
3    Q    Well, please check your file and your
4    documents.
5    A    I'm looking at it.  I get an email from you
6    guys, or from XactAnalysis that came in on 3/23.  I
7    don't know if that's when they reported it.  They don't
8    say loss reported on such and such day.  It just says
9    date of loss.
10   Q    Do you have any correspondence or documents
11   from UPC or anything from the claim, do you see a date
12   reported of March 20, 2020?
13   A    Again, I got the email on 3/23/2020.  I have a
14   date of loss of 9/10/2017.  Those are the dates that I
15   have, except for received it by XactAnalysis on
16   3/23/2020.
17   Q    So by your recollection, the Insured may have
18   made repairs in 2017; is that correct?
19   A    He just said there was repairs made after the
20   storm.  He didn't -- I can't tell you exactly when the
21   repairs were made.  He didn't have an invoice.
22   Q    Okay.  If this claim was reported in March 20,
23   2020, that would mean that he made repairs basically
24   three years prior to him reporting the claim; is that
25   right?

73

1        MR. TOLLEY:  Objection to form.
2    A    It would be right if that's when he did it.
3    Q    (By Mr. Dempsey) Okay.  And he had no receipts
4    or documentation of repairs; correct?
5    A    That is correct.
6    Q    Okay.  Did you see any photos of the roof or
7    the home prior to Hurricane Irma?
8    A    I did not.
9    Q    Did you see any photos of the roof prior to
10   these repairs being made?
11   A    I did not.
12   Q    Did you see any photos or documents for the
13   roof prior to your investigation at the property?
14   A    I did not see prior photos of this home at any
15   time.
16   Q    Okay.  How did you rule out that these prior
17   repairs were made prior to Irma?
18        MR. TOLLEY:  Objection to form.
19   A    I didn't rule out anything.  I wasn't allowed
20   to cover anything or write any damages.  There was no
21   reason to figure any of that out.  I asked if he had a
22   receipt for the repairs and he said no and that's all I
23   could put into my report.
24   Q    (By Mr. Dempsey) You previously stated that
25   the Insured, you took him at his word, and that's not



74

1 exact translation of what you stated.  But you believed
2 the Insured; is that correct?
3     A    I do.
4     Q    Okay.  But he didn't provide any documentation
5 to show when he did or did not make these repairs;
6 right?
7     A    That is correct.
8     Q    And he didn't have any documentation, photos,
9 or evidence of the roof prior to Hurricane Irma or the
10 repairs; correct?
11     A    That's correct.
12     Q    So there's really no way to determine whether
13 these repairs were made before Irma, after Irma, or when
14 they were made; correct?
15     A    Unless I'm giving the Insured the benefit of
16 the doubt.
17     Q    Is there any way to determine when the damages
18 occurred, if they were before Irma or after?
19     A    Depending on when he bought the house and if
20 there was an inspection done before he bought the house.
21 I don't know if he's the original owner. There's lots of
22 different ways that could have been done.  But there's
23 historic photos as well.
24     Q    And you did not review those; correct?
25     A    We do not have any access to any system like

75

1 that when I was working with them.
2     Q    Had any interior repairs been made in the
3 house?
4     A    There were interior damages in the garage that
5 had not been made.
6     Q    And you inspected the interior; correct?
7     A    Yes.
8     Q    All right.  And how did you determine when
9 those interior damages occurred?
10     A    Again, it didn't matter.  I didn't -- I'm not
11 -- they never asked us to determine when anything
12 happened.  They said they weren't paying for anything.
13 So I document what I've seen as far as damages and
14 turned in a report.
15     Q    When you say they said they weren't paying for
16 anything, that's Mid-America Claims; correct?
17     A    That's correct.
18     Q    Okay.  Did the Insured tell you why they did
19 not report the claim sooner?
20     A    Not to my knowledge.
21     Q    Did the Insured state why they did not report
22 after they made the prior repairs?
23     A    Not to my knowledge.
24     Q    Did the repairs appear to be made by a
25 professional?  Or --

76

1     A    I can't really say.  Again, the tiles were
2 temporarily glued together.  A few of them were coming
3 apart.  That cap tile on the top seemed to be holding.
4     Q    What was the adhesive he used?
5     A    Again, I don't know.  I don't know what kind
6 of adhesive.  There's hundreds of different kinds of
7 adhesives.  Whether it was the right one or the wrong
8 one, I can't really say.  It had already separated on a
9 couple of them, so -- I'm not a chemical engineer.  You
10 would have to take a sample of what that was to try to
11 figure out what it is.
12     Q    Earlier you said you are doing appraisals. Who
13 do you do appraisals for?
14     A    St. John's Insurance, AAA Insurance.
15     Q    And how much a year are you making doing
16 appraisals?
17     A    That's none of your business.
18     Q    You said it's about the same as when you were
19 an independent adjuster; correct?
20     A    That's correct.
21     Q    So some of your frustrations are not financed
22 based; is that correct?
23     A    None of them are financed based.  Let me
24 restrict you from doing your job and see how you feel
25 about it.

77

1     Q    What was the circumstances surrounding your
2 departure from Mid-America Claims?
3     A    I told them that I couldn't continue on down
4 the road of doing UPC claims anymore because of what was
5 transpiring.
6     Q    So you resigned?
7     A    Yes.
8     Q    Did they make an effort to retain you?
9     A    Yes.
10     Q    You decided you could no longer work UPC
11 claims; that's correct?
12     A    That is correct.
13     Q    Due to personal animus; is that fair?
14     A    It wasn't personal.  It's business.  You don't
15 run a business that way when you have contracts.  It's
16 unethical.  Again, we as adjusters had to take that oath
17 when we got our license.
18     Q    So have you ever violated your ethical oath?
19     A    I mean, like, 90% of the stuff I did for UPC
20 would probably be listed as unethical, but you know,
21 again, it wasn't my directive and yes, that's one of the
22 reasons why I don't work carrier daily claims anymore
23 because of that.
24     Q    Okay.  But again, you never, ever heard from
25 UPC in any way that they wanted you to handle the claim



Piscitelli, Lari   01-20-2022

78

1 that way?  You only heard that from Mid-America Claims;
2 correct?
3      A    That's correct.
4      Q    Okay.  So is it fair to say that perhaps your
5 disgruntled feelings are better directed to Mid-America
6 Claims?
7      A    So, I've been doing this for 13 years.  I've
8 got probably a couple hundred adjuster friends that work
9 for all different firms, and we were all going through
10 it and we were all having conversations about going
11 through it.  So --
12      Q    All right.  At this time, I have no further
13 questions.
14      MR. TOLLEY:  I do have some follow up
15 based on your Cross Examination.
16            RE-DIRECT EXAMINATION
17 BY MR. TOLLEY:
18      Q    And I'll lead off on that last point that
19 opposing counsel just left off on, Mr. Piscitelli.
20      With regard to Mid-America Claims, you handled
21 several other carriers for them as well at the same time
22 as you handled UPC; correct?
23      A    That's correct.
24      Q    Okay.  And on those other claims, were you
25 instructed to do exactly as you were instructed to do on

79

1 UPC claims?
2      A    I was not.
3      Q    Okay.  So even though it was Mid-America
4 Claims that was giving you this direction, how do you
5 know it was a direction of UPC?
6      A    Because I kept on going back and saying that
7 this was wrong, and they said it was our directive and
8 we have to stick to it.
9      Q    And what is a directive?  Is that some type of
10 direction from the client --
11      A    From the Carrier.
12      MR. DEMPSEY:  Objection.  Form.
13      Q    (By Mr. Tolley) Okay.  And you had mentioned
14 to opposing counsel that during that time that you were
15 adjusting claims for Mid-America Claims that there were
16 legitimate denials; correct?
17      MR. DEMPSEY:  Form.
18      A    Yes.
19      Q    (By Mr. Tolley) Okay.  But in cases like this
20 where you weren't even allowed to go out there and --
21 well, let me ask you this.
22      You were under the understanding that these
23 claims were all going to be denied; correct?
24      A    Yes.
25      Q    So when you went out to the Roberson house,

80

1 that claim was going to be denied before you ever
2 stepped foot on it; correct?
3      A    That is correct.
4      Q    Okay.  So that, you would agree with me, would
5 not be a legitimate denial?
6      MR. DEMPSEY:  Objection to form.
7      Q    (By Mr. Tolley) Correct?
8      A    That's correct.
9      MR. DEMPSEY:  Objection to form.
10      Q    (By Mr. Tolley) Okay.  And then opposing
11 counsel spoke to you about the emails.  I did send you
12 an email today, I don't know if you got it, but it
13 attached your photos and -- it attached your photos and
14 your zero line estimate because I didn't know if you
15 were going to have those prior to your deposition today.
16      But that and obviously the notice of taking
17 deposition, those were the only two correspondences from
18 my firm; correct?
19      A    I guess you did.  It's in my junk mail.
20      Q    I guess you didn't see it anyways.  All right.
21      So those would be the two correspondences that
22 we sent to you; correct?  Via email at least?
23      A    Yes.
24      Q    Yes?
25      A    Yeah.

81

1      Q    And going back to opposing counsel's opinion
2 about the directive.  When you spoke to Mr. Kraft -- you
3 indicated that you spoke to Mr. Kraft several times
4 about your frustration with this policy; correct?
5      MR. DEMPSEY:  Objection.  Form.
6      A    I don't know if it was this policy in
7 particular.  It was basically a few other ones that I
8 had called earlier on in this process.
9      Q    (By Mr. Tolley) Okay.  When I say policy, I
10 didn't mean like an insurance policy.  I mean with the
11 directive that was given, you spoke to Mr. Kraft about
12 that multiple times, right?
13      A    Several times.  Yes.
14      MR. DEMPSEY:  Objection.  Form.
15      Q    (By Mr. Tolley) And did Mr. Kraft indicate
16 that that was all Mid-America Claims or that was UPC's
17 directive?
18      MR. DEMPSEY:  Objection.  Form.
19      A    UPC.
20      Q    (By Mr. Tolley) Okay.  I'm just looking at my
21 notes real quick.
22      Opposing counsel spoke to you about your time
23 with the insurance company prior to your time with Mid-
24 America Claims.  When you left I believe it was
25 Frontline, that was a different experience than UPC;



Piscitelli, Lari   01-20-2022

82

1  correct?
2        MR. DEMPSEY:  Objection.  Form.
3     A   Absolutely.
4     Q   **(By Mr. Tolley) Okay.  And what was the**
5  **difference in that circumstance?**
6     A   They didn't want to make any decisions.
7     Q   **Okay.  And did UPC --**
8     A   To pay it or not pay it.  UPC made the
9  decision that they weren't paying it.
10       MR. DEMPSEY:  Objection.  Form.
11    Q   **(By Mr. Tolley) I have no further questions.**
12          **RE-CROSS EXAMINATION**
13  BY MR. DEMPSEY:
14    Q   **Just a quick one.  Are you a public adjuster?**
15    A   I am not a public adjuster?
16    Q   **You are not a licensed public adjuster?**
17    A   I am not a public adjuster in any state.
18    Q   **Okay.  That's it.  Thank you.**
19       MR. TOLLEY:  Mr. Piscitelli, do you want to
20  read or waive?
21       THE WITNESS:  Waive.
22       (Deposition concluded at 4:05 p.m.)
23       (Reading and signing of the deposition by the
24       witness has been waived.)
25

83

1            CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5     I, BRANDY SPOUTZ, Court Reporter and Notary Public
6  for the State of Florida, do hereby certify that I was
7  authorized to and did digitally report and transcribe
8  the foregoing proceedings, and that the transcript is a
9  true and complete record of my notes.
10    I further certify that I am not a relative,
11  employee, attorney or counsel of any of the parties, nor
12  am I a relative or employee of any of the parties'
13  attorneys or counsel connected with the action, nor am I
14  financially interested in the action.
15
       Witness my hand this 24th day of January, 2022.
16
17
18
19
20
21
22  _____
    BRANDY SPOUTZ, COURT REPORTER
23  NOTARY PUBLIC, STATE OF FLORIDA
24
25

84

1            CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5     I, BRANDY SPOUTZ, the undersigned authority,
6  certify that LARI PISCITELLI appeared before me remotely
7  pursuant to Florida Supreme Court Order AOSC20-23 and
8  was duly sworn on the 20th day of January, 2022.
9
       Witness my hand this 24th day of January, 2022.
10
11
12
13
14
15
16
17  _____
    BRANDY SPOUTZ, COURT REPORTER
18  NOTARY PUBLIC, STATE OF FLORIDA
    Commission No.:  GG 292082
19  Commission Exp:  09/05/2022
20
21
22
23
24
25



877.291.3376
www.UCRinc.com

| | | | |
|---|---|---|---|
| **$** | **200** 16:14 22:8 | **3/25/2020** | **82** 3:8 |
| **$180** 21:1 | **2015** 9:13 | 21:17 71:23 | |
| **$340** 13:22 | 56:23 58:19 | **300** 22:8 | **9** |
| | **2017** 17:11,18 | **305-372-9044** | **9/10/2017** |
| **0** | 61:24 71:19 | 2:10 | 72:14 |
| **09/05/2022** | 72:18 | **32** 4:6 | **90** 59:7 |
| 84:19 | **2018** 62:1 | **33020** 2:5 | **90%** 77:19 |
| | **2019** 19:22 | **33442** 2:10 | |
| **1** | 56:4,7,23 | | **A** |
| **10** 17:11,17 | 62:2,4,9 | **4** | **a/a/o** 1:5 5:9 |
| 70:10 | **2020** 9:13 | **4:05** 82:22 | **AAA** 76:14 |
| **10th** 39:18 | 19:21,22 | **4:05PM** 1:17 | **ability** 8:4,8 |
| **11** 28:23 | 24:11 25:6 | **4:20** 38:16 | 15:6 33:11 |
| **1191** 2:9 | 56:4 62:4 | **4:21** 39:23 | 46:22 47:9 |
| **12:58** 39:10 | 72:12,23 | **43** 4:5 | **able** 15:6 21:3 |
| **125** 59:8 | **2021** 39:10,16 | | 25:10 |
| **13** 9:10 12:7 | **2022** 1:16 | **5** | 27:15,16 |
| 30:10 38:10 | 5:2,6 39:18 | **50** 38:10 | 47:11 49:18 |
| 41:11 66:7 | 83:15 84:8,9 | **501** 2:4 | 50:21 51:24 |
| 78:7 | **20-CA-007448** | **52** 3:5 | 57:22 |
| **14** 4:3 31:13 | 1:3 5:11 | **520** 54:3 | **about** 9:10 |
| **150** 16:14 | **20th** 1:1,16 | **561-245-4703** | 11:8,13 14:4 |
| **17** 39:9 | 5:5 84:8 | 2:5 | 15:22 16:9 |
| **18** 31:20 | **24** 4:4 | | 17:7 20:13 |
| **19** 23:12 56:2 | **24th** 83:15 | **6** | 22:22,24 23:1 |
| **1909** 2:4 | 84:9 | **6** 3:3 | 24:9 27:13 |
| | **25** 24:10 | **60** 22:16 63:25 | 28:24 29:8 |
| **2** | **25%** 34:5 | **60%** 13:22 | 31:17,21 |
| **2:00** 5:6 | **25th** 25:6 | | 34:22 36:25 |
| **2:00PM** 1:17 | **27** 39:16 | **7** | 37:13 |
| **2:12** 15:12 | **292082** 84:18 | **7:00** 62:7 | 40:7,8,20 |
| **2:13** 6:9 7:20 | | **70%** 24:4 | 43:7,24,25 |
| 12:15 | **3** | **78** 3:6 | 46:15 49:22 |
| **2:16** 39:16 | **3/23** 72:6 | | 62:19 65:17 |
| **20** 5:2 22:16 | **3/23/2020** | **8** | 69:12 |
| 56:2 72:12,22 | 16:20 | | 76:18,25 |
| | 72:13,16 | | 78:10 80:11 |
| | | | 81:2,4,11,22 |
| | | | **absolutely** |
| | | | 13:6 35:17 |



52:3 57:6
58:11 59:23
82:3

**access** 14:15
15:3,10 16:6
74:25

**accommodated**
40:1

**account** 35:10

**across** 37:24

**acting** 6:7

**action**
83:13,14

**actually** 11:24
15:4 18:9
25:5 45:8
50:21 51:16
62:5

**addition** 39:25

**address** 39:16

**adhesive**
76:4,6

**adhesives** 76:7

**adjust** 40:10
50:21

**adjusted** 28:5

**adjuster**
8:19,20
9:19,21 10:23
12:3,6 19:10
25:20
26:16,18
28:6,14 32:11
39:14 44:13
55:6 56:7
60:2,20 65:16
76:19 78:8
82:14,15,16,1

7

**adjusters** 19:2
21:24 22:9,13
36:2,5 77:16

**Adjuster's**
54:16

**adjusting**
26:19 44:11
79:15

**advance** 7:2

**affect** 8:4,8

**affected** 46:22

**after** 6:1
14:22 24:23
26:4,12 30:4
31:22 32:5,6
35:2,7,8
41:10 43:19
46:21 50:11
51:17 59:7
61:24 62:9
66:11 67:19
71:18 72:19
74:13,18
75:22

**afternoon** 5:17
6:5 52:8

**again** 20:6
29:18 38:18
39:5 40:23
46:25 47:19
50:10 54:16
60:17 61:14
66:7,14 67:25
72:13 75:10
76:1,5
77:16,21,24

**against** 12:11
54:6

**age** 71:13

**ago** 20:6 38:19

**agree** 45:18
80:4

**agreed** 38:21

**ahead** 6:8
7:11,19 10:7
15:12,13
29:12 32:15
38:13 56:8

**Alabama** 12:4

**alcohol** 8:7

**all** 1:18 5:13
6:15 7:21,23
8:13 14:14
15:21 17:2
18:14 23:11
24:8 31:25
32:8 33:7
36:11,19,24
37:14 39:4
40:5,13,15
41:19 50:15
59:20 60:25
61:10,12
66:13 67:7,23
73:22 75:8
78:9,10,12
79:23 80:20
81:16

**allow** 39:7
67:17
70:13,23

**allowed**
34:16,23 40:1
47:4,15,19
69:20 73:19
79:20

**Allstate** 11:3
56:12

**age** 71:13

**along** 21:8

**already** 16:2
18:19 23:24
33:7 41:4
42:20 45:11
57:11 63:20
66:2 76:8

**also** 5:21,23
38:14
48:1,9,19
67:15 70:6,13

**Although** 24:24

**am** 8:12 12:3
36:17 65:4
66:6,22
82:15,17
83:10,12,13

**America** 9:18
10:22 20:1
21:20 22:2
59:25 61:3
81:24

**analysis** 42:18

**anger** 65:20,23
66:1

**angry** 67:21

**animus** 77:13

**Annette** 1:5
5:9

**annotate** 43:3

**annotated** 43:2

**another**
31:13,20

**answer**
6:15,18,23,25
17:20 18:13
22:21 33:14
56:1 57:24



59:7,19 66:24
67:1,10,17
68:13 69:18

**answering** 6:19

**answers** 41:24

**any** 7:18,25
8:3,7
12:8,10,25
13:4,24 14:1
15:7 17:1
18:6,14,16
19:7,10 21:7
22:22
23:2,9,10,20
25:24 27:9,13
31:17 32:24
34:23
35:13,20
37:12
39:20,24
40:21 41:9,10
42:13,19,21,2
2,23,24
43:4,24 44:18
47:16
48:3,5,7,15,2
4 49:2,19
50:2
51:11,12,24
52:19,20,23
53:6
54:6,21,24
55:2,9
56:12,16
58:23 59:21
60:16 63:3
64:21,24
65:10,22
66:3,19 67:19
68:19,20,23,2
4 69:6,15,22
70:6 72:10
73:6,9,12,14,

20,21
74:4,8,17,25
75:2 77:25
82:6,17
83:11,12

**anybody** 14:4
17:5 26:18
51:7
52:11,13,16
59:9 63:16

**anymore** 13:4,5
35:4 41:17
51:15 77:4,22

**anyone** 14:11
60:6,9
63:13,18,22

**anything** 12:11
14:5
20:12,13,14
21:7 23:1
25:2 27:12
35:24 43:7,25
47:14,15,20
57:17 58:25
59:9 63:7,9
64:8 72:11
73:19,20
75:11,12,16

**anyways** 46:3
80:20

**anywhere** 22:15
69:21

**AOSC20-23** 1:19
5:13 84:7

**apart** 55:5
76:3

**apologize** 7:2

**apparently**
24:24

**appear** 75:24

**APPEARANCES**
2:1

**appeared** 1:18
27:4 30:12
84:6

**appearing** 5:13

**appears** 16:20
25:7 31:15
39:9

**applied** 40:15

**appraisals** 9:8
13:9 50:13
65:13
76:12,13,16

**appreciate**
15:15

**appreciated**
39:8

**approximate**
7:12

**approximately**
5:6 19:18
39:10 62:9

**approximation**
7:10

**area** 18:6

**areas** 37:19
42:19

**arguing** 67:6

**around** 9:12
50:14 62:7

**ask** 6:15
7:4,5,23 9:11
12:14 14:3
21:14 31:17
41:23 66:23
67:18,22

68:12 79:21

**asked** 8:1 15:3
35:3 37:25
42:6 43:24
49:12 51:19
63:17 64:4,25
67:9,18
68:21,22 69:9
71:3 73:21
75:11

**asking** 6:22,25
14:9 30:1
40:6 55:25
57:15 67:5,13

**assessment**
60:13

**assigned**
16:16,22

**assignment**
60:4

**assume** 14:14

**attached** 80:13

**attacking**
68:10

**attend** 6:10
40:2

**attorney** 5:20
6:6 41:9 52:9
66:5 83:11

**attorneys** 14:5
83:13

**authority** 84:5

**authorized**
83:7

**automatically**
33:5

**avoid** 6:18

**aware** 11:18



17:13

---

B

**back** 6:11 9:23
15:2 29:4
58:18 59:18
67:12 79:6
81:1

**background**
8:12 11:22

**bad** 35:10

**based** 27:21
44:14
76:22,23
78:15

**basically**
12:23,24
16:23 19:2
20:17,24,25
55:13 63:6
72:23 81:7

**basis** 36:11
65:6

**BEACH** 2:10

**became** 55:15

**because** 11:5
18:7,11,17
22:5 24:22
29:15 30:21
31:9
34:11,17,21
36:10 38:10
41:5,14,15,16
47:2,15
48:10,20
50:20 57:7,15
61:6 70:23
77:4,23 79:6
80:14

**before**

6:9,22,25
11:21 15:22
16:8 31:14
35:6 38:16
44:4,7 51:1
53:1,4 58:13
64:1
74:13,18,20
80:1 84:6

**begin** 50:18

**beginning**
13:17 23:20

**behalf** 1:15
2:2,7 5:17,19
6:7 13:5
21:25 60:5

**believe**
10:6,11 13:16
17:15 18:24
20:6,7 33:25
35:9 44:22
52:21
61:10,11,14,1
6 62:2 64:12
81:24

**believed** 74:1

**benefit**
26:20,25 28:7
31:3 74:15

**Besides** 51:22

**better** 65:19
78:5

**between** 22:16
53:7

**biggest** 66:8

**bill** 51:20

**billed** 13:22

**billing** 12:21

**Birzon**
53:18,19

**bit** 7:1,8 8:11
16:8 24:9
31:24
49:21,23
50:14

**blanketed**
44:23 45:1

**blanketly**
28:12

**blow** 29:19
30:5

**blown** 24:4
29:21,22

**board** 37:24

**Bootier**
10:4,8,10
61:11

**B-O-O-T-I-E-R**
10:10

**both** 13:9
38:25

**bother** 57:13

**bothered** 57:22
69:12,14,20,2
1,23

**bothers** 69:9

**bought**
74:19,20

**Brandy** 1:24
5:14 83:5,22
84:5,17

**break** 6:10,13
7:18,19,21
12:15 14:22
36:13 40:2

**breakdown** 48:2

**bringing** 51:19

**brought** 47:20

**BROWARD** 83:3
84:3

**bulging** 48:11

**bulk** 48:12

**business** 76:17
77:14,15

---

C

**calendar** 34:6

**call** 8:19,20
14:7,8,12
19:13,15
21:25 26:21
59:18 66:11

**called** 6:1
41:20 43:23
51:18 81:8

**calling** 57:15

**came** 28:7
49:24 52:21
72:6

**Campos** 51:5,8

**can** 6:10,16,18
10:7 14:25
17:20 18:13
22:21 25:12
28:13 29:3
30:10,14
31:18 33:14
36:13 41:10
43:17,18
59:6,17 66:13
67:18,19
68:1,3 69:18

**can't** 18:25



20:7 24:24
25:2 26:21
29:19 30:21
31:1 34:5
41:9 56:6
59:9 62:5,6
71:15,21
72:20 76:1,8

**cap** 42:18 76:3

**caps** 30:23

**care** 59:13,15
66:10

**career** 41:11
70:20

**Carolina** 12:4

**carrier** 9:10
10:24 11:12
13:12 14:6
17:13 36:11
46:13 57:21
77:22 79:11

**carriers** 10:24
11:1 22:5
58:12,16 66:8
70:7,10,20
78:21

**case** 1:3 5:10
11:7 13:19
19:23 21:15
23:22
25:15,23 26:7
27:15,17,22
28:3 32:14

**cases** 13:4
41:9 79:19

**Casualty** 1:8
5:10 60:2
63:5,10,14,23
64:11,14
65:23 68:17

70:23

**Catastrophe**
44:11

**causation**
64:22,25

**cause** 20:10
25:14 27:16
42:17 46:17

**caused** 26:1
47:9,11

**causes** 48:4

**causing** 30:5

**CCing** 39:11

**ccooper@chartw**
**elllaw.com**
39:12

**cease** 58:6

**ceilings** 48:14

**CENTER** 2:9

**Central** 11:25
53:14,15

**CERTIFICATE**
83:1 84:1

**certifications**
55:9

**certify**
83:6,10 84:6

**chance** 8:23

**chanson@chartw**
**elllaw.com**
39:12

**CHARTWELL** 2:9

**check** 72:3

**chemical** 76:9

**Christi** 51:5

**Cindi** 61:10

**Cindy** 10:4

**CIRCUIT** 1:1

**circumstance**
82:5

**circumstances**
24:2 31:8
56:9 77:1

**claim**
10:13,19,20
11:11,18,19
12:23 13:15
16:16,22
17:1,4,6,8,14
,17 21:1
23:15
24:3,10,13
28:5,20
40:10,16
43:21 50:1,22
55:16 60:5,10
64:2,6,8,17
68:23 69:2,13
71:24
72:11,22,24
75:19 77:25
80:1

**claimed** 46:18
48:1

**claims** 8:22
9:3,5,18,22
10:1,16,21,22
11:10
13:4,7,8,11,2
5 14:12
16:10,13
17:23,24
18:10,14 19:9
21:25
22:1,3,10,14
23:7,9,10

26:19
28:13,17 31:9
34:17,20
35:14
37:4,12,20,23
39:3 40:13,15
41:17
50:1,8,9
55:19,22
58:23
59:10,21,25
60:1,5
61:3,13,20
62:4 63:25
66:7 69:17,25
75:16
77:2,4,11,22
78:1,6,20,24
79:1,4,15,23
81:16,24

**class** 53:21,23

**classes**
55:10,12,13

**clear** 7:12
65:18 67:15

**clearly** 27:3
29:1 49:24

**client** 11:16
41:20 79:10

**clients** 41:10

**close** 53:17

**closer** 35:9

**college**
11:23,24
53:11,12
54:18

**color** 29:2
30:1

**come** 25:14,24
27:16 30:24



46:22

comes 33:5
45:4

coming 14:9
26:8 29:24
76:2

commentary
41:25

Commission
84:18,19

communication
60:9

compaction
48:23

companies
55:11

company 1:9
5:10 8:18
16:6 22:25
31:8 41:12,16
44:19 50:11
57:20 58:8
63:5 81:23

competency
7:24

complaints
12:10 54:6

complete 53:23
83:9

comply 54:11

computer 24:25
25:2

concerned 49:9

concluded
82:22

conditions
48:15

conducting
5:23

confirm 42:19

conflict 38:24
40:1

conflicted
40:3

connected
83:13

connection
63:10

consider 59:21

consistent
30:4,18 31:21
32:1

construction
48:22 49:4

contact
36:4,11 51:2

contacted
51:17

continue
68:2,3,13
77:3

contractor
58:2

contracts
77:15

conversations
78:10

cooler 49:22

coordinate
38:24

copy 32:14
42:7,10 49:12

correct 8:25
14:15

16:3,4,6,7
17:8,9,12,18,
21 18:11
21:22 23:7,23
24:11
25:15,16,20,2
2 26:16,17
28:11,17,18,2
0,21 29:2
31:9,11 32:12
34:8
37:4,5,8,10
40:11,16,17
43:5,10,12,21
,22 44:1
45:11 46:1,3
47:5,7 49:17
51:12
54:19,20
55:19,20
56:5,15,24
57:5,8 58:3
60:2
61:4,13,14,17
62:10,11
63:1,2,10,11,
14,19
64:18,22
65:1,3,8,14
66:16,18
68:18
69:10,17,25
70:1,3,4,14,2
4 71:10,19
72:18 73:4,5
74:2,7,10,11,
14,24
75:6,16,17
76:19,20,22
77:11,12
78:2,3,22,23
79:16,23
80:2,3,7,8,18

,22 81:4 82:1

correspondence
63:9 72:10

correspondence
s 80:17,21

could 20:9
21:10 22:3
27:6,7 38:22
39:7 42:19
51:1 57:17
59:11 66:25
67:1,12,17
68:11 73:23
74:22 77:10

couldn't 35:4
47:3 50:23
57:16 61:15
69:22 77:3

counsel 2:1
5:15 6:10
37:18 78:19
79:14 80:11
81:22
83:11,13

counsel's 81:1

count 21:11

COUNTY 1:2
83:3 84:3

couple 7:24
24:23 28:2
46:21 47:25
76:9 78:8

Court
1:1,19,24
5:4,12,14,15
6:16 10:8
48:11
67:11,16
83:5,22
84:7,17



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

**cover** 37:15
47:15 68:23
73:20

**coverage** 19:7
27:17 31:4
46:22 47:17
56:12,15,16,1
9 57:8,12,24
60:18,21
64:5,9,11
65:7 68:17,24
69:7
70:13,21,24

**coverages**
47:20

**covered** 31:18
48:2 57:25
60:18

**covering** 21:6

**cracked**
21:10,12
42:18 43:1

**cracking** 48:12

**cracks** 34:1,3

**create** 33:3

**created** 33:4

**Cross** 3:4 52:6
78:15

**current** 54:4

**currently** 8:16

**customer** 38:10

**customers**
66:11

―――――――
                D
―――――――
**daily** 34:17
41:17 77:22

**damage** 18:16

19:4,5
21:3,7,9
26:1,21,23
27:1 30:19
33:23 44:13
47:10 48:4,25
60:15

**damages** 21:8
33:12 34:23
37:14 40:21
42:14,21,23,2
4 43:4,8,10
44:16,19
45:13 46:7,18
48:1,7,9,20
60:13,16,19
64:17,23
66:19,20
68:19,20,24
69:15,21,22
73:20 74:17
75:4,9,13

**date** 17:10,16
19:19 35:3
61:21
71:22,23,24
72:9,11,14

**dates** 39:13
72:14

**day** 50:15,16
67:7 72:1,8
83:15 84:8,9

**days** 59:7
65:12

**debond** 29:15

**decent** 66:10

**decide** 58:6

**decided** 58:22
77:10

**decision** 60:21

82:9

**decisions**
56:13,15,16,1
9 57:12 60:18
68:24 70:13
82:6

**deemed** 23:15

**DEERFIELD** 2:10

**defect** 48:2

**defective**
48:21 49:3

**defective-type**
48:25

**Defendant** 1:10
2:7 5:19 52:9

**deference** 6:24

**definitely**
27:5,6,7 31:1
38:12

**degree**
54:14,15,18

**Dempsey** 2:8
3:5,8 5:19,20
13:20 14:8,17
15:15
17:19,25
18:4,8,12,22
19:6 20:11,23
21:13,21
22:20 23:8,17
24:6 25:17,21
26:3
27:2,11,19,23
28:9 30:7,20
31:5,10 33:13
34:12 35:16
36:7,13,17,19
37:9,16
38:7,14,18
39:6

40:12,18,23
41:2,19
42:1,9,15,25
43:6,11
44:2,21,25
45:3,10,16,21
46:4,9,24
47:6,13,18
48:17 49:6
50:5,25 51:13
52:2,7,9
57:13 58:19
61:8 66:5
67:2,5,11,22,
23,25
68:1,5,7,14,1
5 71:5
73:3,24
79:12,17
80:6,9
81:5,14,18
82:2,10,13

**denial** 4:5
28:2 43:14,24
44:4,6,9
59:15 69:4
80:5

**denials** 59:22
79:16

**denied** 18:7,17
24:5,14
27:22,25 28:3
34:24 35:12
59:16 79:23
80:1

**deny** 19:3
23:25
60:13,22

**denying** 20:14
28:12 31:9
59:14





department
  51:3,18

departure
  56:10 77:2

depending
  11:10 13:12
  74:19

depends
  29:18,23

depo 8:13
  38:19,22,25
  39:4 40:2

deponent 67:3

depos 38:10

deposition
  1:15 5:1,7,24
  6:9 7:25
  8:2,25 12:16
  14:20 15:20
  27:25 36:23
  37:18
  39:18,20,25
  42:2 49:24
  50:10
  52:10,21
  68:2,8
  80:15,17
  82:22,23

depositioned
  41:6

depositions
  38:11 39:14
  50:19
  51:4,14,23

described
  48:25

description
  4:2 68:16

design 48:21

desk 25:19
  36:1,4 59:8
  60:20

destroy 48:4

deteriorated
  46:13

deterioration
  44:17 46:12

determination
  46:23 64:5,11
  65:7 68:17
  69:7 70:17

determinations
  57:8 70:22,24

determine
  20:10 46:17
  47:3,4,9,11,1
  4 74:12,17
  75:8,11

determined
  17:14 26:24
  43:10 44:15

determining
  45:13

didn't 19:20
  21:14 23:20
  24:2,7
  26:2,6,11
  27:5,12 29:6
  34:10 37:15
  49:15
  58:22,25
  59:4,13 61:25
  63:7,15,17
  70:23 71:20
  72:20,21
  73:19 74:4,8
  75:10
  80:14,20
  81:10 82:6

difference
  82:5

different 11:9
  23:18 56:20
  70:10 74:22
  76:6 78:9
  81:25

differently
  13:12

difficult
  67:16

digitally 83:7

diploma 11:23

direct 3:3 6:3
  9:25 36:10
  58:1 64:13

directed 22:23
  78:5

direction
  79:4,5,10

directive 20:5
  23:5,25 36:3
  37:8 40:15
  47:10 51:25
  77:21 79:7,9
  81:2,11,17

directives
  37:1
  40:8,9,11
  47:16 50:8

directly 36:4
  42:20

disagreed 43:9

discolored
  29:7,9 30:2
  71:9

discontinued
  33:18

discovered
  60:20

discovery 39:2

discussed
  18:19,24

discussion
  15:18 36:21

discussions
  37:12

disgruntled
  65:20 78:5

disheartening
  66:15

disregard
  38:25

document
  15:1,24 40:25
  42:16 43:17
  75:13

documentation
  16:21 35:20
  63:4,8 73:4
  74:4,8

documents 16:1
  72:4,10 73:12

done 19:14
  31:22 35:23
  36:20 47:23
  55:10
  74:20,22

don't 7:4,9,25
  11:3 13:3
  14:7,15
  15:4,10 19:15
  21:7,9 22:22
  23:2,3 30:14
  32:16 33:4
  35:2,22 41:13
  50:10



51:11,15 55:9
59:15
60:17,18
61:17,21,23
62:15,18
63:12,18,24
64:12 65:5,6
67:2,4,7,8
68:5 72:1,2,7
74:21 76:5
77:14,22
80:12 81:6
**doubt** 26:20
28:7 31:3
74:16
**down** 6:17
30:12,22
46:16 59:6,17
61:6 77:3
**Dr** 53:17,19
**draft** 18:10
**DRIVER** 2:9
**drugs** 8:8
**Duces** 14:20
**due** 27:17
41:19 48:2
67:23 77:13
**duly** 6:2 84:8
**during** 9:2
25:25 40:2
48:5,16 79:14
**duties** 9:20
**duty** 26:19

───────────
        E
───────────
**each** 11:12
67:24
**earlier** 76:12

81:8
**EAST** 2:9
**EDEMPSEY@CHART
WELLLAW.COM**
2:11
**edges** 29:21
**education**
53:10
54:22,24 55:3
**educational**
11:22
**effort** 77:8
**eight** 22:6
35:7
**either** 30:13
70:3
**Eliot** 2:8
3:5,8 5:20
15:13 52:9
66:25
**else** 11:4 16:5
23:6 25:3
51:7 63:9
**email** 12:21,22
16:23
39:14,16
52:22 60:8
72:5,13
80:12,22
**emailed**
62:21,23
**emails**
52:19,23
80:11
**employed**
8:16,17
55:16,18,21
58:4

**employee** 58:1
61:2 63:23
64:13
83:11,12
**employees**
61:20
**empty** 33:6
**end** 13:16,18
56:2,4
**engineer** 23:23
65:3,8,10,11
76:9
**engineering**
54:22
**engineers**
23:19,21
**enjoyed** 66:10
**enjoying**
38:7,9
**enough** 30:25
**entered** 14:23
24:19 32:18
43:15
**entire** 37:18
**entries** 15:7
**Esquire** 2:3,8
3:3,5,6,8
**Essentially**
47:1
**estimate** 4:6
7:12 9:24
12:25 18:10
22:3,14 27:15
32:15,20,24,2
5 33:1,12,20
34:9 66:20
80:14
**estimates**

18:6,16
**estimation**
7:11
**estimator**
32:23
**ethical** 54:11
77:18
**ethics** 28:5,6
**evade** 42:16
**every** 8:1
10:20 33:23
50:15,16
**everybody** 10:6
18:23 22:1,11
61:11
**everyone** 67:20
**everything**
10:17 16:5
19:3 20:15
22:12 29:6
33:7 34:24
35:11 37:25
38:4,5 41:4
59:3 60:22
63:24 66:2
**evidence** 74:9
**exact** 7:13
35:3 74:1
**exactly** 19:1
61:18 62:6
72:20 78:25
**Examination**
3:1,3,4,6,7
6:3 52:6
78:15,16
82:12
**except** 72:15
**excluded** 26:21



48:10,20

**Exhibit** 4:2
14:19,23
15:23
24:17,19 25:4
32:18
43:13,15

**EXHIBITS** 4:1

**existed** 62:18

**Exp** 84:19

**expansion**
48:12

**expected** 36:3
37:8

**experience**
16:9 81:25

**explain** 6:18
41:7 50:22,23
51:22

**explanatory**
34:18

**expressed**
49:25

**extended** 27:17
31:4

**extent** 8:8

—————————
F
—————————
**face** 41:14

**fact** 45:23
46:20

**failure** 46:16

**fair** 24:24
30:25 60:13
64:16 70:19
77:13 78:4

**False** 71:1

**Family** 22:24

far 49:8 75:13

Farm 56:11

**fault** 38:12
50:17

**faulty**
48:20,24 49:2

**fee** 13:16,17
20:25

**feel** 34:16
76:24

**feeling** 36:2

**feelings** 37:7
78:5

**felt** 50:21

**few** 9:7 42:19
65:9 76:2
81:7

**field** 10:23
39:14

**fields**
29:21,22

**figure** 73:21
76:11

**file** 12:18,19
20:14 33:6
57:16 72:3

**filed** 38:16,20
39:17

**files** 16:12
59:8

**final** 12:20
45:4,7

**financed**
76:21,23

**financial**

13:24 14:1
50:2 51:10
53:6 58:25

**financially**
83:14

**find** 66:19
68:19,20
71:2,3

**finish** 6:22,24
67:1,9 69:18

**firm** 2:4 5:22
44:11
52:14,20
53:1,7 80:18

**firms** 45:5
78:9

**first** 6:1 10:5
11:3 16:15
29:8,17 30:23
35:8,9 55:15

**five** 9:7,13
38:11

**flat** 13:16,17
20:25

**floating** 13:17

**floors** 48:14

**Florida**
1:2,19,25
2:5,10 5:12
11:25 12:3
34:5 53:14,15
54:16
58:14,16
83:2,6,23
84:2,7,18

**flying** 29:17

**folder** 16:19

**follow** 36:3

37:8 78:14

**followed** 39:15

**following**
59:24 69:1

**follows** 6:2

**foot** 80:2

**footings** 48:13

**foregoing** 83:8

**form** 17:19,25
18:4,8,12,22
20:11,23
21:13,21
22:20 23:8,17
25:17,21 26:3
27:2,11,19,23
28:9 30:7
31:5,10 33:13
34:12 35:16
36:7 37:9,16
40:18,23
42:9,15,25
43:6,11
44:2,21
45:3,10,21
46:4,9,24
47:6,13,18
49:6 50:5
51:13 52:2
57:9 58:17
65:25 70:25
73:1,18
79:12,17
80:6,9
81:5,14,18
82:2,10

**forward** 68:13

**found**
69:15,22,23

**foundations**
48:13



four 9:7,9
  56:22
fourth 46:15
frankly 38:1
  65:21,24 68:7
fresh 30:11
freshly 27:5
  29:4,8
friends 78:8
from 5:22 9:6
  11:10 12:24
  14:5,7,8,11
  16:23 18:25
  19:9 20:3,4,5
  21:19 27:1
  30:2,14 38:2
  39:19
  41:23,25
  44:10 49:18
  52:13,16,19
  54:15 55:5,22
  56:1,10,11
  59:3 60:5,9
  61:15,16
  63:4,9,18
  65:5 70:2
  72:5,6,11
  76:24 77:2,24
  78:1 79:10,11
  80:17
Frontline
  56:7,10,14,21
  57:7,20
  58:2,4,7,13,2
  1 59:24
  70:12,15,21
  81:25
frowned 36:11
frustrated
  36:6 66:6

frustrating
  50:15
frustration
  81:4
frustrations
  37:1 76:21
fucking 67:7
full 33:21
  34:6,15
funny 38:3,5
  71:2,4
further 6:18
  52:4 78:12
  82:11 83:10
future 66:3

───────
G
garage 75:4
gave 18:21
  23:14 40:9
  51:25
general 8:24
  17:3
  37:17,20,23
  39:2
  40:14,20,21
  42:7 43:20
  48:6
generated 33:8
generic 12:14
Georgia 12:4
get 6:9,12 7:1
  11:21,24 14:7
  24:23,25 26:9
  33:6 38:21
  42:2,3 53:25
  54:2 62:19
  67:20 72:2,5

gets 59:7
  66:14
getting 20:22
  25:1 31:22
GG 84:18
Gioia 1:5 5:9
give 6:8 24:22
  26:20 47:22
  64:5,21,23
given 13:3
  23:24 30:17
  36:2 37:1,7
  50:8 81:11
giving 28:7
  74:15 79:4
glue 30:11
  31:20,25
glued 29:4,8
  76:2
go 6:8 7:11,19
  8:12 10:7
  14:25 15:12
  18:5 20:18
  25:4,10 29:12
  32:15 34:20
  38:13 40:2,6
  41:10 53:16
  56:8 67:7
  79:20
goes 44:14
going 6:7,9,23
  7:11,23 8:12
  9:11 12:14
  14:18,20
  15:16 17:5
  19:3 20:25
  23:15,25
  24:5,13,14,21
  29:15 35:5
  36:15

37:17,24
  38:1,14 40:6
  41:23 42:1,3
  43:13 48:10
  50:12,25 56:1
  57:10 59:5,17
  60:16,22
  66:22,23
  68:13 70:8
  78:9,10
  79:6,23
  80:1,15 81:1
gone 31:3
good 5:17 6:5
  22:17 27:20
  31:15 33:25
  34:1
  41:5,11,13,18
  52:8
  58:18,20,21
  67:7
grade 53:25
grading 48:22
great 58:8
greatly 39:8
guess 7:9
  19:22 33:10
  37:6 80:19,20
guidelines
  11:12,14,18
gust 29:19
gusts 29:23
guy 10:6
guys 72:6

───────
H
had 8:23
  10:3,5 11:12
  15:23 18:23



19:21 22:9
24:3
26:5,6,7,23
27:15
33:11,19
34:1,3,20
35:11,15
37:2,3
38:11,24
53:21 54:6
61:1 62:7
66:2 70:6
73:3,21
75:2,5 76:8
77:16 79:13
81:8

**hand** 50:12
83:15 84:9

**handle** 13:4,8
16:25 17:23
18:3 77:25

**handled** 16:13
17:8 22:12
59:20
78:20,22

**handling** 9:2
10:13
11:11,17 13:7
21:25
22:4,10,14
37:11,20,23
39:3 50:9
60:1,9 68:8

**hang** 24:23

**happened**
47:3,5,11
75:12

**happening** 47:3

**happier** 59:10

**hard** 22:6

**has** 10:8
37:18,25
38:17 41:12
45:8 82:24

**have** 7:24
8:3,11 9:25
10:18,20 11:9
12:6,25 13:24
14:1,15
15:3,4,10,23
16:6 17:22
18:19 19:21
21:19 22:7,11
23:24 25:8
26:11,19,24
27:6,7,17
31:3,4,18,20,
24 32:14,23
33:4,7,12,16,
19,20 34:15
35:20 37:12
39:3 40:20
42:7,10
43:19,23
44:4,6,8
46:22
47:9,16,25
48:1
49:16,22,25
50:2,16,22,23
51:2,5,10
52:4,25
53:2,3,5,6
54:6,8,18,21,
23,24
55:1,2,8,9
58:24
59:8,12,14,18
60:17 62:23
64:10,13,15
65:6,18,22
69:6 70:19
71:19,20

72:10,13,15,1
7,21
74:8,22,25
76:10
77:15,18
78:12,14 79:8
80:15 82:11

**having** 6:1
41:5,11,13,18
50:19 51:22
67:16 78:10

**he** 6:10
10:16,18,20,2
1 20:5
26:7,9,11,13
29:5
32:4,6,22
36:1 37:6
51:1 53:20
61:2 71:18
72:19,20,21,2
3
73:2,3,21,22
74:4,5,8,19,2
0 76:4

**head** 6:20

**heading** 19:11

**heads** 48:13
49:22

**hear** 8:4,9

**heard** 70:2
77:24 78:1

**hearing** 6:11
15:13 36:16
40:2

**Heath** 61:5

**held** 15:18
36:21

**help** 41:18

**here** 5:5,7
25:4 27:24
28:4,23 30:1
31:13,20
32:17 36:13
37:21 38:8,12
40:7 41:16
48:1 49:25
55:23 60:14
64:2 65:24
71:5

**hereby** 83:6

**Here's** 25:4
41:22

**he's** 74:21

**High** 11:23
53:11

**highest** 53:10

**highly** 39:5

**him** 20:3
67:1,15,18
68:12 72:24
73:25

**himself** 20:4

**hip** 29:9,11,13
30:13
31:13,14

**hips** 29:14,21

**hired** 56:11
64:4,5,16,19
66:21

**his** 6:11 14:8
15:13 20:3
36:1 67:1
73:25

**historic** 74:23

**hold** 12:1
16:19



holding 76:3

HOLLYWOOD 2:5

home 49:5
   73:7,14

homeowner 26:6
   27:7,9 31:21
   32:1,4

honest 23:4

horrific 58:11

house 74:19,20
   75:3 79:25

human 66:10

hundred 20:7
   59:21 78:8

hundreds 76:6

hurricane
   17:24 24:3
   25:25 26:13
   30:18,23
   31:1,2 46:21
   62:10 73:7
   74:9

hurry 26:9

_____
          I
I'd 22:7 24:23
   27:25 40:3
   65:20

I'll 28:1 32:8
   36:19 68:14
   78:18

I'm 6:6,7,23
   7:23 12:13
   14:18,20
   15:16
   24:21,22
   27:24
   29:12,25

37:17 38:9,14
40:6
41:2,5,11,12,
16,23 43:13
46:25 47:23
48:10
50:14,25
55:23,25 61:5
65:9,10
66:1,5
67:5,7,8,14,1
5 71:5 72:5
74:15 75:10
76:9 81:20

impeded 47:9

improper 37:22

inadequate
   48:20,24 49:2

included 26:21

including
   48:12

independent
   9:19,21 21:24
   58:2,5,7,13
   60:2,17 65:16
   76:19

INDEX 3:1 4:1

indicate 20:9
   35:13,18 36:5
   40:21
   44:13,18
   46:6,11,17
   48:6 81:15

indicated
   26:13 32:4
   37:3,6
   48:9,19 49:15
   81:3

indicates 44:9

influence 8:7

information
   72:2

inherent 48:3

insinuating
   70:8

inspect 9:23
   21:16 44:12

inspected
   21:17 71:8
   75:6

inspecting
   44:13 46:20

inspection
   19:23 21:18
   24:9 25:25
   32:2 43:19
   44:10,15
   48:6,16 49:19
   69:1 74:20

installed 26:6
   27:5

instance 31:2

instructed
   16:25 18:10
   20:9,12,13
   21:4 25:13,18
   34:11 64:10
   78:25

instruction
   18:21 23:14

instructions
   6:8 11:9
   16:24 20:3
   22:18

insurance 1:9
   5:10 11:24
   12:3 14:5
   16:5 22:25

31:8 44:19
53:14,20,22
57:21
58:12,16 63:5
70:20 76:14
81:10,23

Insured 13:8
   26:20,25
   27:13 30:17
   31:3 45:19
   49:9 72:17
   73:25 74:2,15
   75:18,21

insureds 30:3
   49:12 59:11

interested
   83:14

interior 44:14
   75:2,4,6,9

interrupt 67:8

into 11:21
   14:24 19:22
   24:20 32:19
   43:16 73:23

introduce 5:15

invade 37:19
   39:4

invented 19:16

investigate
   64:17

investigation
   44:15 46:19
   73:13

invited 62:20

invoice 71:21
   72:21

involved 55:15

involvement



64:1 69:2

**Irma** 17:24
18:14
23:6,9,10,15
24:3,4
26:1,13 27:1
30:4,5,19
31:1,2,22
32:5,6 46:21
59:21 61:24
62:10 73:7,17
74:9,13,18

**isn't** 31:8
70:24 71:2

**item** 33:1

**items** 13:1

**its** 11:12

**it's** 15:12
20:6 25:1
27:20 29:1,23
30:22
32:16,25 33:1
34:18 38:12
39:5 41:15,20
50:12,15,19,2
0 59:15 60:18
70:19 76:18
77:14,15
80:19

**itself** 33:11
48:4

**I've** 9:8 29:18
38:11 50:10
55:10 57:11
63:20 65:9
66:7 75:13
78:7

---
J
---

**January** 1:16

5:2,5 39:18
83:15 84:8,9

**Jennifer** 2:3
5:22

**Jimenez** 2:3
5:22

**job** 41:19
50:23 51:24
66:16,18,19
68:12,16,19
71:5 76:24

**John** 2:3 3:3,6
5:18 6:6
32:20,21

**John's** 76:14

**join** 58:7

**JTOLLEY@WHISLE
RLAWFIRM.COM**
2:6

**JUDICIAL** 1:1

**jump** 6:11

**junk** 80:19

**just** 5:21
7:5,11,20,24
10:8,24 12:14
14:18 16:23
17:16 18:18
20:15 21:8
24:21,22,24
25:1,19 26:1
29:5,18,23
31:9 33:5
35:4 38:4
39:7 40:3
41:7,24 42:1
44:23 45:15
47:22,24
50:12,15
56:3,19 57:18
58:22 59:5,16

61:18 62:7
64:7 65:5
66:25 67:17
68:11 70:9
72:8,19 78:19
81:20 82:14

**justify** 27:12

---
K
---

**keep** 38:1 40:6
67:6,15 71:7

**Keith** 10:5,16
19:11,25
35:19 37:3
60:25
61:2,5,6,7

**K-E-I-T-H** 61:7

**kept** 56:19
57:15 79:6

**kick** 59:6,17

**kind** 20:21
21:19 30:1
34:18 38:5
55:12 57:20
76:5

**kinds** 76:6

**knew** 24:13

**know** 6:25
10:12 11:3
13:3,10,19
14:7 15:10
16:15
19:8,15,16
20:4
22:9,13,22
23:1,2,19
24:4 26:25
27:22 28:22
29:20
30:3,5,16,22

31:12 33:4,17
35:2,22 36:19
41:25 42:2,23
49:21,22,24
50:10
51:10,23
58:23 59:7
61:17,19,21
62:7,16,18
63:12,18 65:6
67:22 71:17
72:1,7 74:21
76:5 77:20
79:5 80:12,14
81:6

**knowing** 28:4
33:17 34:14

**knowledge** 21:6
27:21 49:1
75:20,23

**Kraft**
10:5,8,10
19:11,25 23:5
35:19,24 37:3
40:7 60:25
61:2
81:2,3,11,15

**K-R-A-F-T**
10:10

---
L
---

**L.L.C** 1:5 5:9

**label** 21:9

**lack** 44:16,20
45:13,24 46:2
65:19

**lag** 7:1

**laid** 30:12

**language** 45:8

**Lari** 1:15 3:2



5:1,8,25 84:6

**last** 8:3 9:9
15:2 36:25
42:6,17 58:21
67:12 78:18

**Lastly** 46:15

**late** 17:14,23
18:7,11,17
19:3 20:15
23:6,11,15,25
24:3 31:9
47:2 60:23

**latent** 48:2

**laughing**
71:3,7

**law** 2:4,9 5:22
37:13,14
47:17
52:14,19,20
53:1,7

**lay** 39:6,7

**lead** 78:18

**leading** 20:1
51:14 64:7
66:9

**leak** 29:6

**learn** 11:13
62:19

**least** 80:22

**leave** 15:16
35:3

**LEE** 1:2

**left** 35:6
36:25 40:7
56:7 57:1
58:10 78:19
81:24

**legal**

**legitimate**
59:15,22
79:16 80:5

**length** 47:8

**let's** 10:7
15:12 17:4,7
24:8 29:8
38:13
67:21,24

**letter** 4:5
28:2 43:14,24
44:4,6,9 69:4

**level** 53:10

**license** 11:25
12:2,11
54:1,2,7,12,1
7 55:5 77:17

**licensed**
12:3,6
26:15,18,19
28:6,14 82:16

**licenses**
12:2,8

**lie** 27:13

**line** 13:1 33:1
80:14

**listed** 77:20

**listen** 57:10
66:12

**literally** 59:3
66:12

**little** 7:1,8
8:11 11:23
16:8 23:18
24:9 49:21,23
56:3 59:7
66:14

**living** 50:13

**LLC** 52:17
53:3,8

**log** 14:15
15:7,13 37:22
39:1 40:24

**logs** 15:4

**long** 9:5 12:6
20:6 35:5
53:16 67:7

**longer** 55:18
77:10

**look** 8:23 15:7
25:10

**looked** 71:14

**looking** 25:24
30:16 33:10
34:9 55:23
72:5 81:20

**looks** 25:6
31:24 56:1

**loss** 8:24
17:10 20:10
25:14 27:16
40:20,21
42:7,17 43:20
48:6 68:25
72:8,9,14

**lost** 16:19
44:5

**lot** 30:23

**lots** 74:21

**loud** 6:16

**Louis** 1:5 5:9

———————
M
———————

**Madam** 48:11

67:11

**made** 11:18
34:22 41:1,3
45:14 46:2
49:11 58:6
71:17,18
72:18,19,21,2
3 73:10,17
74:13,14
75:2,5,22,24
82:8

**mail** 52:22
80:19

**main** 10:6

**maintain** 49:10
54:12

**maintaining**
45:20

**maintenance**
44:17,20
45:14,25 46:3

**majority** 37:21

**make** 7:24 27:8
33:18 34:16
37:17 38:13
48:5
56:12,14,16,1
8 57:8,12
60:20 65:15
68:6
70:13,15,16,2
1,23 74:5
77:8 82:6

**makes** 12:19
29:25

**making** 76:15

**manager** 10:5
51:18

**managers** 19:10



35:14 36:5
60:25 61:8,12

manner 67:22

many 16:12
22:3,5,9,13
50:10

map 12:20

March 24:10
25:5 72:12,22

marching 21:19

mark 14:19
24:17 43:13

marked 15:23

marks 32:1

match 26:6
27:5 71:12

materials 49:3

matter 5:8 6:7
8:25 9:2
24:2,7,14
28:13 36:12
69:22 75:10

max 22:8

may 38:3 58:24
72:17

maybe 9:7
16:14

me 6:22 7:5
14:3 24:22
26:6 27:13
31:19 32:15
35:3 38:10,18
39:7 41:7,8
45:18
47:22,23
51:18,19,20,2
1 56:18 57:18
66:6,17,23

67:8,9 68:11
69:14,20,21,2
3,24 71:3
76:23 79:21
80:4 84:6

mean 17:16
19:20 21:24
27:3 31:8
45:2 53:13,19
72:23 77:19
81:10

mechanical
48:2

medications
8:3

meeting
18:23,24
19:1,9,12,17
20:1 22:2
35:11 60:25
61:9,20
62:5,7,12,19,
20,22,25
63:3,6,10,15,
21,22 64:1

mentioned
79:13

messed 7:8

meteorology
54:25

Mid 9:17 10:22
19:25 21:19
22:1 59:24
61:2 81:23

Mid-America
8:22
9:3,5,12,21,2
3 10:1 11:10
13:4,11,25
14:11 16:9,13

19:9 22:16
35:14 36:10
37:2,4 44:11
55:17,18,22
59:25 60:5
61:12,19
62:24,25
69:16,25 70:8
75:16 77:2
78:1,5,20
79:3,15 81:16

Mid-American
50:8

might 15:3
33:4

mindful 12:13

mine 13:23
25:7

minute 24:22

minutes 28:2

missing 27:6
31:14 66:12

moment 47:22

monetary 53:6

money 51:11,20
65:15

month 35:8,9
59:18,19
63:25

months 11:8
19:21 22:7
35:7,9 50:12
53:17,23

more 23:21
24:9 31:17
34:5 41:9,10
47:25 65:9,15

morning 8:4

most 33:24
35:22
58:14,15

mostly 19:1

motion
38:15,20
39:1,23

motivation
50:2,3 51:11

mouth 71:1

much 8:13
20:24 21:14
47:23 53:12
59:13 76:15

multiple
10:23,25
55:9,10 81:12

must 32:22

mute 15:16

mutually 38:24

my 5:18
6:5,22,25
8:5,9 11:24
14:20 21:6
24:21 26:4
28:10
32:15,20
33:7,8,25
36:1 38:12
39:7,9,15,18,
25
41:11,14,19,2
0,24 42:17
44:22 45:4
47:24 49:1
50:23 51:20
52:22 53:20
54:16 65:20
66:19 68:2,19
71:1,5 73:23



75:20,23
77:21
80:18,19
81:20 83:9,15
84:9

**myself** 15:17
38:9

---

N

**name** 5:18 6:6
8:18 32:17,23
33:7

**Nationwide**
11:3

**need** 6:18
7:10,18 15:5
67:20 68:5

**needed** 62:21

**neighborhood**
26:8 32:7

**net** 20:25

**never** 23:22
34:20 54:20
70:2,6 75:11
77:24

**new** 11:16
24:25 26:5
27:4
71:11,14,15,1
6

**newer** 42:18
43:1

**NEWPORT** 2:9

**next** 6:25 7:23
59:18,19 69:2

**night** 8:3
18:23 19:2
61:1,22,23
62:8,22 63:25

**nine** 11:8
19:21 22:6,7
35:7,9 50:11

**no** 1:3 6:17
7:22 8:6,10
12:9,12
13:6,9 14:13
18:20 20:12
23:24 24:14
25:6 28:13,15
33:18
36:8,12,18
38:15
39:16,19
41:25
43:19,23
47:14,19,20
49:1,20
51:9,10
52:4,15,18
54:10 55:18
60:7,11,15
61:25 63:6,8
64:7,13,25
66:14 67:20
68:19,24
69:5,8,11
70:15
73:3,20,22
74:12 77:10
78:12 82:11
84:18

**nobody** 43:24
69:9

**nodding** 6:19

**none** 69:3
70:7,10
76:17,23

**non-matching**
26:10 27:3

**Nope** 65:2

**nor** 41:10
83:11,13

**normally**
31:6,7 68:20

**North** 12:4

**not** 5:23 7:13
10:14 11:5
13:2 14:2,16
15:11 17:5
18:6,10,15
19:4,20
20:10,12,13,2
4 21:4,6
24:22
25:13,25
27:24 28:6
29:1 32:20,25
34:11 35:3
36:9 37:13,21
38:23 39:15
40:15
42:19,21 43:7
44:8 46:10,14
47:4,11,19
48:1,8,18
49:1,7 50:19
51:23 52:3,24
53:2,5,9
54:8,18,23
55:1 56:18
57:8,12,22,25
58:2,9,24
60:12,15,16,1
9,21 63:12,17
64:8,15,21,23
65:3,4,10
66:16,18
67:14,24
68:4,15,21,23
,24 69:14,22
70:9,13,15,16
,17,21 71:12
73:8,11,14,25

**nor** 41:10
83:11,13

**normally**
31:6,7 68:20

**North** 12:4

74:5,24,25
75:5,10,19,20
,21,23
76:9,21 79:2
80:5
82:8,15,16,17
83:10

**Notary** 1:25
83:5,23 84:18

**notate** 42:13

**noted** 42:18
45:15,17

**notes** 14:15
47:24 81:21
83:9

**nothing** 9:8

**notice** 4:3
14:9,19 27:12
33:23 39:18
52:21 80:16

**noticed** 26:5
71:9,11

**now** 5:4 12:14
13:7 25:2,13
28:4 32:10
37:11 38:2
40:8 49:22
50:13 58:11
65:15 71:3

**nowhere** 43:3

**number** 5:11
7:13 21:11
71:15

---

O

**oath** 7:16
77:16,18 84:1

**object** 37:24
41:20 50:25



66:3

**objected**
38:4,5 41:4
66:2

**objection**
13:20,21
14:17
17:19,25
18:4,8,12,22
19:6 20:11,23
21:13,21
22:20 23:8,17
24:6 25:17,21
26:3
27:2,11,19,23
28:9 30:7,20
31:5,10 33:13
34:12 35:16
36:7
37:9,16,17
38:14 39:7,24
40:12,23
41:1,3
42:9,15,25
43:11
44:21,25
45:3,10,16,21
46:4,9,24
47:6,13,18
48:17 49:6
50:5 51:13
52:2 57:9
58:17 65:25
68:6 70:25
73:1,18 79:12
80:6,9
81:5,14,18
82:2,10

**objectionable**
39:5

**objections**
65:21

**obligations**
13:25 14:1

**observations**
27:9 42:24
43:25 45:24
48:5 65:6

**observe** 21:2
27:8 48:15,24
49:2 64:17

**observed** 24:14
44:13 45:23
48:7

**obviously** 7:10
8:23 11:5
12:1 17:7
24:10 25:13
26:15 28:4
32:10 33:10
34:4,9 37:2
49:22 51:22
80:16

**occurred** 62:5
74:18 75:9

**October** 39:16

**Oden** 32:20,21

**off** 11:4
15:13,18,22
23:18 24:4
29:18,21,22
30:6,24
36:21,25 40:7
78:18,19

**offense** 7:25

**office** 14:9
20:8 38:21
39:9,11,15,17
,19,25 52:14
66:12

**official** 63:13

**Oh** 23:13 38:9

**okay** 5:4
6:13,20
7:2,6,13,15,1
8,20 8:11,14
9:2,11,15,17,
25
10:12,15,18
11:9,17,21
12:15,25
13:7,10,14,24
14:3,11,14,18
,21 15:5,9
16:1,8,12,15,
21
17:7,13,16,22
18:9,21
19:8,25
20:3,17,21
21:15 22:3,24
23:13
24:2,8,17
25:8,13,23
26:15
28:1,12,16,22
29:1,7
30:9,16,25
31:12,17,24
32:4,8
33:20,23
34:4,9,14
35:13 36:18
38:13
42:3,5,13
43:9,19,23
44:3,9
45:7,12 46:6
47:22
49:12,15,18
51:7,22 52:4
54:18,21
55:24 56:17
57:7,13 59:2

62:1,3,17,25
63:3
64:4,16,21
65:12 68:2,14
69:1,12,18,19
,24 70:12,19
71:13,19
72:22
73:3,6,16
74:4 75:18
77:24 78:4,24
79:3,13,19
80:4,10
81:9,20
82:4,7,18

**old** 25:1

**Olympus** 11:2

**on** 1:15 2:2,7
5:4,17,19
6:7,11
8:19,20,25
9:10 11:4,10
13:4,12
15:2,16
16:19,20,24,2
5 18:23 19:7
21:12,25
23:19 24:10
25:5 26:9,10
27:4,21
29:9,14,18,23
30:9 32:16
33:23 34:1
35:5 36:11,15
38:2,15,18
39:9,15,18
40:4,6,24
41:14
42:17,19,22
44:14
45:15,17,19
47:16 49:25
50:1,12 55:14



57:15,24 59:8
60:5 62:14
65:9 67:6
68:23,25
69:13 71:7,15
72:1,6,8,13,1
5 74:19
76:3,8 77:3
78:15,18,19,2
4,25 79:6
80:2 81:8
84:8

**once** 70:20,22

**one** 10:24 11:6
17:2 19:11
20:14 25:10
28:24
29:1,4,8,9
30:11
31:16,18
32:16 34:6
38:19 39:19
43:23 53:21
64:25 76:7,8
77:21 82:14

**ones** 16:2 29:3
31:25 81:7

**one's** 30:15

**online** 19:17
62:13,14

**only** 13:8 16:1
18:20
22:10,11
37:21 38:23
40:15 53:21
57:17 61:19
69:16,24 78:1
80:17

**onto** 15:13
43:4

**open** 19:7

**opine** 46:8

**opinion** 25:14
27:16 28:10
45:14
58:9,15,20
64:21,25
65:5,7 69:10
81:1

**opinions** 25:24
35:25 43:4
64:24

**opportunity**
15:24 26:24

**opposing** 6:10
78:19 79:14
80:10 81:1,22

**opposite** 45:24
64:7

**orally** 70:3

**order** 1:19
5:12 12:17,23
16:23
38:16,20,21
39:1,23 54:12
68:9 84:7

**orders** 21:19

**ordinance**
37:13,14
47:17

**orientation**
30:14

**original** 74:21

**other** 12:8
14:3 16:21
18:19 19:9
21:23,24
29:3,4 41:14
50:1

51:8,24,25
52:20,23 65:5
67:24 70:6,7
78:21,24 81:7

**our** 8:13 12:15
16:3 38:14,20
39:17
44:15,23
77:17 79:7

**out** 6:16 17:5
18:5 20:18
23:21 24:13
31:1 38:21
39:10,20 42:3
50:12,16
73:16,19,21
76:11
79:20,25

**outstanding**
13:24 14:1
51:12

**over** 16:2
20:16 35:23
50:22,24
51:21 55:11
56:3 66:13,14
67:24 68:9,11

**overlooked**
10:17

**overlooking**
10:18

**owe** 51:11

**owed** 51:20,21

**own** 11:12

**owner** 74:21

_____

P

**P.A** 2:4

**p.m** 5:6 38:17

39:10,16,23
82:22

**page** 3:2 4:2
28:23 30:10
31:13

**paid** 13:11,14
20:22,24
51:16
59:10,11

**paperwork** 63:4

**paragraph**
46:16

**parboleda@char
twell.com**
39:13

**Pardon** 66:17

**part** 23:4 25:1
44:22 49:23
68:16

**particular**
17:1,2,4,6
28:19
40:10,16 81:7

**particularly**
22:18

**parties** 1:18
5:13 83:11,12

**past** 17:17

**patios** 48:13

**pavements**
48:13

**pay** 51:20
58:23,24
59:4,5 60:21
70:17,18 82:8

**paying**
59:3,4,13
75:12,15 82:9



PENTHOUSE 2:9

people 18:25
  20:8 22:16
  32:6 41:18
  52:20
  56:11,20
  57:15 59:6
  61:19

people's 57:24

per 23:2

percent 20:7

perform 49:19
  67:21 68:12

perhaps 78:4

person 19:13

personal 50:3
  65:22
  77:13,14

personally
  68:10

phone 19:13
  35:23

photo 28:23
  30:10

photograph
  18:5 28:23
  30:10 31:13
  43:20

photographs
  25:5,19,24
  32:11 42:22

photos 4:4
  8:24 9:24
  20:18 21:8,9
  24:18 26:4
  33:25 64:19
  73:6,9,12,14
  74:8,23 80:13

picked 11:16

picking 35:10

pictures 20:15

Piscitelli
  1:15 3:2
  5:1,8,25 6:5
  15:21 36:24
  38:3 40:5
  41:23 42:1,5
  47:23 52:8
  55:22 68:15
  78:19 82:19
  84:6

Plaintiff
  1:6,15 2:2
  5:18 37:18

Plaintiff's
  14:23 24:19
  32:18 43:15

please 5:15
  7:5,25 36:14
  66:13,23
  67:12 68:3,11
  72:3

point 37:17,24
  39:24 41:23
  44:18 61:25
  62:18 66:9
  68:9 78:18

policy 37:14
  81:4,6,9,10

portion 33:25
  34:1 68:2

position 9:18
  57:4

positive 56:6

possession
  16:2

possibility

27:20

Possibly 15:8

practice 58:7

prejudiced
  46:18

Prelim 12:20

preparation
  52:10

prepare 12:17

pre-populated
  45:11

present 5:23
  19:9 43:4
  61:9

President
  10:16,21

pre-tokened
  45:4

pretty 8:13
  22:17 47:23
  58:18 59:13
  65:9 66:1,10

prevailed
  49:23

previously
  70:12 73:24

printout 15:4

prior 8:20,24
  17:5 19:23
  21:18 37:25
  50:25 58:4,19
  72:24
  73:7,9,13,14,
  16,17 74:9
  75:22 80:15
  81:23

privilege
  37:20,22 39:1

40:24 42:25

privileged
  37:19 40:24
  42:9,16

privileges
  37:23 39:2

probably 6:12
  9:9,14,16
  10:20 22:15
  27:25 33:8
  35:2 38:11
  51:4 53:17
  56:2 70:10
  77:20 78:8

problem 7:22
  11:5 36:18

problems 35:15
  65:22

proceed 38:22

proceedings
  83:8

process 67:13
  81:8

processes
  37:20 39:3

product 37:19

professional
  12:1,2,8
  67:21 75:25

promptly 46:16

properly 50:21

property 1:8
  5:10 21:16,17
  40:22 43:5
  44:12 48:3,16
  60:1
  63:4,9,14,19,
  23 64:11,14



65:23 66:21
68:17 69:2,13
70:2,22
71:8,22,23
73:13

**protective**
38:16,20
39:1,23

**provide** 41:24
64:11 68:17
74:4

**provided** 32:16

**provider** 11:10

**providers** 11:6
18:19

**providing** 6:23
65:7

**public** 1:25
82:14,15,16,1
7 83:5,23
84:18

**purposes** 5:22
11:19

**pursuant** 1:18
5:12 84:7

**put** 21:12 33:9
37:14
38:14,18 40:3
42:19 71:15
73:23

**putting** 71:1

---
Q
---

**quality** 48:3

**question**
6:22,25
7:4,6,8 15:3
30:16 31:15
42:6 51:1

55:25 66:23
67:9,12,19

**questions** 6:16
7:24 8:1,5,9
12:14 31:17
37:21 40:6
41:24,25
43:24 47:25
52:5 57:24
66:4
67:5,18,22
68:12 78:13
82:11

**quick** 15:14
47:24 81:21
82:14

**quicker**
20:22,24

**quickly** 14:19

**quit**
34:17,21,22,2
5 35:3 51:19
57:7

**quite** 28:11
31:24 50:14
65:9 68:7

---
R
---

**ran** 23:2 55:10

**rather** 54:15
64:6 71:14

**reached** 38:20
39:10,19

**read** 67:12
82:20

**Reading** 82:23

**real** 14:19
15:14 47:24
81:21

**really** 20:13
30:21 32:25
41:11,13,18
65:6 71:21
74:12 76:1,8

**reason** 7:19
47:14,20
51:24 65:23
73:21

**reasons** 77:22

**recall** 61:23

**receipt** 26:11
71:20 73:22

**receipts** 49:13
73:3

**receive** 16:22
52:19,23
54:14,15 60:8

**received** 21:19
39:22 44:10
54:16,21,24
55:2,8 60:4
63:8 72:15

**recently** 44:10

**recess** 7:20

**recognize**
32:24

**recollection**
15:6 72:17

**recommended**
23:19,23

**record**
5:5,16,21
7:12 14:24
15:19 24:20
32:19 36:22
38:15,18 39:8
40:4 43:16

67:15 83:9

**RE-CROSS** 3:7
82:12

**redacted** 25:7

**RE-DIRECT** 3:6
78:16

**re-explain**
50:17

**refresh** 15:5

**refused** 38:23

**regard** 11:17
12:16 13:7,10
35:20 37:11
42:6 45:12
78:20

**regarding** 50:9
51:23 60:9

**regards** 29:7
43:21 44:3

**re-glued** 30:22

**related** 42:20
44:16 45:13
46:7

**relationships**
53:7

**relative**
83:10,12

**remember** 19:18
23:3 63:24

**remodeling**
48:22 49:4

**remotely** 1:18
2:6,11 5:13
84:6

**removed** 30:6

**renovation**
48:22 49:4



**repair** 26:9
48:21

**repaired** 26:7
43:1

**repairing**
45:19

**repairs** 30:3
31:22 32:5
33:18
45:15,17
49:3,11,13
55:14 71:17
72:18,19,21,2
3
73:4,10,17,22
74:5,10,13
75:2,22,24

**repeat** 46:25
69:24

**repeated** 57:11

**rephrase** 7:5,6

**replace** 34:5

**replaced** 33:19
42:20

**replacement**
33:21
34:6,10,15

**report** 8:24
9:23,24 12:20
18:6 20:16
21:8,12 26:5
33:8 40:20,21
42:7,13,14,17
43:20
44:10,22
45:4,7 46:16
48:6 64:20
73:23
75:14,19,21
83:7

**reported** 1:24
10:6
17:10,14,17,2
4 23:6,11,16
24:3 71:25
72:1,7,8,12,2
2

**Reporter** 1:24
5:4,14 6:16
10:8 48:11
67:11,16
83:1,5,22
84:17

**reporting** 5:15
18:7,11,17
19:4 20:15
24:1 31:9
47:2 60:23
72:24

**represent**
41:20 67:2

**representative**
63:13

**representing**
67:14

**requesting**
39:13

**required** 54:11

**requirements**
54:12

**requires** 68:8

**reschedule**
38:23 39:20

**resigned** 57:4
77:6

**respect** 41:19
67:23

**responded**

39:15

**response** 39:17

**responsibiliti
es** 9:20

**rest** 29:2

**restate** 7:5,6

**restrict** 76:24

**result** 40:11
44:20

**resultant**
48:12

**resumed** 15:20
36:23

**retain** 77:8

**retained** 44:12

**review** 15:24
47:24 57:19
74:24

**reviewed** 12:18

**reviewing** 26:4

**revocations**
12:10

**ridge** 29:9
30:13,15

**ridges**
29:14,20,22

**ridiculous**
41:15

**right** 6:11,15
7:21,23
10:9,19 11:7
14:14 15:21
19:23 20:19
21:5 23:13
24:8,15 26:20
29:10,16
32:5,6,8

33:1,2
36:19,24 40:5
43:25 45:25
49:13,16 51:5
56:25 57:11
58:2 59:12,20
61:3 62:14
65:13,17
71:18 72:25
73:2 74:6
75:8 76:7
78:12 80:20
81:12

**road** 59:6,17
77:4

**Roberson** 1:5
5:9 79:25

**Robersons** 6:7

**role** 9:18 69:6

**roof** 21:3 24:4
26:11 27:4
29:2
33:11,21,24
34:1,6,10,15
44:14,16,19
45:15,17,19
46:7,8,13,21
47:4,5,10,12
49:10 55:14
73:6,9,13
74:9

**roofing** 34:2
55:3,10,13

**roofs** 48:14
65:10

**room** 22:16

**ruined** 41:12

**rule** 31:1
73:16,19



rules 8:13

run 50:13
  77:15

_____
S
said 6:5,17
  7:20 19:2,25
  20:5 21:23
  24:10 27:7,9
  29:5 32:6
  35:11 37:6
  38:6 51:20
  54:20 59:20
  62:15 63:24
  65:12 66:2,3
  70:7,15 71:18
  72:19 73:22
  75:12,15
  76:12,18 79:7

same 6:24 29:2
  30:16
  31:12,14,16
  36:2 39:16
  50:15 59:19
  65:17 76:18
  78:21

sample 76:10

satisfied
  59:12

saw 63:12

say 6:17
  9:9,12
  16:12,14
  18:16 19:4
  20:7,12
  21:4,7 22:6,7
  27:25 30:21
  31:1,7
  34:1,21
  35:5,24 44:14
  45:1,6 46:2

53:12 56:2
57:10
58:15,25
60:18 61:15
62:5,6 63:22
64:16 65:20
66:12 70:19
72:8 75:15
76:1,8 78:4
81:9

saying 23:13
  30:3 47:2
  56:14,23 79:6

says 16:24
  25:6 42:18
  72:8

school 11:23
  53:11

screen 14:20
  24:22 32:9,15

scroll 31:19

se 23:3

second 14:21
  16:19

section 42:17

Security 11:2
  22:24

see 14:25
  29:3,15
  30:1,10
  31:19,25
  41:13 43:17
  63:3,7,15,17
  71:24 72:11
  73:6,9,12,14
  76:24 80:20

seeing 50:14

Seeks 42:15

seem 38:3,7

seemed 76:3

seems 38:1

seen 10:20
  29:18 44:4,6
  75:13

self 8:17
  34:18

seminars 55:14

send 11:15
  18:6 20:16
  21:8 60:19
  64:19 80:11

sense 29:25

sent 23:21
  80:22

Separate 55:5

separated 76:8

September
  17:11,17 39:9

Services 1:5
  5:8 6:6 44:11
  52:16 53:3,7

set 38:19
  39:17 44:23

settling 48:11

several 10:4
  59:20 63:20
  78:21 81:3,13

SFR 1:5 5:8
  6:6 52:16
  53:3,7

shaking 6:19

share 14:20
  24:21 32:15

sharing 32:8

she 5:23
  10:5,8

sheet 12:21

short 7:19
  15:18 36:21

shortly 35:2,7
  61:24

should 28:5
  31:2,4 41:22
  51:4 59:15,16

show 6:23 28:1
  74:5

showed 15:22

shown 65:20

shrinkage
  48:11

sick 51:3

side 9:10
  41:25

sides 13:9

signing 82:23

simply 25:18

single 8:1

sir 12:12 15:2
  20:20 30:8
  33:22 38:12
  41:2 49:20
  61:18 69:23
  71:2,6

sitting 27:24
  28:4 41:16

six 53:17,23

size 22:17

slope 33:24

slopes 33:24



slow 48:10

smallest 66:8

smile 41:14

Solutions 8:22

some 6:8 8:23
11:1 12:14
18:25 20:8
26:10 27:3
29:3 30:10,12
31:22 40:6
41:14
45:11,19
46:12
53:11,12
56:11
65:18,20
66:7,8 68:8,9
76:21 78:14
79:9

somebody 26:8
61:16

someone 32:22
61:14

something 21:1
26:1 28:13
30:4,18 41:7
45:5 59:14
71:2,3

sometimes 6:25
29:20,21

somewhere 9:12

soon 36:20

sooner 75:19

sorry 15:22
29:12 41:2
46:25 61:5

sought 37:19
39:3

sounds 56:25

South 12:4

speak 52:10
60:6

speaking 68:5

specialized
55:2

specific 20:14
40:16 55:25
56:1

specification
48:21

spell 10:7

spelling 10:9

spoke 80:11
81:2,3,11,22

spoken 37:3

sporadic 34:2

spot 30:3

Spoutz 1:24
5:14 83:5,22
84:5,17

St 76:14

staff 56:7

standard 8:1
65:21

start 12:23
17:4 29:17
51:4

started 6:9
23:18 35:7
51:1

state 1:25
34:4 56:11
58:14,16
65:10 66:9

75:21 82:17
83:2,6,23
84:2,18

stated 60:12
61:18 63:20
70:12 73:24
74:1

statement
44:23 45:2

statements
30:17

status 57:16

stepped 80:2

Steve 61:10

stick 79:8

still 15:10
29:20,22
30:22 46:2
50:12,14 54:4
57:19

stop 28:23
31:19 32:8
49:18 68:1

storm 30:5
71:18 72:20

STREET 2:4

Studies 53:20

stuff 8:24
50:17 77:19

subject 44:12

submit 25:19
43:20

subsidiaries
22:19,22

subsidiary
22:25

suggested 45:8

SUITE 2:4,9

supervisor
9:25 10:3,12

supervisors
19:10 35:14

suppose 71:20

supposed 17:23
18:2,5,15
21:11 40:10
45:5 49:9

Supreme 1:19
5:12 84:7

sure 7:24
25:12 36:15
44:6 47:1
49:11
61:15,17 65:9
66:1

surrounding
56:9 77:1

suspensions
12:10 54:9

sworn 6:2 7:16
84:8

system 34:2
74:25

————————
            T
————————
tackle 15:9

take
6:10,12,16
7:18,19,25
12:15 14:21
15:2 20:15,18
25:19 35:4
36:13 40:1
50:16 51:19
64:19 76:10
77:16



877.291.3376
www.UCRinc.com

taken 1:15 8:3

taking 7:20
  14:19 32:10
  52:21 66:10
  80:16

talk 14:4
  17:5,7 24:9
  29:8 40:19
  46:15 49:21
  52:13,16
  66:22 67:24

talking 16:8
  28:24 36:25
  40:8 51:5
  67:8 68:9,11

tasked 32:10

teacher
  53:20,21

tear 44:17
  46:7

Tecum 14:20

tell 7:10,11
  18:25 20:21
  21:3 30:14
  46:12 56:1,19
  57:16,17,18
  59:5,9,11,14,
  17 71:21
  72:20 75:18

telling 27:13
  31:21 32:2
  41:8 51:3
  56:19

temporarily
  76:2

temporary 26:9
  49:11,13

ten 11:2,4

tense 49:23

term 65:19

terminated
  57:2

terms 51:11

testified 6:2

testify 50:3
  51:25

testifying
  50:4,6,7,20

testimony 7:16
  14:4 16:3
  30:2 60:14

Texas 12:5

texted
  62:21,23

than 19:10
  34:5 51:8
  52:1 65:5,10
  81:25

Thank 36:20
  68:13 82:18

that
  6:12,15,16,24
  7:2,4,8,11,13
  ,15 8:1,4,8
  9:11,13
  10:3,6
  11:6,21 12:11
  13:3,21,22
  14:5,22
  15:1,2,3,9,10
  ,15,22
  16:2,4,6,7,18
  ,20
  17:8,12,16,17
  18:14,18,19
  19:3
  20:9,18,21,25

21:1,4,14,22
22:1,4,7,8,16
23:1,3,6,9,14
,24,25
24:10,13,18
25:5,7,10,22
26:1,5,6,7,8,
11,12,13,17,2
3,24,25
27:4,9,12,14,
21
28:10,13,16,2
4,25
29:1,4,5,8,19
,25
30:1,2,4,5,11
,15,17,18,21
31:2,4,11,14,
18,20
32:1,4,8,16
33:5,17
34:2,5,11,14,
16
35:3,11,14,18
,21 36:5
37:1,3,6,7,15
,25
38:5,6,15,17
39:4,8,9,14,2
2,23,25
40:3,9,20
41:8,16
42:6,7,10,13,
19
43:10,17,22,2
5
44:10,13,14,1
5,19,22,23
45:2,5,8,13,1
4,15,17,19,24
46:6,8,11,13,
17,20,21
47:9,10
48:1,3,6,9,19

,25
49:15,17,18
50:17,22
51:3,12,19,20
,21,25 53:19
54:4,12 55:20
56:4,23,25
57:5,11,13,19
,22
58:1,2,3,25
59:11,12
60:2,12,13,16
,22,24
61:1,4,11,18,
25
62:7,14,18,21
,22
63:2,20,22,24
,25 64:2,8,16
65:12,13,18,1
9
66:2,6,9,16,1
8 67:18,19
68:20
69:9,10,14,15
,16,20,21,22,
24
70:2,6,7,8,10
,11,12,14,19,
24
71:2,9,11,22
72:1,2,6,14,1
8,23,24
73:5,16,21,24
74:2,7,22
75:1,4
76:3,10,22
77:3,12,13,15
,16,23,25
78:1,4,8,18
79:4,6,9,14,1
5,22
80:1,3,4,16,2
1



81:3,7,11,12,
16,25 82:5,9
83:6,8,10
84:6

**that's** 8:13
17:9 22:25
25:16 26:19
28:19,22
29:9,11,13,14
,17 30:13
31:13,15
33:5,6 34:8
40:17 43:21
44:1,23 47:7
59:19 60:1
61:14 63:17
65:14 68:6,21
69:23 72:7
73:2,22,25
74:11
75:16,17
76:17,20
77:11,21
78:3,23 80:8
82:18

**their** 11:18
22:19 36:4
46:19 47:10
57:16

**them** 11:15
17:2 18:3
19:7,20
23:2,12 29:18
51:3 56:22
57:16,17,18
58:14,24
59:5,12,14,17
,18,19
61:10,25
70:11,16
71:18 75:1
76:2,9,23

77:3 78:21

**themselves**
5:16 70:16

**then** 6:11,12
13:17 17:7
20:18
23:19,20 30:9
31:12 35:11
37:2 38:25
39:15,17
44:12
58:18,22
59:18 60:20
67:18 68:6
80:10

**there** 7:9 9:18
10:4,5 11:2,4
14:25 15:6
18:25
20:7,8,18
21:23 22:7
23:6 24:13
26:5,7,10
27:3
29:3,4,20,23
30:22 32:6
33:9,18 34:1
38:2,15,17
39:23 43:10
45:15,17
46:2,7,11
47:14,20
49:23 51:24
53:21 58:22
61:11,15,16
63:18 65:23
66:12,19
67:20 71:9,11
72:19 73:20
74:17,20 75:4
79:15,20

**therefore**

46:18

**there's**
74:12,21,22
76:6

**Thereupon** 5:3
14:23 15:18
24:19 32:18
36:21 43:15

**these** 7:25
17:23 21:19
22:18 25:4,11
29:15 30:3
31:19,25 32:5
37:12 40:8,9
50:9,14 51:3
61:12 65:12
73:10,16
74:5,13 79:22

**they** 11:15
13:25 17:17
18:7,17
19:2,3
20:4,14,21
21:14 22:9
23:11,14,20,2
5 26:19
28:10,19
29:5,17,19
30:3,12
35:3,10,11
36:3 37:7,8
41:8,15 42:20
44:10,12,23
45:20
46:6,11,15,16
,17,18 47:1,2
48:1,9,19
49:9,11,15
51:4,11,14,15
,16,20,21
56:11,16,18,1
9 57:7,11,18

58:8,9,11,18,
19,22,24,25
59:3,4,5,11
60:16,21,22
62:21 63:22
70:7,15,16,17
,21,23 71:14
72:1,7
74:14,18
75:11,12,15,1
8,21,22
77:8,25 79:7
82:6,9

**thing** 31:13
50:15

**things** 41:14
45:19 51:5,12
56:20

**think** 6:12 7:8
10:4,21 11:2
13:22 14:21
19:22
22:8,11,15
24:23 27:14
29:25 30:9,14
31:18 32:16
34:18 35:8,22
41:4,22 44:5
47:23 56:6
58:24 62:4
66:3

**Thirteen** 34:19

**this** 6:7
8:4,25 9:2
10:7,13,18
11:7,17,19
12:16 13:19
14:2,10
15:16,24
16:16,25
17:2,4,6,8,14
18:10,15,21



19:13,14,18,2
3 20:5,22
21:15,18
23:5,14,22
24:9,13,23
25:14,23
26:1,7
27:4,13,14,16
,22 28:17,19
29:7
32:14,16,24
33:3,8
34:9,20
35:2,4,5,15
36:6,20
37:16,17,23,2
5 38:25 39:25
40:10,16,23,2
4 41:12,23
42:2 43:21
44:3,6,9
46:8,13,15,20
49:4,25
50:1,3,20
52:8 55:15
60:4
61:9,20,24
62:1,12,18,19
,20,25
63:3,10,21
64:1,6,8
66:13 67:21
68:8,23,25
69:13 70:9
71:24 72:22
73:14 78:7,12
79:4,7,19,21
81:4,6,8
83:15 84:9

**those** 11:13
27:17 28:7,24
32:11 40:4,11
43:4 48:7,15

49:3,13,16
71:13,17
72:14 74:24
75:9 78:24
80:15,17,21

**though** 11:5
26:2 45:12
79:3

**thought** 41:15

**three** 72:24

**through** 6:12
8:12 11:25
16:13 25:11
26:4,8 34:20
42:2 50:11
52:22 78:9,11

**throughout**
34:2 63:21

**tighten** 29:5

**tile** 27:4 29:8
30:2,5,21
31:4 33:17
55:13 76:3

**tiles** 21:10,12
26:5,10 27:18
28:8,24 29:15
30:12 34:2
42:18 43:1,2
66:13
71:9,11,13
76:1

**time** 5:6 8:11
12:13 14:2
18:15 20:25
22:4
23:11,14,24
38:24 39:24
41:5,11,13,18
44:18 47:8
50:16 54:3

58:1,8,9
62:15 63:25
66:11 67:16
70:10 73:15
78:12,21
79:14
81:22,23

**times** 30:23
38:10 63:20
81:3,12,13

**today** 5:5,24
6:15 7:9,15
8:13,25 12:17
14:4,10 37:21
38:8,22 39:4
49:25 50:13
60:14 64:2
65:24
80:12,15

**today's** 52:10

**together** 29:4
76:2

**told** 26:6
42:21 43:7
57:18
60:12,15,22,2
4 64:7 66:14
68:23
69:14,16,24
70:9,11 77:3

**Tolley** 2:3
3:3,6
5:17,18,21
6:4,6 13:21
14:18,25
15:16,21
17:20
18:2,9,13
19:8 20:17
21:2,15,23
22:21

23:10,22
24:8,21
25:18,23
26:12
27:8,14,21
28:1,12
30:9,25
31:7,12 32:21
33:14 34:14
35:18
36:9,15,18,24
37:11 38:13
39:6
40:5,14,19
41:22
42:5,10,22
43:3,9,13,17
44:3
45:1,7,12,18,
23 46:6,11
47:1,8,16,22
48:19 49:8
50:7 51:7,16
52:4,20,25
57:9 58:17
61:5 65:25
66:25
67:2,4,14,24
68:3,7 70:25
73:1,18
78:14,17
79:13,19
80:7,10
81:9,15,20
82:4,11,19

**Tolley's** 52:13

**took** 24:18
25:5 73:25

**top** 26:10
28:23 30:10
31:13 76:3

**torn** 46:8



total 34:10
38:25

towards 13:18

TPO 55:13

training
54:21,24 55:2

transcribe
83:7

transcript
83:8

translation
74:1

transpiring
77:5

tried 38:21

triggered 66:1

trouble 58:25

true 83:9

truth 27:7,10
50:4,6 52:1

try 6:17,22,23
41:9 48:10
49:10 68:14
76:10

trying 12:13
29:5 41:17
67:15 71:5

turned 75:14

Turner 61:10

twice 57:11
70:20

Twitter 25:2

two 9:9 62:9
80:17,21

TYLER 2:4

type 12:25

39:24 40:21
43:4 46:12
48:7 68:9
79:9

_____

U

UCF 53:15,16
54:15

uh-huhs 6:19

uh-uhs 6:19

unable 46:17

unacceptable
59:19

under 7:16 8:7
32:23 37:14
79:22

undersigned
84:5

understand
7:4,15 8:5,9

understanding
17:22 39:19
79:22

understands
36:1

understood
37:7

unethical
77:16,20

unilaterally
38:19 39:17

United 1:8
5:10 60:1
63:4,9,13,19,
23 64:10,14
65:22 66:21
68:16 69:12
70:2,22

Universal 5:14

University
11:25 53:15

Unless 74:15

unredacted
25:8

until 12:15
39:22

up 7:8 11:16
12:19 26:9,10
29:6 33:9
35:10 39:15
44:23 47:21
51:14,20
58:21 64:7
66:9 78:14

UPC
11:3,5,8,17
13:5,10,14,25
14:11 16:13
17:8
18:18,20,25
20:4,5,8
21:3,20,25
22:1,4,10,14,
19,23,25
23:4,6
28:6,16 32:22
34:11,17,21,2
2,25 35:1
36:4 37:1,12
40:9,13,15
44:9 46:2
49:25
51:2,7,25
60:5,6,9
61:15,16 66:7
70:9 71:25
72:11
77:4,10,19,25
78:22 79:1,5

81:19,25
82:7,8

UPC's 14:15
50:9 81:16

uploaded 33:8

uploading
32:11

upon 36:11

upset 36:1
66:6 67:20
70:20

upsetted 70:14

upsetting 59:8

us 7:10,11
11:15 36:3
44:24
56:12,19 59:1
61:1 62:21
70:9,11,17
75:11

use 21:10
44:24 45:9

used 25:1 49:3
76:4

usually 11:15
29:17 57:18

_____

V

verbal 63:6,15

verbally 18:24

version 25:8

Via 2:6,11
80:22

vice 48:3

video 5:5

videotaped
1:15 5:1,7



violate 28:6

violated 77:18

violation
  37:22

visual 65:6

voice 35:25

voluntarily
  57:1,4

volunteered
  57:3

vs 1:7 5:9

_____
          W
_____

waive 82:20,21

waived 82:24

walls 48:13

want 7:9 9:9
  16:14 23:20
  24:17 28:22
  31:19 40:19
  49:21 56:2
  59:4 67:6,19
  68:1 82:6,19

wanted 26:9
  28:22 59:6
  60:21 66:3
  70:17 77:25

wasn't 20:13
  27:9 28:10
  39:22 50:17
  62:15 73:19
  77:14,21

way 17:1
  29:19,23
  32:24
  33:5,6,18
  36:2 39:20
  49:19 50:3,20

68:8 74:12,17
77:15,25 78:1

ways 74:22

we 5:4,5,7
  6:9,11,12
  7:1,9,19,20,2
  4 8:11
  11:15,21
  12:15 13:22
  14:21 15:9,22
  16:8
  18:5,14,15,19
  ,23 20:12,25
  21:6,9
  23:19,24
  25:4,10
  31:18,20,24,2
  5 33:6
  34:4,23 35:11
  36:2,13,25
  37:24
  38:1,19,20,22
  39:22 40:7,8
  41:22
  42:1,2,18,21
  43:7 45:5
  47:15,19
  60:17,18,19,2
  2 62:7,21
  64:2,8 66:25
  67:17,19
  68:13
  69:14,15,20,2
  1,22,23 74:25
  77:16,17
  78:9,10 79:8
  80:22

wear 44:17
  46:7

week 38:19

went 11:24
  16:2 23:19

32:2 53:14
56:7 59:3,24
71:8 79:25

were
  9:3,17,20,21
  10:4,13,23
  11:1,6,11,18
  13:11,14
  16:8,15,22,25
  17:23
  18:2,5,7,9,14
  ,15,17 19:3
  20:4,7,9,12,1
  4,17,21,22,25
  21:4,6,11,23
  22:4,7,13,18
  23:11,25
  25:13,18 29:5
  32:10 34:2,11
  36:2,5,25
  37:1,7,8
  40:8,10 41:15
  42:20,21
  43:2,4,7,10
  44:19
  45:5,13,15,24
  46:17,18,20
  47:4
  48:1,9,20
  49:8,9 54:11
  55:16,21
  56:9,21
  57:1,22
  58:1,4,8,9,13
  ,18,19
  59:10,11,13,2
  5
  60:1,12,16,22
  61:8,12 63:22
  64:4,5,16
  65:15,19
  66:4,21 69:14
  70:8

71:9,11,17,22
72:21 73:17
74:13,14,18
75:4
76:1,2,18
78:9,10,24,25
79:14,15,22,2
3 80:15,17

weren't
  34:16,23
  35:10 47:15
  50:21 59:5
  69:20
  75:12,15
  79:20 82:9

We've 38:2

what 6:17 8:18
  9:6,11,18,20
  11:1,10,21
  12:2,16,19,22
  13:12,19
  15:23 16:21
  19:19 22:24
  24:14 27:6,9
  28:10,13,16,1
  9,22 29:25
  31:21 32:1
  33:16,17
  34:21 35:24
  37:13 41:7,22
  45:2
  47:1,3,4,9,11
  49:9,25 51:19
  53:10,19
  54:2,14
  55:8,12
  56:9,21
  57:15,18,20
  58:6,12,15,23
  61:8,18 62:16
  63:17 68:21
  69:2,12,23
  71:2,13,24



72:1 74:1
75:13
76:4,5,10,11
77:1,4 79:9
82:4

**What's** 71:22

**whatsoever**
21:4 32:24
39:21
42:14,23
49:19 69:6

**when** 9:21
10:13,22
11:15
16:15,18,22
19:18 21:15
28:7 31:7
32:2 33:8
34:1,21,25
35:24 36:25
41:20 45:1
50:16 53:12
55:15,21,22
57:1 58:13,22
59:8,10,25
60:1,4
61:20,23
62:4,5,6
64:4,5 65:15
66:1,11 67:8
70:21 71:8,17
72:7,20 73:2
74:5,13,17,19
75:1,8,11,15
76:18
77:15,17
79:25
81:2,9,24

**where** 8:16,21
29:14,17
31:8,25 58:4
62:12 79:20

**whether** 25:25
26:21 37:13
57:25 58:23
60:18,21
63:12 70:17
74:12 76:7

**which** 29:23
56:23 57:18
62:9 71:19

**while** 9:17
25:10 40:14

**Whisler** 2:4
5:22 52:14,19
53:1,7

**white** 31:25

**who** 10:3,12
11:3 18:21
19:1,8,11
21:24
32:21,22
35:18 36:12
51:5 55:16
60:20,24
61:17 62:23
63:13 76:12

**whoever** 23:5

**why** 36:9
50:7,20 51:24
57:13
75:18,21
77:22

**will** 5:15
6:11,12
7:12,19 14:21
15:9 33:6,7
59:18 68:13

**wind** 21:3
29:15,19
42:20

**with** 5:14 6:19

7:1 8:12
9:12,23 11:17
12:16 13:7,10
14:21 16:5
17:4 18:18
19:25 21:9
23:4 29:7
30:4,18,23
31:21
32:1,10,15
35:1,15,20
36:6,11
37:1,3,11,12,
13 38:22 40:3
41:19
42:6,7,11
45:12,18
50:18 51:2
52:25 53:3
54:11
55:15,21
56:21,22
58:12,23
59:25 61:1
63:10 64:8
65:22 66:6
70:6,20,21,22
75:1 78:20
80:4
81:4,10,23
83:13

**without** 34:6
41:17

**witness** 3:2
6:1 38:4,9
41:1,3 42:4
67:6,17 68:10
82:21,24
83:15 84:9

**wizard** 25:2

**won't** 31:17

**word** 18:15,16

19:4 21:7,9
60:15 64:23
69:21 73:25

**words** 21:10
71:1

**work** 8:21 9:5
10:23 12:23
13:3,9,11
16:23 19:20
37:19 58:12
61:25
77:10,22 78:8

**worked** 9:10
11:1 22:1
34:20 36:10
52:25 53:3
61:11 66:7
70:9

**working** 8:20
9:3,17 11:6
16:9 22:5
34:17,25
36:12 50:11
65:16 75:1

**workmanship**
48:21

**works** 32:22

**worn** 46:8

**would** 8:4,8
9:12,13
10:18,20
11:13,15
14:14 16:5,12
17:16 19:21
21:3,18,25
22:6,8,15
26:24
27:12,17
28:10
30:4,17,18
32:1



33:11,16,19,20 34:10,13,15 35:5,25 39:8 41:8 46:21 47:8 51:19,25 57:8,11 58:15 60:20 62:23 65:8 70:13,15,16 71:19 72:23 73:2 76:10 77:20 80:4,21

**wouldn't** 16:6 22:11 45:18 56:12,14,16,18

**write** 18:6,15,16 19:4 21:7,8 34:10,23 42:21,23 43:7 47:19 60:12,15,16,19 64:23 66:13,20 68:20 69:4,14,21,22 73:20

**writing** 18:14 70:3

**written** 33:12,16,20 34:15

**wrong** 76:7 79:7

**wrote** 61:6

─────────── X
**XactAnalysis** 12:24 16:24 72:6,15

─────────── Y
**yeah** 16:17 23:2,18 25:7 27:25 28:2 29:25 30:12 36:17,18 38:9,12 41:10,12,18 44:22 63:8 65:18 66:25 71:7 80:25

**year** 9:6 19:19 34:7 41:11 51:21 56:3 58:21 76:15

**years** 9:7,9,10,13 12:7 24:23 34:19,20 38:11 46:21 55:11 56:21,22 62:9 66:7 72:24 78:7

**Yep** 6:14 26:22 42:4 53:22

**yes** 6:17,21 7:3,7,14 8:15 9:16 11:8 13:13 15:2,25 16:11 18:1 19:24 20:2,20 24:12 26:14 27:20 28:25 29:3,11 30:8 31:23 32:3,13 33:15,22 39:4 45:22 46:5 53:24 54:5,13 55:4,7 60:3 61:18 63:21

64:3 66:6 75:7 77:7,9,21 79:18,24 80:23,24 81:13

**yesterday** 38:16 39:22

**you** 6:8,15,17,18,23,24 7:4,5,9,10,11,15,18 8:3,7,12,16,21,23 9:3,5,12,17,21,25 10:3,7,12,13,22,23 11:1,6,9,10,13,18 12:1,6,14,17,25 13:3,4,8,10,11,14,19,24 14:1,3,8,12,14,21,25 15:3,5,6,22,23 16:2,6,12,15,21,22,25 17:13,20,22,23 18:2,9,13,21,25 19:8,16,18,25 20:4,9,17,21,22 21:2,3,4,11,16,18,23,24 22:3,4,9,13,21,25 23:4,13,19,22

24:3,4,10,13,14,18 25:5,8,10,13,18,24 26:2,12,15,21,23,24 27:8,14,15,17,22 28:1,5,13 29:3,15,20 30:1,3,5,10,14,16,22,25 31:1,7,12,18,19,21 32:2,10,15,24 33:3,10,11,12,14,16,20,23 34:5,10,11,14,15,16,21,22,25 35:5,6,13,14,18,20,24 36:4,5,12,15,19,20 37:2,3,6,12 38:3,4,5,7,19,22,23 39:3,6,7,11 40:1,3,6,10,19,20,21 41:1,4,7,8,9,10,13,24,25 42:2,6,7,8,10,11,13,23 43:3,9,17,19,20,23 44:4,5,6,18 45:1,2,8,14,15,18,23 46:2,8,12,20 47:4,11,16,25 48:5,7,11,15,24 49:2,8,12,18,21,22,24,25



```
50:2,3,7,8,16
,19,20,21,22
51:10,11,17,2
3,24,25
52:10,12,13,1
6,19,23,25
53:3,6,12,13,
16,21,23,25
54:2,6,11,14,
18,21,24
55:2,8,15,16,
18,21,25
56:1,14,21,23
57:1,2,4,7,8,
10,14,22
58:1,4,6,10,1
2,13,15
59:8,10,11,13
,14,16,17,18,
20,21,24,25
60:1,4,5,8,12
,24
61:16,17,19,2
3 62:19,23
63:3,6,8,12,1
7,18
64:4,5,10,13,
16
65:6,12,15,18
,19,22
66:1,3,4,11,1
3,21,22,23
67:1,2,6,9,11
,18,19,22
68:1,3,8,9,11
,13
69:4,6,9,12,1
6,25
70:2,8,12,13,
14,19,23
71:1,2,3,8,9,
15,17,21,22,2
4
72:5,10,11,20
```

```
73:6,9,12,16,
24,25 74:1,24
75:6,8,15,18
76:9,12,13,15
,18,24
77:6,8,10,14,
15,18,20,24,2
5
78:1,20,22,24
,25
79:4,13,14,20
,21,22,25
80:1,4,11,12,
14,19,20,22
81:2,3,11,22,
24
82:14,16,18,1
9

you'd 24:23

your
  6:18,23,24
  7:15
  8:4,8,12,18,2
  4,25 9:18,20
  10:12 11:22
  12:2,11 13:11
  14:4 15:5,7
  16:1,9 19:23
  21:12 24:9
  25:25
  32:2,17,23
  34:5 35:25
  36:15,25 37:7
  38:10,21
  39:4,6,11,19
  40:1,20
  41:1,3,16
  42:6,14
  43:19,20,25
  44:15,16
  46:22 47:9
  48:5,6,16
  49:19
```

```
50:16,17
51:24 53:10
54:6 55:5
56:9 57:4
58:6,9,15,20
59:8 60:13
64:1,25
65:5,20,23
66:16,18
68:6,12,16
69:1,2,10
70:20,22
72:3,17 73:13
76:17,21,24
77:1,18
78:4,15
80:13,14,15
81:4,22,23

you're 28:24
  41:9 65:3
  71:3

yourself 38:7
  50:17 51:23

you've 30:2
  41:3,4

─────── Z ───────
zero 13:1 33:1
  80:14

Zoom 2:6,11
  7:1 15:16
  19:15,16
  62:14,15,16,1
  8
```



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com